# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

JAGPRIT SINGH SEKHON, JADDIP SINGH SEKHON, MANJIT KAUR RAI, aka Manjit Kaur Kang, IOSIF CAZA, and LUCIANA HARMATH

## I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. § 371 - Conspiracy to Defraud the United States in Asylum Applications (11 counts); 18 U.S.C. § 1001 - False Statements (6 counts); 18 U.S.C. § 371 - Conspiracy to Make False Statements; 18 U.S.C. § 982(a)(6)(A)(ii)(I) and (a)(6)(A)(ii)(II) - Criminal Forfeiture

*A true bill,*

_____/5/_____

*Foreman.*

*Filed in open court this* ___ *18th* ___ *day*

*of* _ October _ _ _ _, *A.D. 20* 06 _ _

_____ C Schultz

*Clerk.*

*Bail, s* No proven necessary as to D Caza; Ө pendeng hearing as to all other Ds

GPO 863 525

1   McGREGOR W. SCOTT
    United States Attorney
2   BENJAMIN B. WAGNER
    CAMIL A. SKIPPER
3   Assistant U.S. Attorneys
    501 "I" Street, Suite 10-100
4   Sacramento, California 95814
    Telephone: (916) 554-2745
5

**FILED**

OCT 18 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,      )   Case No. CR.-S-06-058 FCD
                                   )
12          Plaintiff,             )   VIOLATIONS: 18 U.S.C. § 371 -
                                   )   Conspiracy to Defraud the United
13          v.                     )   States, and to Make False
                                   )   Statements in Asylum Applications;
14  JAGPRIT SINGH SEKHON,          )   18 U.S.C. § 1546 - False
    JAGDIP SINGH SEKHON,           )   Statements in Asylum Applications
15  MANJIT KAUR RAI,               )   (11 counts); 18 U.S.C. § 1001 -
         aka Manjit Kaur Kang,     )   False Statements (6 counts); 18
16  IOSIF CAZA,                    )   U.S.C. § 371 - Conspiracy to Make
    LUCIANA HARMATH,               )   False Statements; 18 U.S.C. §§
17                                 )   982(a)(6)(A)(ii)(I) and (II) -
            Defendants.            )   Criminal Forfeiture
18  _____)

19

20              S U P E R S E D I N G   I N D I C T M E N T

21  COUNT ONE:   [18 U.S.C. § 371 - Conspiracy to Defraud the United
                 States, and to Make False Statements in Asylum
22               Applications]

23          The Grand Jury charges:

24                      JAGPRIT SINGH SEKHON,
                        JAGDIP SINGH SEKHON,
25                      MANJIT KAUR RAI,
                        IOSIF CAZA, and
26                      LUCIANA HARMATH,

27  defendants herein, as follows:

28  ///

                                   1

1          I.   INTRODUCTION

2    At all times relevant to this Indictment:

3          A.   The Granting of Asylum Status

4          1.   Prior to March 1, 2003, the U.S. Immigration and
5    Naturalization Service ("INS") was an agency within the U.S.
6    Department of Justice which was responsible, among other things, for
7    the processing of asylum applications filed by aliens in the United
8    States who applied for asylum status.  After March 1, 2003, that
9    component of the INS which handled the processing of asylum
10   applications became part of the Bureau of Citizenship and
11   Immigration Services ("CIS") within the U.S. Department of Homeland
12   Security, and is referred to herein as CIS.  CIS maintained offices
13   at several locations in the United States at which asylum officers
14   heard and adjudicated claims for asylum.

15         2.   Under U.S. immigration laws, an alien who was in the
16   United States was eligible for asylum if the alien could establish
17   that he was unable or unwilling to return to the alien's native
18   country because the alien had a well-founded fear of persecution on
19   account of race, religion, nationality, membership in a particular
20   social group, or political opinion.  The burden of proof was on the
21   applicant for asylum to establish that race, religion, nationality,
22   membership in a particular social group, or political opinion was at
23   least one central reason for persecution of the applicant in his
24   native country.  Under the law, the applicant had to satisfy the
25   trier of fact that his testimony was credible and persuasive and
26   referred to specific facts sufficient to demonstrate entitlement to
27   asylum status.

28         3.   The process of applying for asylum status was

2

1  initiated when an application form was submitted by mail to the CIS
2  service center in Lincoln, Nebraska. Asylum application forms were
3  completed and signed under penalty of perjury. After record checks
4  and data entry, the service center referred the application to the
5  regional CIS Asylum Office which had jurisdiction over the location
6  of the applicant's residence. Under U.S. immigration law, a
7  person's "residence" was a person's principal, actual dwelling
8  place. The CIS Asylum Office in San Francisco, California had
9  jurisdiction over applications from aliens residing in the
10 Sacramento area and in other areas of northern California and
11 adjacent states. According to statistics for the year 2003
12 published by CIS in 2004, of the eight CIS Asylum Offices nation-
13 wide, the San Francisco office had the second highest approval rate
14 for asylum applications.

15         4.    The Asylum Office would schedule the applicant for
16 an interview before an Asylum Officer. The applicant could appear
17 with his or her attorney or representative and an interpreter if the
18 applicant did not speak English. The applicant was responsible for
19 providing the interpreter. At the asylum interview, the applicant
20 was placed under oath and questioned by the Asylum Officer about the
21 contents of the asylum application. The asylum applicant could
22 present supporting documents to the Asylum Officer to bolster his or
23 her asylum claim. The documents had to be accompanied by a
24 certified English translation. In some cases, a second interview
25 was required. The Asylum Officer would make a determination whether
26 the applicant had a well-founded fear of persecution based on race,
27 religion, nationality, membership in a particular group, or
28 political opinion.

3

1    5.   The Asylum Officer could either grant asylum, or refer
2  the asylum applicant to an immigration judge for further review.  If
3  the asylum applicant was referred to an immigration judge, a Notice
4  to Appear for Removal Proceedings was issued and the administrative
5  process was initiated at an Immigration Court administered by the
6  Department of Justice, Executive Office of Immigration Review
7  ("EOIR").  Referrals from the San Francisco CIS Asylum Office went
8  to the EOIR Immigration Court in San Francisco.  The EOIR scheduled
9  the asylum applicant for a hearing before an immigration judge.  At
10  the hearing, the asylum applicant was placed under oath and
11  questioned by the immigration judge, by the applicant's attorney or
12  representative and by an assistant chief counsel for the Bureau of
13  Immigration and Customs Enforcement of the Department of Homeland
14  Security.  The applicant had the opportunity to present documentary
15  evidence of past persecution.  The immigration judge had the
16  authority to grant asylum, deny the asylum claim, or take certain
17  other actions under U.S. immigration laws.  The immigration judge's
18  decision could be appealed to the Board of Immigration Appeals, and
19  ultimately to the federal courts.

20    6.   In general, under U.S. immigration laws, an alien who
21  was granted asylum status could not be removed to that alien's
22  country of nationality.  Once granted asylum status, the "asylee"
23  may subsequently be eligible to apply for an adjustment of status in
24  order to remain permanently in the United States.  If an alien was
25  granted asylum status, his or her spouse and children could be
26  granted the same status.

27  ///

28  ///

4

B.  Defendants

7.  Defendants JAGPRIT SINGH SEKHON and JAGDIP SINGH SEKHON were brothers, attorneys licensed to practice law in the State of California, and partners in the law firm of Sekhon & Sekhon.  Sekhon & Sekhon was a law firm with offices in Sacramento, in the Eastern District of California, and in San Francisco.  The firm specialized in immigration law, and particularly in matters relating to asylum.  It represented numerous aliens who applied for asylum through the San Francisco CIS Asylum Office.

8.  The law firm of Sekhon & Sekhon was owned and controlled by defendants JAGPRIT SINGH SEKHON and JAGDIP SINGH SEKHON.  Defendant JAGPRIT SINGH SEKHON worked primarily out of the firm's Sacramento office, and JAGDIP SINGH SEKHON worked primarily out of the firm's San Francisco office.  The firm had several other employees, including attorneys and receptionists.  In the late 1990s, the bulk of the firm's asylum clients were from India and other countries in South Asia.  Beginning in approximately 2000, an increasing percentage of the firm's asylum clients were from Romania.

9.  Defendant MANJIT KAUR RAI was an attorney licensed to practice law in the State of California in December 2001.  Beginning in September 2001, she worked at the law firm of Sekhon & Sekon, first as a law clerk and then as an attorney, specializing in representing asylum applicants.  She worked in both the Sacramento and San Francisco offices of the firm.

10.  Defendant IOSIF CAZA was a resident of Sacramento County, California, originally from the country of Romania.  Beginning no later than September 15, 2000, he began working on a

5

1  regular basis as a contract interpreter for Romanian clients of
2  Sekhon & Sekhon.

3          11.  Defendant LUCIANA HARMATH was a resident of
4  Sacramento County, California, originally from the country of
5  Romania.  She was listed as the spouse of a Romanian applicant for
6  asylum in an application filed in July 2001.  The asylum application
7  was prepared by defendant JAGPRIT SINGH SEKHON.  Beginning no later
8  than September 2, 2003, she began working on a regular basis as a
9  contract interpreter for Romanian clients of Sekhon & Sekhon.

10                    II.  THE CONSPIRACY

11         12.  Beginning no later than May 10, 2000, and continuing
12  through at least September 23, 2004, in the State and Eastern
13  District of California and elsewhere, defendants JAGPRIT SINGH
14  SEKHON, JAGDIP SINGH SEKHON, MANJIT KAUR RAI, IOSIF CAZA and LUCIANA
15  HARMATH, knowingly combined, conspired, and agreed among themselves,
16  and with others both known and unknown to the Grand Jury:

17          a.   to knowingly defraud the United States by
18  impairing, impeding, obstructing and defeating the lawful functions
19  of CIS in the fair and objective evaluation of applications for
20  asylum status by aliens located in the United States, and to do so
21  by deceit, craft, and trickery; and

22          b.   to commit an offense against the United States,
23  specifically, to knowingly make under oath, or knowingly subscribe
24  as true under penalty of perjury, false statements with respect to
25  material facts in applications, affidavits, and other documents
26  required by the immigration laws or regulations prescribed
27  thereunder, and to knowingly present such applications, affidavits,
28  and other documents which contained such false statements and which

                            6

1  failed to contain any reasonable basis in law or fact, in connection
2  with asylum applications by clients of Sekhon & Sekhon, in violation
3  of Title 18, United States Code, Sections 1546 and 2.

4        13.  It was an object of the conspiracy for the defendants
5  to assist clients of Sekhon & Sekhon in obtaining asylum status
6  under U.S. immigration laws, by creating and filing false and
7  fraudulent asylum applications containing fictitious stories of
8  persecution, and supporting the applications with materially false
9  testimony and fabricated documents.  An object of the conspiracy was
10 also for defendants JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON,
11 MANJIT KAUR RAI, IOSIF CAZA and LUCIANA HARMATH, to profit by
12 collecting various fees from such clients in connection with the
13 fraudulent asylum claims.  It was also an object of the conspiracy
14 for the defendants to conceal the purpose of the conspiracy and the
15 acts committed in furtherance of the conspiracy.

16            III.  MANNER AND MEANS OF THE CONSPIRACY

17       In furtherance of the conspiracy, defendants and their
18 coconspirators employed, among others, the following ways and means:

19       14.  Defendant JAGPRIT SINGH SEKHON interviewed
20 prospective clients who wanted to obtain legal status in the United
21 States.  The interviews were usually conducted at the Sacramento
22 office of Sekhon & Sekhon.  In the case of Romanian clients who did
23 not speak sufficient English, Defendants IOSIF CAZA or LUCIANA
24 HARMATH, or other translators, assisted in the interview.

25       15.  Clients who resided outside of the geographic area
26 covered by the San Francisco Asylum Office were told to secure an
27 address within the region that could be used as their residence
28 address and mailing address for purposes of the asylum application.

7

1  If necessary, defendants JAGPRIT SINGH SEKHON, IOSIF CAZA, and
2  others associated with the firm of Sekhon & Sekhon would secure the
3  use of an address in the Sacramento area which could be used as the
4  client's "residence address" for purposes of the asylum application.
5  Clients who resided outside of the San Francisco Asylum Office
6  district were told not to obtain driver's licenses, open accounts,
7  or engage in other transactions near their true residences which
8  might be detected by CIS through record checks and reveal that the
9  residence addresses for the clients that appeared on their
10 applications were false.

11          16.  After the initial client interview, and after being
12 paid by the client, defendant JAGPRIT SINGH SEKHON drafted asylum
13 applications which contained fictitious narratives about persecution
14 that the clients had supposedly suffered in their home countries due
15 to their religious, political or ethnic affiliations.  The
16 narratives often included detailed but fictitious accounts of
17 beatings, harassment, torture and sexual abuse.

18          17.  The asylum applications, with accompanying
19 narratives, were provided to the clients.  In cases where the asylum
20 application narrative involved persecution on religious or political
21 grounds, the clients were also provided with background materials or
22 fact sheets for them to memorize relating to religious or political
23 matters.  Where the clients were Romanian, the documents were
24 translated into Romanian by defendant IOSIF CAZA.

25          18.  Defendant JAGPRIT SINGH SEKHON would cause the
26 fraudulent asylum applications with accompanying narratives to be
27 mailed from the Sacramento office of Sekhon & Sekhon to the CIS
28 service center in Nebraska for filing.

8

1          19.   Defendants JAGPRIT SINGH SEKHON, MANJIT KAUR RAI, and
2   others at the firm of Sekhon & Sekhon told the asylum clients to
3   gather documentation to support the fictitious narrative in the
4   asylum application, such as letters from foreign doctors relating to
5   treatment for wounds or sexual abuse, letters from foreign religious
6   figures attesting to the clients' participation in religious
7   proselytizing activities in that country, or certificates from
8   political organizations indicating the clients' membership in such
9   organizations.  Romanian clients who sought assistance in obtaining
10  such documentation were referred to defendant IOSIF CAZA who, for an
11  additional fee, would generate counterfeit documents that appeared
12  to be doctor's letters, certificates or other official documents
13  from Romania.

14         20.   Once the San Francisco Asylum Office scheduled an
15  interview with an Asylum Officer, employees of Sekhon & Sekhon would
16  contact the asylum client and arrange for the client to come to the
17  Sacramento office of the firm for a preparation session
18  approximately two business days before the scheduled interview.
19  During the preparation session, defendants JAGPRIT SINGH SEKHON or
20  MANJIT KAUR RAI would question the client to determine whether he or
21  she had sufficiently memorized the fictitious asylum narrative,
22  would assist the client in developing additional fabricated details
23  relating to the persecution story, such as dates and times, and
24  rehearsed the client's presentation to the Asylum Officer.  Where
25  the clients were Romanian, the preparation sessions were joined by
26  defendants IOSIF CAZA, LUCIANA HARMATH, or other translators.  Often
27  a second preparation session was held the following day in the San
28  Francisco office of Sekhon & Sekhon, where defendants JAGDIP SINGH

9

1 SEKHON or MANJIT KAUR RAI would rehearse the fictitious story with
2 the client, accompanied in the case of Romanian clients by
3 defendants IOSIF CAZA, LUCIANA HARMATH, or other translators.  On
4 occasions where the client had not sufficiently memorized the
5 fictitious persecution story, defendants JAGDIP SINGH SEKHON or
6 MANJIT KAUR RAI would sometimes contact CIS and delay the interview.

7        21.  Asylum clients were accompanied to the interview at
8 the San Francisco Asylum Office and represented in the hearing by
9 defendants JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON, or MANJIT KAUR
10 RAI, or by another attorney associated with the firm.  In the case
11 of Romanian clients, they were also accompanied by defendants IOSIF
12 CAZA, LUCIANA HARMATH, or other translators.  During the interview,
13 clients gave false testimony under oath in which they described the
14 supposed persecution they had suffered in their home countries due
15 to their religious, ethnic or political affiliations.  During the
16 interview, defendants JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON, or
17 MANJIT KAUR RAI provided to the Asylum Officer the counterfeit
18 documents that purported to be from foreign doctors, religious
19 figures, or political organizations.

20        22.  In cases where the Asylum Officer referred the asylum
21 application to EOIR for further proceedings, defendants JAGPRIT .
22 SINGH SEKHON, JAGDIP SINGH SEKHON, or MANJIT KAUR RAI would often
23 file pleadings with the Immigration Court containing additional
24 counterfeit documents to support the asylum claim.

25        23.  Prior to the date scheduled for the Immigration Court
26 hearing, defendants JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON, or
27 MANJIT KAUR RAI would again conduct a preparation session with the
28 asylum client, at which they coached the client on how to respond to

10

1   questions about the asylum narrative.

2          24.  Asylum clients were accompanied to the Immigration
3   Court hearing in San Francisco and represented in the hearing by
4   defendants JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON, or MANJIT KAUR
5   RAI, or by another attorney associated with the firm.  During the
6   hearing, clients gave false testimony under oath in which they
7   described the supposed persecution they had suffered in their home
8   countries due to their religious, ethnic or political affiliations.
9   In the manner set forth above, scores of alien clients of Sekhon &
10  Sekhon who would not have been entitled to asylum status in the
11  United States fraudulently obtained asylum status.

12         25.  Defendants JAGPRIT SINGH SEKHON, IOSIF CAZA, and
13  others, warned clients not to disclose the fact that the asylum
14  application narratives were fictitious, and that supporting
15  documentation was fake, and took other steps to conceal the
16  conspiracy.

17         26.  The firm of Sekhon & Sekhon earned between
18  approximately $1,500 and $5,000 for each asylum claim it handled.
19  Defendant IOSIF CAZA earned fees ranging from $400 to $1,200 for
20  translation services for each asylum claim, depending on the number
21  of appearances necessary.  He also received additional fees of $500
22  to $1,000 to produce fraudulent documents, and charged $100 to $200
23  to supply a Sacramento area address for the use of Romanian clients
24  who resided outside the region.

25                          IV.  OVERT ACTS

26         In furtherance of the conspiracy, and to achieve the
27  objects thereof, the defendants and their coconspirators committed,
28  among others, the following overt acts in the State and Eastern

                                11

1 District of California, and elsewhere:

2       27.  On or about September 25, 2000, in Sacramento,
3 defendant JAGPRIT SINGH SEKHON submitted an asylum application on
4 behalf of R. K., to the CIS Service Center in Nebraska.

5       28.  On or about February 16, 2001, defendants JAGPRIT
6 SINGH SEKHON and IOSIF CAZA met in the Sacramento office of Sekhon &
7 Sekhon with client F.F., to prepare her for her asylum interview.

8       29.  On or about March 15, 2001, defendants JAGPRIT SINGH
9 SEKHON and IOSIF CAZA met in the Sacramento office of Sekhon &
10 Sekhon with client M.L., to prepare her for her asylum interview.

11       30.  On or about June 8, 2001, defendants JAGPRIT SINGH
12 SEKHON and IOSIF CAZA met in the Sacramento office of Sekhon &
13 Sekhon with client B.O., to prepare him for his asylum interview.

14       31. On or about July 3, 2001, in Sacramento, defendant
15 JAGPRIT SINGH SEKHON submitted an asylum application on behalf of
16 P.B., to the CIS Service Center in Nebraska.

17       32.  On or about October 17, 2001, in Sacramento,
18 defendant JAGPRIT SINGH SEKHON submitted an asylum application on
19 behalf of M. Singh, to the CIS Service Center in Nebraska.

20       33.  On or about March 15, 2002, defendant MANJIT KAUR RAI
21 met in the Sacramento office of Sekhon & Sekhon with client A.C., to
22 prepare her for her asylum interview.

23       34.  On or about March 19, 2002, defendants JAGDIP SINGH
24 SEKHON and IOSIF CAZA accompanied Sekhon & Sekhon client A.C. to an
25 asylum interview in San Francisco.

26       35.  On or about May 30, 2002, in Sacramento, defendant
27 JAGPRIT SINGH SEKHON submitted an asylum application on behalf of
28 client C.G., to the CIS Service Center in Nebraska.

12

1        36.  On or about January 6, 2003, defendant MANJIT KAUR
2   RAI sent a letter to the CIS Asylum Office in San Francisco with
3   corrections in the asylum application of client P.C.

4        37.  On or about January 7, 2003, defendant JAGDIP SINGH
5   SEKHON accompanied client P.C. to the asylum office in San
6   Francisco, California for an asylum interview.

7        38.  On or about March 27, 2003, defendant JAGPRIT SINGH
8   SEKHON sent a letter with asylum application materials from the
9   Sekhon & Sekhon office in Sacramento to client S.K. in Anaheim,
10  California.

11       39.  On or about September 2, 2003, defendant LUCIANA
12  HARMATH accompanied client S.K. to the asylum office in San
13  Francisco, California for an asylum interview.

14       40.  On or about January 13, 2004, defendants JAGPRIT
15  SINGH SEKHON and IOSIF CAZA met in the Sacramento office of Sekhon &
16  Sekhon with client G.J., to prepare him for his asylum interview.

17       41.  On or about January 14, 2004, defendants MANJIT KAUR
18  RAI and LUCIANA HARMATH met in the Sacramento office of Sekhon &
19  Sekhon with client G.J., to prepare him for his asylum interview.

20       42.  On or about January 14, 2004, defendant MANJIT KAUR
21  RAI sent a letter to the CIS Asylum Office in San Francisco relating
22  to the asylum application of G.J., seeking a delay in the scheduled
23  asylum interview.

24       43.  On or about February 23, 2004, defendants MANJIT KAUR
25  RAI and LUCIANA HARMATH met in the San Francisco office of Sekhon &
26  Sekhon with client F.V., to prepare him for his asylum interview.

27       44.  On or about September 21, 2004, in San Francisco,
28  several days after the execution of a search warrant at the offices

13

1  of Sekhon & Sekhon, defendant IOSIF CAZA told F.V., an asylum client
2  of Sekhon & Sekhon, that he was in big trouble and could go to jail,
3  and that he should tell authorities that the false documents
4  prepared by defendant CAZA in connection with F.V.'s application
5  were in fact true and authentic.

6  COUNTS TWO THROUGH TWELVE: [18 U.S.C. § 1546 - False
   Statements in Asylum Applications]
7
       The Grand Jury further charges: T H A T
.8
                    JAGPRIT SINGH SEKHON,
9                     MANJIT KAUR RAI,
                       IOSIF CAZA, and
10                    LUCIANA HARMATH,
11
   defendants herein, as follows:
12
       1.   Paragraphs 1 through 11 and 14 through 44 of Count One
13
   of this Superseding Indictment are re-alleged and incorporated
14
   herein as if fully set forth.
15
       2.   On or about each of the dates listed below, within the
16
   Eastern District of California, defendants JAGPRIT SINGH SEKHON,
17
   MANJIT KAUR RAI, IOSIF CAZA and/or LUCIANA HARMATH, did knowingly
18
   make under oath, or knowingly subscribed as true under penalty of
19
   perjury, false statements with respect to material facts in
20
   applications, affidavits, and other documents required by the
21
   immigration laws or regulations prescribed thereunder, and did
22
   knowingly present such applications, affidavits, and other documents
23
   which contained such false statements, in connection with asylum
24
   applications of clients of the firm of Sekhon & Sekhon, and
25
   knowingly aided and abetted others known to the Grand Jury in doing
26
   so, as set forth below:
27
   ///
28

                              14

| Count | Date | False Document | Defendants |
|-------|------|----------------|------------|
| 2 | 10/22/01 | Application of D.P.B. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 3 | 10/23/01 | Medical certificate of doctor in India dated 9/10/01 submitted to EOIR in support of application of P. Singh | JAGPRIT SEKHON<br>MANJIT KAUR RAI |
| 4 | 2/11/02 | Medical certificate of doctor in Romania dated 5/08/01 submitted to EOIR in support of application of D.B. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 5 | 2/12/02 | Notarized Romanian affidavit dated 2/25/02 submitted to EOIR in support of application of D.P.B. | JAGPRIT SEKHON<br>MANJIT KAUR RAI<br>IOSIF CAZA |
| 6 | 6/05/02 | Application of F.V. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 7 | 6/12/02 | Medical certificate of doctor in Romania dated 4/25/02 submitted to EOIR in support of application of G.D.D. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 8 | 6/20/02 | Medical certificate of doctor in Romania dated 5/20/02 submitted to EOIR in support of application of P.B. | JAGPRIT SEKHON<br>LUCIANA HARMATH |
| 9 | 10/28/02 | Application of A.E. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 10 | 11/19/03 | Letter of Romanian Jehovah's Witnesses official dated 10/15/02 submitted to EOIR in support of application of A.E. | JAGPRIT SEKHON<br>IOSIF CAZA |
| 11 | 11/24/03 | Application of G.J. | JAGPRIT SEKHON<br>IOSIF CAZA<br>LUCIANA HARMATH |
| 12 | 2/09/04 | Medical certificate of doctor in Romania dated 6/17/02 submitted to EOIR in support of application of F.V. | JAGPRIT SEKHON<br>IOSIF CAZA |

15

1 All in violation of Title 18, United States Code, Sections 1546

2 and 2.

3 COUNTS THIRTEEN THROUGH SEVENTEEN: [18 U.S.C. § 1001 - False
                                        Statements]

4

5 The Grand Jury further charges: T H A T

6 JAGPRIT SINGH SEKHON,
      MANJIT KAUR RAI,
      IOSIF CAZA, and

7 LUCIANA HARMATH,

8 defendants herein, as follows:

9        1.  Paragraphs 1 through 11 and 14 through 44 of Count One

10 of this Superseding Indictment are re-alleged and incorporated

11 herein as if fully set forth.

12       2.  On or about each of the dates listed below, within the

13 Eastern District of California, defendants JAGPRIT SINGH SEKHON,

14 MANJIT KAUR RAI, IOSIF CAZA and/or LUCIANA HARMATH, in a matter

15 within the jurisdiction of the executive branch of the Government of

16 the United States, specifically the Departments of Justice and

17 Homeland Security, did aid and abet clients of Sekhon & Sekhon to

18 knowingly and willfully make materially false, fictitious, and

19 fraudulent statements in connection with such clients' asylum

20 applications, by assisting them in preparing false testimony and

21 false oral statements, as set forth below:

| Count | Date | Client-Related Activity | Defendants |
|-------|------|-------------------------|------------|
| 13 | 11/23/01 | Asylum interview of D.P.B. | JAGPRIT SEKHON IOSIF CAZA |
| 14 | 5/16/03 | Asylum interview of R.G. | MANJIT KAUR RAI IOSIF CAZA |
| 15 | 6/30/03 | EOIR testimony of R.G. | JAGPRIT SEKHON |
| 16 | 8/29/03 | Asylum interview of S.K. | LUCIANA HARMATH |

28 ///

16

```
 1  17        7/07/04    Asylum interview of F.V.        JAGPRIT SEKHON
                                                         IOSIF CAZA
 2
```

3 All in violation of Title 18, United States Code, Sections 1001

4 and 2.

5 COUNT EIGHTEEN: [18 U.S.C. § 371 - Conspiracy to Make False
 Statements]

6
7                  The Grand Jury further charges: T H A T

                          JAGPRIT SINGH SEKHON,
8                          MANJIT KAUR RAI,
                           IOSIF CAZA, and
9                          LUCIANA HARMATH,

10 defendants herein, as follows:

11          1.   Paragraphs 1 through 11 and 14 through 44 of Count One

12 of this Superseding Indictment are re-alleged and incorporated

13 herein as if fully set forth.

14          2.   Beginning at a date no later than approximately

15 September 17, 2003, and continuing through on or about January 14,

16 2004, in the State and Eastern District of California and elsewhere,

17 defendants JAGPRIT SINGH SEKHON, MANJIT KAUR RAI, IOSIF CAZA and

18 LUCIANA HARMATH, knowingly combined, conspired, and agreed among

19 themselves to assist Sekhon & Sekhon client G.J. to knowingly and

20 willfully make materially false, fictitious, and fraudulent

21 statements in connection with such client's asylum application, in a

22 matter within the jurisdiction of the executive branch of the

23 Government of the United States, specifically the Department of

24 Homeland Security, in violation of Title 18, United States Code,

25 Sections 1001 and 2.

26          3.   In furtherance of the conspiracy, and to achieve the

27 objects thereof, defendants JAGPRIT SINGH SEKHON, MANJIT KAUR RAI,

28 IOSIF CAZA and LUCIANA HARMATH, and their coconspirators, committed

                                17

1 the following overt acts in the State and Eastern District of
2 California, and elsewhere:

3            A.    On or about September 17, 2003, defendants JAGPRIT
4                 SINGH SEKHON and LUCIANA HARMATH met with client
5                 G.J. at the Sacramento office of Sekhon & Sekhon
6                 for purposes of an intake interview.

7            B.    On or about November 5, 2003, defendant JAGPRIT
8                 SINGH SEKHON sent a letter to G.J. in Deluth,
9                 Georgia, relating to G.J.'s asylum application and
10                payment due to Sekhon & Sekhon, attaching a
11                separate document containing religious
12                information.

13           C.    On or about November 24, 2003, defendant JAGPRIT
14                SINGH SEKHON caused an asylum application on
15                behalf of G.J. to be filed with the CIS service
16                center in Nebraska.

17           D.    On or about January 13, 2004, defendants JAGPRIT
18                SINGH SEKHON and IOSIF CAZA met with client G.J.
19                at the Sacramento office of Sekhon & Sekhon in
20                preparation for an asylum interview.

21           E.    On or about January 14, 2004, defendants MANJIT
22                KAUR RAI and LUCIANA HARMATH met with client G.J.
23                at the Sacramento office of Sekhon & Sekhon in
24                preparation for an asylum interview.

25           F.    On or about January 14, 2004, defendant MANJIT
26                KAUR RAI sent a letter to the CIS Asylum Office in
27                San Francisco relating to the asylum application
28                of G.J., seeking a delay in the scheduled asylum

18

1 | interview.

2 | All in violation of Title 18, United States Code, Section 371.

3 | COUNT NINETEEN: [18 U.S.C. § 1001 - False Statements]

4 | The Grand Jury further charges: T H A T

5 | MANJIT KAUR RAI,

6 | defendant herein, on or about May 19, 2005, in the County of

7 | Sacramento, State and Eastern District of California, in a matter

8 | within the jurisdiction of the U.S. Departments of Justice and

9 | Homeland Security, did knowingly and willfully make false material

10 | statements and representations, that is, she stated to Special

11 | Agents of the Department of Homeland Security who were investigating

12 | allegations of fraud involving the processing of asylum applications

13 | by certain persons at the law firm of Sekhon & Sekhon, that:

14 | (i) she had not been aware that any Sekhon & Sekhon clients lived

15 | outside of the State of California, (ii) she had never heard any

16 | client say that the events described in an asylum declaration were

17 | false, (iii) that she had not rescheduled asylum interviews when

18 | there was a discrepancy between the client's asylum application and

19 | his oral statements, and (iv) she had never doubted the authenticity

20 | of client asylum declarations; when in fact, as defendant MANJIT

21 | KAUR RAI then well knew, (i) she knew that many Sekhon & Sekhon

22 | clients had resided outside the state of California, (ii) some

23 | clients had indicated to her that their asylum claims contained

24 | false information, (iii) she had rescheduled asylum interviews when

25 | there was a discrepancy between the client's asylum application and

26 | his oral statements, and (iv) she had doubted the authenticity of

27 | client asylum declarations; all in violation of Title 18, United

28 | States Code, Section 1001.

19

1  FORFEITURE ALLEGATION:   [18 U.S.C. §§ 982(a)(6)(A)(ii)(I) and
                            (a)(6)(A)(ii)(II) - Criminal Forfeiture]

2

3          The Grand Jury further charges:  T H A T

4          1.   The allegations of Counts One through Twelve of this

5  Superseding Indictment are realleged and fully incorporated herein

6  by reference.

7          2.   As a result of the offenses alleged in Counts One

8  through Twelve this Superseding Indictment:

9          A.   Defendant IOSIF CAZA shall forfeit to the United

10 States any property, real or personal, which constitutes or is

11 derived from or is traceable to, proceeds obtained directly or

12 indirectly from the commission of such offense or any property, real

13 or personal, that was used to facilitate, or was intended to be used

14 to facilitate, the commission of such offense pursuant to Title 18,

15 United States Code, Sections 982(a)(6)(A)(ii)(I) and

16 (a)(6)(A)(ii)(II).  The property subject to forfeiture as a result

17 of the aforementioned offenses includes, but is not limited to, the

18 following:

19                    (1)   The sum of the money equal to $685,125,

20                          representing the amount of proceeds obtained as a

21                          result of the offenses; and

22                    (2)   Real property located at 5191 64th Street,

23                          Sacramento, California, APN: 023-0163-024-0000.

24         B.   Defendants JAGPRIT SINGH SEKHON and JAGDIP SINGH

25 SEKHON shall forfeit to the United States any property, real or

26 personal, which constitutes or is derived from or is traceable to,

27 proceeds obtained directly or indirectly from the commission of such

28 offense pursuant to Title 18, United States Code, Section

20

1  982(a)(6)(A)(ii)(I).  The property subject to forfeiture as a result
2  of the aforementioned offenses includes, but is not limited to a sum
3  of the money equal to $2,542,500, representing the amount of   .
4  proceeds obtained as a result of the offenses, for which the
5  defendants are jointly and severally liable.

6          3.  If any property subject to forfeiture, as a result of
7  the offenses alleged in Counts One through Twelve of this
8  Superseding Indictment cannot be located upon the exercise of due
9  diligence; has been transferred or sold to, or deposited with, a
10  third person; has been placed beyond the jurisdiction of the Court;
11  has been substantially diminished in value; or has been commingled
12  with other property which cannot be subdivided without difficulty;
13  it is the intent of the United States, pursuant to 18 U.S.C. §
14  982(b), incorporating 21 U.S.C. 853(p) to seek forfeiture of any
15  other property of said defendants, up to the value of the property
16  subject to forfeiture, including but not limited to the following:

17          A.  Real property located at 5191 64th Street,
          Sacramento, California, APN: 023-0163-024-
18          0000,

19          B.  Real property located at 1841 North Bend
          Drive, Sacramento, California, APN: 225-1110-
20          096-0000, and

21          C.  Real property located at 592 Crestmont
          Drive, Oakland, California, APN: 037A-3148-
22          010-01.

23

24                                    A TRUE BILL.

25                                    

26                                    FOREPERSON

27  _____
    McGREGOR W. SCOTT
28  United States Attorney

                           21

## PENALTY SLIP

**DEFENDANTS:**          **JAGPRIT SINGH SEKHON, JAGDIP SINGH SEKHON, MANJIT KAUR RAI, IOSIF CAZA, and LUCIANA HARMATH**

**Count One:**          Jagprit Singh Sekhon, Jagdip Singh Sekhon, Manjit Kaur Rai, Iosif Caza and Luciana Harmath

**Violation:**          18 U.S.C. § 371 Conspiracy to Defraud the United States, and to Make False Statements in Asylum Applications

**Penalty:**          Not more than $250,000 fine;
Not more than 5 Years Imprisonment,
3 Years TSR

**Counts Two -Twelve:** Jagprit Singh Sekhon, Manjit Kaur Rai, Iosif Caza and Luciana Harmath

**Violation:**          18 U.S.C. § 1546 - False Statement in Immigration Application
**Penalty:**          Not more than $250,000 fine;
Not more than 5 Years Imprisonment,
3 Years TSR

**Counts Thirteen - Seventeen:** Jagprit Singh Sekhon, Manjit Kaur Rai, Iosif Caza and Luciana Harmath

**Violation:**          18 U.S.C. § 1001 - False Statements
**Penalty:**          Not more than $250,000 fine;
Not more than 5 Years Imprisonment,
3 Years TSR.

**Count Eighteen:**          Jagprit Singh Sekhon, Manjit Kaur Rai, Iosif Caza and Luciana Harmath

**Violation:**          18 U.S.C. § 371 - Conspiracy to Make False Statements
**Penalty:**          Not more than $250,000 fine;
Not more than 5 Years Imprisonment,
3 Years TSR.

**Count Nineeen:**          Manjit Kaur Rai

**Violation:**          18 U.S.C. § 1001  - False Statements
**Penalty:**          Not more than $250,000  fine;
Not more than 5 Years Imprisonment,
3 Years TSR.

**Forfeiture Allegation:**

**Violation:**          18 U.S.C. §  982(a)(6)(A)(ii)(I) and (a)(6)(A)(ii)((II) - Criminal Forfeiture
**Penalty:**          As Indicated in the Indictment