IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE FRANK C. DAMRELL, JUDGE

---o0o---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                        No. Cr.S. 06-058

JAGPRIT SINGH SEKHON, JAGDIP
SINGH SEKHON, MANJIT KAUR RAI,
aka Manjit Kaur Kang, IOSIF
CAZA, and LUCIANA HARMATH,

        Defendants.

_____/

---o0o---

REPORTER'S TRANSCRIPT

JURY TRIAL

TUESDAY, MAY 5, 2009

---o0o---

Reported by:   KATHY L. SWINHART, CSR #10150

                          APPEARANCES


For the Plaintiff:

         LAWRENCE G. BROWN
         Acting United States Attorney
         501 I Street, Suite 10-100
         Sacramento, California  95814
         BY:     BENJAMIN B. WAGNER
                 CAMIL A. SKIPPER
                 KYLE REARDON
                 Assistant U.S. Attorneys


For Defendant Jagprit Singh Sekhon:

         LAW OFFICES OF MICHAEL STEPANIAN
         819 Eddy Street
         San Francisco, California  94109
         BY:     MICHAEL STEPANIAN

               and

         LAW OFFICES OF RANDY SUE POLLOCK
         2831 Telegraph Avenue
         Oakland, California  94609
         BY:     RANDY SUE POLLOCK


For Defendant Jagdip Singh Sekhon:

         DAVID WARREN DRATMAN
         1007 7th Street, Suite 305
         Sacramento, California  95814


For Defendant Manjit Daur Rai:

         BLACKMON & ASSOCIATES
         813 Sixth Street, Suite 450
         Sacramento, California  95814
         BY:     CLYDE M. BLACKMON


                    (Continued next page...)

                    APPEARANCES (Continued)


For Defendant Iosif Caza:

          DANIEL J. BRODERICK
          Federal Defender
          801 I Street, 3rd Floor
          Sacramento, California  95814
          BY:     TIMOTHY ZINDEL
                  Assistant Federal Defender


For Defendant Luciana Harmath:

          JAI MANHAR GOHEL
          816 Eddy Street
          San Francisco, California  94109


          Also Present:

                  JAGPRIT SINGH SEKHON
                  JAGDIP SINGH SEKHON
                  MANJIT DAUR RAI
                  IOSIF CAZA
                  LUCIANA HARMATH

INDEX

PLAINTIFF WITNESSES:                                          PAGE:


WEBSTER, CAROL

DIRECT EXAMINATION (Cont'd) BY MR. WAGNER          3576
CROSS-EXAMINATION BY MR. STEPANIAN                 3669
CROSS-EXAMINATION BY MR. DRATMAN                   3745

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

NO.:                       DESCRIPTION:                PAGE:


14.7    Medical certificate for DL              3667
14.8    Medical certificate for ML              3667
28.2    I-589 application for PB                3594
28.3    I-589 narrative for PB                  3594
31.2    I-589 application for MS                3584
31.3    I-589 narrative for MS                  3584
31.4    I-589 cover letter for MS               3584
60.1    I-589 application for PC                3596
60.2    I-589 narrative for PC                  3596
60.4    Romanian declaration for PC             3601
60.5    Cover letter for PC                     3601
60.6    I-589 correction letter for PC          3601
68.1    I-589 application for BP                3646
68.2    I-589 narrative for BP                  3646
69.1    I-589 application for MA                3647
69.2    I-589 narrative for MA                  3647
70.1    I-589 application for SN                3582
70.2    I-589 narrative for SN                  3582
71.2    I-589 narrative for DP                  3625
72.2    I-589 narrative for LB                  3586
74.2    I-589 narrative for NB                  3581
75.4    Asylum narrative chart                  3579
75.4A   Asylum narratives                       3579

(Continued next page...)

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE (Cont'd)

| NO.: | DESCRIPTION: | PAGE: |
|------|-------------|-------|
| 75.5 | Asylum narrative chart | 3589 |
| 75.5A | Asylum narratives | 3589 |
| 75.6 | Asylum narrative chart | 3623 |
| 75.6A | Asylum narratives | 3623 |
| 75.7 | Asylum narrative chart | 3606 |
| 75.7A | Asylum narratives | 3606 |
| 79.1 | I-589 application for FZ | 3608 |
| 79.2 | I-589 narrative for FZ | 3608 |
| 80.2 | I-589 narrative for VB | 3613 |
| 81.2 | I-589 narrative for BS | 3614 |
| 82.2 | I-589 narrative for EB | 3609 |
| 84.2 | I-589 narrative for DM | 3610 |
| 90.2 | I-589 narrative for GN | 3617 |
| 91.2 | I-589 narrative for IF | 3618 |
| 92.2 | I-589 narrative for DM | 3621 |
| 93.1 | I-589 application for IV | 3628 |
| 93.2 | I-589 narrative for IV | 3628 |
| 94.1 | I-589 application for IP | 3629 |
| 94.2 | I-589 narrative for IP | 3629 |
| 95.1 | I-589 application for RA | 3651 |
| 95.2 | I-589 narrative for RA | 3651 |
| 96.1 | I-589 application for BM | 3651 |
| 96.2 | I-589 narrative for BM | 3651 |

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|------|-------------|-------|
| 6B | Chart prepared by Agent Webster | 3751 |
| 6C | Client file for RA | 3757 |
| 6C1 | Handwritten narrative for RA | 3757 |

1          SACRAMENTO, CALIFORNIA

2          TUESDAY, MAY 5, 2009, 9:09 A.M.

3                    ---o0o---

4          (The following proceedings were had in the

5          presence of the jury:)

6          THE CLERK:  Calling criminal case 06-0058, the United

7     States versus Jagprit Singh Sekhon, et al., on for jury trial,

8     Your Honor.

9          THE COURT:  Good morning, Ladies and Gentlemen.  The

10    Clerk advised me we have some jurors under the weather.  So if

11    you ever feel any need to take a recess or we can talk about

12    this at some point, if things get difficult for any of you,

13    let me know.  All right?

14          Mr. Wagner, you may proceed.

15          MR. WAGNER:  Thank you, Your Honor.

16                    CAROL WEBSTER,

17    a witness called by the Government, having been previously

18    duly sworn by the Clerk to tell the truth, the whole truth,

19    and nothing but the truth, testified further as follows:

20                 DIRECT EXAMINATION (Continued)

21    BY MR. WAGNER:

22    Q.     Good morning, Agent Webster.

23    A.     Good morning.

24    Q.     Yesterday when we broke, we were discussing some

25    charts that you had prepared based on your review of asylum

1    narratives.  Do you recall that?

2    A.     Yes.

3    Q.     Let me show you what's been marked as Government's

4    Exhibit 75.4 and ask you what that is.

5    A.     This is a chart with a list of 43 asylum applicants

6    who had similar wording in their narrative regarding a

7    scenario in which the applicant was taken to the police

8    station, presented before an officer, the officer slapped the

9    applicant and screamed insults at the applicant.

10   Q.     And did you prepare this chart in the same manner that

11   you described yesterday based on those 300 or so narratives

12   that you looked at?

13   A.     Yes.

14   Q.     And were all of the -- how many asylum narratives are

15   listed on this chart?

16   A.     There's 43.

17   Q.     And were all of those asylum narratives for applicants

18   who were clients of Sekhon & Sekhon and were submitting asylum

19   claims?

20   A.     Yes.

21   Q.     And does the chart include both Indian and Romanian

22   claims or, I should say, Romanian and non-Romanian claims?

23   A.     Yes.

24   Q.     And what is 75.4A?

25   A.     So these are all the narratives that correspond to the

1    initials on this list.

2    Q.      So does 75.4A contain copies of each of the 43

3    narratives that are on the chart?

4    A.      Yes.

5    Q.      And where did you obtain those?

6    A.      From the alien files of these applicants.

7            MR. WAGNER:  The government would move 75.4 and 75.4A

8    into evidence, Your Honor.  18 of the 43 entries on this chart

9    are non-Romanian, and I can list those for the Court.

10           THE COURT:  Perhaps that would be a good idea.

11           MR. WAGNER:  Okay.  Can I publish the chart and go

12   through the chart which ones they are?

13           THE COURT:  All right.  That might be -- well, let me

14   again advise the jury that, as I did previously, the

15   non-Romanian claims, that evidence cannot be considered as to

16   the defendants Harmath and Caza.  Do you recall my previous

17   instructions?  So any of the non-Romanian applicants in

18   evidence as to those narratives cannot be considered as to

19   them, and you're instructed not to consider that evidence as

20   to those defendants.

21           Why don't you -- I'll admit the exhibits into

22   evidence, and you may publish and list them and just for the

23   jury's benefit go through those non-Romanian applicants.

24           MR. WAGNER:  Thank you, Your Honor.

25   /////

1                    (GOVERNMENT'S EXHIBITS 75.4 and 75.4A,

2                    asylum application narratives and

3                    chart, ADMITTED INTO EVIDENCE.)

4          MR. WAGNER:  The -- on the screen is 75.4.  And the

5   non-Romanians are NKB, GK, SN, and in the right-hand column

6   YS, SSJ, AS.  There are two DS's, two GS's, KDS, KS, MS, there

7   are two SS's -- I'm sorry -- three SS's and one TS.  So it's

8   those three in the left-hand column and another 15 in the

9   right-hand column which are non-Romanian.  The remainder are

10  Romanian.

11         THE COURT:  All right.  Would the jury just like to

12  make a note of those.  Have you had an opportunity to do that?

13  Why don't you just make note of those.

14         MR. WAGNER:  I can repeat the initials if that would

15  be helpful.

16         THE COURT:  Pardon?

17         MR. WAGNER:  I can repeat the initials one more time.

18         THE COURT:  Very well.

19         MR. WAGNER:  This is Government Exhibit 75.4.  The

20  non-Romanians are NKB, GK, SN, YS, SSJ, AS, DS, a second DS,

21  GS, a second GS, KDS, KS, a second KS, MS, SS, a second SS, a

22  third SS, and TS.

23         THE COURT:  All right.

24         MR. WAGNER:  Thank you, Your Honor.

25         THE COURT:  Thank you, Mr. Wagner.  Proceed.

1   Q.      BY MR. WAGNER:  Now, Agent Webster, do each of these

2   listed applicants contain this scenario in one form or

3   another?

4   A.      Yes.

5   Q.      Now, the first DS that is listed there in the

6   right-hand column, the one that has an A file number ending in

7   590, is that Davinder Singh who testified in this case?

8   A.      Yes.

9   Q.      And let me show you what I believe has previously been

10  admitted, 7.3, which is the asylum attachment for Mr. Davinder

11  Singh, the prior witness in the case.  And can you go to page

12  4, please.

13      Now, Agent Webster, turning to page 4 or the fourth

14  page of this document, is there information in the two

15  paragraphs that I have bracketed that relate to the scenario

16  that is described in the chart 75.4?

17  A.      Yes.

18  Q.      Can you enlarge that.

19      And what is it in that language that resulted in this

20  application being listed on that chart?

21  A.      He was taken to the police station, presented before

22  the station house officer, called names, terrorized, and then

23  he was slapped across the face.

24  Q.      And let me show you what's previously been marked as

25  Government's Exhibit 74.2, which is an asylum application for

1    NB, I believe it is, or NKB.

2             And let me ask you first, is that an asylum

3    application for a client, an asylum client of Sekhon & Sekhon?

4    A.       Yes.

5    Q.       And was this individual a -- a woman?

6    A.       Yes.

7    Q.       From India?

8    A.       Yes.

9    Q.       And where did you find this document?

10   A.       In her alien file.

11            MR. WAGNER:  Okay.  The government would move 75.2 --

12   I'm sorry -- 74.2 into evidence.

13            THE COURT:  Be admitted.  You may publish.

14                           (GOVERNMENT'S EXHIBIT 74.2, I-589

15                            application narrative for NB,

16                            ADMITTED INTO EVIDENCE.)

17            MR. WAGNER:  Thank you.  Page 5.

18   Q.       Is there information in the top two and a half

19   paragraphs of this asylum narrative that relates to the

20   scenario that you described in the chart?

21   A.       Yes.

22   Q.       And what is it about that that relates to the

23   narrative?

24   A.       She was taken to the police station, to an

25   interrogation room, presented before the station house

1  officer, he slapped her and screamed some -- some insults or

2  threats.

3  Q.     Okay.  Let me show you what's been marked -- this

4  relates to SN, who is about the 19th person listed on the

5  chart.  Let me show you Government's Exhibit 70.1 and 70.2 and

6  ask you what those documents are.

7  A.     70.1 is a 589 asylum application for an applicant by

8  the initials of SN.  And 70.2 is the asylum narrative that

9  goes with that application.

10  Q.     And where did you find those documents?

11  A.     In the alien file of this applicant.

12  Q.     And looking at the I-589, does it indicate that this

13  individual was a client of the Sekhon firm?

14  A.     Yes.

15  Q.     And what attorney signed that signature page?

16  A.     Jagprit Singh Sekhon.

17  Q.     And what -- what nationality is this individual?

18  A.     He's Fijian.

19      MR. WAGNER:  Okay.  The government would move 70.1 and

20  70.2 into evidence, Your Honor.

21      THE COURT:  Admitted.  You may publish.

22                      (GOVERNMENT'S EXHIBITS 70.1 and 70.2,

23                      I-589 application and narrative for

24                      SN, ADMITTED INTO EVIDENCE.)

25      MR. WAGNER:  Thank you.  Could I have 70.2.

1    Q.      And this individual -- page 3, please.  Does this

2    individual appear on more than one of the charts that you

3    compiled that -- in the course of your investigation in this

4    case?

5    A.      Yes.

6    Q.      Now, looking at the bottom of page 3 and then at the

7    top of page 4, starting with the bottom of page 3, is there

8    language on this chart that related to the scenario described

9    in the -- I'm sorry -- on this asylum narrative that relates

10   to the scenario you described in your chart, which is 75.4?

11   A.      Yes, it continues on to the next page.  And the

12   applicant is taken to the police station, presented before the

13   inspector, the officer told them something, and then on the

14   next page it continues where he's slapped and called names.

15   Q.      Is that the beginning of the fourth page there?

16   A.      Yes.

17   Q.      Let me just ask you about a couple more individuals

18   listed on this chart, an individual with the initials MS.  And

19   let me show you Government's Exhibit 31.2 and 31.3 and ask you

20   what those are.

21   A.      31.2 is a 589 asylum application form for the

22   applicant with the initials MS.  And 31.3 is the asylum

23   narrative that goes with that application.

24   Q.      I should have also showed you 31.4.

25           And is -- does this -- do these documents all relate

1    to an asylum claim filed by MS?

2    A.      Yes.

3    Q.      And looking at the I-589, who was the attorney that

4    signed that document?

5    A.      Jagprit Singh Sekhon.

6    Q.      And is there a received stamp on the first page of

7    that document?

8    A.      Yes.  It's dated October 17th, 2001.

9    Q.      And what is 31.4?

10   A.      This is the cover letter that looks like it went with

11   the application from Sekhon & Sekhon to the Nebraska service

12   center.

13   Q.      And the Nebraska service center, is that an office of

14   CIS?

15   A.      Yes.

16   Q.      And is that where asylum claims are received?

17   A.      Yes.

18   Q.      And who's the author or the signatory on that letter?

19   A.      Jagprit Singh Sekhon.

20           MR. WAGNER:  Okay.  The government would move 31.2,

21   31.3 and 31.4 into evidence, Your Honor.

22           THE COURT:  Be admitted.  You may publish.

23                              (GOVERNMENT'S EXHIBITS 31.2, 31.3 and

24                              31.4, I-589 application, narrative and

25                              cover letter for MS, ADMITTED INTO

1                         EVIDENCE.)

2    Q.      BY MR. WAGNER:  If you look at 31.4, is page 2 a copy

3    of the envelope that accompanied that mailing?

4    A.      Yes.

5    Q.      And what's the postmark date on that?

6    A.      October 10th, 2001.

7    Q.      And this individual, MS, again what nationality is he?

8    I assume this is a male that we're talking about?

9    A.      Yes.

10   Q.      And what is his nationality?

11   A.      He's also Fijian.

12   Q.      If you could pull up -- the narrative is 31.3?

13   A.      Yes.

14   Q.      Could you pull up 31.3.

15           And is there a -- page 4, please.  Is there some

16   information in that asylum narrative that relates to the

17   scenario that you've been talking about on page 4?

18   A.      Yes.  He's at the police station, presented before the

19   inspector, the officer asked him some questions and becomes

20   upset, screams some insults and slaps him across the face.

21   Q.      And is this individual MS also -- does he appear on

22   more than one of the charts that you prepared in this case?

23   A.      Yes.

24   Q.      Let me now ask you about an applicant LB who is about

25   the fifth listed -- about the sixth listed individual on the

1    chart which is 75.4.  And let me show you what's been marked

2    as 72.2 and ask you what that is.

3    A.     This -- 72.2 is an asylum narrative for an applicant

4    with the initials LB.

5    Q.     And is that male or female?

6    A.     Male.

7    Q.     And where is LB from?  What is LB's nationality?

8    A.     Romanian.

9    Q.     And where did you find this document?

10   A.     In his alien file.

11   Q.     And is LB a client or was he a client of Sekhon &

12   Sekhon in connection with his application for asylum?

13   A.     Yes.

14          MR. WAGNER:  The government would move 72.2 into

15   evidence.

16          THE COURT:  Be admitted.  You may publish.

17          MR. WAGNER:  Thank you, Your Honor.

18                        (GOVERNMENT'S EXHIBIT 72.2, I-589

19                         application narrative for LB,

20                         ADMITTED INTO EVIDENCE.)

21          MR. WAGNER:  Could I have page 5.

22   Q.     And is there starting on -- toward the bottom of page

23   5, is there text in this asylum narrative which also

24   corresponds to the scenario that you described in 75.4?

25   A.     Yes.  He's -- he's not at the police station, but he's

1    stopped by the -- oh, no, he is at the police station.  I'm

2    sorry.

3          He's at the police station, presented before the

4    officer, the officer calls him names and slaps him.

5    Q.     And this individual LB, does he -- does his narrative

6    also appear on more than one of the charts that you prepared

7    in this case?

8    A.     Yes.

9    Q.     And finally let me just ask you about LD, who is about

10   the 14th listed individual on your chart, and ask you whether

11   or not there were some other -- were there some other

12   documents that were recovered from the law firm computer that

13   related to that individual?

14   A.     Yes.

15   Q.     And do you recall what types of documents those were?

16   A.     They were templates.

17          MR. WAGNER:  Can we publish 67.1.18.  It was

18   previously admitted, I believe.

19          MS. KENNEY:  67.1.18?

20          MR. WAGNER:  Yes.  May I have that, please.

21   Q.     Do you see on the screen 67.1.18, a template for a

22   church letter?

23   A.     Yes.

24   Q.     And the full name has been redacted, but you see the

25   initials LD?

1    A.      Yes.

2    Q.      And is that the same LD that is listed on this chart?

3    A.      Yes, it is.

4    Q.      And were there some other templates admitted around

5    the same time as that one in this case?

6    A.      Yes, there were.

7    Q.      That related to the same individual?

8    A.      Yes.

9    Q.      Okay.  Let me turn your attention to another chart

10   which I'm going to show you which has been marked as

11   Government's Exhibit 75.5 and ask you what that is.

12   A.      This is a list of 35 asylum applicants with their

13   initials that all contain a similar scenario with similar

14   wording in which the applicant was beaten unconscious at the

15   police station.  Then when the applicant regained

16   consciousness, he or she was lying in a cell, and the police

17   returned and beat him or her again until he or she lost

18   consciousness again.

19   Q.      And, again, did you compile this chart?

20   A.      Yes.

21   Q.      And was it based on the review of the asylum

22   narratives that you described earlier?

23   A.      Yes.

24   Q.      And how many claims are listed on this chart 75.5?

25   A.      There's 35.

1  Q.      And are all of those -- are all of those 35

2  individuals asylum applicants who were clients of the Sekhon &

3  Sekhon law firm?

4  A.      Yes.

5  Q.      And let me show you 75.5A and ask you what that is.

6  A.      These are all the asylum narratives that correspond to

7  the initials on this list.

8  Q.      So does that include copies of each of the 35 asylum

9  narratives that were filed?

10  A.      Yes.

11  Q.      And where did you obtain each of those documents?

12  A.      In the alien files.

13         MR. WAGNER:  The government would move 75.5 and 75.5A

14  into evidence, Your Honor.  There are two non-Romanian

15  applicants on this chart 75.5, and I can identify those.

16         THE COURT:  Very well.  Be admitted.

17                      (GOVERNMENT'S EXHIBITS 75.5 and 75.5A,

18                       asylum application narratives and

19                       chart, ADMITTED INTO EVIDENCE.)

20         THE COURT:  Once again, Ladies and Gentlemen, the two

21  non-Romanian applicants cannot be considered as evidence

22  against defendants Caza or Harmath.  If you would just point

23  out those non-Romanian applicants for the benefit of the jury,

24  counsel.

25         MR. WAGNER:  Yes, Your Honor.

```
 1           Of the 35 applicants on 75.5, two of them, GS and MS
 2   are non-Romanians.
 3           May I publish the chart?
 4           THE COURT:  You may.
 5           MR. WAGNER:  So GS and MS are listed in the second
 6   from the end and third from the end in the right-hand column
 7   of 75.5.
 8   Q.      Now, Agent Webster, do you have the chart 75.5 in
 9   front of you?
10   A.      Yes.
11   Q.      Do you see about the 17th person listed there, I think
12   second from the bottom, there is an applicant with the
13   initials of CI?
14   A.      Yes.
15   Q.      Did that individual testify in this case?
16   A.      Yes, he did.
17   Q.      And who is that?
18   A.      Cosmin Iacob.
19   Q.      And let me show you what's been previously admitted as
20   Government's Exhibit 8.3, which is the asylum narrative that
21   accompanied Cosmin Iacob's asylum claim.
22           And could I have 8.3, page 4, please.
23           And is there language in Cosmin Iacob's asylum
24   application that reflects the scenario that you described in
25   this chart 75.5?
```

1   A.      Yes.

2   Q.      And what is that?

3   A.      He's at the police station, thrown into a cell, three

4   policemen pummeled him with batons until he lost

5   consciousness, and when he regained consciousness the

6   policemen again burst into the cell and beat him again until

7   he fainted from the pain.

8   Q.      Now showing you what I believe was admitted yesterday

9   as Exhibit 20.3.  That was previously admitted?

10          MS. KENNEY:  Yes.

11  Q.      BY MR. WAGNER:  Do you see that?

12  A.      Yes.

13  Q.      Does that relate to a Romanian male?

14  A.      Yes, it does.

15  Q.      Did this individual appear on a previous chart that

16  you discussed yesterday?

17  A.      Yes.

18  Q.      And if you turn to page 4 of the application -- of the

19  narrative, again, is there language in this document which

20  reflects the scenario that is reflected in 75.5?

21  A.      Yes.

22  Q.      And what is it in this narrative that reflects that

23  scenario?

24  A.      Two policemen were beating him until he fell down and

25  hit him with batons until he lost consciousness.  When he

1    regained consciousness, he was alone in the cell, and within

2    about 15 minutes the policemen returned to the cell, called

3    him some names and -- down in the next paragraph -- he was

4    beaten in the same fashion until he fainted.

5    Q.    And let me show you what was admitted just a moment

6    ago as 31.3.

7          Is that the asylum narrative for the Fijian man MS

8    that you spoke about just a moment ago in connection with the

9    last chart?

10   A.    Yes.

11   Q.    And is there data in that document, in that asylum

12   narrative that reflect -- text I should say that reflects the

13   scenario contained in this chart?

14         And let me turn your attention to the bottom of page 4

15   and the top of page 5, the language starting at the bottom --

16         THE COURT:  Counsel, I may have missed it, but do you

17   have the initials for the previous applicant and this one as

18   well?

19         MR. WAGNER:  I should have mentioned that, Your Honor.

20   The previous applicant I believe is CS.

21         THE COURT:  And this one?

22         MR. WAGNER:  And this one is MS.

23         THE COURT:  All right.  Thank you.

24   Q.    BY MR. WAGNER:  And just to recap, CS is a Romanian

25   male; is that correct?

1    A.      Correct.

2    Q.      And MS is a Fijian male; is that right?

3    A.      Yes.

4    Q.      So turning back to the asylum narrative for MS, 31.3,

5    the bottom of page 4, is there language that begins on page 4

6    and continues on page 5 that relates to this scenario that

7    you've been discussing?

8    A.      Yes.

9    Q.      And what is it about this asylum narrative that

10   reflects the chart?

11   A.      He's at the police station, and he did not agree to

12   sign a statement.  He was beaten by the policemen until he

13   fainted.  When he regained consciousness, he was in a cell,

14   and then it continues to the next page.  And then three hours

15   later the inspector, the officer and two policemen came into

16   the cell and proceeded to beat him again until he fainted from

17   the pain.

18   Q.      Let me just ask you about two more individuals that

19   are listed on this chart.  The first, do you see that there's

20   an individual at the bottom of the left-hand column of the

21   chart which would be about No. 18 with the initials PB?

22   A.      Yes.

23   Q.      And is that a male or female?

24   A.      It's a male.

25   Q.      And what is his nationality?

1    A.        Romanian.

2    Q.        Let me show you what's been marked as Government's

3    Exhibit 28.2 and 28.3 and ask you what those are.

4    A.        28.2 is a 589 form application for asylum for the

5    applicant with the initials PB.  And 28.3 is the asylum

6    narrative attachment that goes with that application.

7    Q.        And who is the attorney that signed the I-589?

8    A.        It is signed by Jagprit Singh Sekhon.

9    Q.        And where did you obtain these two documents?

10   A.        From the alien file of PB.

11             MR. WAGNER:  The government would move -- is it 28.2

12   and 28.3?

13             THE WITNESS:  Yes.

14             THE COURT:  Be admitted.  You may publish.

15             MR. WAGNER:  Thank you, Your Honor.

16                              (GOVERNMENT'S EXHIBITS 28.2 and 28.3,

17                              I-589 application and narrative for

18                              PB, ADMITTED INTO EVIDENCE.)

19   Q.        BY MR. WAGNER:  Turning to the asylum narrative which

20   is 28.2 -- well, let me ask you first, the I-589, is there a

21   received stamp on that?

22   A.        Yes.

23   Q.        When was that filed?

24   A.        July 3rd, 2001.

25   Q.        And then turning to the narrative, to page 5, is there

1  text in that document that reflects the scenario that you were

2  referring to in this chart?

3  A.      Yes.

4  Q.      And what is it about the asylum narrative of PB that

5  reflects that scenario?

6  A.      He is in a cell, and the policemen were beating him

7  with batons and kicked him until he fainted from the pain.

8  When he regained consciousness, the policemen were in the

9  cell, and they beat him again until he fainted.

10  Q.      And finally let me ask you about -- is there an

11  individual on the chart with the initials PC?

12  A.      Yes.

13  Q.      Let me take some of those others out of your way.

14          And what -- is that again male or female?

15  A.      Male.

16  Q.      And what nationality is PC?

17  A.      Romanian.

18  Q.      Let me show you what's been marked as Government's

19  Exhibit 60.1 and 60.2 and ask you what those are.

20  A.      60.1 is a 589 asylum application for the applicant

21  with the initials PC.  And 60.2 is the asylum narrative that

22  goes along with that application.

23  Q.      And where did you recover these documents?

24  A.      From the alien file.

25  Q.      And was PC an asylum client of Sekhon & Sekhon?

```
1    A.      Yes.

2    Q.      Looking at the I-589 first, is there a signatory for

3    an attorney who signed that?

4    A.      Yes.

5    Q.      And who was that?

6    A.      Jagprit Singh Sekhon.

7            MR. WAGNER:  The government would submit 60.1 and 60.2

8    into evidence, Your Honor.

9            THE COURT:  Be admitted and be published.

10           MR. WAGNER:  Thank you.

11                          (GOVERNMENT'S EXHIBITS 60.1 and 60.2,

12                           I-589 application and narrative for

13                           PC, ADMITTED INTO EVIDENCE.)

14   Q.      BY MR. WAGNER:  Turning to 60.2, is that the asylum

15   narrative?

16   A.      Yes.

17   Q.      Is there -- if you look at the first -- what sort of

18   claim is this one by the way?

19   A.      Gypsy.

20   Q.      How do you mean gypsy?  What --

21   A.      Well, it says Indian security forces, but it also says

22   gypsy.

23   Q.      Okay.  Does the reference to Indian security forces

24   appear to be an error?

25   A.      Yes.
```

1    Q.      The rest of the narrative, does the rest of the

2    narrative say anything about India?

3    A.      No.

4    Q.      Is this a claim that relates to purported persecution

5    in Romania?

6    A.      Yes.

7    Q.      Now turning to page 6 of the application -- I'm

8    sorry -- of the narrative, is there language in that asylum

9    application which reflects the scenario in your chart 75.5?

10   A.      Yes.

11   Q.      And what is it -- what is it about that language that

12   reflects that scenario?

13   A.      The applicant's at the police station, he's thrown

14   into a cell, and the policemen burst in and yell and curse at

15   him and beat him with their batons until he loses

16   consciousness.  He regains consciousness, and the police

17   officer and two policemen came into the cell, made some

18   demands and called him names, and then beat him again with

19   their batons until he lost consciousness.

20   Q.      Now, were there some other documents in the case that

21   were recovered that relate to Mr. PC?

22   A.      Yes.

23   Q.      Let me show you 60.3 and ask you what that is.

24   A.      60.3 is notice of entry of attorney on behalf of

25   applicant PC.

1    Q.      Is that one of those G-28 forms of the sort we've seen

2    previously in the case?

3    A.      Yes.

4    Q.      And where did you obtain this document?

5    A.      From the alien file.

6    Q.      And is this signed by an attorney and dated?

7    A.      Yes.

8    Q.      And who is the attorney that signed this one?

9    A.      Jagdip S. Sekhon.

10   Q.      And what's the date?

11   A.      July 1st, 2002.

12   Q.      Now turning back to the I-589, do you have that in

13   front of you?  I think it's 60.1.

14   A.      Yes.

15   Q.      Is there a local address listed there?

16   A.      Yes.

17   Q.      And is this one of the individuals for whom you seized

18   some files in the course of the search of the law firm?

19   A.      Yes, it is.

20   Q.      Could I have 61.3.1, which has previously been

21   admitted.

22           And looking at 61.3.1 on the screen, is there a local

23   address and an address in another state?

24   A.      Yes.

25   Q.      What state is the -- the out-of-state address in?

1    A.      Washington.

2    Q.      And the address at the top, is that a local address?

3    A.      Yes.

4    Q.      And is -- does that -- if you compare that with the

5    address on the I-589, are they the same?

6    A.      Yes.

7    Q.      And let me show you what was previously admitted as

8    61.3.3 and 61.3.2 and ask you what those are.  I believe they

9    were previously admitted.

10           MR. BLACKMON:  I'm sorry, Mr. Wagner.  What are those?

11   I'm sorry.

12           MR. WAGNER:  61.3.2 and 61.3.3.

13           MR. BLACKMON:  Thank you very much.

14   Q.      BY MR. WAGNER:  Do you see those?

15   A.      Yes.

16   Q.      And can you just generally indicate what those are.

17   A.      61.3.2 is an action taken sheet from the client file

18   belonging to PC.  And 61.3.3 was an asylum narrative with

19   notes on it found in the client file of PC.

20   Q.      And were those seized in the course of the search?

21   A.      Yes.

22   Q.      And 61.3.3 is -- can we pull that up.

23           Is that what is now on the screen?

24   A.      Yes.

25   Q.      And is that a copy of the asylum narrative that you

1    just reviewed?

2    A.      Yes, it is.

3    Q.      Does this one have notes on it?

4    A.      Yes.

5    Q.      Are they in English or Romanian?

6    A.      The notes are in English.

7    Q.      And let me show you what's been marked for

8    identification as 60.6 and ask you what that is.

9    A.      60.6 is a letter to the San Francisco asylum office

10   from Sekhon & Sekhon on behalf of PC.

11   Q.      And what type of a letter is it?  That is, what kind

12   of contents are in there?

13   A.      It lists some corrections to the 589 asylum

14   application.

15   Q.      And who -- is there an attorney who -- what's the date

16   of the letter?

17   A.      It's dated January 6, 2003.

18   Q.      And is there an attorney who signed that?

19   A.      Yes.

20   Q.      Who is that?

21   A.      Manjit Kaur Kang.

22           MR. WAGNER:  The government would move 60 point -- is

23   that six?

24           THE WITNESS:  Yes.

25           MR. WAGNER:  -- 60.6 into evidence, Your Honor.

1          THE COURT:  Be admitted.

2                         (GOVERNMENT'S EXHIBIT 60.6, I-589

3                         application correction letter for

4                         PC, ADMITTED INTO EVIDENCE.)

5     Q.     BY MR. WAGNER:  Now let me show you 60.4 and 60.5 and

6     ask you what those are.

7     A.     60.5 is an affidavit, a declaration for -- that was

8     submitted on behalf of the applicant PC.  And it's notarized,

9     what appears to be a Romanian notary.  60.4 is the notary

10    document from Romania for PC.

11    Q.     Okay.  So that's 60.4 and 60.5?

12    A.     Yes.

13    Q.     And where did you obtain those documents?

14    A.     From the alien file of PC.

15    Q.     And is there a stamp on them that indicates that they

16    were received?

17    A.     Yes.

18         MR. WAGNER:  The government would move 60.4 and 60.5

19    into evidence.

20         THE COURT:  Be admitted.

21                         (GOVERNMENT'S EXHIBITS 60.4 and 60.5,

22                         Romanian declaration and correction

23                         letter for PC, ADMITTED INTO

24                         EVIDENCE.)

25         MR. WAGNER:  May I publish?

1          THE COURT:  You may.

2          MR. WAGNER:  Could we have 60.4, please.

3   Q.     Is this the stamp that we referred to just a moment

4   ago?

5   A.     Yes.

6   Q.     Indicating that the original was seen and returned?

7   A.     Yes.

8   Q.     So what you found in the A file in this case, was it a

9   copy?

10  A.     Correct, a copy.

11  Q.     And what is that stamp that I have indicated?  What

12  does that appear to be?

13  A.     Appears to be a Romanian notary stamp from Bucharest.

14  Q.     What is Bucharest?

15  A.     I think it's the capital of Romania.

16  Q.     And could we bring that up on one side, please, and

17  67.2.1 on the other.

18         The compilation of images from the floppy disks seized

19  from Mr. Caza's house that were discussed yesterday, do you

20  see that on the right of the screen?

21  A.     Yes.

22  Q.     And is there a stamp that was listed on that exhibit

23  that appears to have the same information on it as the stamp

24  in 60.4?

25  A.     Yes.

1    Q.      And now let me turn your attention to the other

2    declaration or apparently the declaration that was submitted

3    with that 60.5.  And could I have the full document on the

4    right.

5            Turning to page 2 of 60.5, does that same -- I'm

6    sorry.  Is that a -- that was a document that was submitted

7    apparently at the same time?

8    A.      Yes.

9    Q.      According to the stamp on the first page?

10   A.      Yes.

11   Q.      What does that stamp appear to be?

12   A.      It appears to be a translator stamp from Romania.

13   Q.      And let me show you -- can you pull up 65.10, that was

14   previously admitted, on the right side.  And let me show you

15   the original of 65.10.  And could I have page 2 of 60.5.

16           So this is the stamp that you indicated appears to be

17   for a translator, a stamp for a translator in Romania?

18   A.      Yes.

19   Q.      And 65.10, is that one of the documents, the hard copy

20   documents that was seized at Mr. Caza's house?

21   A.      Yes.

22   Q.      And does the same information for that translator

23   appear on the stamp recovered in the document from Mr. Caza's

24   house?

25   A.      Yes.

1   Q.      And finally if you look at the text of 60.5, which is

2   the English translation of the first page I believe of 60.5,

3   is that the English translation of the declaration?

4   A.      Yes.

5   Q.      And can you review that and just indicate generally

6   who does that purport to be from and what it's generally

7   about?

8   A.      It looks to be from the wife of PC, and it's an

9   affidavit regarding his problems in Romania.

10  Q.      And let me show you 61.3.5, which was previously

11  admitted, I believe.

12          Is 61.3.5 one of the templates that was seized from

13  the law firm?

14  A.      Yes.

15  Q.      And if you compare -- other than the top where there

16  is no name and no address, other than that is the text in the

17  template substantially identical to the text in the

18  declaration that was submitted to customs and -- to the asylum

19  office?

20  A.      Yes.

21  Q.      Agent Webster -- you can take that down, Ms. Kenney --

22  I'm going to ask you about two more charts, 75.6 and 75.7.

23  I'd like to skip ahead and cover 75.7 first.  And let me show

24  you what's been marked for identification as 75.7.

25          And let me ask you first, do you recall earlier in the

1   trial the testimony of Robert Irons?

2   A.      Yes.

3   Q.      And do you recall his discussion about having some

4   difficulty with a client about the issue of instruments?

5   A.      Yes.

6   Q.      Did you attempt to conduct a similar analysis of

7   asylum claims of Romanians that related to instruments?

8   A.      Yes, I did.

9   Q.      And what did you do in that regard?

10  A.      I did a word search on the scanned narratives

11  regarding musical instruments and cars or vehicles being

12  damaged or vandalized.

13  Q.      And is the chart 75.7 a result of that search?

14  A.      Yes.

15  Q.      And how many individuals are listed on that chart?

16  A.      Twelve.

17  Q.      And what nationality are they?

18  A.      Romanian.

19  Q.      So all the entries on this one are Romanian?

20  A.      Yes, I believe so.

21  Q.      And let me show you 75.7A and ask you what those are.

22  A.      These are the asylum narratives that correspond with

23  each applicant listed.

24  Q.      And where did you locate those documents?

25  A.      In the alien file of the applicants.

1    Q.      And were each of the applicants in this case asylum

2    applicants who were clients of Sekhon & Sekhon?

3    A.      Yes.

4           MR. WAGNER:   The government would move 75.7 and 75.7A

5    into evidence, Your Honor.

6           THE COURT:   Be admitted.   You may publish.

7           MR. WAGNER:   Thank you, Your Honor.

8                         (GOVERNMENT'S EXHIBITS 75.7 and 75.7A,

9                          asylum application narratives and

10                         chart, ADMITTED INTO EVIDENCE.)

11   Q.      BY MR. WAGNER:   Now, the first -- could we have the

12   chart 75.7, please.

13          The first applicant listed on here is not by initials,

14   it's by Gheorge Jianu, correct?

15   A.      Correct.

16   Q.      And just to remind us all, who is Gheorge Jianu?

17   A.      That was the name used in the undercover operation by

18   Daniel Chisca.

19   Q.      And showing you what's previously been admitted as

20   Government's Exhibit 9.2.   Is that the asylum attachment that

21   was filed for him?

22   A.      Yes.

23   Q.      And is his one of the claims -- and let me ask you to

24   turn to -- I'm sorry -- 9.2, page 2, please.

25          Was his asylum application one of the ones that

1    contained a reference to the destruction of instruments and

2    vandalization of cars?

3    A.      Yes.

4    Q.      And what is it in that application that so indicates?

5    A.      It's regarding a physical attack in a town in Romania

6    and lists the people that he was with and that they were

7    attacked by villagers, and the villagers destroyed their

8    instruments and broke the windows of Walter's car.

9    Q.      Now, let me ask you this generally.

10          In connection with the 12 individual asylum

11   applications that you've listed on 75.7, it refers to the

12   destruction of instruments.  My question is, in any of those

13   applications was there a specific identification of what

14   instrument was being destroyed?

15   A.      I don't think so.

16   Q.      Okay.  The second individual is FZ; is that correct?

17   A.      Yes.

18   Q.      Let me show you what's been marked as 79.1 and 79.2.

19          And what are those?

20   A.      79.1 is the I-589 asylum application for the asylum

21   applicant with the initials FZ.  And 79.2 is the asylum

22   narrative attachment that goes along with that application.

23   Q.      And were those recovered from the A file?

24   A.      Yes.

25          MR. WAGNER:  The government would move 79.1 and 79.2

1    into evidence, Your Honor.

2            THE COURT:  Be admitted.  You may publish.

3                            (GOVERNMENT'S EXHIBITS 79.1 and 79.2,

4                            I-589 application and narrative for

5                            FZ, ADMITTED INTO EVIDENCE.)

6    Q.    BY MR. WAGNER:  Turning to the asylum narrative 79.2,

7    page 4, is there language in that document which refers to the

8    vandalization of instruments and vehicles?

9    A.    Yes.

10   Q.    And what does that indicate?

11   A.    It was -- the paragraph prior to this says they were

12   in a village in Romania evangelizing and attacked.  And then

13   it says, In addition to cursing and attacking us, our

14   instruments and vehicles were also vandalized.

15   Q.    Now let me ask you this, each of these twelve, were

16   they religion-based claims?

17   A.    Yes.

18   Q.    Let me show you -- let me show you 82.2.

19         Is 82.2 the asylum application for EB who is the third

20   individual listed on the chart?

21   A.    Yes.

22   Q.    And was that recovered from her A file?

23   A.    Yes.

24   Q.    And was she an asylum applicant client of Sekhon &

25   Sekhon?

1    A.      Yes.  I think it's a male.

2    Q.      Oh, sorry, a male.  Was he an asylum applicant client

3    of Sekhon & Sekhon?

4    A.      Yes.

5            MR. WAGNER:  The government would move 82.2 into

6    evidence, Your Honor.

7            THE COURT:  Be admitted.  You may publish.

8                        (GOVERNMENT'S EXHIBIT 82.2, I-589

9                         application narrative for EB, ADMITTED

10                        INTO EVIDENCE.)

11           MR. WAGNER:  Thank you.

12           Could I have 82.2, page 4.

13   Q.      And is there language in that application which

14   reflects the scenario that you've just discussed?

15   A.      Yes.

16   Q.      And these attacks and vandalization of instruments and

17   cars in these 12 asylum applications, do those occur during

18   evangelizing activities?

19   A.      Yes.  Yes.

20   Q.      Let me show you -- the next person is DM; is that

21   correct?

22   A.      Yes, that's correct.

23   Q.      Let me show you 84.2.  Was he a client of Sekhon &

24   Sekhon?

25   A.      Yes.

1              THE COURT:  Counsel, did you give the initials of the

2    last one?  I may have missed it.

3              MR. WAGNER:  The last one was EB.

4              THE COURT:  All right.

5    Q.        BY MR. WAGNER:  And 84.2, is that DM?

6    A.        Yes, it is.

7    Q.        And was he an asylum applicant client of Sekhon &

8    Sekhon?

9    A.        Yes.

10   Q.        And where did you get this document?

11   A.        From his alien file.

12             MR. WAGNER:  The government would move 84.2 into

13   evidence, Your Honor.

14             THE COURT:  Be admitted.  You may publish.

15             MR. WAGNER:  Thank you.

16                          (GOVERNMENT'S EXHIBIT 84.2, I-589

17                          application narrative for DM, ADMITTED

18                          INTO EVIDENCE.)

19             MR. WAGNER:  Could I have page 3, please.

20   Q.        And is there language in that asylum application that

21   reflects the scenario that you've been discussing?

22   A.        Yes.

23   Q.        And what does it indicate in that regard?

24   A.        He was also at a village and attacked by villagers,

25   and the villagers destroyed their instruments, literature and

1    vandalized their cars.

2    Q.      Now, with respect to this individual, DM, let me show

3    you 63.5.5.

4            What is that document?

5    A.      This is a Romanian notarized medical certificate.

6    Q.      And did you -- I think that was previously admitted,

7    63.5.5.

8    A.      Yes.

9    Q.      And was that recovered from the A file for DM?

10   A.      Yes, it was.

11   Q.      And is that one of the ones that purports to be an

12   original?

13   A.      Yes.

14   Q.      And is that one of the documents that you provided --

15   that you testified about earlier that you provided to the

16   forensic document laboratory?

17   A.      Yes.  This one was sent to the laboratory by an ICE

18   attorney in San Francisco.

19   Q.      And is that one of the ones that Mr. Sexton testified

20   about?

21   A.      Yes.

22   Q.      Okay.  Thank you.

23           Turning back to the chart, the next individual is LB.

24   Do you see that?

25   A.      Yes.

1    Q.      Now let me show you 72.2.  Is LB one of the asylum

2    applications that we just talked about in connection with a

3    previous chart?

4    A.      Yes.

5    Q.      And I believe 72.2 was previously admitted.  And let

6    me direct your attention to page 3.

7           And is there information in LB's application that

8    reflects the scenario about being attacked while evangelizing

9    and the vandalization of instruments and cars?

10   A.      Yes.

11   Q.      And is that what I've reflected on the chart there on

12   the screen?

13   A.      Yes.  I'm not sure if this one has information about

14   the cars.

15   Q.      Okay.

16   A.      Instruments.

17   Q.      Instruments.

18          Okay.  The next one on the chart is VB.  Let me show

19   you Government's Exhibit 80.2 and ask you what that is.

20          MR. ZINDEL:  Mr. Wagner, what was that number?

21          MR. WAGNER:  80.2.

22          MR. ZINDEL:  Thank you.

23          THE WITNESS:  This is an asylum narrative relating to

24   the applicant with the initials of VB.

25   Q.      BY MR. WAGNER:  And where did you obtain that

1    document?

2    A.      From his alien file.

3    Q.      And was he an asylum applicant client of Sekhon &

4    Sekhon?

5    A.      Yes.

6            MR. WAGNER:  The government would move 80.2 into

7    evidence, Your Honor.

8            THE COURT:  Be admitted.  You may publish.

9                            (GOVERNMENT'S EXHIBIT 80.2, I-589

10                            application narrative for VB, ADMITTED

11                           INTO EVIDENCE.)

12   Q.      BY MR. WAGNER:  And turning to page 3, is there a --

13   is there text in that asylum application that refers to the

14   while evangelizing the vandalization of instruments and cars?

15   A.      Yes.

16   Q.      And is it the paragraph that is now on the screen?

17   A.      That's correct.

18   Q.      And turning to -- the next individual is BS.  Let me

19   show you 81.2.

20   A.      Okay.

21   Q.      Is that an asylum narrative for the application of an

22   individual with the initials BS?

23   A.      Yes.

24   Q.      And where did you obtain that document?

25   A.      From the applicant's alien file.

1    Q.      And was he an asylum client of the Sekhon & Sekhon law

2    firm?

3    A.      Yes.

4            MR. WAGNER:  The government would move 81.2 into

5    evidence, Your Honor.

6            THE COURT:  Be admitted.  You may publish.

7            MR. WAGNER:  Thank you.

8                         (GOVERNMENT'S EXHIBIT 81.2, I-589

9                         application narrative for BS, ADMITTED

10                        INTO EVIDENCE.)

11           MR. WAGNER:  Page 2.

12   Q.      And, again, on this document is there -- in this

13   asylum narrative is there text referring to the same scenario

14   of being attacked while evangelizing and cars and musical

15   instruments being damaged?

16   A.      Yes.

17   Q.      And is that reflected in the paragraph toward the

18   bottom of page 2 that I now have on the screen?

19   A.      Yes.

20   Q.      And the next individual listed on that chart is LP.

21   Let me show you what's been marked for identification as

22   Government's 88.2 and ask you what that is.

23   A.      This is an asylum narrative belonging to the applicant

24   with the initials LP.

25   Q.      And was LP an asylum applicant client of Sekhon &

1  Sekhon?

2  A.      Yes.

3  Q.      And where did you get that document?

4  A.      From the applicant's alien file.

5          MR. WAGNER:  The government would move 88.2 into

6  evidence, Your Honor.

7          THE COURT:  Be admitted.  You may publish.

8                        (GOVERNMENT'S EXHIBIT 88.2, I-589

9                        application narrative for LP, ADMITTED

10                       INTO EVIDENCE.)

11         MR. WAGNER:  Page 2.

12 Q.      And is there text in this asylum application narrative

13 reflecting the same scenario that we've been discussing

14 involving attacks that injure or damage instruments and cars

15 while evangelizing?

16 A.      Yes.

17 Q.      And is that the paragraph that I have highlighted on

18 the screen?

19 A.      Yes, it is.

20 Q.      And the next individual is DF; is that correct?

21 A.      Yes.

22 Q.      Let me show you what's been marked as Government's

23 Exhibit 89.2 and ask you what that is.

24 A.      This is an asylum narrative for the applicant with the

25 initials DF.

1    Q.      And where did you obtain that document?

2    A.      From the applicant's alien file.

3    Q.      And was he an asylum client of Sekhon & Sekhon?

4    A.      Yes.

5            MR. WAGNER:  The government would move 89.2 into

6    evidence.

7            THE COURT:  Be admitted.  You may publish.

8                        (GOVERNMENT'S EXHIBIT 89.2, I-589

9                        application narrative for DF, ADMITTED

10                       INTO EVIDENCE.)

11   Q.      BY MR. WAGNER:  Can you turn to page 5 of that

12   narrative.  Is there text on page 5 of that narrative that

13   relates to the scenario that we've been describing?

14   A.      Yes.

15   Q.      And does it constitute the text of the paragraph that

16   I have highlighted on the screen now?

17   A.      Yes, it does.

18   Q.      The next individual listed is GN.  Let me show you

19   Government's Exhibit 90.2.

20           What is that document?

21   A.      This is also an asylum narrative that relates to the

22   applicant with the initials GN.

23   Q.      And was he a Romanian asylum applicant client of

24   Sekhon & Sekhon?

25   A.      Yes.

3617

1  Q.      And where did you obtain this Government's Exhibit

2  90.2?

3  A.      From the applicant's alien file.

4          MR. WAGNER:  The government would move 90.2 into

5  evidence, Your Honor.

6          THE COURT:  Be admitted.  You may publish.

7          MR. WAGNER:  Thank you.

8                          (GOVERNMENT'S EXHIBIT 90.2, I-589

9                          application narrative for GN, ADMITTED

10                          INTO EVIDENCE.)

11         MR. WAGNER:  Page 3.

12  Q.      And if you turn to the bottom of page 3, again is

13  there a description of the applicant evangelizing in villages

14  in Romania?

15  A.      Yes.

16  Q.      And is there language relating to an attack in which a

17  car was vandalized and instruments were destroyed?

18  A.      Yes.

19  Q.      And is that the paragraph I've highlighted on the

20  screen?

21  A.      Yes, it is.

22  Q.      And we are down to the last two of these individuals.

23          Let me show you 91.2 relating to the applicant IF.

24  And let me ask you what that document is.

25  A.      This is an asylum narrative relating to the applicant

1   with the initials IF.

2   Q.      And --

3            MR. STEPANIAN:  What number is this, Mr. Wagner?

4            MR. WAGNER:  91.2.

5   Q.      And was IF a Romanian asylum applicant client of

6   Sekhon & Sekhon?

7   A.      Yes.

8   Q.      And where did you obtain this document?

9   A.      From the applicant's alien file.

10           MR. WAGNER:  The government would move 91.2 into

11  evidence.

12           THE COURT:  Be admitted.  You may publish.

13                            (GOVERNMENT'S EXHIBIT 91.2, I-589

14                             application narrative for IF, ADMITTED

15                             INTO EVIDENCE.)

16           MR. WAGNER:  Page 3, please.

17  Q.      And, again, is there reference in this asylum

18  application to --

19           MR. GOHEL:  Your Honor?  Sorry, Mr. Wagner.

20           MR. WAGNER:  Yes.

21           MR. GOHEL:  Could I have a side bar quickly?  May we

22  have a side bar?

23           THE COURT:  All right.

24           (Side bar conference.)

25           MR. GOHEL:  I apologize, Your Honor.  I'm just

1    raising --

2              THE COURT:  Identify yourself.

3              MR. GOHEL:  I'm sorry.  Jai Gohel, Your Honor.

4              I could be wrong, but I did a quick survey, and I

5    don't believe we have these exhibits.

6              MR. DRATMAN:  I'm the only one that has them,

7    I guess.

8              MR. GOHEL:  Okay.  It's not a big deal, it just wasn't

9    anywhere on any of these disks.

10             THE COURT:  All right.  You don't have these exhibits?

11             MR. GOHEL:  You know, we can probably resolve this at

12   the break, but maybe could we take the break now?

13             THE COURT:  Let's -- you have one more to go?

14             MR. WAGNER:  I think this one and one more on this

15   chart, and then I break.

16             THE COURT:  Let's do this, let's take a recess now and

17   then resolve it.  We can pick up where you left off.

18             MR. WAGNER:  Okay.

19             THE COURT:  All right.  Very well.

20             (Side bar conference concluded.)

21             THE COURT:  We'll take an early recess, Ladies and

22   Gentlemen, so about 20 minutes or so.

23             (Recess taken.)

24             THE COURT:  You may proceed, Mr. Wagner.

25             MR. WAGNER:  Thank you, Your Honor.

1   Q.      Agent Webster, when we broke we were talking about the

2   11th of the 12 remaining applicants listed on Government's

3   Exhibit 75.7, which is the chart involving the instruments and

4   vehicles.  Do you recall that?

5   A.      Yes.

6           MR. WAGNER:  And I think we had admitted 91.2.  Did we

7   admit that?

8           THE COURT:  91.2.

9           THE CLERK:  Yes.

10          MR. WAGNER:  Thank you.

11  Q.      Can you turn to the third page.  And is there a

12  paragraph near the top of that page which relates to the same

13  scenario that you've been discussing, instruments being

14  destroyed and cars vandalized while evangelizing?

15  A.      Yes.

16  Q.      Okay.  And finally let me ask you --

17          THE COURT:  Do you have that -- has the jury seen that

18  paragraph that counsel is referring to?

19          MR. WAGNER:  Let me highlight that, Your Honor.

20          THE COURT:  All right.

21  Q.      BY MR. WAGNER:  And finally let me show you 92.2.

22  Does that relate to an asylum applicant by the name of DM?

23  A.      Yes.

24  Q.      And is this DM different from the DM that's referred

25  to earlier on the chart?

1    A.       Yes, this is a female.

2    Q.       And is she Romanian?

3    A.       Yes.

4    Q.       And was she an asylum client of the Sekhon & Sekhon

5    law firm?

6    A.       Yes.

7    Q.       And where did you find this document?

8    A.       In her alien file.

9            MR. WAGNER:  The government would move 92.2 into

10   evidence.

11           THE COURT:  It's admitted.  You may publish.

12           MR. WAGNER:  Thank you.

13                          (GOVERNMENT'S EXHIBIT 92.2, I-589

14                          application narrative for DM, ADMITTED

15                          INTO EVIDENCE.)

16           MR. WAGNER:  Could I have page 2, please.

17   Q.       And is there -- is there text on page 2 of this

18   woman's asylum application which reflects the scenario in

19   chart 75.7?

20   A.       Yes.

21   Q.       And what is it that is in that language that so

22   reflects the scenario?

23   A.       It's a scenario about evangelizing in a Romanian

24   village and being attacked by villagers who chased us out,

25   vandalized the car and instruments.

1    Q.    Let me ask you this about instruments, I asked you

2    earlier about the twelve on this chart.  Do you recall ever

3    seeing a particular type of instrument identified in any of

4    the asylum narratives that you -- the Romanian asylum

5    narratives that you read in the course of your analysis?

6    A.    No.

7    Q.    Okay.  Let me turn to the last chart, Government's

8    Exhibit 75.6.

9          Did you prepare that chart?

10   A.    Yes.

11   Q.    And what does -- generally what does it reflect?

12   A.    This chart reflects -- they're grouped into two, two

13   narratives that have a substantial portion of the narrative

14   that's the same as the other one that it's paired with.

15   Q.    So there are pairs of asylum applications?

16   A.    Yes.

17   Q.    Okay.  How many pair are there?

18   A.    Seven.

19   Q.    And let me show you 75.6A and ask you what that is.

20   A.    These are the narratives that correspond to this list

21   on the chart.

22   Q.    And so would that be a total of 14 narratives?

23   A.    Yes.

24   Q.    And where did you find those documents?

25   A.    In the alien files of these applicants.

1  Q.     And were each of those 14 applicants individuals who

2  were asylum clients of Sekhon & Sekhon?

3  A.     Yes.

4  Q.     A few of them -- were a few of them individuals that

5  we've already talked about in the course of your analysis

6  today?

7  A.     Yes.

8         MR. WAGNER:  Okay.  The government would move 75.6 and

9  75.6A, Your Honor.  There are four pairs of Romanians and

10  three pairs of non-Romanians, and it is indicated -- so

11  indicated on the chart.

12         THE COURT:  Very well.  Be admitted.  You may publish.

13                      (GOVERNMENT'S EXHIBITS 75.6 and 75.6A,

14                       asylum application narratives and

15                       chart, ADMITTED INTO EVIDENCE.)

16         MR. WAGNER:  Okay.  Subject to the limiting

17  instruction --

18         THE COURT:  Can you note those that are non-Romanian?

19         MR. WAGNER:  Yes, I can, Your Honor.

20         The first four pair are Romanian.  Then there is a

21  pair, which is BP and MA, who are Nepalese; RA and BM, who are

22  also Nepalese; and finally MS and SN, who are Fijian.

23         THE COURT:  All right.  The jury is instructed that

24  the applicants that are Nepalese and Fijian, the non-Romanian

25  applicants, you may not consider that as evidence as to

1    defendants Caza or Harmath.

2              MR. WAGNER:  Thank you, Your Honor.

3              THE COURT:  All right.

4    Q.     BY MR. WAGNER:  Now, Agent Webster, can we start with

5    the first pair.  Do you see the pair for DP and LB?

6    A.     Yes.

7    Q.     Now, LB, is that the Romanian LB that we discussed in

8    some previous charts?

9    A.     Yes.

10   Q.     Let me show you what's been marked as Government's

11   Exhibit 71.2.

12   A.     Okay.

13   Q.     And what is that?

14   A.     This is an asylum narrative for the applicant with the

15   initials DP.

16   Q.     And was he a Romanian asylum applicant client of

17   Sekhon & Sekhon?

18   A.     Yes.

19   Q.     And where did you find this document?

20   A.     In his alien file.

21             MR. WAGNER:  The government would move 71.2 into

22   evidence, Your Honor.

23             THE COURT:  Be admitted, and you may publish.

24             MR. WAGNER:  Thank you.

25   /////

1                    (GOVERNMENT'S EXHIBIT 71.2, I-589

2                     application narrative for DP, ADMITTED

3                     INTO EVIDENCE.)

4          MR. WAGNER:  Could we have that on one side, please,

5    and on the other side 71.2, which has previously been

6    admitted, and that's the application for LB.

7    Q.     Now, just so we understand the nature of the chart,

8    the pairs, does -- do the pairs contain information, text that

9    are similar to each other in each pair?

10   A.     In a certain portion of it.

11   Q.     And what about between pairs?  That is, between, say,

12   the Romanian pair at the top and the Fijian pair at the

13   bottom, is that a similar scenario or different?

14   A.     Each pair is different from the other pairs.  But

15   actually there is some overlap, I think.

16   Q.     Okay.  Now, do you have DP and LB in front of you?

17   A.     Yes.

18   Q.     Okay.  On DP, can I ask you to turn to page 5 of the

19   narrative, and could we enlarge that portion.

20          And as to LB, also page 5, can you start by reading

21   the first paragraph that I've highlighted from page 5 of DB.

22   A.     In the second week of June 2001, I was involved in an

23   effort to bury an evangelist in Stefanesti, which was opposed

24   by the Orthodox church.  According to Orthodox Christians, the

25   land belonged exclusively to them, and Pentecostals could not

1    be buried in the cemetery.

2    Q.      And could you read the lead paragraph in the other

3    one, LB.

4    A.      In the middle of October 1999, I was involved in an

5    effort to bury an evangelist in a plot situated on land given

6    by the village council, which was opposed by the Orthodox

7    church.  According to the Orthodox Christians, the land

8    belonged exclusively to them, and the Pentecostals could not

9    be buried in the cemetery.

10   Q.      And turning back to DB, can you read the next two

11   paragraphs.

12   A.      During the funeral, members of the parochial council

13   stopped us and were cursing us that we were polluting the

14   cemetery.  At the same time, the village police and local

15   authorities were called.  The argument became heated, and we

16   were attacked.  The local authorities and the police also

17   began pushing us out of the area.  In the course of the

18   attack, I was hit in the back with a hard object which I was

19   later told was a stick.  I fell to the ground and had to be

20   carried out of the area.

21   Q.      And now the two paragraphs highlighted in the

22   narrative of LB.

23   A.      During the funeral, members of the parochial council

24   stopped us.  At the same time, the village police and local

25   authorities were called.  The argument became heated, and we

1    were attacked.  The local authorities and the police

2    participated in the attack.  In the course of the attack, I

3    was hit in the back with a hard object which I was later told

4    was a shovel, and I lost consciousness.

5    Q.     So those paragraphs that you just read, would that

6    be -- would those be the similarities between the narratives

7    that is the reason you listed these two on the chart that is

8    75.6?

9    A.     Yes.

10   Q.     Okay.  Now let me turn your attention to the second

11   pair of Romanian applicants, IV and LP.  And let me show you

12   93.1 and 93.2 and 94.1 and 94.2.

13          What is 93.1 and 93.2?

14   A.     93.1 is an I-589 application for asylum with an

15   applicant with the initials IV.  And 93.2 is the asylum

16   narrative which goes along with that application.

17   Q.     And where did you find those documents?

18   A.     In the applicant's alien file.

19   Q.     And is -- that's for IV?

20   A.     Yes.

21   Q.     And was IV a Romanian asylum applicant of the Sekhon

22   firm?

23   A.     Yes.

24   Q.     And 93.1, the I-589, does that have a received stamp

25   on it?

1    A.      Yes, it does.

2    Q.      And when was it received?

3    A.      July 16th, 2001.

4    Q.      And is there an attorney who signed that?

5    A.      Yes.

6    Q.      And who was that?

7    A.      Jagprit Singh Sekhon.

8            MR. WAGNER:  The government would move 93.1 and 93.2

9    into evidence, Your Honor.

10           THE COURT:  Be admitted.  You may publish.

11                              (GOVERNMENT'S EXHIBITS 93.1 and 93.2,

12                              I-589 application and narrative for

13                              IV, ADMITTED INTO EVIDENCE.)

14   Q.      BY MR. WAGNER:  Let me ask you about the other pair,

15   IP.  94.1 and 94.2, do you see those?

16   A.      Yes.

17   Q.      What are those documents?

18   A.      94.1 is an asylum application form I-589 for the

19   applicant with the initials IP.

20   Q.      And 94.2?

21   A.      94.2 is an asylum narrative that goes with the

22   application for IP.

23   Q.      And was he a Romanian asylum applicant client of

24   Sekhon & Sekhon?

25   A.      Yes.

1    Q.      And where did you find those documents?

2    A.      In his alien file.

3            MR. WAGNER:  The government would move 93.1 and 93.2

4    and 94.1 and 94.2 into evidence, Your Honor.

5            THE COURT:  Be admitted.  You may publish those as

6    well.

7            MR. WAGNER:  Thank you.

8                           (GOVERNMENT'S EXHIBITS 94.1 and 94.2,

9                            I-589 application and narrative for

10                           IP, ADMITTED INTO EVIDENCE.)

11           MR. WAGNER:  Can I have IV on the left and -- I'm

12   sorry.  That would be 93.2 on the left and 94.2 on the right.

13   Q.      And, Agent Webster, as to IV, which is the asylum

14   narrative 93.2, can you turn to page 4.  And as to IP, the

15   asylum narrative for 94.2, can you turn to page 3.

16   A.      Okay.

17   Q.      And turning first to the -- what's on the left-hand

18   side of the screen which is the narrative for IV, 93.2, can

19   you read the first two paragraphs of that.

20   A.      My arrests occurred in August of 1994 and June of 1998

21   and October of 2000.  In August of 1994, I was arrested from

22   the civic center in Strimbu-Baiut.  On that occasion, I had

23   rented a hall at the center for a religious program with my

24   colleagues Valer Manu and Valer Bechis.  However, on the day

25   of the program, the local Orthodox priest with close to 50

1    villagers guarded the entrance and did not let us pass.

2    Q.      And can you now turn your attention to the first two

3    paragraphs I've highlighted in 94.2 for client IP.

4    A.      I was arrested in January of 1999, November 1999 and

5    May 2000.  In January 1999, I was arrested from the civic

6    center in Mara.  On that occasion, I had rented a hall at the

7    center for a religious program.  But on the day of the

8    program, the local Orthodox priest with close to a hundred

9    villagers guarded the entrance and did not let us pass.

10   Q.      And then turning back to 93.2, can you read the next

11   two paragraphs.

12   A.      Thus we began holding the program outside of the

13   center.  The priest, however, called the police, and they

14   demanded that we leave.  My colleagues advised me to leave,

15   but I refused as close to a hundred individuals gathered for

16   the program.  When I refused, I was arrested, and the

17   remaining members of the congregation were forcibly dispersed.

18   I was transported to a substation in the village where I was

19   thrown into a cell, and within minutes I was presented before

20   an officer.  The officer yelled at me and demanded that I

21   explain why I was causing a problem in the village.

22   Q.      And now can you turn to the two paragraphs I've

23   highlighted in the narrative Exhibit 94.2.

24   A.      Thus, I held the religious service outside the center.

25   The priest, however, called the police, and they demanded that

1    we leave.  When I refused, I was arrested, and the remaining

2    members of the congregation were forcibly dispersed.  I was

3    transported to the Baia Mare police station where I was thrown

4    into a cell, and an hour later I was presented before the

5    officer.  The officer cursed me as a repentant troublemaker

6    and further degraded my faith and family.  He stated that he

7    did not want any further problems from me.

8    Q.      Now, turning back to 93.2, in the remainder of that

9    section, does it indicate that he was slapped several times?

10   A.      Yes.

11   Q.      And did he -- according to the narrative, was he

12   released?

13   A.      Yes.

14   Q.      And did he have to pay a fine?

15   A.      Yes.

16   Q.      How much?

17   A.      100,000 lei.

18   Q.      And then turning to 94.2, again, does it indicate that

19   the asylum applicant was slapped several times?

20   A.      Yes.

21   Q.      And was he released?

22   A.      Yes.

23   Q.      And how much according to that asylum narrative did he

24   have to pay?

25   A.      Also 100,000 lei.

1    Q.      And is that the text that you identified in those two

2    applications with the similarity that you -- is that the

3    reason that you listed it on this chart?

4    A.      Yes.

5    Q.      Okay.  Turning to the third Romanian pair, is one of

6    those individuals again Gheorge Jianu, the name for the

7    undercover in this case?

8    A.      Yes.

9    Q.      Let me show you Government's Exhibit 9.1 and 9.2.  Is

10   that the I-589 and the narrative for Gheorge Jianu that were

11   previously admitted in this case?

12   A.      Yes.

13   Q.      And a few moments ago with respect to another chart, I

14   believe you talked about an asylum applicant with the initials

15   FZ.  Do you recall that?

16   A.      Yes.

17   Q.      Let me show you 79.1 and 79.2.  Are those the I-589

18   and the asylum narrative for FZ?

19   A.      Yes.

20           MR. WAGNER:  Was 79.1 previously admitted, Ms. Kenney?

21           MS. KENNEY:  Yes.

22           MR. WAGNER:  Okay.  So all of these four documents

23   were previously admitted I understand.

24   Q.      Let me -- turning first to Gheorge Jianu, the asylum

25   narrative which is 9.2, can I direct your attention to the

1    very bottom of page 2 and continuing on pages 3 and 4.

2              And with FZ can I turn to your attention to page 5.

3    I'm sorry, that's 79.2, page 5.

4              Now, if you could just read the two one-sentence

5    paragraphs from the two respective ones starting with Gheorge

6    Jianu, 9.2.

7    A.        In the middle of August 2002, Cristi and Vali began

8    attending church services.

9    Q.        And the paragraph I've indicated on 79.2.

10   A.        In the end of June 2001, Mircea and Ioan began

11   attending church services.

12   Q.        Now on 9.2, could I have the next page, please.

13             And could you read the first three paragraphs on page

14   3 of Gheorge Jianu's asylum application.

15   A.        The following week when we were meeting at Cristi's

16   home, seven men from the village came to his home and demanded

17   that I immediately leave the village.  When I refused and

18   asked that they sit me with me as brothers, I was grabbed by

19   the arms and pulled out of the home.  My friends tried to

20   intervene, but they were beaten.

21             After I was dragged out of the home, I was thrown to

22   the ground in his front yard, and the men began hitting and

23   kicking me and cursing me as a Baptist and devil and yelled at

24   me that I was not to return to the village.  I was severely

25   beaten.

1    Q.      And then turning to 79.2, can you read the three

2    paragraphs that I've indicated.

3    A.      The following week when we were meeting at Mircea's

4    home, seven men from the village came to his home and demanded

5    that I immediately leave the village.  When I refused and

6    asked that they sit me with me as brothers, I was grabbed by

7    the arms and pulled out of the home.  My friends tried to

8    intervene, but they were beaten.

9            After I was dragged out of the home, I was thrown to

10   the ground in his front yard, and the men began hitting and

11   kicking me and cursing me as a Pentecostal and devil and

12   yelled at me that I was not to return to the village.  I was

13   beaten until I lost consciousness.

14   Q.      Okay.  Could we have the full page again.

15           Can you then read in 9.2, the Jianu application, the

16   next few short paragraphs that I've marked.

17   A.      There were two policemen standing outside the fence

18   but did nothing to intervene.  I recovered in Cristi's home.

19   I rested for about four hours and then left his home to return

20   to Arad.  However, on my way out of the village, I was stopped

21   by the two policemen who warned me not to return to the

22   village and told me that if I did not obey their orders I

23   would suffer much worse.  Two days later I learned that Vali

24   left the village.

25   Q.      And now the entry in 79.2 that I've highlighted.

1    A.       There were two policemen standing outside the fence

2    but did nothing to intervene.  When I regained consciousness,

3    I was in Mircea's home.  I was rested for about four hours and

4    then left his home to return to home.  On my way out of the

5    village, I was stopped by the two policemen who warned me not

6    to return to the village and told me that if I did not obey

7    their orders I would suffer much worse.  Two days later I

8    learned that Ioan left the village.

9    Q.       May I have the full page, please.

10           And then in Gheorge Jianu, the undercover, can you

11   read the next three paragraphs.

12   A.       I was very disturbed by the fact that Vali left the

13   village, and I decided that I could not quit my activities.

14   Hence, despite the warning and attack, I returned to Cristi's

15   home in the end of August 2002.  He nonetheless was unwilling

16   to meet me and asked that I not return to his home.  He was

17   very upset and stated that the police had threatened him to

18   quit interacting with me.

19           Upset, I immediately went to the police station and

20   demanded that an officer speak to me.  In response, however, I

21   was cursed as a repentant and told to leave the station

22   immediately.  Otherwise, I would be arrested and beaten.

23   Q.       And could I have the -- oh, could you read the

24   language in 79.2 that I've highlighted.

25   A.       I was very disturbed by the fact that Ioan left the

1   village, and I decided that I could not quit my activities.

2   Hence, despite the warning and attack, I returned to Mircea's

3   home the following week.  He, however, was unwilling to meet

4   me and asked that I not return to his home.  He seemed very

5   upset but was not willing to speak to me.

6   Q.      And the paragraph at the top of the next page, please.

7   A.      Upset, I immediately went to the police station and

8   demanded that an officer speak to me.  In response, however, I

9   was cursed as a repentant and told to leave the station

10  immediately.  Otherwise, I would be arrested and tortured.

11  Q.      Okay.  Full page, please.

12          And could I have the next page of 9.2, which is the

13  undercover's asylum application.  Can you read the first three

14  paragraphs on page 4 of 9.2.

15  A.      Despite the police's warnings, however, I refused to

16  leave the station and frustrated I began saying that the

17  police did not have any right to interfere in our religious

18  activities and that what was happening was wrong.  Again the

19  police demanded that I leave the station and threatened me.

20  However, I demanded that I be allowed to speak to the head

21  officer as to what was going on.  Then when I did not leave, I

22  was forced to the ground, arrested and thrown into a cell.

23          About 15 minutes, the officer and two policemen burst

24  into my cell.  He slapped me and screamed, You wanted to see

25  me, repentant?  I did not answer.

1   Q.      And in 79.2, the language that I've highlighted there,

2   which is from page 6.

3   A.      Despite the police's warnings, however, I refused to

4   leave the station and frustrated I began saying that the

5   police did not have any right to interfere in our religious

6   activities and that what was happening was wrong.  Again the

7   police demanded that I leave the station and threatened me.

8   However, I demanded that I be allowed to speak to the head

9   officer as to what was going on.  Then when I did not leave, I

10  was forced to the ground, arrested and thrown into a cell.

11          About 15 minutes, the officer and two policemen burst

12  into my cell.  He slapped me and screamed, You wanted to see

13  me, repentant?  I did not answer.

14  Q.      Okay.  The full page, please.

15          Can I ask you to look at the next two paragraphs in

16  9.2 and read that which I've highlighted.

17  A.      He then slapped me again and cursed me as a repentant

18  bastard and damn convert.  He then asked me if I needed a

19  lesson in respecting the church and the law.  I finally

20  answered that the police and priests needed a lesson in

21  respecting God.  And when I answered in that way, the officer

22  slapped me and ordered his men to beat me.

23          The policemen then pounced on me and began pummeling

24  me with batons until I fell to the ground.  Then they

25  continued to kick me until I fainted from the pain.

1   Q.      And the highlighted text in 79.2.

2   A.      He then slapped me again and cursed me as a repentant

3   bastard and damn convert.  He then asked me if I needed a

4   lesson in respecting the church and the law.  I finally

5   answered that the police and priests needed a lesson in

6   respecting God.  And when I answered in that way, the officer

7   slapped me and ordered his men to beat me.  The policemen then

8   pounced on me and began pummeling me with their batons until I

9   fell to the ground.  They continued to kick me until I fainted

10  from the pain.

11  Q.      Could I have the whole thing.  Thank you.

12          And then turning back to 9.2, the undercover's asylum

13  application, can you read the two paragraphs that I've

14  highlighted.

15  A.      I was detained until the early -- until early the

16  following morning, and in that night the officer returned to

17  my cell with two policeman and asked me, Have you learned your

18  lesson, devil?  When I did not respond, I was again beaten

19  with batons until I fainted.

20          The following morning when I was being released, the

21  police took all the money from my wallet, which was about

22  200,000 lei, and the officer said that I caused him enough

23  troubles and that if he ever saw me again it would be for the

24  last time.

25  Q.      And turning to 79.2, the asylum application for FZ,

1   can you read those two paragraphs.

2   A.      I was detained until early the following morning, and

3   in that night the officer returned to my cell with two

4   policemen and asked me, Have you learned your lesson, devil?

5   When I did not respond, I was again beaten with batons until I

6   fainted.

7          The following morning when I was being released, the

8   police took all the money from my wallet, which was about two

9   million lei, and the officer said that I caused him enough

10  troubles and that if he ever saw me again it would be for the

11  last time.

12  Q.      Could I have the full page and the next page of 79.2,

13  please.

14         And could you read the two paragraphs at the bottom of

15  page 4 of 9.2, the undercover's asylum application.

16  A.      I was then thrown into the police car, transported out

17  of the village, and thrown out of the car.  One policeman then

18  kicked me several more times and cursed me as a criminal and

19  told me to pay close attention to the officer's warnings.  I

20  was in poor physical shape from the beatings that I suffered

21  and, upon making it home, required medical treatment for three

22  days.

23  Q.      And turning to 79.2, can you read the two paragraphs

24  that I've highlighted there, which is at the top of page 7.

25  A.      Oh, okay.

1          I was then thrown into the police car, transported

2     home and thrown out of the car.  One policeman then kicked me

3     several more times and cursed me as a criminal and told me to

4     pay close attention to the officer's warnings.  I was in poor

5     physical shape from the beatings that I suffered and, thus,

6     required medical treatment for three days.

7     Q.     Could I have the next page of 9.2.

8          And finally, Agent Webster, as to 9.2, the asylum

9     application for the undercover, can you read the paragraphs

10    that I've highlighted from the top of page 5.

11    A.     Two days after my treatment began, two men in civilian

12    clothes came to my home and said that they were sent from the

13    police chief.  They asked why I was still home and if I

14    planned on defying the police again.  They stated that I

15    needed to take the officer's warnings seriously.  Hence, the

16    following day, I went into hiding.

17    Q.     And then finally can you read the language from 79.2,

18    the application of FZ that I've highlighted on this.

19    A.     Two days after my treatment began, two men in civilian

20    clothes came to my home and said that they were sent from the

21    police chief.  They asked why I was still home and if I

22    planned on defying the police again.  They stated that I

23    needed to take the officer's warnings seriously.  Hence, the

24    following day, I went into hiding.

25    Q.     Thank you.

1          Now can you turn to the two I-589s, 91 -- sorry -- 9.1

2    and 79.1.  Turning to 79.1, is there a date when that document

3    was signed?  That would be the application for FZ.

4    A.      It was signed on September 3rd, 2002.

5    Q.      And what about the one for the undercover, Gheorge

6    Jianu?

7    A.      It's not dated.

8    Q.      Is there a received stamp on the -- on the first page

9    of that document?

10   A.      Yes.  November 24th, 2003.

11   Q.      Now turning to the signature page of each document, is

12   there an attorney who signed that?

13   A.      Yes.

14   Q.      And is that under part E?

15   A.      Yes.

16   Q.      What is part E?

17   A.      Part E is the declaration of the person preparing the

18   form if it's other than the applicant.

19   Q.      And what is the -- you don't have to read it, but

20   generally speaking what does the declaration certify?

21          Can you pull up 9.1, the last page.

22   A.      That it's prepared on behalf of the person and that

23   the person signing is aware that knowing placement of false

24   information on form I-589 may also subject me to civil

25   penalties.

1    Q.      And does each of the I-589s that we've reviewed in

2    this case bear that text?

3    A.      Yes.

4    Q.      Turning back to the chart, 75.6.

5            Does the next -- is the next pair that you have there

6    for VB and BS?

7    A.      Yes.

8    Q.      Let me ask you this.  Is each of those individuals,

9    are they individuals that we discussed a few moments ago in

10   connection with another chart?

11   A.      Yes.

12           MR. WAGNER:  I've located it, Your Honor.

13   Q.      Let me show you what's been admitted as 80.2 and 81.2.

14   And are those the asylum attachments for VB and BS?

15   A.      Yes.

16   Q.      And which one is for BS?

17   A.      BS is Exhibit 81.2.

18   Q.      And was BS one of the asylum applicants that you

19   listed on the chart relating to the instruments and the

20   vandalized cars?

21   A.      Yes.

22   Q.      And the other one, 82.2, is that for VB?

23   A.      80.2.

24   Q.      80.2, I'm sorry.

25           And is VB also one of the ones that you listed on your

1    chart for the vandalized instruments?

2    A.      Yes.

3            MR. WAGNER:  And I believe they were both previously

4    admitted, Your Honor.

5            Ms. Kenney, could I have 80.2 and 81.2.

6    Q.      And turning first to 80.2, Agent Webster, can I direct

7    your attention to page 3.  And as to 81.2, the asylum

8    application for BS, can I also direct your attention to page

9    2.  I'm sorry, page 3.

10           Was there language in these two which appeared similar

11   to each other?

12   A.      Yes.

13   Q.      Directing your attention first to 80.2, can I ask you

14   to read the paragraph that I'm indicating which is in the

15   middle of page 3.

16   A.      In the middle of January 2000, Iosif was brutally

17   attacked in Apahida and hospitalized for one week as a result

18   of the attack.  He had been in the village evangelizing, but

19   three policeman witnessed the attack and did nothing.  A

20   Pentecostal family in the village rushed him to the hospital.

21   Q.      And can you read the text at the top of page 3 of 81.2

22   that I've highlighted.

23   A.      In the beginning of August 1998, Ioan Feher was

24   brutally attacked in Comlaucdsa and hospitalized for one week

25   as a result of the attack.  He had been in the village

1   evangelizing, but the local police accused him of stealing.

2   And when he did not admit to committing the crime, he was

3   brutally beaten.  A Pentecostal family in the village rushed

4   him to the hospital.

5   Q.      And turning back to 80.2, the application -- the

6   narrative for VB, can I ask you to just read the next two

7   paragraphs.

8   A.      While Iosif was in the hospital, I visited him every

9   day.  I was deeply disturbed by what happened to him.  And in

10  that week, I went to Apahida three times to ask people what

11  they had witnessed and ask that they make a report against the

12  responsible villagers and policemen.

13          On the third occasion, while I was in the village I

14  was confronted by the policemen and threatened that if I did

15  not quit spreading lies about the police that I would suffer

16  like Iosif.

17  Q.      And turning to 81.2, can you read the two paragraphs

18  that I've highlighted there from the asylum narrative relating

19  to client BS.

20  A.      While Ioan was in the hospital, I visited him every

21  day.  I was deeply disturbed by what happened to him.  And in

22  that week, I went to Comlaucdsa three times to ask people what

23  they had witnessed and ask that make a report against the

24  responsible policemen.

25          On the third time, while I was in the village I was

1    confronted by the policemen and threatened that if I did not

2    quit preaching and inspiring people to revolt against the

3    police, that I would suffer the same fate as Ioan.

4    Q.      And the two paragraphs that you've just read in those

5    two, do they detail a similar story involving someone who was

6    hospitalized and events surrounding that?

7    A.      Yes.

8    Q.      And is that why you listed those two applicants on

9    your list in 75.6 of asylum narratives with similar text?

10   A.      Yes.

11   Q.      Let me now turn your attention to the fifth narrative

12   on 75.6 which relates to a pair of Nepalese clients; is that

13   correct?

14   A.      Yes.

15   Q.      Let me show you first Government's Exhibit 68.1 and

16   68.2.  And let me ask you what those two documents are.

17   A.      68.1 is asylum application form I-589 for an applicant

18   with the initials BP.  And 68.2 is the asylum narrative that

19   goes with that application.

20   Q.      And was BP an asylum client of the Sekhon & Sekhon law

21   firm?

22   A.      Yes.

23   Q.      The I-589, is there a date when that was signed?

24   A.      Yes.

25   Q.      What's the date?

1    A.       September 23rd, 2002.

2    Q.       And is there an attorney who signed that form?

3    A.       Yes.

4    Q.       What attorney is that?

5    A.       Jagdip Singh Sekhon.

6    Q.       And let me now show you Government's Exhibit 69.2 --

7    69.1 and 69.2 and ask you what those documents are.

8    A.       69.1 is an asylum application form I-589 for an

9    applicant with the initials MA.  And 79.2 is the asylum

10   narrative that goes along with that application.

11   Q.       Can I get my copy of 69.2, I think it's attached

12   there.  Thank you.

13            And was this individual, MA, a Nepalese asylum client

14   of the Sekhon & Sekhon law firm?

15   A.       Yes.

16   Q.       And where did you obtain these documents?

17   A.       From the applicant's alien file.

18            MR. WAGNER:  The government would move 68.1 and 68.2

19   and 69.1 and 69.2.

20            THE COURT:  Be admitted.  You may publish.

21            MR. WAGNER:  Thank you.

22                               (GOVERNMENT'S EXHIBITS 68.1 and 68.2,

23                               I-589 application and narrative for

24                               BP, ADMITTED INTO EVIDENCE.)

25   /////

1           (GOVERNMENT'S EXHIBITS 69.1 and 69.2,

2           I-589 application and narrative for

3           MA, ADMITTED INTO EVIDENCE.)

4    Q.    BY MR. WAGNER:  You indicated earlier that 68.1, the

5    I-589 for client BP, was signed by Jagdip Sekhon; is that

6    correct?

7    A.    Correct.

8    Q.    Turning to 69.1, the application, the I-589 for client

9    MA, does that have a date when that was signed?

10   A.    Yes.

11   Q.    And what's the date?

12   A.    May 28th, 2002.

13   Q.    And who's the attorney that signed in part E of that

14   document?

15   A.    Jagdip Singh Sekhon.

16   Q.    Ms. Kenney, can I ask you to put on the screen 68.2 on

17   the left and 69.2 on the right.  And for 68.2, can I ask you

18   to go to page 4, and 69.2, page 3.

19         And, Agent Webster, can I ask you to read the

20   paragraph I've highlighted on page 4 of 68.2, the narrative

21   for client BP.

22   A.    On December 17th, 2000, I was returning home from work

23   when I was stopped by a group of men.  The men demanded that I

24   board off my scooter.  Frightened and with no option, I did as

25   they told me.  Suddenly they began plummeting me -- plummeting

1    with sticks all over my body.  As they beat me, they screamed

2    that I was an opponent of the people's war.  They said that I

3    had to now pay for me opposing the people.  As the men beat

4    me, no one dared to intervene.  The men beat me for close to

5    10 minutes and drove off with my scooter.

6    Q.      And then turning to 69.2, is there a paragraph that

7    starts at the bottom of page 3 and continues on page 4 which

8    is similar?

9    A.      Yes.

10           On November 13th, 2001, I was returning home from work

11   when I was stopped by a group of men.  The men demanded that I

12   board off my scooter.  Frightened and with no option, I did as

13   they told me.  Suddenly they began plummeting with sticks all

14   over my body.  As they beat me, they screamed that I was an

15   opponent of the people's war.  They said that my family had to

16   now pay for me opposing the people.  As the men beat me, no

17   one dared to intervene.  The men beat me for close to 10

18   minutes and the [verbatim] drove off with my scooter.

19   Q.      Did you see that there were a couple of uses of

20   language in there that were the same, the use of the word

21   "plummeting"?

22   A.      Yes.

23   Q.      The paragraph at the top of page 4 of -- I'm sorry --

24   at the bottom of page 3 of 69.2, could you turn to that.

25   A.      Yes.

1    Q.      And was that same word also used in 68.2?

2    A.      Yes.

3    Q.      And did both of them indicate at the bottom that --

4    that they drove off with my scooter?

5    A.      Yes.

6    Q.      And could I direct your attention to the next

7    paragraph in each document -- next page, yeah, next page --

8    and ask you to read the paragraph that I've highlighted from

9    68.2.

10   A.      After the beating, I laid down for approximately 20

11   minutes.  Even when I was able to gather the strength to get

12   up, I could not walk.  Finally some men in the street helped

13   me to a taxi that drove me home.

14   Q.      And is there a corresponding paragraph in the asylum

15   application 69.2?

16   A.      Yes.

17   Q.      Is that what I've highlighted on page 4?

18   A.      Yes.

19   Q.      And can you read that.

20   A.      After the beating, I laid down for approximately 20

21   minutes.  Even when I was able to gather the strength to get

22   up, I could not walk.  Finally some men in the street helped

23   me to a taxi that drove me home.

24   Q.      Now, are those paragraphs about the same language

25   about a similar attack on each individual while they're riding

1    home on a scooter the reason that you included these two

2    Nepali narratives in your list of asylum applicants that have

3    nearly identical language?

4    A.      Yes.

5    Q.      Let me turn your attention to the sixth pair on the

6    list, which is another pair of Nepalese; is that correct?

7    A.      Yes.

8    Q.      Let me show you what's been marked as 95.1 and 95.2

9    and ask you what those documents are.

10   A.      95.1 is an application for asylum form I-589 for an

11   applicant with the initials RA.  And 95.2 is the asylum

12   narrative that goes along with that application.

13   Q.      And was RA a Nepali asylum applicant client of Sekhon

14   & Sekhon?

15   A.      Yes.

16   Q.      And where did you obtain those documents?

17   A.      From the alien file of this applicant.

18   Q.      And let me show you what's been marked as 96.1 and

19   96.2 and similarly ask you what those two documents are.

20   A.      96.1 is an asylum application form I-589 for an

21   applicant with the initials BM.  And 96.2 is an asylum

22   narrative for the same applicant that goes with the

23   application.

24   Q.      Let me just ask you one question about MA, the

25   applicant that you talked about in the previous pair, the

1    Nepali pair.  Did you have an opportunity to review the client

2    file for that individual?

3    A.      Yes.

4    Q.      Was that seized in the course of the search?

5    A.      Yes.

6    Q.      And were there some handwritten notes in that file

7    that related to some of the events that were covered in the

8    language that you -- that you read?

9    A.      Yes.

10   Q.      And do you know whose handwriting that is?

11   A.      No.

12   Q.      Okay.  Turning back to 95.1 and 95.2 and 96.1 and

13   96.2, where did you obtain those documents?

14   A.      From the alien file of the applicants.

15          MR. WAGNER:  The government would move 95.1 and 95.2

16   and 96.1 and 96.2 into evidence, Your Honor.

17          THE COURT:  Be admitted.  You may publish.

18          MR. WAGNER:  Thank you.

19                              (GOVERNMENT'S EXHIBITS 95.1 and 95.2,

20                              I-589 application and narrative for

21                              RA, ADMITTED INTO EVIDENCE.)

22                              (GOVERNMENT'S EXHIBITS 96.1 and 96.2,

23                              I-589 application and narrative for

24                              BM, ADMITTED INTO EVIDENCE.)

25   Q.      BY MR. WAGNER:  Turning first to 95.1, the I-589, is

1    there a received stamp in that one?

2    A.      Yes.

3    Q.      What date was that received by CIS?

4    A.      February 10th, 2002.

5    Q.      And what about 96.1, the I-589 for BM, when was that

6    received?  Is there a stamp?

7    A.      That was received December 26th, 2001.

8    Q.      And can you turn to the last page, the signature pages

9    of each of those I-589s.

10          First for RA, which is 95.1, who's the attorney that

11   signed in block E of that document?

12   A.      It's typed Jagdip Singh Sekhon, but I recognize the

13   signature as Jagprit Singh Sekhon.

14   Q.      And turning to 96.1, whose signature appears on the

15   I-589 for BM in that block E?

16   A.      Jagdip Singh Sekhon.

17   Q.      Okay.  Can I now turn your attention to the asylum

18   narratives.  And, Ms. Kenney, can you pull up 95.2 and 96.2.

19   And let me direct your attention to 95.2, page 3, and 96.2,

20   page 2.

21          You see the three paragraphs that I've highlighted in

22   95.2?

23   A.      Yes.

24   Q.      Can you read those.

25   A.      I also spoke against the Maoists at our meetings as

1  well as the executive committee meeting urging the people to

2  oppose their ideology as well as their exploitation.  As a

3  result, on March 22nd, 2000, I received a threat from Maoists.

4  It was over the telephone.  The Maoists militants stated to me

5  that I was the enemy of the people and that if I did not

6  abandon my activities against the people war, I would be

7  eliminated.

8          Initially I was not deterred as I understood that

9  other members of our party received such telephone calls.

10  However, the telephone calls me became increasingly frequent

11  and threatening.  I became most startled when they warned that

12  they would target my family.

13  Q.     And is there some nearly identical language in 96.2,

14  the asylum application for BM, starting at the bottom of page

15  2 and continuing on to page 3?

16  A.     Yes.

17  Q.     Can you read those three paragraphs that I've

18  highlighted.

19  A.     I also spoke against the Maoists at our local meetings

20  as well as the executive committee meetings urging the people

21  to oppose their ideology as well as their exploitation.  As a

22  result, on March 21st, 2000, I received my first threat from

23  the Maoists.  It was over the telephone.  The Maoist militant

24  stated to me that I was the enemy of the people and that if I

25  did not abandon my activities against the people's war, I

1    would be eliminated.

2          Initially I was not deterred as I understood that

3    other members of our party received such telephone calls.

4    However, the telephone calls me became increasingly frequent

5    and threatening as they became [verbatim] stating that they

6    would target my family.

7    Q.      And turning back to 95.2, page 3, can you look at the

8    next three paragraphs and read those.

9    A.      The constant threats, which were as many as four to

10   five a day, began to wear on me.  My family and I feared

11   answering the telephone.  Every noise we heard in our own

12   house startled us.  And every day my brother and sister went

13   to school or my mother, my father went shopping, I prayed that

14   they would return safely.

15         I tried to gain protection from the police, but they

16   rebuffed me stating that their resources were already spread

17   far too thin protecting other government officials.  I

18   nonetheless remained active in the public as I feared that if

19   I did not remain active, then I would be sending a message to

20   the community that they should be paralyzed by the terror of

21   Maoists.

22   Q.      And is those -- do those three paragraphs virtually

23   verbatim appear in 96.2 on page 3?

24   A.      Yes.

25   Q.      And are those the three paragraphs that I've

1    highlighted on the screen?

2    A.      Yes.

3    Q.      Okay.  The full page, please.

4            Can you -- turning to 95.2, can you read the two

5    paragraphs at the bottom of page 3.

6    A.      On April 21st, 2001, as I was walking to a meeting

7    after just finishing posting some posters on behalf of the

8    Nepali Congress party, I began to feel extremely uneasy.  I

9    then witnessed a car oncoming on the road speeding relatively

10   fast given the rainy conditions.  It seemed to be coming right

11   me.  I began -- or excuse me.  I ran to the side of the road

12   and laid down flat.  I was sprayed by bullets, but not a one

13   hit me.  I laid down for approximately 10 minutes and then

14   fled to my friend's home where I went into hiding.

15   Q.      And is there similar language in 96.2 on page 3, the

16   application for BM?

17   A.      Yes.

18   Q.      Can you read those two paragraphs.

19   A.      On December 21st, 2000, as I was walking to a meeting

20   after just finishing posting some posters on behalf of the

21   Nepali Congress party, I began to feel extremely uneasy.  I

22   then witnessed a car oncoming on the road speeding relatively

23   fast given the weather conditions.  It seemed to be coming

24   right me.  I ran to the side of the road and laid down flat.

25   I was sprayed by bullets, but not a one hit me.  I laid down

1    for approximately 10 minutes and then fled to my friend's home

2    where I went into hiding.

3    Q.    Now, does this -- if you could go back to those --

4    let's see.

5          And do you see that in the line that says "It seemed

6    to be coming right me," they seem to be missing an article

7    there?

8    A.    Yes.

9    Q.    Is that also true in the entry in 96.2?

10   A.    Yes.

11   Q.    And we just talked about the application of BP, which

12   was one of the Nepalese that you discussed in the previous

13   pair; is that right?

14   A.    Yes.

15   Q.    Do you still have 68.2 there on the table?

16   A.    No, I don't.

17   Q.    Well, let me put up on the screen -- on the right-hand

18   side, Ms. Kenney, can you put up 68.2, page 5.

19         And that was one of the ones that we discussed in the

20   prior pair; is that correct?

21   A.    Correct.

22   Q.    Does that one also contain this same language about

23   being shot at and laying down and not a one hit me?

24   A.    Yes.

25   Q.    Can you read the entry from 68.2, which is the

1   application for BP.

2   A.       On April 21st, 2001, I was returning home on an

3   alternative route I had adopted.  I, however, began to feel

4   extremely uneasy.  I then witnessed a car oncoming on the road

5   speeding relatively fast given the rainy conditions.  It

6   seemed to be coming right me.  I ran to the side of the road

7   and laid down flat.  I was sprayed by bullets, but not a one

8   hit me.  I laid down for approximately 10 minutes and then

9   fled to my friend's home where I went into hiding.

10  Q.       And does this one also appear to contain that sentence

11  that has the missing article?

12  A.       Yes.

13  Q.       Okay.  Turning back to 95.2, can you go to page 4.

14  And the next two paragraphs, are they the paragraphs after the

15  two -- after the paragraph that you just read in that

16  narrative?

17  A.       Yes.

18  Q.       And can you read those, please.

19  A.       I called my home to find out if everyone was okay.  I

20  spoke to my father, told him of the incident and explained him

21  that when the Maoists call, that he should tell them that I

22  fled home.  Apparently the Maoists did not call my home a few

23  hours after the attack according -- and told my father that if

24  they saw me again, they would murder me.  They further warned

25  my father that when they were -- when they were through with

1  me, they would turn to my family.  I thereafter remained in

2  hiding at my friend's home while the Maoists continued to

3  issue threats against my family.  I remained in hiding until

4  June of 2001.

5       I was able to contact some of my party colleagues and

6  ask them if there were -- if there was any way I could remain

7  in Nepal.  They all agreed that it was not feasible for me to

8  stay as I would receive no protection from the police and that

9  Maoists were ruling the country on the ground.

10 Q.     And turning again back to 96.2, which is the asylum

11 application for BM, is there substantially the same language

12 at the bottom of page 3 of that asylum application?

13 A.     Yes.

14 Q.     And is that what I've highlighted there?

15 A.     Yes.

16 Q.     Can you read that.

17 A.     I called my home to find out if everyone was okay.  I

18 spoke to my wife, told her of the incident and explained to

19 her that when the Maoists call, that she should tell them that

20 I fled home.  The Maoists did call my home a few hours after

21 the attack according to my wife and told her that their attack

22 was simply a warning and that was more to come if they saw me

23 again.  They further warned my wife that when they were

24 through with me, they would turn to my family.  I thereafter

25 remained in hiding at my friend's home while the Maoists

1    continued to issue threats against my family.  I remained in

2    hiding until May of 2001.

3         I was able to contact some of my party colleagues and

4    ask them if there was any way I could remain in Nepal.  They

5    all agreed that it was not feasible for me to stay as I would

6    receive no protection from the police and that Maoists were

7    ruling the country on the ground.

8    Q.      And all the language that you've just read from 95.2

9    to 96.2, is that the substantially similar language concerning

10   persecution that was the reason that you included these two on

11   your chart 95.6?

12   A.      Yes.

13   Q.      And finally let me ask you about the last pair on that

14   chart.  What is the nationality of that pair?

15   A.      They're Fijians.

16   Q.      And is one of them a client by the name of MS?

17   A.      Yes.

18   Q.      And was MS previously listed on another chart?

19   A.      Yes.

20   Q.      Was he on the chart involving being beaten up and

21   passing out in jail and then being beaten up again until

22   they're unconscious?

23   A.      Yes.

24   Q.      And let me show you 31.1 -- I'm sorry -- 31.2 and

25   31.3.  Are those both in evidence, Ms. Kenney?

1      MS. KENNEY:  Yes, they're both in.

2      MR. WAGNER:  Yes?

3      MS. KENNEY:  Yes.

4   Q.      BY MR. WAGNER:  And is 31.2 and 31.3, is that the

5   I-589 and the asylum narrative for client MS?

6   A.      Yes, it is.

7   Q.      And let me show you 70.1 and 70.2, which relate to an

8   individual, a Fijian individual with the initials SN.

9           And did you previously discuss applicant SN in another

10  one of -- in another chart that you've discussed today?

11  A.      Yes.

12  Q.      Was that 75.4, the one relating to being presented to

13  officers and being slapped?

14  A.      Yes.

15      MR. WAGNER:  So I believe 70.1 and 70.2 -- are they

16  admitted?

17      MS. KENNEY:  Yes.

18  Q.      BY MR. WAGNER:  Can you, Agent Webster, turn to 31.1

19  or 31.2, the I-589 for MS.  What's the date -- is there a

20  received stamp on that?

21  A.      Yes.

22  Q.      What's the date that that was received by the service?

23  A.      October 17th, 2001.

24  Q.      And what about the I-589 for SN, 70.1, when was that

25  received by the service?

1    A.       August 24th, 2000.

2    Q.       And can you look at the signature pages on those two

3    documents.  Turning first to 31.2, the I-589 for MS, who was

4    that signed by?

5    A.       Jagprit Singh Sekhon.

6    Q.       And finally the I-589 for SN, who is that signed by?

7    That's 70.2.

8    A.       That's also signed by Jagprit Singh Sekhon.

9    Q.       Okay.  Now let me direct your attention, if I may, to

10   the asylum narratives 31.3 and 70.2.  On 31.3, can I direct

11   your attention to page 2.

12   A.       Okay.

13   Q.       And if I could have that on the left-hand side.  And

14   on 70.2, could I direct your attention to page 2.

15   A.       Okay.

16   Q.       If I could have 31.3, page 2, and 70.2, page 2.

17            Does the paragraph that I've highlighted in 31.3, does

18   that refer to a relative of the applicant operating a taxi

19   business in Fiji and being attacked and robbed by native

20   Fijians?

21   A.       Yes.

22   Q.       And 70.2, the paragraph that I've highlighted on page

23   2, does that also refer to a relative of the applicant's

24   operating a taxi and being attacked and robbed by native

25   Fijians?

1   A.      Yes.

2   Q.      And do you see the language at the bottom of that

3   paragraph, My family complained?  That's 70.2.

4   A.      Yes.

5   Q.      Can you read that.

6   A.      My family complained to the police many times and even

7   identified the assailants, but the police were unwilling to

8   take any action.

9   Q.      And could I have the full page on 31.3.

10          Does similar language appear in 31.3?

11  A.      Yes.

12  Q.      And can you read that paragraph that I've highlighted.

13  A.      My family complained to the police many times and even

14  identified the assailants, but the police were unwilling to

15  take any action.

16  Q.      Okay.  Could I have the full page, please.

17          And if you look at the next two paragraphs on 31.3

18  that begin -- the paragraph that starts, In addition, can you

19  read those two paragraphs.

20  A.      Yes.

21          In addition, when we were at the gurdwara, you could

22  hear indigenous Fijians cursing us, and they also threw stones

23  at the gurdwara.  Although I suffered from verbal harassment

24  and discrimination, fortunately I was able to -- on the whole

25  to escape being physically attacked until the summer of 1999

1    after the Fiji Labour Party won the May 1999 elections and

2    formed the government.  Mahendra Chaudhry became our country's

3    first Indian prime minister.

4    Q.    Is there similar language in 70.2 that I've

5    highlighted?

6    A.    Yes.

7    Q.    Can you read that.

8    A.    In addition, when we were at the mandhir praying, you

9    could hear indigenous Fijians cursing us, and they also threw

10   stones at the mandhir.  Although I suffered from verbal

11   harassment, fortunately I was able to -- on the whole to

12   escape being physically attacked until the summer of 1999

13   after the Fiji Labour Party won the May 1999 elections and

14   formed the government.  Mahendra Chaudhry became our country's

15   first Indian prime minister.

16   Q.    And if we can go back to the full page.

17         Toward the bottom of page 2 of 31.3 and in the middle

18   of the page in 70.2, is there language in both which indicates

19   that the applicant became involved in the election campaign on

20   behalf of the Labour Party?

21   A.    Yes.

22   Q.    And that the Labour Party won and that indigenous

23   Fijians were upset?

24   A.    Yes.

25   Q.    If you could turn to the next page, page 3 of 31.3.

1   And is there an account in each about an altercation that

2   began which led to subsequent beating?

3   A.      Yes.

4   Q.      And in 31.3, page 3, do you see the paragraph I've

5   highlighted?

6   A.      Yes.

7   Q.      What does that say?

8   A.      In the beginning of July 1999, during the early

9   evening -- the name is redacted -- blank and I were walking in

10  our town when we crossed the police officer's home.  He began

11  cursing us as Indians and stating that Indians needed to leave

12  Fiji.  He further yelled that Fiji was for Fijians and that we

13  would never be anything but slaves.

14  Q.      And is there a, not identical, but similar paragraph

15  about an altercation that began involving applicant SN in

16  70.2?

17  A.      Yes.

18  Q.      And can you read the paragraph I've highlighted there.

19  A.      In the middle of July 1999 during the evening, Daya

20  Nand and I were walking in our town when we crossed an Army

21  officer's home.  We began cursing -- he began cursing us as

22  Indian and stating that Indians needed to leave Fiji.  I did

23  not respond, but Daya exchanged words with the officer, and

24  then the officer confronted us in the street.

25  Q.      And looking at the text in each of these two asylum

1  applicants that follows those entries, did -- according to the

2  narrative, did that lead to an altercation in the street in

3  front of the house in each case --

4  A.      Yes.

5  Q.      -- in which the applicants were beaten?

6  A.      Yes.

7  Q.      And was there subsequent persecution in each case?

8  A.      Yes.

9  Q.      And is the language that you've read from 31.3 and

10  70.2 the similar narrative language that is the reason you

11  listed it on Government's Exhibit 75.6?

12  A.      Yes.

13       MR. WAGNER:  Your Honor, I believe I have no further

14  questions of this witness.  I might want to check over the

15  lunch hour to make sure I've admitted everything.

16       THE COURT:  That's fine.

17       All right.  We'll recess until 1:45 instead of 1:30

18  today.  1:45.

19       (Lunch recess taken.)

20                         ---o0o---

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2             TUESDAY, MAY 5, 2009, 1:50 P.M.

3                         ---o0o---

4         (The following proceedings were had in the

5         presence of the jury:)

6         THE COURT:  Mr. Wagner.

7         MR. WAGNER:  Your Honor, just a very few housekeeping

8    matters.

9         THE COURT:  All right.

10                   DIRECT EXAMINATION (Continued)

11   BY MR. WAGNER:

12   Q.    Agent Webster, let me show you what was previously

13   admitted as 14.6, and two documents, 14.7 and 14.8.  14.6 was

14   previously admitted.

15         Is that one of those pleading forms in which documents

16   were submitted to the immigration court?

17   A.    Yes.

18   Q.    And if you could take that out of its sleeve and look

19   at what's listed as the attachments.

20   A.    Okay.

21   Q.    What's listed as attachment P that was submitted with

22   that document to the immigration court?

23   A.    Attachment P is medical certificate for ML.

24   Q.    And if you look at 14.7 that I've put next to you, is

25   that a copy of the certificate that was attached with that

1    document as attachment P?

2    A.      Yes.

3    Q.      And 14.8 which I have in front of you, can you look at

4    what was attached as Q, attachment Q to the pleading 14.6.

5    A.      Medical certificate for DL.

6    Q.      And if you look at Government's Exhibit 14.8, is that

7    a copy of the certificate that was submitted to the

8    immigration court as attachment Q?

9    A.      Yes.

10   Q.      Okay.  And is that -- do all of those documents relate

11   to an asylum claim by some individuals DL, GDD -- and I think

12   it's GDD, DL and ML, who were clients of the Sekhon law firm?

13   A.      Yes.

14         MR. WAGNER:  Your Honor, I think 14.6 is already

15   admitted.  14.7, I think we had a difference between our

16   records and the Court's records, and 14.8 I think we did not

17   admit.  And I would move to admit 14.8 and 14.7 if it was not

18   previously admitted.

19         THE COURT:  It shall be admitted.

20                        (GOVERNMENT'S EXHIBITS 14.7 and 14.8,

21                         medical certificates for ML and DL,

22                         ADMITTED INTO EVIDENCE.)

23         MR. WAGNER:  I just have a couple of questions, a

24   couple more questions, Agent Webster.

25   Q.      The search that you -- the searches that were

1    conducted September 10th, 2004, was the scope of what you were

2    searching for limited in some way?

3    A.      Yes, it was.

4    Q.      And by what?

5    A.      It was limited to what was listed on attachment B,

6    which --

7    Q.      Is that an attachment to the search warrant?

8    A.      Attachment to the search warrant.

9    Q.      And Agent McDonald testified earlier that she

10   conducted some searches of the floppy disks and computers that

11   she received.  Do you recall that?

12   A.      Yes.

13   Q.      And did you give her her instructions as to what to

14   search for?

15   A.      Yes, I did.

16   Q.      And in your instructions, was Agent McDonald's search

17   limited?

18   A.      Yes.

19   Q.      And why?

20   A.      It was also limited to what was listed on attachment B

21   of the search warrant.

22   Q.      Okay.  And is that the scope of what you were

23   authorized to search for?

24   A.      Yes.

25           MR. WAGNER:  Nothing further, Your Honor.

1              THE COURT:  Mr. Stepanian.

2              MR. STEPANIAN:  Yes.

3              THE COURT:  Cross-examination.

4              MR. WAGNER:  I'll remove those documents, Your Honor.

5                           CROSS-EXAMINATION

6    BY MR. STEPANIAN:

7    Q.      Good afternoon, Ms. Webster.

8    A.      Good afternoon.

9            (Counsel conferring.)

10   Q.      BY MR. STEPANIAN:  You were questioned by Mr. Wagner

11   about your ability to grant or deny asylum.  You have no power

12   to do that; is that correct?

13   A.      Yes, that's correct.

14   Q.      And you're not an asylum officer or an immigration

15   judge.

16   A.      Correct.

17   Q.      And those people, asylum officers and -- are allowed

18   to grant asylum and potentially refer a person to the

19   immigration court; is that correct?

20   A.      Yes.

21   Q.      And the asylum -- the immigration judge, he is in a

22   courtroom as opposed to an office that the asylum officer is

23   in; isn't that right?

24   A.      Yes.

25   Q.      And there is a more adversarial relationship or an

1   adversarial setting in an immigration court as opposed to an

2   asylum interview; is that correct?

3   A.      I don't know that.

4   Q.      All right.  And there are procedures to determine

5   whether a person is to be granted asylum, there are various

6   procedures that are involved; is that correct?

7   A.      Yes.

8   Q.      And there are procedures in an asylum -- in an

9   immigration court, there are various procedures that one

10  follows; is that right?

11  A.      Yes.

12  Q.      Okay.  And these procedures or this information is

13  given to an asylum officer by an applicant in an interview

14  with an asylum officer; is that correct?

15  A.      Yes.

16  Q.      Okay.  Now, you cannot grant adjustments of status,

17  you have no power for that; is that right?

18  A.      Yes, that's correct.

19  Q.      And you can't determine voluntary departure, you have

20  no power to do that.

21  A.      No.

22  Q.      And obviously if you can't do the voluntary departure,

23  you in a sense have no authority to grant bail either.

24  A.      No.

25  Q.      No.

1        And you, however, can make a recommendation.

2   A.      Yes.  Actually, I -- as a supervisor, I --

3   Q.      Excuse me.  Excuse me.

4   A.      -- now can.

5   Q.      Can you make a recommendation for bail or voluntary

6   departure, notwithstanding whether it's going to be followed

7   or not, but can you make a recommendation?

8   A.      As a supervisor or as an agent?

9   Q.      As who you are.

10  A.      Oh.  Currently as a supervisor, yes, I can recommend.

11  Q.      Okay.

12  A.      As an agent, not -- not as much.

13  Q.      Not as much.  But you can make a recommendation to

14  your supervisor from your investigation, and then he and/or

15  she can make a recommendation.

16  A.      Yes.

17  Q.      You give them information, they rely on the

18  information as an agent, and they can make a recommendation.

19  You give them your opinion as to a recommendation or not, this

20  is part of your investigation process; is that correct?

21  A.      Yes.

22  Q.      Okay.  Now, these recommendations are important; is

23  that correct?

24  A.      Well, they're taken into consideration.

25  Q.      Right.  As an example, Agent Harwood, whom you

1    remember testifying here, Agent Harwood around January 2003

2    arrested Mr. Chisca.  You remember him saying that?

3    A.      Yes.

4    Q.      And after -- this is after Mr. Chisca had been

5    underground or had not surfaced since approximately 1997 to

6    the date in which he was arrested by Mr. Harwood or Agent

7    Harwood in 2003; is that right?

8    A.      I can't really testify to that.

9    Q.      Okay.  But he was arrested you know in January of

10   2003.

11   A.      Yes.

12   Q.      He was arrested when he was brought by local

13   authorities to Mr. Harwood, who placed him under arrest and

14   read him the Miranda rights; is that correct?

15   A.      Yes.

16   Q.      Okay.  And Mr. Chisca, he answered certain questions

17   that were put to him by Agent Harwood after he was given his

18   Miranda rights.

19          MR. WAGNER:  Objection, calls for speculation.

20   Q.      BY MR. STEPANIAN:  But you --

21          THE COURT:  It does, Counsel.  Sustained.

22          MR. STEPANIAN:  All right.

23   Q.      Do you recall me asking Agent Harwood whether or not

24   Mr. Chisca answered certain questions on a form which was

25   admitted, a form after the Miranda rights were given?  Do you

1  remember that?

2  A.      I remember you asking Mr. Chisca that.

3  Q.      Okay.

4  A.      But I don't remember Mr. Harwood.

5  Q.      Well, I showed Mr. Harwood, and I -- strike that.

6          I asked Mr. Harwood questions about questions that he,

7  Harwood, told Mr. Chisca.  Do you remember my saying that?

8  A.      Kind of.

9  Q.      Well, you've been -- you've been taking notes here

10  about what was -- what's been said in this courtroom in the

11  last several weeks.

12  A.      I just don't have a good memory of that part of the

13  testimony.

14  Q.      Oh, okay.  All right.

15  A.      Sorry.

16  Q.      Now, it's true, is it not, that after Mr. Chisca was

17  dealing with Ukrainians, dealing with arms dealers, he told

18  that to Mr. Harwood?  You remember that?

19  A.      No, I don't remember that.

20  Q.      You don't remember that?

21  A.      Ukrainians?

22  Q.      Yeah, Ukrainians and arms dealers is what he was doing

23  with the local police.  Do you remember him saying that --

24  A.      No.

25  Q.      -- Agent Harwood?

1    A.       I remember something about drugs.

2    Q.       Okay.  Well, you don't remember -- I'm saying your

3    answer is you don't remember Ukrainians, you don't remember

4    arms dealers; is that right?

5    A.       That's right.

6    Q.       Okay.  Just drugs?

7    A.       Yes.

8    Q.       You remember drugs?

9    A.       Yes.

10   Q.       Okay.  And you recall Agent Harwood, he made a

11   recommendation for a voluntary departure and that he, Mr.

12   Chisca, be put on his own recognizance, meaning he didn't have

13   to go to jail.  Do you remember that?

14   A.       I remember the own recognizance, but I'm not sure

15   about the voluntary departure recommendation.

16   Q.       Don't you recall that Agent Harwood made a

17   recommendation that Mr. Chisca be allowed to voluntarily

18   depart and he was set for voluntary departure some three or

19   four months after he was arrested?  You remember the voluntary

20   departure?

21   A.       I know Mr. Chisca received a voluntary departure.  I'm

22   not sure -- usually it's recommended by the ICE attorney, so

23   I'm not sure if that took place with Mr. Harwood, with Agent

24   Harwood.

25   Q.       Well, didn't Agent Harwood recommend, didn't Agent

 1    Harwood recommend -- he testified that he recommended it.  Do

 2    you remember that?

 3    A.      I really don't remember that.

 4    Q.      Okay.

 5    A.      But it's possible.

 6    Q.      No problem.  No problem.

 7            And he recommended at least that he be bailed out,

 8    Agent Harwood did.

 9    A.      Well, he recommended that he be released --

10    Q.      OR.

11    A.      -- on his own recognizance.

12            THE COURT:  Wait.

13            MR. STEPANIAN:  I'm sorry.  I'm sorry.  I meant own

14    recognizance.

15            THE COURT:  You may answer.  One at a time.

16            MR. STEPANIAN:  Okay.

17            THE COURT:  Did you finish your answer?

18            THE WITNESS:  Yes.

19            MR. STEPANIAN:  Own recognizance.

20            THE WITNESS:  Correct.

21    Q.      BY MR. STEPANIAN:  That means you don't put up bail.

22    A.      Yes.

23    Q.      Okay.  And Agent Harwood wasn't even in court at the

24    time that that own recognizance or being allowed to leave the

25    courtroom without bail was administered.

1          MR. WAGNER:  Calls for speculation, Your Honor.

2    Q.    BY MR. STEPANIAN:  Well, do you recall him --

3          THE COURT:  Sustained.

4          MR. STEPANIAN:  All right.

5    Q.    Now, at any rate, Mr. Chisca was out on bond and

6    received a voluntary departure date of some -- of September

7    5th, 2003; is that correct?

8    A.    I think he was given a three-month period in which to

9    leave.

10   Q.    Well, he was arrested on June 9th.  And September 5th,

11   the voluntary departure date, was -- June, July, August,

12   September -- about two and a half or three months.  So that --

13   is that about right, September 5th?

14   A.    I'm not sure about the exact date.  But, yeah, it's

15   about right, somewhere around there.

16   Q.    All right.  Now, you had a conversation with Cornelius

17   Hedge.  You recall that, don't you?

18   A.    Yes.

19   Q.    And did you make any recommendation about Cornelius

20   Hedge, him getting an OR or bail?

21   A.    He was subject to reinstatement of removal, and --

22   Q.    Right.

23   A.    -- there's no bail conditions.  At the time, in I

24   think it was 2003 or 2004 --

25   Q.    Okay.

1    A.      -- there is no way to get bail conditions for that

2    type of --

3    Q.      Well, if he cooperated, if he cooperated you would be

4    able to arrange bail.  If he cooperated you would make a

5    recommendation for him to be bailed?

6    A.      It's not called bail.

7    Q.      It's -- sorry.  It's parole or -- you could make a

8    recommendation like that, can't you?

9    A.      If somebody has a reinstatement of removal?

10   Q.      If someone -- if someone was in the position of Mr.

11   Hedge or in the position, as an example, of Radu Vlad who was

12   a fugitive from justice because he never showed up at his

13   master hearing, you could make a recommendation to determine

14   whether they are to be released on bond.

15          MR. WAGNER:  Objection.  The question is compound

16   because he's asking about two different --

17          MR. STEPANIAN:  All right.  I'll ask --

18          THE COURT:  Sustained.  Rephrase.

19   Q.      BY MR. STEPANIAN:  In Radu Vlad's case, you could make

20   a recommendation that he not be arrested; is that correct?

21   A.      You mean at the point when I talk to him?

22   Q.      Yeah.

23   A.      Yes.  There's discretion for if somebody is arrested

24   or not, that's correct.

25   Q.      Right.  And he was -- he was allowed to be on bond, he

1    wasn't put in custody.

2    A.       Well, it's not -- it's not bond actually.

3    Q.       All right.  What do you want --

4    A.       But I kind of see what you mean.  Like, released.

5    Q.       Released.  Okay.  You recommended that, and he was

6    released; is that correct?

7    A.       Well, the way it works is the only people who are

8    detained usually are people with criminal records because

9    there's not enough jail space.  So --

10   Q.       In Radu Vlad's case, he was a fugitive because he did

11   not show up at a bail hearing and had a deportation order or

12   a -- he was being deported, and he did not show up at his --

13   at his master calendar call; isn't that true?

14   A.       I don't think he was a fugitive.  But, yeah, I think

15   you're correct that he didn't go to his hearing.

16   Q.       Well, didn't he have a warrant out for his arrest?  He

17   had a warrant.

18   A.       Yeah, but it was a mistake actually because he was

19   under a different category.  He was under visa waiver, so it

20   was an error in his file.  But --

21   Q.       Wasn't there a warrant out for Radu Vlad?  There was a

22   warrant.

23   A.       Yes, there was.

24   Q.       And that if he was stopped by an immigration officer

25   and it was checked, then he would be arrested by a police

1  officer or by someone and turned over to ICE?  If he was

2  stopped and it was determined by the warrant and found out

3  about the warrant, he would be arrested; is that right?

4  A.     Possibly.

5  Q.     Okay.  All right.  And Cornelius Hedge, he didn't

6  cooperate with you and, in fact, he said in a fairly vehement

7  way that his application was true; is that right?

8  A.     Yes.

9  Q.     Yeah.  And not only did he say it was true, but when

10  you asked him about his -- who his attorneys were or how much

11  he paid his attorney, he said it was none of your business.

12  Remember that?

13  A.     Yes, he said something similar to that.

14  Q.     And not only that, but he kind of ripped up a receipt

15  and put it in his mouth.

16  A.     Yes, he ate it.

17  Q.     He ate it.

18         And he was -- ended up in jail awaiting deportation

19  for how long was it, a year?

20  A.     I'm not sure of the time.  But it was because he was

21  in -- under that category of --

22  Q.     Excuse me.  I only asked --

23         THE COURT:  Counsel, let the witness answer.

24         MR. STEPANIAN:  All right.  Okay.

25         THE COURT:  Question and answer.  Okay?

3680

1          MR. STEPANIAN:  No problem.

2          THE COURT:  Complete your answer.

3          THE WITNESS:  Because he was a reinstatement, he had a

4     prior deport --

5          MR. STEPANIAN:  Right.

6          THE WITNESS:  -- there was no bond conditions

7     available to him.

8     Q.     BY MR. STEPANIAN:  He was in jail for a year or so; is

9     that correct?

10    A.     I would have to check, but it could be.

11    Q.     Yeah.

12           And these recommendations -- strike that.

13           How long have you been working as, first, in INS and

14    then for ICE?  How long has that been?  1997 did you say?

15    A.     It's a total of about 19 years --

16    Q.     Okay.

17    A.     -- with INS and ICE.

18    Q.     Sorry.

19           And you were there during the transition to ICE?

20    A.     Correct.

21    Q.     All right.  And you are -- and this investigation that

22    you're involved in, you are the chief investigator of this

23    case in laymen's terms; is that correct?

24    A.     Yes, the case agent.

25    Q.     Right.

1  A.       Uh-huh.

2  Q.       And your recommendations, if you tell a supervisor or

3  if you make them yourself, are considered important.  Is that

4  a fair statement?

5  A.       I guess the facts of the -- of each situation are

6  considered.

7  Q.       Right.  And your recommendation, you make

8  recommendations.  You give information to make

9  recommendations, and you have made recommendations; is that

10  true?

11  A.       Yes.

12  Q.       Okay.  And when you were talking about how the various

13  steps in what an applicant can go through -- asylum officer,

14  immigration judge, appeals, Ninth Circuit -- when you were

15  talking about these various steps and various bureaucracies

16  that one has to walk through in order to get a result, your --

17  should you make a recommendation, that recommendation's in the

18  file unless it's changed; is that correct?

19  A.       I'm kind of confused on what you -- what the question

20  is.

21  Q.       All right.  Well, you know, you've been an agent for

22  19 years.  I'll make it simpler.

23           You make a recommendation, it goes in the file; is

24  that correct?

25  A.       Yes.

1   Q.      Okay.  And it stays in the file until and unless it's

2   changed throughout all of the bureaucratic steps that you

3   testified to that a person has an opportunity in immigration

4   proceedings.

5   A.      Well, if I made a recommendation, then it wouldn't be

6   an immigration proceeding.

7   Q.      No, I'm not saying it's an immigration proceeding.  It

8   is in the files, it is in the A file, a recommendation, or

9   it's somewhere that the people are going to see it.  If a

10  person wants to see your recommendation who has some

11  discretion in these cases, they're going to be able to see

12  your recommendation one way or another; is that true?

13  A.      Well, we don't really have something called a

14  recommendation.  But I can see what you mean, maybe a request

15  for a parole status or something like that.  Those things,

16  yes, are in the A file.

17  Q.      Right.  Okay.

18  A.      Yes.

19  Q.      Well, as an example, Radu Vlad was denied a 485, you

20  remember that?  He was denied a 485 I think in Chicago.

21  A.      Yes.

22  Q.      Yeah.  He --

23  A.      I thought it was the waiver but maybe, yeah, it was

24  the 485.

25  Q.      Well, I think it was the 485.

3683

1          And he was upset about that because he applied and he

2     didn't get it, and there was a letter that was written to him

3     and that letter said that he was denied.  Do you remember

4     that?

5     A.     Yes, because he didn't include the fee.

6     Q.     Whatever it was, he was denied.

7     A.     Uh-huh.  Yes.

8     Q.     Actually there was some reference in that letter

9     besides fees that made a mention of the fact that he had lied

10    in an application.  That was in the letter also, not just the

11    fact that he didn't pay fees.

12    A.     Well, he didn't pay the fee for the waiver, which

13    would have waived the fraud.  So that's what happened.

14    Q.     That would have waived the fraud, that's right.

15    A.     Uh-huh.

16    Q.     Okay.  All right.  And so he was denied.  And he

17    called you, didn't he?

18    A.     No, his wife called me.

19    Q.     His wife called you.  And she was upset about this; is

20    that right?

21    A.     Well, she wanted to know what they should do.

22    Q.     Right.  And what did you tell them to do?

23    A.     I -- actually I don't think I told them to do

24    anything.

25    Q.     But you made a recommendation, didn't you?

1    A.      I told -- first of all, I told them to file the

2    waiver, but I don't think they understood what it was.

3    Q.      Okay.

4    A.      And then they didn't include the fee.

5    Q.      All right.

6    A.      And I don't think they filled it out correctly either.

7    Q.      Okay.  All right.

8    A.      So if they would have paid the fee and filled it out

9    correctly, perhaps it would have been approved.

10   Q.      But you -- you sent an E-mail to someone in Chicago,

11   and within a month that waiver was corrected and he ultimately

12   got his 485 granted; isn't that right?

13   A.      Yes, I sent some E-mails to them requesting that they

14   look at it again.

15   Q.      Right.

16   A.      And also our office sent a letter --

17   Q.      Yeah.

18   A.      -- recommending that.

19   Q.      And it was only a month after that that he -- that he

20   received his 485.  It was 35 days or 40 days.

21   A.      I thought it was longer, but it could have been --

22   Q.      Well, it was reopened.  It was reopened, and then he

23   was ultimately -- he got his 485; is that right?

24   A.      Yes, it was reopened.

25   Q.      Okay.  All right.

1    A.       Yes.

2    Q.       Now, lawyers called you concerning clients that had

3    come to them during the course of this investigation; is that

4    right?

5    A.       Yes.

6    Q.       And lawyers -- Mr. Gaman is an example, I'm just

7    picking an example.  He called you to hopefully make a deal

8    for his client.

9             Perfectly legitimate for lawyers to do that; is that

10   right?

11   A.       Well, he seemed to be concerned about what was going

12   on.

13   Q.       Okay.  But he called you and gave you an opportunity

14   to speak to his client.  His client was Florin Vorobiov; is

15   that right?

16   A.       I think he had a couple clients.

17   Q.       Well, he had -- he had -- Radu Vlad was one of his

18   clients.

19   A.       For a short time, yes.

20   Q.       Yeah.  Well, enough amount of time so that a meeting

21   was arranged so you could meet him.

22   A.       I think it was a different client, but, yes.

23   Q.       Well, and Beniamin Opris's cousin.

24   A.       Correct, Opris.

25   Q.       Right.  Opris was his client, correct?

1    A.      Yes.

2    Q.      And isn't Radu Vlad and Opris related in some way?

3    A.      Yes.

4    Q.      Yeah.  And it was a fact that on July 8th or somewhere

5    around there that Beniamin Opris spoke to you, around that

6    time; isn't that correct?

7    A.      2003, yes.

8    Q.      Yes.  And then the next day he talked to Radu Vlad,

9    and Radu Vlad met with you in Opris's house with yourself,

10   some agents, an interpreter, Beniamin Opris met together, and

11   he made a statement; is that right?

12   A.      Yes.

13   Q.      And he wasn't arrested.

14   A.      No.

15   Q.      No.

16           And there was a warrant out for him.

17   A.      Yes.

18   Q.      Okay.

19   A.      But at the time I didn't know about that, when I

20   talked to him.  But --

21   Q.      All right.  Well, you didn't check any file or

22   anything when you were called by Mr. Gaman or when you were

23   called by Beniamin Opris to see his cousin, didn't you check

24   out his -- his computer as to whether or not he had a warrant

25   out for him?  You checked that.

1    A.      What happened was I first talked to Opris, and I knew

2    I was meeting with Opris.

3    Q.      Right.

4    A.      And I did not know I would be meeting with Radu Vlad.

5    Q.      Okay.  It was, what, Opris's idea to have you meet

6    with Radu Vlad?

7    A.      No.  I asked Opris if he knew of any other --

8    Q.      I see.

9    A.      -- people who had the same thing happen to them.

10   Q.      He said his cousin?

11   A.      Correct.

12   Q.      And you met the cousin the next day?

13   A.      Yes, shortly thereafter.

14   Q.      I think a day later.  I'm not sure, but I think that's

15   what it was.

16           Okay.  Now, lawyers I say call you, they call you and

17   they hope that you would be able to make recommendations

18   concerning their client if they want to cooperate.  This

19   happens, this is not an unusual circumstance; is that correct?

20           MR. WAGNER:  Object, calls for speculation as to what

21   the lawyers are hoping.

22           THE COURT:  Sustained.

23           MR. STEPANIAN:  All right.

24   Q.      Lawyers have called you from time to time generally

25   speaking to negotiate on behalf of their clients who either

1    are fugitives or who want to cooperate with you.  Have you

2    received calls from time to time when you're -- in your

3    capacity as an agent?

4    A.      I think it only happened twice or -- twice with Mr.

5    Gaman and then another attorney, Davinder Singh's.

6    Q.      Okay.  They call -- sorry.

7    A.      I don't remember every call, but it's possible.

8    Q.      All right.  And they're hoping -- they're hoping to

9    talk to you and they're hoping to communicate with you so that

10   you would make a recommendation in relationship to their

11   client.  This is why they called.

12           MR. WAGNER:  Same objection.

13           THE COURT:  Sustained.

14           MR. WAGNER:  Calls for speculation.

15           MR. STEPANIAN:  All right.

16   Q.      Now, there was a period of time that you testified

17   that you collected all of the files for various people that

18   were represented by the Sekhon & Sekhon firm; is that right?

19   A.      I wouldn't use the word "all," but a lot, yes.

20   Q.      A lot of them.

21           And these files were in a repository of some kind

22   which was under your control.

23   A.      They were in our records room at the office.

24   Q.      All right.  Well, besides you and your fellow agents,

25   no one is going to be able to go in there and get them.

1    A.      The records personnel.

2    Q.      Right.  The records personnel, yourself, and people

3    who were working with you in this investigation had access to

4    those records.

5    A.      Not exactly.

6    Q.      Well, did you have access to the records?

7    A.      Well, we have records people who --

8    Q.      Right.

9    A.      -- they run the file room.

10   Q.      Okay.  That's right.  All right.

11   A.      So they would -- like, if someone requests a file,

12   they would be the one to do the transaction.

13   Q.      All right.  Well, access meaning like perhaps in the

14   old days in a library, ask for the file and you get the file;

15   is that correct?

16   A.      Yes.

17   Q.      All right.

18   A.      Something like that, correct.

19   Q.      All right.  And you had these files in Sacramento,

20   correct?

21   A.      Yes.

22   Q.      And they came from various places in the country.

23   Some came from Phoenix; is that right?

24   A.      Yes, they came from all over.

25   Q.      And Chicago?

 1    A.      Yes.

 2    Q.      Indianapolis?

 3    A.      Well, see, in our records system we have this place

 4    called the national records center.

 5    Q.      Right.

 6    A.      So most every record goes to the national records

 7    center.

 8    Q.      Okay.

 9    A.      So that's where they're usually at when they're

10    requested.

11    Q.      All right.

12    A.      Unless they have some application going on, then they

13    would be in a specific office.

14    Q.      Okay.  But when someone went -- you recall testimony

15    about people who went to find out about their cases in

16    Indianapolis or in Chicago, that they were told that the

17    record was in Sacramento; is that right?

18    A.      Yes, their A file was in Sacramento.

19    Q.      And the A file is the file that is basically the

20    history of the individual alien; is that right?

21    A.      Yes.

22    Q.      From the moment that he comes in or she comes in with

23    their visas, when they go through the airport and they get

24    their passport or whatever document it is, when they get

25    through that period is the beginning of the A file or when

1    they first get a visa.  That's the beginning of their A file,

2    their history.

3    A.     Umm --

4    Q.     Is that correct?

5    A.     It's different for every applicant.

6    Q.     Okay.  All right.  Some come as undocumented, so it

7    takes a while before they get an A file.

8    A.     Well, the A file is created based on certain

9    applications and not on others.

10   Q.     Right.  So you had, when they -- when someone was

11   asking for their file, the file that they were asking for was

12   the A file that you had in Sacramento; is that right?

13   A.     I guess you can put it like that, but --

14   Q.     Okay.

15   A.     Usually the files are requested from one office to

16   another.

17   Q.     Okay.

18   A.     And an individual might be told that their file is in

19   Sacramento, but they wouldn't, like, move the file themselves.

20   Q.     Well, it's a fact, is it not, that when someone

21   went -- some of these people went to their locale where they

22   were living and they wanted some information or some activity

23   for various applications that they made, they were told the

24   file is in Sacramento; is that correct?

25   A.     Yes.  Yes.

1    Q.      And they came to Sacramento, and when they came to

2    Sacramento they called and you were alerted as to the fact

3    that they were coming; is that right?

4    A.      Yes.  I asked the people in our information unit to

5    let me know if anybody has an inquiry so I could talk to them.

6    Q.      Right.  And one of these people were -- was Davinder

7    Singh as an example?

8    A.      Correct.

9    Q.      A truck driver who came to Sacramento because he was

10   getting no information or was told his file was in Sacramento

11   when he went to his local ICE office; is that right?

12   A.      Yes.

13   Q.      Okay.  And when he -- when he came, he was told that

14   his file had been moved to Sacramento.

15   A.      I think it was, like -- it wasn't moved to where he

16   want -- to Indianapolis, it was in Sacramento.

17   Q.      Okay.  And you heard him testify about the fact that

18   you told him that he wouldn't cooperate, that you would not

19   have him get his -- his green card and that you would stop him

20   from getting his green card.  You heard him say something of

21   that nature; is that correct?  He was upset about that.

22   A.      Yes.  I don't remember him saying those words, but

23   something like that, yes.

24   Q.      Right.  And you denied that on the stand.  You denied

25   that you threatened him in any way.

3693

1    A.       That I threatened him with deportation, I --

2    Q.       Right.

3    A.       -- denied that, yes.

4             But I did have a conversation with him about the

5    status of his green card, so I'm not denying that.

6    Q.       Right.  Well, you said to him, I believe that this is

7    your testimony, you said adjudication cannot go through until

8    the trial is over and your case will go to the asylum office

9    for reopening.

10            You said something like that --

11   A.       Yes.

12   Q.       -- right?

13   A.       Yes.

14   Q.       And I assume reopening would be that it would be

15   looked at anew as to his asylum grant.

16   A.       Correct.  Correct.

17   Q.       And you would, I assume, make a recommendation

18   depending upon whether you thought he was telling the truth or

19   not.

20   A.       No.  What I was going to do is hopefully send all of

21   the files at the same time for this case --

22   Q.       Okay.

23   A.       -- so they would all have the same information.

24   Q.       Well, didn't you say to him that your -- you will go

25   to the asylum office for reopening of his case?

1    A.    Yes.  I told him when the trial is over --

2    Q.    Right.

3    A.    -- that the files would be sent to the asylum office.

4    Q.    And you said that, did you not, after he denied that

5    his asylum application was false.  When you asked him whether

6    it was false, he said it wasn't.  And you said, did you not,

7    that it would go to the asylum office after the trial for

8    reopening?  That was the sequence of events.

9    A.    Yes.  I don't know if that was the exact sequence,

10   but --

11   Q.    Close enough?

12   A.    Close, yes.

13   Q.    All right.  Okay.  And Mr. Vorobiov came to see you,

14   and he was interested in the status of his 485 which he filed;

15   is that correct?

16   A.    No.

17   Q.    He didn't come to Sacramento?

18   A.    No, I went to Chicago and talked to him with his

19   attorney.

20   Q.    All right.  All right.  And you spoke to him

21   concerning his communications with Jagprit Sekhon; is that

22   right?

23   A.    I -- yeah, I spoke to him on a number of topics.  That

24   could have been one of the topics.

25   Q.    Right.  And he told you -- did he tell you -- in your

1  investigative report, did he tell you that he spoke to Jagprit

2  Sekhon in sign language?  Did he use those words?

3  A.     I don't think so.

4  Q.     Okay.  And he also told you that the interpreter who

5  was at his asylum hearing was at his asylum hearing for one

6  day.  He had a two-day asylum hearing, and his asylum

7  hearing -- the interpreter was there for one day; is that

8  correct?  Do you remember that?

9  A.     I'm sorry, I don't remember that.

10  Q.     Okay.  And he told --

11  A.     I thought it was both days.

12  Q.     No problem.  No problem.

13        In his case, he was ultimately allowed to leave the

14  country and come back.

15  A.     Yes, he was given a voluntary departure so that he

16  could be paroled back in.

17  Q.     Right.  He told you in his investigative report also

18  that he called or attempted to call a doctor in Romania or

19  Moldavia, a Dr. Ghidras.  Do you remember him telling you

20  that?

21  A.     Umm --

22  Q.     But he couldn't get ahold of him.  He called a doctor,

23  but he couldn't get ahold of him.

24        THE COURT:  Let the witness answer.

25        MR. STEPANIAN:  I'm sorry.  I just want to make it

1    clearer.

2         THE COURT:  Don't interrupt.  Just let the witness

3    answer, then ask the question.

4         MR. STEPANIAN:  No problem.

5         THE WITNESS:  Yes, I remember him saying that he tried

6    to call the doctor.

7    Q.    BY MR. STEPANIAN:  Okay.  All right.  And you recall

8    Cosmin -- I'm not going to go through all of these, but you

9    recall Cosmin Iacob, you sent the file to Phoenix; is that

10   correct?

11   A.    Yes.

12   Q.    And you testified on direct that you didn't speak to

13   anybody concerning Mr. Iacob.

14   A.    Yes, concerning the adjudication of his application.

15   Q.    Right.  And did you -- you didn't tell anybody that it

16   was your opinion that he filed a fraudulent I-589.

17   A.    No.

18   Q.    And you didn't tell anybody that his 485 was based on

19   an asylum claim, a granting of asylum.

20   A.    I thought it was -- it was based on his marriage to a

21   U.S. citizen.

22   Q.    He had two 485s that he filed; isn't that right?

23   A.    Yes.

24   Q.    He had one 485 which was filed based on an asylum

25   claim; is that correct?

1    A.      Correct.

2    Q.      And he had another 485 going at the same time for a

3    marriage, right?

4    A.      I believe he withdrew the asylum 485.

5    Q.      I'm saying -- pardon me.  But he filed a 485 for an

6    asylum claim; is that correct?

7    A.      Yes, that's correct.

8    Q.      And he filed -- at the same time that the 485 on the

9    asylum was pending, he filed, didn't adjudicate, but he filed

10   a 485 based upon his marriage; is that right?

11   A.      Yes.

12   Q.      And had both of them, both of them going at the same

13   time for a period of time.

14   A.      Yes.  That's not very unusual.  That happens a lot.

15   Q.      But it's frowned upon by the immigration office to

16   have two 589s going at the same time, isn't it?

17   A.      Two 485s going at the same time, yes, you would have

18   to withdraw one.  But what happens is the asylum 485 has a

19   waiting list.

20   Q.      Right.

21   A.      So when people apply for it, sometimes they don't

22   realize that there's a waiting list.  So that's why you see

23   that, where there's multiples.

24   Q.      Well, in this particular case, he had two going at one

25   time.  When the 485 the marriage was granted or he had his

1    interview, he withdrew his 485 that he did for asylum; is that

2    correct?

3    A.      At some point, yes, he withdrew the other one.

4    Q.      All right.  He ultimately got his green card --

5    A.      Yes.

6    Q.      -- didn't he?

7            All right.  Now, besides having the, quote, A files in

8    Sacramento, there were certain documents that you sent for

9    investigation during your investigation, you sent to various

10   places; is that correct?

11   A.      Umm --

12   Q.      Documents.

13   A.      Like the medical certificates?

14   Q.      Yes.

15   A.      Yes.

16   Q.      And you sent some medical certificates to Mr. Mates,

17   who is in Romania; is that right?

18   A.      Correct.

19   Q.      And you sent some medical certificates to India which

20   ended up in -- being investigated by Mr. Sharma and local

21   investigators there; is that correct?

22   A.      Well, there were two other agents helping me with this

23   investigation --

24   Q.      Right.

25   A.      -- Agent Morihara and Agent Roach, and they handled

1   that portion of it with the documents going to India.

2   Q.      All right.  At any rate, which was part of this

3   investigation, those documents went to various countries, one

4   to Romania which ended up with Mr. Mates, another one to India

5   which went with an agent and Mr. Sharma; is that right?

6   A.      Correct.

7   Q.      Okay.  There was also information that went to ICE

8   Agent Sexton, and he came and testified, and information was

9   sent to him; is that right?

10  A.      Yes, to the document laboratory.

11  Q.      And that was the lab, the forensic lab in -- someplace

12  back east --

13  A.      Correct.

14  Q.      -- is that right?

15  A.      Correct.

16  Q.      And also there was documents sent to the lab

17  concerning fingerprint analysis for the passports of Radu Vlad

18  and Beniamin Opris; is that correct?

19  A.      That's correct.

20  Q.      And those -- well, I'll just go back.

21          Those -- the first documents that were sent to India,

22  were there other documents besides medical certificates by the

23  way that were sent there?

24  A.      I can't remember every document.  I think it was

25  mostly medical documents, but there could have been others,

1    too.

2    Q.      Well, did you receive any reports concerning

3    interviews with people who had given affidavits or --

4    A.      Yes.  But I -- there was one affidavit, and it seemed

5    like it wasn't part of this case.  I think somebody added it

6    on in error.

7    Q.      But by and large, you sent medical reports to Mr.

8    Mates; is that right -- medical documents to Mr. Mates,

9    ultimately ended up with Mr. Mates; is that right?

10   A.      Yes.

11   Q.      Okay.  And you don't recall, do you not, whether or

12   not there was any other documents that were sent to him that

13   was pertinent to this investigation?

14   A.      Oh, yes, there was a church letter also.

15   Q.      Right.  There was a church letter also.

16           Anything else?

17   A.      I just --

18   Q.      Do you remember --

19   A.      I don't remember every single document.

20   Q.      Okay.  And how about in India, were there any other

21   documents that were sent besides the medical reports that were

22   testified here in this courtroom concerning Mr. Sharma's

23   activity?

24   A.      You mean besides medical documents?

25   Q.      Yeah.

1   A.      That was the one I was mentioning about the affidavit

2   which appeared that it wasn't related to this case.

3   Q.      Okay.  That's fine.  Besides that, though.

4   A.      No, not that I know of.

5   Q.      All right.  And the forensic document that was sent

6   to -- that was sent to Mr. Sexton, those were mainly the

7   stamps and the -- those kinds of things, the stamps and the --

8   and the notary.

9   A.      For Mr. Sexton, they had to be original documents.

10  Q.      Right.

11  A.      Correct.

12  Q.      You sent that to him?

13  A.      Yes.

14  Q.      Okay.  And also you sent -- to the Bureau of

15  Immigration and Customs Enforcement, you sent the fingerprints

16  analysis of the German passport for Radu Vlad and the German

17  passport of Beniamin Opris; is that correct?

18  A.      That's correct.

19  Q.      And you sent a copy of the fingerprint card of Jagprit

20  Singh; is that right?

21  A.      Jagprit Sekhon Singh, I mean, yes.

22  Q.      Yeah.  And they were processed -- and they were

23  processed for development of latent fingerprints, and they

24  were compared to known prints of Jagprit Singh; is that right?

25  A.      Yes.

1    Q.      Okay.

2    A.      Wasn't it Jagprit Sekhon?

3    Q.      I'm sorry.  I'm sorry.  You're exactly -- Jagprit

4    Sekhon, that's correct.  It's spelled incorrectly

5    interestingly.

6           And it turned out that -- the analysis of the forensic

7    document laboratory turned out that they -- the report

8    reflected that -- and the German passports, Exhibits 1 and 2,

9    were chemically processed for latent fingerprints and compared

10   to the known fingerprints of Jagprit Sekhon, and the results

11   of the examination were negative; is that correct?

12   A.      That's correct.

13   Q.      Okay.  Now, Ms. Webster, there was a -- I'm talking

14   now about Daniel Chisca for a moment.  Okay?

15   A.      Okay.

16   Q.      And in Daniel Chisca's use as an informant, there was

17   a source suitability assessment that was created; is that

18   correct?

19   A.      Yes.

20   Q.      And this -- why don't you explain to us, please, what

21   a source, confident source suitability assessment is.

22   A.      Is it the supervisor assessment that you're referring

23   to?

24   Q.      Yeah.  It goes through you as group supervisor and --

25   A.      Oh, okay, that one.

1    Q.      This is in 2/27/09.

2    A.      Oh, okay.

3    Q.      All right.  You're familiar with that document, right?

4    A.      Yes.

5    Q.      Let me ask you some questions about it, it would be

6    easier, I guess.

7            And it states in here that the source appears to be

8    reliable and truthful.  And they ask what is the CI's

9    motivation.  That's one of the questions they ask; is that

10   correct?

11   A.      Correct.

12   Q.      And one of the motivations you have is immigration

13   status and monetary; is that correct?

14   A.      Correct.

15   Q.      Now, the monetary aspect of it you testified was -- I

16   don't know, what was it -- $400, $200?

17   A.      Umm --

18   Q.      What was it that he got for --

19   A.      For the undercover operation, I'm pretty sure it was

20   400, but I'd have to look at the report to make sure.

21           And then --

22   Q.      That's right.

23   A.      -- for other work he did, it was 800, so a total of

24   1,200.

25   Q.      Okay.  All right.  And that other work was going

1  through the tapes and listening to the tapes and giving you

2  information concerning it; is that right?  That was the other

3  work that you mentioned?

4  A.      Right.  He had to make a couple trips here.

5  Q.      Right.  And the monetary aspect was one consideration

6  because he did get his plane flights paid for to come out

7  here; is that right?

8  A.      Well, yes.  We were asking him to come, so naturally

9  we would have to pay for that.

10  Q.      And he received a per diem for hotel and --

11  A.      Yes, so he could have food and hotel, correct.

12  Q.      And the immigration status, it's fair to say that the

13  immigration status is -- was more important to him than the

14  money that he was making.  Is that a fair statement?

15  A.      Actually he only talked about money, he didn't really

16  mention immigration.  But that was my -- that was what my

17  feeling was, to put the immigration status on there.

18  Q.      Well, didn't he ask you for a green card as soon as he

19  got out here?  That was the first thing he said to you, right?

20  A.      Well, that was in 2003, and this one was 2009.  So --

21  Q.      Okay.  When he came -- when he came to you to see you,

22  this is 2009, he still has immigration status as one of his

23  motivations.  It was his motivation in his source suitability

24  assessment; is that right?

25  A.      Right, that was my assessment.

1   Q.      Yeah.  And in 2003, the first thing he asked you was

2   for a green card or one of the early requests; is that right?

3   A.      Right, that's before he had a green card.

4   Q.      Right.  And the fact of the matter is is that he asked

5   you that, and he knew that he wasn't going to get a green card

6   from Mr. Harwood, Agent Harwood.

7   A.      I don't know if he knew that.

8   Q.      Well, it's a fact, is it not, that Agent Harwood was

9   miffed at Chisca because he asked you for a green card and

10  went behind his back to ask for one?

11  A.      Yes.

12  Q.      You heard him testify to that.

13  A.      But I don't know if Mr. Chisca thought that he was not

14  going to give him one or if he eventually would do something.

15  Because he kept asking so it seemed like he thought he was

16  going to get a green card.

17  Q.      Right.  He kept asking for a green card because he

18  wanted a green card and that was a motivation for him; is that

19  right?

20  A.      That's -- yes, back in 2003.

21  Q.      Yeah.  Well, in 1997 he got married and he was married

22  for less than a year, and he filed a 485 and ultimately that

23  was withdrawn after he left his wife or she left him; is that

24  right?  And that was way back in '97.

25  A.      Yes, that's right.

1  Q.      Okay.  So -- and he had filed this previous 485, and

2  he withdrew it in 1997.  And did you investigate that

3  marriage?

4  A.      The 1997 marriage?

5  Q.      Right.

6  A.      No.

7  Q.      You have adjudicated marriage status; is that right?

8  A.      Well, this is something that took place back east and

9  too far away for me to investigate.

10  Q.      Well, did -- well, when I'm saying investigate, did

11  you get any information from Agent Harwood about any

12  investigation concerning that 1997 marriage?

13  A.      No.

14  Q.      Okay.  And he was married, he got married again in

15  March of 2003.  Did you investigate that marriage to the

16  Canadian woman?

17  A.      I was unaware of that marriage.

18  Q.      He never told you?

19  A.      No.

20  Q.      He never put that in the I-751 or the -- or any other

21  document when he was going for removal -- to remove the

22  conditions of his 485; is that right?

23  A.      That's right.

24  Q.      Yeah.  And the fact of the matter is when you don't

25  put that into a document, it's a material misrepresentation,

1    and you can get in a lot of trouble for that; is that right?

2    A.      I'm not sure if this is material because it wouldn't

3    have affected his status.  But it's an omission that, yes, it

4    should have been on there.

5    Q.      Right.

6            And the fact of the matter is after that -- after that

7    marriage in March of 2003, he was divorced and he got

8    remarried about three months later.  Did you in any way

9    investigate that divorce and that fairly quick marriage 60

10   days or 90 days after he got divorced?

11   A.      I wasn't involved in -- with Mr. Chisca.  After our

12   undercover operation was finished in January of '04, I really

13   didn't have much communication with him besides renewing his

14   parole.  But, like, his marriages and divorces, I wasn't -- I

15   didn't know -- for example, I didn't know about his second

16   wife or his divorce.

17   Q.      But didn't -- but isn't sham marriages one of --

18   probably one of the worst things that a person could do as far

19   as the immigration service is concerned?  It's one of the real

20   taboos as far as being able to file 485s or adjustments of

21   status or any of that nature?  Sham marriages are bad, aren't

22   they?

23   A.      I would say all immigration fraud is equally bad.

24   Q.      But isn't sham marriages and posing as a United

25   States -- United States citizen, isn't that one of the most

1   severe penalties that -- received which would be permanent,

2   permanent deportation if you are caught doing that, those two

3   matters?

4   A.      Are you talking about the --

5   Q.      Talking about --

6   A.      -- Section 204(c)?

7   Q.      I don't know if it's 204(c).  But if you're caught

8   with a sham marriage or posing as a United States citizen, you

9   are permanently removed from the United States of America as

10  far as getting immigration status here.  That's true, isn't

11  it?

12  A.      Not exactly.  There's a 204(c), which is kind of like

13  a bar, but it doesn't -- it's not a deportation.  That's a

14  whole nother proceeding.

15  Q.      That's a bar, you're barred to come back here; is that

16  right?

17  A.      There's some limitations to it.  But then there's a

18  whole nother proceeding, which is deportation.  Then you go

19  see a judge and you can request asylum and appeal it.

20  Q.      Okay.  Even if you have a sham marriage?

21  A.      Yes.

22  Q.      Even if you have a U.S. -- even if you have a -- pose

23  as a United States citizen?

24  A.      You can get asylum, yes, if -- if you have posed as a

25  United States citizen.

1   Q.      How about if it's a sham marriage?  Can you get

2   status, 485 status or any kind of adjudication for a green

3   card if you are accused and are convicted or have a sham

4   marriage?

5   A.      Based on?  Because there -- immigration law is so

6   complicated, so there's always different ways --

7   Q.      There's always an out you're saying.

8   A.      -- to get -- well, for example, asylum.  If you ask

9   the immigration judge for asylum, and you have, like, the

10  immigration fraud that you mentioned, you could still possibly

11  get asylum.

12  Q.      Okay.  Let me ask you this.  But in those kinds of

13  situations, if you adjudicate a -- or not adjudicate, I'm

14  sorry -- but if you investigate and conclude that this person

15  had a sham marriage, and you make a recommendation in the

16  file, this has heavy weight as far as a person's ability to

17  get immigration relief; is that true?

18  A.      Well, there's -- well, the section I was mentioning,

19  204(c), yes, that exists.  But you have to have a finding and

20  it has to be, like, for example, the U.S. citizen provided a

21  sworn statement confirming that it's a fraud marriage or

22  something to that effect.  You can't just guess that it's a

23  fraud marriage and get a sham marriage bar.

24  Q.      I'm not talking about guessing.  I'm talking about

25  investigating, making a determination and filing a -- a

1   recommendation from an investigation.  I'm not talking about

2   guesswork.

3          I'm talking about if it is determined through

4   investigation, if it is determined through investigation and

5   documentation and communication that a recommendation of a

6   sham marriage is a bar.  I'm not talking about guessing.  I'm

7   talking about a successful investigation by someone like

8   yourself --

9   A.      Uh-huh.

10  Q.      -- who's adjudicated these matters in the past.

11  A.      The only way that I would be able to get -- well, that

12  I've seen in the past where that bar is if the U.S. citizen

13  provides a sworn statement even as part of an investigation.

14  Q.      Okay.  The person who the person married?

15  A.      Correct.

16  Q.      Okay.  And you've gotten sworn statements like that

17  before.

18  A.      Yes.

19  Q.      Right.  And that -- when you get a sworn statement,

20  which is part of your investigation, that would go in the

21  file.

22  A.      Yes.

23  Q.      And then it would be a bar; is that right?

24  A.      Well, then CIS, Citizenship and Immigration Services,

25  would determine if it fits that section of law, 204(c).

1   Q.     All right.  All right.  The investigation, it fits

2  that section of law, it is determined that it is a sham

3  marriage, then that's a bar; is that correct?

4  A.     If they determine that.

5  Q.     Right.  Based on your investigation as an

6  investigator.

7  A.     Well, it would be based on whatever happens in that

8  situation.

9  Q.     I understand.

10      Okay.  Because you've adjudicated sham marriages, so

11  you know the procedures in sham marriages, right?

12      MR. WAGNER:  Objection to adjudication, the term

13  "adjudication."

14      MR. STEPANIAN:  I'm sorry.

15      THE COURT:  Counsel, these questions are getting so

16  complicated.

17      MR. STEPANIAN:  Okay.  No problem.

18      THE COURT:  No, it's not okay.  Just ask questions.

19  Don't comment on your questions or the answers.

20      MR. STEPANIAN:  Okay.  All right.

21      THE COURT:  Me, too.  All right?  Don't comment, just

22  ask questions.  You keep commenting on answers that the

23  witness gives.  Don't comment.  Just ask a question, she

24  answers, then you ask another question.

25      MR. STEPANIAN:  I'm hoping to ask questions, Your

1    Honor.

2            THE COURT:  All right.  That's what I want you to do.

3            MR. STEPANIAN:  Okay.

4    Q.     When Daniel Chisca came out to be an informant under

5    your auspices, he was given a telephone for him to use; is

6    that correct?

7    A.     Yes.

8    Q.     All right.  He also had his own telephone.

9    A.     Yes, I assume so.

10   Q.     Well, you had difficulty getting in touch with him

11   over a period of time while he was here or while he was under

12   your -- while he was doing the undercover investigation

13   prior -- strike that.

14          He was -- you had difficulty reaching him during the

15   course of this investigation in Sacramento; is that right?

16   A.     Yes.  He didn't turn the phone on.

17   Q.     Right.  And you were upset with the fact that you

18   couldn't get in touch with him.

19   A.     Yes, I wasn't happy that he didn't turn on the phone.

20   Q.     And you mentioned that to Inspector Harwood; is that

21   right?

22   A.     Yes.

23   Q.     Okay.  And you had an ability and Agent Harwood had an

24   ability to tape telephone calls that he might make.

25   A.     Yes.

1    Q.      And this machinery could be put on a phone so when

2    someone makes a telephone call, it could be recorded; is that

3    right?

4    A.      Yes.

5    Q.      Now, that was not done in this particular case, was

6    it?

7    A.      I think we gave him that machine.  He came here in

8    early September.

9    Q.      Right.

10   A.      And, you know, I don't remember exactly, but I'm

11   pretty sure we gave him that machine.  And then when he came

12   back in mid September for the first intake meeting, then I had

13   to get the equipment back from him, and my supervisor wouldn't

14   allow him to take it back because they needed it for another

15   case.

16   Q.      Well, the fact of the matter is that he made -- he

17   made telephone calls which were not monitored or taped; is

18   that right?

19   A.      He did not make any.  I think he received them.

20   Q.      He received them.

21           And the only information that you received as to the

22   conversation is what he told you; is that correct?

23   A.      Yes.

24   Q.      And how many phone calls did he receive that he told

25   you that he received?  How many of those?

1  A.      Oh, I don't remember, but they were really short calls

2  regarding his prep session appointment, something like that.

3  Q.      This is what he said?

4  A.      Yes.

5  Q.      Right.  And you have no way of knowing except what he

6  said concerning the length and the -- the length and how many

7  phone calls he received; is that correct?

8  A.      Yes.

9  Q.      And you don't know whether or not he made any phone

10 calls except the phone calls that he tells you about; is that

11 right?

12 A.      Yes.

13 Q.      Okay.  And there was an issue concerning a mailbox.

14 This was the mailbox in Atlanta.  Do you recall testimony

15 about that?

16 A.      Yes.

17 Q.      And there was testimony by Agent Harwood about control

18 of that box; is that right?

19 A.      Yes.

20 Q.      And there was testimony concerning who had control of

21 that box; is that right?

22 A.      Yes.

23 Q.      Agent Harwood said that he had no control over the

24 box, but that the material that ended up in that box was given

25 to him by Mr. Chisca.  Do you recall his testimony?

1    A.       Yes, I think he said that.

2    Q.       Yeah.  And Mr. Chisca said that he didn't take things

3    out of the box, but Agent Harwood took it out of the box.  Do

4    you remember him testifying to that?

5    A.       I guess.  Not detailed, but --

6    Q.       All right.  And you mentioned that you can't -- you

7    mentioned that you can't adjudicate claims of asylum, but --

8    because you don't have any training as an adjudicating asylum

9    officer or a judge; is that correct?

10   A.       Correct.

11   Q.       And the asylum officer or the officer -- the asylum

12   person who conducts interviews, he is trained to conduct these

13   interviews.  This is what the evidence showed; is that

14   correct?

15   A.       Yes.  They go to training.  Asylum officers receive

16   specialized training.

17   Q.       They go to training.

18            And this period of time of training is an evaluation

19   of a person's asylum claim.  This is what they're taught to

20   do; is that right?

21            MR. WAGNER:  Object --

22            THE WITNESS:  I don't have --

23            MR. WAGNER:  Object to the form of the question, Your

24   Honor.

25            THE COURT:  Sustained.

1                MR. STEPANIAN:  All right.

2     Q.      The asylum officer conducts an interview with a

3     potential asylee, is that how it works?

4     A.      Yes.

5     Q.      And the asylee fills out a 589 or fills out -- with

6     the assistance of a lawyer or another person, fills out under

7     oath an asylum application, a 589.

8     A.      Correct.

9     Q.      And that 589 is filed with the CIS.

10    A.      Yes.

11    Q.      Okay.  And this 589 is then -- after it's filed, there

12    is an asylum interview which is scheduled; is that correct?

13    A.      Yes.

14    Q.      And at this asylum interview, an asylum officer

15    interviews the person, they could have a lawyer or they don't

16    have to have a lawyer.  Is this correct?

17    A.      Correct.

18    Q.      And that asylum interview in many respects asks

19    questions to determine whether or not the person was

20    persecuted in the past; is that correct?

21    A.      I'm not -- I don't really have that much knowledge on

22    the details of asylum training, how they --

23    Q.      Okay.

24    A.      -- what questions they ask.

25    Q.      Well -- all right.  Now, do you know whether or not

1  the asylum officer takes into consideration in making a

2  determination his experience with asylum applicants?

3  A.     I don't know.

4  Q.     All right.  Do you know whether or not an asylum

5  officer uses country condition at the time he's making a

6  determination of asylum for an individual?

7  A.     Yes, I know that.  They do check on country

8  conditions.

9  Q.     And the country conditions are determined on a

10  year-by-year basis; is that correct?

11  A.     Yes.

12  Q.     And they use, in their determination of the validity

13  of claims, the information that they get on a yearly basis

14  from various sources, right?

15  A.     I assume so.  I'm not positive --

16  Q.     Okay.

17  A.     -- on how they do it.

18  Q.     And the documents that they use are from Amnesty

19  International or various other State Department material that

20  they get as up-to-date information as to country conditions;

21  is that correct?

22  A.     I was only aware of State Department country

23  conditions publications.

24  Q.     Okay.  Well, these are public -- these are

25  publications that essentially tell or inform an asylum officer

1    as to what the conditions are at the time that the person is

2    trying to get asylum; is that correct?

3    A.       Yes.

4    Q.       And country conditions vary from year to year

5    depending upon who's in control and who's out of control as

6    far as the governments are concerned.  This is what country

7    conditions are.

8    A.       I don't really have experience in this area, so --

9    Q.       Okay.  All right.  And before an asylum judge, as you

10   testified before, the person is put under oath like he was put

11   under oath before the asylum officer; is that correct?

12   A.       Yes.

13   Q.       And he's put under oath, the person is put under oath,

14   signs under oath when he mails in his 589.

15   A.       They're put under oath before mailing?

16   Q.       He signs an oath.  He signs an oath.

17   A.       The form is signed.  Oftentimes it's not translated to

18   their language.

19   Q.       Okay.  All right.  And when they go before the judge,

20   they take an oath, the immigration judge.

21   A.       Correct.

22   Q.       And at that hearing there's a -- there's a

23   representative of the government --

24   A.       Yes.

25   Q.       -- an attorney.

1    A.      Yes.

2    Q.      And there's the person who's trying to get asylum, and

3    there is a judge; is that correct?

4    A.      Correct.

5    Q.      And the judge can ask questions of the person to

6    determine the validity of his claim.

7    A.      I've never been in an asylum --

8    Q.      All right.

9    A.      -- hearing with an immigration judge, so I don't know

10   if the judge actually asks questions.

11   Q.      Okay.

12           THE COURT:  Would this be a good time to break,

13   counsel?

14           MR. STEPANIAN:  Fine.  Thank you, Your Honor.

15           THE COURT:  Recess for 15 minutes.

16           (Recess taken.)

17           THE COURT:  Proceed, Mr. Stepanian.

18           MR. STEPANIAN:  Yes, Your Honor.

19   Q.      Agent Webster, I'm going to go to the charts now and

20   go over a few of them to get a sense of what you testified to

21   previously.

22           Would you please go to 75.2.  That's the chart that I

23   brought up there.  And would you look at the front page that

24   the government exhibit number is on, please.

25   A.      Yes.  Okay.

1   Q.      And this is the one where a large number of police

2   raided the home in the middle of the night?

3   A.      Yes.

4   Q.      There are some asylum applications with the A numbers

5   next to them on the front page.

6   A.      Yes.

7   Q.      Now, how many of those applications do you know have

8   been granted either by an asylum officer or asylum judge or on

9   appeal?

10  A.      I haven't checked that information so I don't know.

11  Q.      You don't determine as you sit there now how many of

12  these were granted?

13  A.      No, I don't know.

14  Q.      Okay.  Would you please go to JSS 589 attachment.

15  A.      Okay.

16          MR. DRATMAN:  Exhibit number, please.

17          MR. STEPANIAN:  I'm sorry.  Exhibit 75.2, I believe

18  that would be A.  Or 75.2.  That's the pack of the 589s.

19          THE WITNESS:  Yes, okay.

20          MR. STEPANIAN:  And the first one -- I'm just picking

21  the ones you made reference to in your direct examination.

22          JSS, I believe that's in evidence, Your Honor.  May I

23  publish?

24          THE COURT:  You may.

25          MR. STEPANIAN:  Thank you.

1   Q.      Please go to page 4.

2   A.      Okay.

3   Q.      Ms. Webster, and I believe you read a section that

4   began three days later, and you read a line about the 20

5   policemen who raided my home; is that correct?

6   A.      In court?

7   Q.      Yes.

8   A.      I'm not sure if it was this one or a different one.

9   Q.      Well, this is JSS.

10  A.      Okay.

11  Q.      Do you recall reading it?

12          And you also -- you read two lines, and the next line

13  you read was the statement that starts, Next I was transported

14  to the Phagwara police station; is that correct?

15  A.      Yes, I think so.

16  Q.      Okay.  I notice that there's -- at the beginning of

17  paragraph 2 and a line on the beginning of paragraph 5, those

18  are the two lines that you read.  But there are lines, there

19  are a portion in between those two lines; is that correct?

20          MR. WAGNER:  I think she read the one for BSS,

21  counsel.  I think that the one she read in court was BSS.

22          MR. STEPANIAN:  Okay.

23          MR. WAGNER:  I don't mean to interrupt your question,

24  I just want to --

25          THE COURT:  If there is a correction, this is the time

1    to do it.

2              MR. STEPANIAN:  That's no problem.

3    Q.       I'm going to show you BSS, and on page 3.

4    A.       Okay.

5    Q.       Do you have that?

6    A.       Yes.

7    Q.       And you read on the fourth paragraph, Approximately a

8    dozen policemen raided my home in the early hours of the

9    morning.  Do you see that?

10   A.       Yes.

11   Q.       And then you read another line.  I was taken into the

12   interrogation room and presented before the station house

13   officer.  You remember reading that?

14   A.       Yes.

15   Q.       But there's a paragraph in between which states -- if

16   you could, would you please read that.  I was approximately

17   two officer, would you read that, please.

18   A.       Can you show me where to start.

19   Q.       Approximately a dozen policemen raided my home.

20   A.       Start with approximately?

21   Q.       Yeah, that's what you began with when you testified,

22   approximately a dozen policemen raided my home.  You recall

23   saying that?

24   A.       Yes.

25   Q.       Okay.

1    A.      Do you want me to read the paragraph?

2    Q.      Yes, please.

3    A.      Okay.  Approximately a dozen policemen raided my home

4    in the early hours of the morning.  I was forced out of bed,

5    made to lie face down on the ground.  My hands were tied

6    behind my back, and I was placed into the police Jeep.  I was

7    transported to the Nur Mahal police station.  While I was

8    being arrested, the police were cursing at me for

9    participating in the federation and for campaigning in the

10   boycott.

11   Q.      All right.  And would you read the next paragraph,

12   please.

13   A.      At the police station, I was taken into the

14   interrogation room and presented before the station house

15   officer.  He proceeded to interrogate me regarding my

16   federation membership, my activities, the federation members

17   under whom I worked, if I held any leadership position within

18   the federation, and if I maintained any links to Sikh

19   militants.

20   Q.      Okay.  Now, you read two lines in your direct

21   examination which was separated by --

22           THE COURT:  Counsel, could you move that paper so the

23   jury can see what you're referring to.

24           MR. STEPANIAN:  Yes, Your Honor.

25   Q.      You read two lines, which was the line that started

1    approximately and the line that started I was taken.  There

2    are -- there's a whole paragraph in between; is that correct?

3    A.    Yes.

4    Q.    And those two lines are part of an asylum application

5    that was filed under oath; is that correct?

6    A.    Yes.

7    Q.    It's a narration.

8    A.    Yes, this is the attachment to the asylum application.

9    Q.    Okay.  And that is -- this document is seven pages

10   long; is that correct?

11   A.    Yes.

12   Q.    And the rest of the document is an explanation of why

13   the people were arrested, what went on in their lives which

14   was part of a claim that was presented to an asylum officer;

15   is that correct?

16   A.    It has to do with another arrest and beating.

17   Q.    Right.

18         That's in there; isn't that correct?

19   A.    After the part that I just read, yes.

20   Q.    Yes.  Okay.

21         Please may I call your attention to Exhibit 75.3.  Do

22   you have that in front of you?

23   A.    Yes.

24   Q.    There's a face sheet which has asylum applicants and

25   their A number next to it; is that correct?

1   A.       Correct.

2   Q.       And this is an officer and two or three policemen

3   approached the applicant, and the officer slapped the

4   applicant across the face.  Do you see that?

5   A.       Yes.

6   Q.       Now, of those -- of those asylum applicants, do you

7   know how many of those where asylum was granted?

8   A.       No, I don't know that.

9   Q.       That would be in their A file; is that right?

10  A.       Yes, but I didn't memorize that number.

11  Q.       I'm just asking it would be in the A file, correct?

12  A.       Correct.

13  Q.       And which one of these asylum applicants did you read

14  on your direct examination, AE, CS or PS?

15  A.       I think I summarized them.

16  Q.       Okay.  Which one did you read or which one did you

17  summarize?

18  A.       Umm, AE.

19  Q.       All right.

20  A.       I can't remember actually.

21  Q.       Okay.  That's okay.  Let's look at AE, please.

22  A.       CS I think was the other one.

23  Q.       Okay.  All right.  Let's look at AE.

24           May I publish that, Your Honor?

25           THE COURT:  You may.

1          MR. STEPANIAN:  I believe it's in evidence.

2          THE COURT:  You may.

3     Q.    BY MR. STEPANIAN:  Now, would you look at the asylum

4     application on page 5, please.

5     A.    Okay.

6     Q.    And you made reference to page 5, the last -- the last

7     paragraph starting on October 2nd.  Do you see that?

8     A.    Yes.

9     Q.    Okay.  And that makes reference to three police

10    officers came to my home; is that correct?

11    A.    Correct.

12    Q.    And in the next paragraph it says, I was slapped

13    across the face; is that right?

14    A.    Yes.

15    Q.    But before -- in between three police came to my home

16    and slapped across the face was a paragraph concerning what

17    the police spoke to or told the applicant; is that correct?

18    A.    Yes.

19    Q.    And that statement was that the three police came to

20    my home, forced their way inside, cursed me as a lying and

21    stupid repentant and arrested me.  They were yelling at me for

22    going to the county officials and stated that they were going

23    to teach me a good lesson for complaining about the police at

24    the police station.

25          You see that, correct?

1    A.      Yes, that's on there.

2    Q.      And you took, I believe -- about the slaps applicant

3    across the face is in the next paragraph where it says, I

4    objected, but I was slapped across the face, arrested and

5    taken to the police station; is that correct?

6    A.      Yes.

7    Q.      And in the next paragraph there was a reference of

8    slapped me across the face on the top of page 6.

9            And in that -- in that situation, it says, in the

10   middle of that paragraph, slapped me across the face, but

11   there's a statement before that concerning him being thrown

12   into a cell and three police returning and screaming at him.

13   Do you see that?

14   A.      Yes.

15   Q.      Okay.  Now, this document is seven pages long.  And

16   the reference that you made the similarities is found on page

17   5, that line where three police came to my home, and the last

18   paragraph on 5, and at the police station, the top paragraph

19   on page 6.  Do you recall that?

20   A.      Yes.

21   Q.      And this is a seven-page asylum claim; is that

22   correct?

23   A.      Correct.

24   Q.      All right.  May I call your attention, please, to

25   75.4.

1    A.        Okay.

2    Q.        All right.  This is a chart that says the applicant

3    was taken to the police station, presented before an officer,

4    the officer then slapped the applicant and screamed insults at

5    the applicant; is that correct?

6    A.        Yes.

7    Q.        And in that would you please tell me, pick any one you

8    wish of one that you spoke about on your direct examination.

9    I believe that you spoke about -- there were five that you

10   spoke about.  Would you tell me which one you spoke about on

11   direct, any one.

12   A.        MS, I believe.

13   Q.        Okay.  Whatever is comfortable for you.

14             Is it DS or MS?

15   A.        MS.

16   Q.        All right.  I have MS.  Do you have that in front of

17   you?

18   A.        I'm trying to find it.

19   Q.        No problem.

20   A.        Okay.  I have it.

21   Q.        This is an applicant that his name is MS.  And this --

22   I'm pointing to 31.3, which is a government exhibit which was

23   admitted into evidence.  Do you see that?

24   A.        Yes.

25   Q.        Okay.  Please turn to page 4.

1        You read, did you not, at the police station I was

2   presented before the inspector.  Do you recall reading that?

3   A.      Yes.

4   Q.      And what happens here, you read that and you said at

5   the police station you were presented before an inspector, the

6   officer asked me if I'm one of the men that had complained to

7   the officer.  And you continued that paragraph, and then you

8   read slapped me across the face; is that correct?

9   A.      Yes.

10  Q.      But there is a paragraph in between the first sentence

11  and slapped me across the face; is that correct?

12  A.      Yes.

13  Q.      And that paragraph says, The officer asked if I was

14  one of the men that had complained about the officer, and I

15  mentioned that it was, and the officer asked me if I wanted to

16  proceed with my complaint.  And you go on to say, it goes on

17  to say that it slapped me across the face; is that correct?

18  A.      Yes, in the next paragraph.

19  Q.      That's right.

20  A.      Uh-huh.

21  Q.      And that was at the police station, and that was one

22  paragraph of a seven-page document; is that correct?

23  A.      Yes, two.

24  Q.      You testified that you did not -- you did not know or

25  had not read, I could be wrong, about country conditions in

1  India.  You testified that you were not aware of that; is that

2  correct?

3  A.      That's correct.

4  Q.      And you do not know what the basis of -- much of the

5  conduct that you saw by police officers on page 4 of Exhibit

6  31.3; is that correct?

7  A.      Yes.  I did not use country conditions as part of this

8  chart.

9  Q.      Okay.  And you also, if you're -- if I'm incorrect,

10  please help me.  Do you know whether or not any of these

11  people have been granted asylum?

12  A.      I'm pretty sure some of them have.

13  Q.      Okay.  How many have been granted asylum?

14  A.      I couldn't tell you right now.

15  Q.      Okay.  You have the wherewithal to find that out; is

16  that correct?

17  A.      Yes, I could go check --

18  Q.      Okay.

19  A.      -- if you want a specific number.

20  Q.      All right.  Well, we'll see if we need that, and maybe

21  your memory will suffice.

22         Did you also speak on DS?  That's 7.3.

23  A.      Are we on a different exhibit?

24  Q.      Yes.  We are on 74.2, Government's Exhibit 74.2 and in

25  particular 7.3.

1    A.       Would you -- do you mean 75.5?

2             MR. WAGNER:  I think it's actually 75.4.

3             THE WITNESS:  Oh, that's the one that I have up here.

4             MR. STEPANIAN:  Okay.  Yeah.

5             THE WITNESS:  We're still on this one?

6             MR. STEPANIAN:  We'll go on.  We'll go on, that's

7    fine.  We'll go on.

8    Q.       Calling your attention to 75.5.

9    A.       Okay.

10   Q.       75.5 is 35 asylum applicants and their narrations.  Do

11   you see that?

12   A.       Yes.

13   Q.       And that was the applicant was beaten unconscious at

14   the police station; when he regained consciousness, he or she

15   was lying in the cell; the police return, beat him or her

16   again until he or she lost consciousness again.

17            You recall testifying to that; is that correct?

18   A.       Correct.

19   Q.       All right.  And there are 35 applicants on this -- in

20   this package of 75.5.  You see that?

21   A.       Yes.

22   Q.       Okay.  Now, how many of those do you know have been

23   granted asylum?

24   A.       I can't tell you right here the number.  I'd have to

25   look --

1    Q.      Were some of them granted asylum?

2    A.      I'm sure that some of them were, yes.

3    Q.      Okay.  Now, would you please choose any one you wish

4    that you testified to on your direct examination.

5    A.      PB.

6    Q.      PB.  PC?

7    A.      PB.  Or we could do PC, it doesn't matter.

8    Q.      Okay.  That would be -- 60.2 as a government exhibit

9    is PC; is that correct?

10   A.      Yes.

11   Q.      Okay.  I'm calling your attention, please, to line 6

12   of the asylum narrative.  Do you have that?

13   A.      What page are you on?

14   Q.      I'm sorry?

15   A.      What page is that?

16   Q.      Page 6.

17   A.      Oh, page 6.  Okay.

18           Okay.

19   Q.      Now you read on direct examination the top of page 6

20   which began, At the station I was thrown into a cell, and two

21   hours later policemen arrested me.  Do you recall that?

22   A.      Yes.

23   Q.      And you also stated I lost consciousness, correct?

24   A.      Correct.

25   Q.      Then you go down and then you read, Policemen then

1   beat me with batons until I lost consciousness, correct?

2   A.      I think he regains consciousness.

3   Q.      I'm sorry.  Well, I'm looking at the paragraph where

4   it says, Police then beat me with their batons until I lost

5   consciousness.  Do you see that?

6   A.      Yes.

7   Q.      That's what you mentioned in your statement on direct;

8   is that right?

9   A.      Correct.

10  Q.      Okay.  Now, there is a substantial amount of

11  information, three paragraphs between those two lines; is that

12  correct?

13  A.      Well, I did mention that he regained consciousness and

14  he was in the cell --

15  Q.      Okay.

16  A.      -- and then beaten unconscious again.

17  Q.      All right.  Did you read that or did you just go

18  through mentioning the consciousness and unconscious issue?

19  Did you read that?

20  A.      I think on this one we summarized it, and we read the

21  last two charts.

22  Q.      Okay.  Well, why don't you just quickly read that so

23  that we can get the context of which those statements were

24  made.

25  A.      Okay.  Which -- where do you want me to start?

1  Q.      Well, you mentioned at the station that he lost

2  consciousness.  Police then beat me with batons until I lost

3  consciousness.  You don't have to read it.  But generally

4  speaking from at the station down to policemen beat me, there

5  is a statement about what happened at the police station; is

6  that correct?

7  A.      Yes.  It looks like he's getting slapped and insults.

8  Q.      Right.  And that statement is three paragraphs, four

9  or five paragraphs, two of which were quite short, in a

10 seven-page document; is that correct?

11 A.      Correct.

12 Q.      Now, do you know whether or not this person that you

13 just testified to received an asylum grant?  That particular

14 person.

15 A.      I don't know.

16 Q.      You spoke about pairs of documentation; is that

17 correct?

18 A.      Correct.

19 Q.      And these pairs were Romanian pairs and Nepalese and

20 Fijian pairs; is that correct?

21 A.      Correct.

22 Q.      And on the front of that document, it states that

23 these are similar and exact wording replicated in portions of

24 the 589 narrative.  That would be 75.6.

25 A.      Okay.  Yes.

1    Q.      And there are initials of applicants and their A

2    number; is that correct?

3    A.      Yes.

4    Q.      And you could identify these people from the A number

5    that you have in their -- their file; is that correct?  You

6    could find out who these people are.

7    A.      Yes.

8    Q.      Okay.  Now of these people, could you tell me, if you

9    recall, how many of them received an asylum grant?

10   A.      Again, I don't know.  I would have to check because I

11   couldn't remember that number.

12   Q.      Okay.  All right.  I'm calling your attention, please,

13   to BS and another pair which doesn't have a designation on it,

14   but it's, I believe -- well, let me get one that does, one

15   that's a little clearer.

16           Would you look at IP, please.  Do you have it?

17   A.      Yes, I have it here.

18   Q.      Okay.  And along with IP is IV; is that correct?

19   A.      Yes.

20   Q.      Do you know whether or not any of those was --

21   received an asylum grant?

22   A.      I don't know.

23   Q.      Okay.  I'm showing you IP, page 3.  Next to it I'm

24   going to show you IV.

25           Oh, I guess I'll have to do it -- now, do you recall

1    which portion of this that you read?

2    A.      Yes.

3    Q.      That would be on page 4.

4    A.      For IP, I think it's on page 3.

5    Q.      Okay.

6    A.      For IV, page 4.

7    Q.      Right.

8            IV would be page 4; is that correct?

9    A.      Correct.

10   Q.      And you mentioned -- which portion did you read?

11   A.      Which one?

12   Q.      On IP.

13   A.      It was on page 3.

14   Q.      Okay.  All right.

15   A.      And it was this paragraph, I was arrested, and the

16   following paragraph.

17   Q.      Okay.

18   A.      And I think maybe the one after that, too.

19   Q.      Did you -- did you read the second paragraph?  That is

20   the paragraph that begins, I was transported to the Baia Mare

21   police station?

22   A.      I don't think we went to that paragraph.

23   Q.      Okay.  You say this was the group of documents that

24   were the exact language; is that correct?

25   A.      Well, at the -- very similar language and the

1    paragraphs that we showed.

2    Q.     This was under oath, these documents, by the

3    applicant; is that correct?  These were signed, these 589

4    forms they were under oath?

5    A.     They took an oath at the asylum interview.

6    Q.     Well, when they file a 589, isn't there an oath

7    attached to the 589 that they are -- they are attesting to

8    this document under oath?

9    A.     Yes.  But what I saw a lot of times is that people

10   only got the back page, and they didn't have it translated.

11          So --

12   Q.     Okay.

13   A.     -- I don't know if they were -- if they --

14   Q.     In this particular case, do you know whether the

15   person read this document?

16   A.     No, I don't know that.

17   Q.     Okay.  Now, many of the documents that were sent, the

18   testimony is here, of the persons that testified here, they

19   received their oath in their native language; is that

20   correct -- they received the 589s in their native language; is

21   that correct?

22   A.     Yes, this -- the asylum story, yes.

23   Q.     Yeah.  And some were Romanian, some were Indian; is

24   that right?

25   A.     Yes.  I believe the Indians received it in English.

1    Q.      Okay.  Now, in this case, you read both paragraphs or

2    you made a reference to the fact that this was the same

3    language as the other one, the other pair; is that correct?

4    Same or -- what were the exact words that you used?

5    A.      Umm --

6    Q.      Let's take a look at that.

7    A.      Similar or exact wording replicated in portions of the

8    589 narrative.

9    Q.      Okay.

10   A.      And those were the portions that we talked about.

11   Q.      Okay.  I'm just choosing one that you chose.  And it

12   states that -- in this case it says, I was arrested -- this is

13   in the paragraph after January 1999.  I was arrested from the

14   civic -- from the civic center in a particular town; is that

15   correct?

16   A.      Correct.

17   Q.      And it was with my colleagues, and they name the

18   colleagues.  And it was 50 villagers.

19   A.      Correct.

20   Q.      And it states that we began holding a program, and

21   that the colleagues advised them to leave, but he refused as

22   close to a hundred individuals gathered for the program; is

23   that correct?

24   A.      Correct.

25   Q.      And that the person was forced to pay a hundred

1   thousand lei fine for disturbing the peace; is that correct?

2   A.     I don't see that on there.  That wasn't the part of

3   the -- I don't think that was the part that we read.

4   Q.     I understand, but it states there a hundred thousand

5   lei fine for disturbing the peace.

6   A.     Oh, okay.

7   Q.     Do you see that?

8   A.     That's not the one that's on the screen.  But, yes,

9   it's over here.

10  Q.     Okay.  I'm calling your attention to IV.  You recall

11  that one that you testified to?

12  A.     Yes.

13  Q.     That states that the arrests occurred in August 1994,

14  it begins there; is that correct?

15  A.     Correct.

16  Q.     And that states that he was with colleagues, Valer

17  Manu and Valer Bechis, two people; is that right?

18  A.     Yes.

19  Q.     And that there were 50 villagers, not a hundred; is

20  that right?

21  A.     Yes.

22  Q.     And that instead of he, I holding programs, it was we

23  began to hold programs, a plural; is that correct?

24  A.     Yes, sir.  There is a little difference there.

25  Q.     Yeah.  And that he was transported to the substation

1    in the village, and he was forced to pay a hundred thousand

2    fine for disturbing the peace, and he was warned that any more

3    difficulties they would not spare him; is that correct?

4    A.        Correct.

5    Q.        Now, that paragraph that you read is one portion of

6    it.  The arrests occurred in August of 1994 till June of 1998.

7    That's a six-year period; is that correct?  It's around six

8    years.

9    A.        Could you ask that question again.

10   Q.        My arrests occurred in August 1994, June of 1998, and

11   October of 2000.  Is that correct?  That's around -- over the

12   course of '94 to 2000 arrests occurred.

13   A.        That's what it says on there, yes.

14   Q.        Right.

15   A.        Three arrests.

16   Q.        Yeah.

17   A.        Yes.

18   Q.        And in the other document, it states that this person

19   was arrested in January of 1999 to November of nineteen --

20   sorry -- January of 1999, November of 1999, and May of 2000.

21   You remember that?

22   A.        Yes.

23   Q.        And that's a one-and-a-half-year period; is that

24   correct?

25   A.        Correct.

1    Q.      All right.  Now, these documents represent a portion

2    of the 589 attachment; is that correct?

3    A.      Yes.

4    Q.      And the paragraphs that you read and the portions that

5    you read are a part of a five-page document as far as IP is

6    concerned.  Yes?

7    A.      Yes.

8    Q.      And as far as IV is concerned, it's a seven-page

9    claim; is that correct?

10   A.      Correct.

11   Q.      Okay.  Now, if I were to read you -- if you had gone

12   into the rest of the pairs, they're a portion of the claim; is

13   that correct?

14   A.      Correct.

15   Q.      And you took a portion of the claim, and the portion

16   that you took you stated was similar or identical to the

17   pairs; is that correct?

18   A.      Correct.

19   Q.      All right.  Now, that portion is a part, a paragraph

20   or several lines, a part of a six-, seven-, five-page

21   document; is that correct?

22   A.      Yes.

23   Q.      Okay.  I'm almost done.

24           I'd like to call your attention to 75.7.  Now, do you

25   know there is a front section that you previously testified to

1    that contains approximately -- some narrations prepared by

2    Sekhon & Sekhon; is that correct?

3    A.      Yes.

4    Q.      And they have to do with people who are the applicants

5    who are listed in the front part of that just like the other

6    ones; is that correct?

7    A.      Yes.

8    Q.      And how many of those received asylum or had asylum

9    granted?

10   A.      Again, I didn't count.

11   Q.      This you could find.  You could find --

12   A.      Yes.

13   Q.      -- this.

14   A.      Yes, I could look that up.

15   Q.      All right.  Now, these people -- and I took a portion

16   of these as examples, the people -- you say that some of the

17   people in this case received asylum or was granted asylum; is

18   that correct?

19   A.      Yes.

20   Q.      And this portion of people were granted asylum perhaps

21   at an interview or by an immigration judge; is that correct?

22   A.      Yes.

23   Q.      Okay.  And these people, before they testified in an

24   asylum interview, had to take an oath before they went in to

25   tell the truth and when they came out they say they told the

1    truth; is that correct?

2    A.      I don't know about coming out.  But, yes, they took an

3    oath before the interview.

4    Q.      Well, they -- sorry.  There are two oaths that they

5    take, and those are two lines on the oath taking.  Do you know

6    that?

7    A.      I'm only aware of one.

8    Q.      Okay.

9    A.      At the asylum interview?

10   Q.      Yeah.

11   A.      Yeah.

12   Q.      All right.  But when they go before a judge, they must

13   take an oath to tell the truth; is that correct?

14   A.      Correct.

15   Q.      And if they don't tell the truth or they lie, then

16   there are serious consequences; is that correct?

17   A.      I don't know how serious, but it happens a lot.

18   Q.      Okay.  All right.  And one of the serious consequences

19   are, is that if it's a frivolous claim, then -- in a frivolous

20   claim then you're in a position -- those people are in a

21   position to be permanently barred for coming to the United

22   States; is that correct?

23   A.      There is a provision for frivolous asylum finding, but

24   it's very rarely implemented or used.  It has to be a finding

25   by an immigration judge.

1  Q.      Right.  It's a dramatic thing at any rate; is that

2  correct?

3  A.      I've never seen it --

4  Q.      Okay.

5  A.      -- happen.

6  Q.      Okay.  All right.  Now, asylum -- do you know the

7  difference between a frivolous claim and a claim that's a

8  fraudulent claim or a misrepresented claim?  Do you know the

9  difference between the two?

10 A.      No, I don't.

11 Q.      Okay.  And asylum to people is a very, very important

12 thing.  It means they can stay in this country; is that

13 correct?

14 A.      Can you say that one more time.  To who?

15 Q.      Asylum is important to these people.

16 A.      To the applicants?

17 Q.      Yes.

18 A.      I guess if they're an asylum applicant they have an

19 interest in the outcome, yes.

20 Q.      That's right.

21         MR. STEPANIAN:  I have no further questions.  Thank

22 you.  If you could just keep track of the research you could

23 do, perhaps we could talk about it later on then as far as who

24 got granted asylum.  Is that fair?

25         THE WITNESS:  Sure, I can do that.

1            THE COURT:  Mr. Dratman, you may cross-examine.

2            MR. DRATMAN:  Thank you, Your Honor.

3            Don't worry, I'm not going to hit anybody with this.

4                         CROSS-EXAMINATION

5      BY MR. DRATMAN:

6      Q.     Ms. Webster, I've heard several times you say that you

7      have 19 years of experience in various INS or ICE positions;

8      is that correct?

9      A.     Yes.

10     Q.     A long time ago you went to a training facility, I

11     would assume, to train you as an investigative officer; is

12     that correct?

13     A.     Yes.

14     Q.     When was that?  Well, let's not say when that was.  It

15     was about 19 years ago.  How long was that course?

16     A.     Well, I've been to -- when I went to the academy we

17     call it, I went as an inspector, so that wasn't exactly the

18     investigator's course.  Then I went to an investigator's

19     course in '97 or '98, sometime around there.

20     Q.     And in the course of your training and experience, you

21     have learned how to write reports.  Is that fair to say?

22     A.     Yes.

23     Q.     It is something that you do on an almost daily

24     basis --

25     A.     Yes.

1    Q.      -- when you're investigating; is that correct?

2    A.      Correct.

3    Q.      And in writing a report, what you are -- what you have

4    been trained to do is to take information that you've gathered

5    and condense it or sometimes not condense it into something

6    that accurately reflects what you've investigated, correct?

7    A.      Yes.  I try to make it accurate as possible.

8    Q.      And you do that based upon -- when you interview a

9    witness, you do that based upon listening to the witness and

10   taking notes of what the witness may say and then translating

11   those notes into a report, correct?

12   A.      Yes.

13   Q.      And in this case you've written over 140 reports.  Is

14   that fair to say?

15   A.      Yes.

16   Q.      And in writing those reports, each time that you write

17   a report and you've taken notes of a particular subject matter

18   that's going to wind up in one of your reports, you don't keep

19   the notes, do you?

20   A.      Yes.

21   Q.      You do keep the notes?

22   A.      Yes.

23   Q.      Do you have the notes for all of your reports?

24   A.      I think so.

25   Q.      In your handwriting?

```
 1   A.      Yes.

 2   Q.      Have you turned those over to the government, to

 3   any -- to Mr. Wagner?

 4   A.      No.

 5   Q.      Those are the notes that you took from interviewing

 6   all of the witnesses?

 7   A.      Yes.

 8   Q.      And -- okay.  Where -- how accessible are all of those

 9   notes?  Where are they?

10   A.      In my office.

11   Q.      Is that something that you could get to the government

12   and get copied and delivered to us?

13   A.      Yes.

14   Q.      Okay.

15           MR. WAGNER:  I'd object to that, Your Honor, for the

16   record.

17           THE COURT:  Your objection is noted.

18   Q.      BY MR. DRATMAN:  Now, in terms of -- in terms of

19   report writing that you might do, there are situations in --

20   well, strike that.

21           The fact that you keep notes doesn't mean that your

22   notes are the best reflection of what occurred in an interview

23   of a witness.  Would you agree with that?

24   A.      I don't know.  I don't understand your question.

25   Q.      Let me back up.
```

1          You have written over 140 reports, correct?

2   A.      Yes.

3   Q.      And in writing those reports, you've just told us that

4   you've saved your notes, correct?

5   A.      Correct.

6   Q.      Are your notes a verbatim relation of what it was that

7   you learned in the course of your investigation?

8   A.      No.

9   Q.      They are a summary that you take at the time that you

10  are doing, for example, a witness interview, correct?

11  A.      Yes.

12  Q.      And then you -- what you do is you use those notes and

13  translate it into a more complete report, correct?

14  A.      Correct.

15  Q.      And those notes -- and the report is really the

16  compilation of your memory and the notes, correct?

17  A.      Yes.

18  Q.      And generally the report is more complete than your

19  notes would be?

20  A.      Yes.

21  Q.      Now, in this particular case, you did an examination

22  of files that were seized from the law offices, correct?

23  A.      Yes.

24  Q.      And in one of the reports that you wrote, you examined

25  several files that had handwritten notes in them.  Do you

1    remember that?

2    A.      The client files?

3    Q.      Yes.

4    A.      Yes.

5    Q.      And you wrote a report or you wrote a face sheet or

6    chart, I guess would be fair to say, that reflected five files

7    that you headed up as exculpatory.  Do you remember that?

8    A.      Yes.

9    Q.      And you wrote them up as exculpatory because those

10   were the only five files that had in them any kind of

11   handwritten notes.

12   A.      Well, no.  It was basically something that resembled

13   an asylum claim intake, something besides just the narrative,

14   the narratives that we were looking that might --

15   Q.      Had you ever examined other law office files before

16   the seizure of the Sekhon law office files?

17   A.      No.

18   Q.      Have you ever examined any other law office file to

19   see whether or not there are any handwritten notes in a -- in

20   a file that is in the client's handwriting or the attorney's

21   notes of an interview?  Ever done that?

22   A.      If I've ever done --

23   Q.      Ever examined any other lawyer's files --

24   A.      No.

25   Q.      -- to see whether or not contained within a client's

1    file relating to an I-589 application there are original notes

2    either of the client or of an attorney interviewing the

3    client?

4    A.      No.

5    Q.      Do you know whether that is some kind of an accepted

6    practice or a necessary practice?

7    A.      No.  Like I said, I wasn't just looking for

8    handwritten notes, but evidence that it could be a valid

9    claim.

10   Q.      The files that --

11          MR. DRATMAN:  Actually I don't have this marked, but I

12   will.  I'm going to put a sticker on this tomorrow.  What is

13   next in order?

14          THE CLERK:  It is 6B.

15          MR. DRATMAN:  6B.  This will be 6B.  And if I might

16   approach, Your Honor.

17   Q.      I'm going to show you a copy of what's been marked as

18   Exhibit 6B.  Do you recognize that as the chart that you

19   created?

20   A.      Yes.

21   Q.      And that chart is headed up exculpatory?

22   A.      Yes.

23          MR. DRATMAN:  And if I can approach again, Your Honor.

24          THE COURT:  You may.

25   Q.      BY MR. DRATMAN:  6B is a -- the one that's been marked

1    has all of the names and certain identifying information

2    blacked out so that the persons can't be identified other than

3    by initials and the last three digits of the A numbers.

4            Would you agree with that?

5    A.    Yes.

6    Q.    And I have given you a copy of your actual report

7    page, correct?

8    A.    Correct.

9    Q.    With nothing blacked out.

10           And this was a document that you prepared?

11   A.    Yes, I did.

12   Q.    And it was prepared based upon your review of client

13   files, correct?

14   A.    Correct.

15           MR. DRATMAN:  Your Honor, I move 6B into evidence.

16           THE COURT:  Be admitted.

17                        (DEFENSE EXHIBIT 6B, chart prepared

18                         by Agent Webster, ADMITTED INTO

19                         EVIDENCE.)

20           MR. DRATMAN:  May I publish?

21           THE COURT:  You may.

22           MR. DRATMAN:  Okay.  I just wonder if everybody can

23   see 6B.  My eyes are terrible, I can't see it.  Is it visible

24   on the computer screen?  Okay.  Good.

25   Q.    The first initials there are A -- excuse me -- last

1    name is A, and first name is R with a middle name of K,

2    correct?

3    A.      Correct.

4    Q.      And that person shows up on your chart 75.6, would you

5    agree with that?  That's the -- that's one of the people

6    that -- you have put a chart up, with Mr. Wagner's assistance,

7    showing that that claim has some language in it that seems to

8    track language in another claim; is that correct?

9    A.      Yes.  I believe there were two other claims tracking

10   that.

11   Q.      Two other claims or one other claim?

12   A.      Well, one that it was paired with, and then there was

13   another one that had a little bit of it, too.

14   Q.      It had a paragraph, correct?

15   A.      Correct.

16   Q.      Okay.  And those were all claims relating to Nepalese,

17   correct, people from Nepal?

18   A.      Yes.

19   Q.      And there were four such claims that you went over on

20   chart 75.6, correct?

21   A.      Yes.

22   Q.      And the first name, RA, is one that you analyzed as

23   being exculpatory, meaning that based on your analysis of the

24   file this was a claim that appeared to be valid on its face,

25   correct?

1    A.      I wouldn't say that because the claim did not seem

2    valid.

3    Q.      Well, the word "exculpatory" means that -- well, what

4    does the word "exculpatory" mean to you in your chart?

5    A.      It means that there's a possible that it's not fraud.

6    Q.      And you used as your basis for saying that it's not

7    fraud that there was a narrative handwritten in the client's

8    handwriting, correct?

9    A.      I guess what I really meant was exculpatory against

10   the defendants.  But I -- the claim had something -- that he

11   was sprayed by bullets and not -- none of the bullets hit him,

12   so that didn't seem like a valid claim.

13   Q.      You made a judgment call that a person in a

14   situation -- have you ever been to Nepal?

15   A.      Well, there were three people that said they were

16   sprayed by bullets.

17   Q.      Correct.  And as I understand your testimony

18   previously, you testified that you were not familiar at all

19   with any of the country conditions with the applications that

20   you reviewed, Romania, India, Fiji, and Nepal; is that

21   correct?

22   A.      Yes.  But I just know that it's really hard not to get

23   shot being sprayed by bullets.  So --

24   Q.      How do you know that?

25   A.      How do I know that?

1    Q.      Yes.  How do you know that?

2    A.      Well, I do have firearms training.

3    Q.      Yes.

4    A.      I wouldn't want to be in the path of being sprayed by

5    bullets.  So --

6    Q.      The fact that there is a description that is contained

7    in a report that says that -- where somebody attempts to

8    communicate and maybe inartfully an event to them appeared to

9    be sprayed by bullets may not really be what happened to them,

10   correct?  It may be their exaggeration.  It may be that they

11   thought that was happening.  It may be something for an asylum

12   officer or an immigration judge to judge, correct?

13   A.      Can you say that again.

14   Q.      A description of someone who says in a document that

15   they were sprayed by bullets may be in their mind what

16   happened to them as they perceive it, but it may not have been

17   what really happened.  Would you agree with that?

18           MR. WAGNER:  Calls for speculation, Your Honor.

19           THE COURT:  Sustained.

20   Q.      BY MR. DRATMAN:  Okay.  When you say that you -- you

21   wrote that this claim -- you put this claim on an exculpatory

22   chart because, as I understand it -- narrative handwriting in

23   client's handwriting, that's what you wrote down, correct?

24   A.      Correct.

25   Q.      And contained in the file --

1          MR. DRATMAN:  If I could have this marked next in

2   order as 6 --

3          THE CLERK:  C.

4          MR. DRATMAN:  -- C.

5          THE COURT:  Mr. Wagner, do you have a copy?

6          MR. DRATMAN:  I don't have a copy.  Mr. Wagner just

7   provided this to me today.

8          THE COURT:  All right.

9          MR. DRATMAN:  I'm going to ask you -- can I approach?

10          THE COURT:  You may.

11          MR. WAGNER:  For the record, Your Honor, it's been

12   available for several months.

13          MR. DRATMAN:  I just requested it today.

14          THE COURT:  All right.  It's been available, though.

15          MR. DRATMAN:  It's been available, and I asked him to

16   bring the original to court.

17          THE COURT:  All right.

18   Q.     BY MR. DRATMAN:  Can you look through 6C, please.

19   A.     Sure.

20          Okay.

21   Q.     And is 6C the file that relates to RA?

22   A.     Yes.

23   Q.     And contained in that file, is there a handwritten

24   narrative?

25   A.     Yes, there is.

1    Q.      And is that the narrative handwriting -- handwritten

2    in the client's handwriting?

3    A.      Well, that was speculation that I made.  I think it's

4    similar to his signature, so I'm not sure it's in his

5    handwriting.

6    Q.      Well, it's on your chart as his handwriting, but you

7    don't know, correct?

8    A.      Yes, correct.

9            MR. DRATMAN:  Your Honor, if I could have this marked

10   as 6C1.

11           THE COURT:  All right.

12   Q.      BY MR. DRATMAN:  Is that a copy of the -- is that a

13   copy of the handwriting or the handwritten narrative that you

14   just referred to?

15   A.      Yes, this is it.

16   Q.      And that is what you were referring to as the

17   exculpatory portion of 6C, correct?

18   A.      Yes.

19   Q.      And that is what you were referring to in your chart

20   that is 6B, correct?

21   A.      Correct.

22           MR. DRATMAN:  I would move 6C1 into evidence.

23           THE COURT:  Just 6C1?

24           MR. DRATMAN:  6C1, Your Honor.

25           THE COURT:  But not 6C?

1      MR. DRATMAN:  Oh, I would move 6C into evidence as

2 well.

3      THE COURT:  They both shall be admitted.

4                      (DEFENSE EXHIBITS 6C and 6C1, client

5                       file and handwritten narrative for

6                       RA, ADMITTED INTO EVIDENCE.)

7      MR. DRATMAN:  May I publish?

8      THE COURT:  You may.

9  Q.    BY MR. DRATMAN:  This is a copy of the first page of

10 6C that has telephone numbers blacked out, correct?

11 A.    Yes.

12 Q.    And the original does not have telephone numbers

13 blacked out; is that right?

14 A.    That's correct.

15 Q.    And it also has the name of the -- only the initials

16 of the person, correct?

17 A.    Correct.

18 Q.    And this document consists of how many pages?

19 A.    Four and a half.

20 Q.    And that document was translated into an I-589

21 attachment, correct?

22 A.    I don't know.

23 Q.    Do you remember testifying about Exhibit 75.6, a

24 chart?

25 A.    Yes.

1  Q.      And do you recall testifying about two pairs of Nepali

2  applicants?

3  A.      Yes.

4  Q.      And do you recall testifying about one of the pairs

5  whose initials are RA?

6  A.      Yes.

7  Q.      And is this the same applicant that you were referring

8  to in 75.6 as RA?

9  A.      Yes, but I don't know if -- at what point this was

10 written.

11 Q.      I didn't ask you that, Agent Webster.  So if we could

12 just get on the same page.

13         MR. WAGNER:  Objection, Your Honor.  He asked if it

14 had been copied, he did ask that.

15         THE COURT:  Counsel, you did ask.  So maybe you ought

16 to rephrase your question.

17         MR. DRATMAN:  I will.  Then I apologize, Agent.

18 Q.      Do you know whether the information that is contained

19 within 6C1 and 6C representing the narrative was put into the

20 I-589 application?

21 A.      I don't -- I don't know that.

22 Q.      Well, you compared in your investigation and wrote a

23 report on your comparison of the I-589 application together

24 with this document, did you not?

25 A.      What I said is it's similar.  The handwritten claim is

1    similar to what was submitted, but I don't know at what point

2    this was written or who wrote it.

3    Q.      You know that at least it was in the file, correct?

4    A.      Correct.

5    Q.      And as such, you considered it to be exculpatory,

6    correct?

7    A.      Correct.

8    Q.      And you have -- in terms of the claim itself, you have

9    no basis -- you've not interviewed RA, correct?

10   A.      Correct.

11   Q.      And you have not interviewed the other person in that

12   Nepali pair, BM; is that correct?

13   A.      That's correct.

14   Q.      And you don't know whether or not these people -- in

15   fact, you don't know whether or not the four Nepalese that are

16   referred to as pair one and pair two know each other, do you?

17   A.      I don't know.

18   Q.      Did you do any checking to determine the -- the other

19   pair on 75.6 are BP and MA.  Those are Nepalese, too, correct?

20   A.      Yes.

21   Q.      Did you interview either one of those people?

22   A.      No.  No, I didn't.

23   Q.      Did you review their files?

24   A.      Their claim files?

25   Q.      Their -- the attorney files.

1    A.      I think three of them, yes.

2    Q.      And do you know whether or not it is the practice

3    of -- an accepted practice within a law office to put all the

4    information into an I-589 and not keep any notes based on the

5    client interview?  Do you have any background basis at all to

6    give an opinion on that?

7    A.      To -- what was the question?

8    Q.      Do you have any basis -- do you know and do you have

9    experience or -- with which to render an opinion as to whether

10   or not it's acceptable practice to -- after an I-589

11   application has been prepared with the attachment and signed

12   off on by the client, whether it's necessary to keep client

13   notes?

14   A.      I don't have experience with that.

15   Q.      So --

16           MR. DRATMAN:  This would be a good time to break, Your

17   Honor.

18           THE COURT:  All right.  We'll take our evening recess,

19   Ladies and Gentlemen.  Remember my admonition.  We'll recess

20   until 9:00 a.m. tomorrow morning.

21           (Proceedings were adjourned at 4:32 p.m.)

22                          ---o0o---

23

24

25

1

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4

5                              /s/ Kathy L. Swinhart
                               _____
6                              KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25