IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE FRANK C. DAMRELL, JUDGE

---o0o---


UNITED STATES OF AMERICA,

                     Plaintiff,

vs.                                          No. Cr.S. 06-058


JAGPRIT SINGH SEKHON, JAGDIP
SINGH SEKHON, MANJIT KAUR RAI,
aka Manjit Kaur Kang, IOSIF
CAZA, and LUCIANA HARMATH,

                     Defendants.
_____/




---o0o---

REPORTER'S TRANSCRIPT

JURY TRIAL

WEDNESDAY, MAY 6, 2009

---o0o---




Reported by:   KATHY L. SWINHART, CSR #10150

APPEARANCES


For the Plaintiff:

        LAWRENCE G. BROWN
        Acting United States Attorney
        501 I Street, Suite 10-100
        Sacramento, California  95814
        BY:     BENJAMIN B. WAGNER
                CAMIL A. SKIPPER
                KYLE REARDON
                Assistant U.S. Attorneys


For Defendant Jagprit Singh Sekhon:

        LAW OFFICES OF MICHAEL STEPANIAN
        819 Eddy Street
        San Francisco, California  94109
        BY:     MICHAEL STEPANIAN

                and

        LAW OFFICES OF RANDY SUE POLLOCK
        2831 Telegraph Avenue
        Oakland, California  94609
        BY:     RANDY SUE POLLOCK


For Defendant Jagdip Singh Sekhon:

        DAVID WARREN DRATMAN
        1007 7th Street, Suite 305
        Sacramento, California  95814


For Defendant Manjit Daur Rai:

        BLACKMON & ASSOCIATES
        813 Sixth Street, Suite 450
        Sacramento, California  95814
        BY:     CLYDE M. BLACKMON


(Continued next page...)

APPEARANCES (Continued)


For Defendant Iosif Caza:

          DANIEL J. BRODERICK
          Federal Defender
          801 I Street, 3rd Floor
          Sacramento, California  95814
          BY:     TIMOTHY ZINDEL
                  Assistant Federal Defender


For Defendant Luciana Harmath:

          JAI MANHAR GOHEL
          816 Eddy Street
          San Francisco, California  94109


          Also Present:

                  JAGPRIT SINGH SEKHON
                  JAGDIP SINGH SEKHON
                  MANJIT DAUR RAI
                  IOSIF CAZA
                  LUCIANA HARMATH

INDEX

PLAINTIFF WITNESSES:                                          PAGE:


WEBSTER, CAROL

CROSS-EXAMINATION (Cont'd) BY MR. DRATMAN          3767
CROSS-EXAMINATION BY MR. BLACKMON                 3859
CROSS-EXAMINATION BY MR. ZINDEL                   3883

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

NO.:                    DESCRIPTION:                  PAGE:


3J     Memorandum re: Ranbir Khera                3809
3K     AFU memorandum re: Ranbir Khera            3807
3L     AFU adjustment of status memorandum        3807
       re: Ranbir Khera
6D     S visa application for Florin Vorobiov     3820
6G     Memorandum re: Florin Vorobiov             3943

1                    SACRAMENTO, CALIFORNIA

2                WEDNESDAY, MAY 6, 2009, 9:18 A.M.

3                           ---o0o---

4           (The following proceedings were had outside

5           the presence of the jury:)

6           THE CLERK:  Criminal case 06-058, United States v.

7    Jagprit Singh Sekhon, et al., on for jury trial, Your Honor.

8           THE COURT:  We're meeting outside the presence of the

9    jury.  I understand there's an issue about the rough notes of

10   the witness Webster.

11          MR. DRATMAN:  That's correct, Your Honor.

12          THE COURT:  What does 3500 have to say about all of

13   this?

14          MR. DRATMAN:  Well --

15          THE COURT:  The Jencks Act, do we have Jencks Act

16   implications here?

17          MR. DRATMAN:  Well, all these reports are -- that have

18   been generated by Agent Webster are -- especially as to

19   witnesses, have -- and we haven't seen the notes, so we don't

20   know what's in them.  They have summaries of the -- well, they

21   have -- whatever notes there are relating to the witnesses that

22   she interviewed and testified about as well as she's written

23   141 reports according to what we have -- whether all of those

24   relate to her testimony, I don't know.

25          But to the extent that she has rough notes, and an

3762

1    examination of those notes reflects that there are quotations

2    in them of substantially verbatim statements of witnesses or

3    they reflect her own observations which she's testified about,

4    they're producible under the Jencks Act.

5         THE COURT:  Even though they're not in the possession

6    of the government?  What's the government's position?

7         MR. DRATMAN:  Well, they would be in possession of the

8    government -- I'm sorry, Mr. Wagner.  They would be in the

9    possession of the government, Your Honor.  I mean, Ms. Webster

10   has them.

11        THE COURT:  All right.  Mr. Wagner.

12        MR. WAGNER:  Your Honor, I'd like to start by just

13   making the observation that Mr. Dratman has made comments a

14   number of times to this court and sometimes in front of the

15   jury implying that we have not complied with our discovery

16   obligations.  We've produced something like 12,000 pages of

17   discovery.  We've produced all of the relevant and discoverable

18   reports written by Agent Webster.  Despite Mr. Dratman's

19   statement the other day he hadn't seen certain A files that

20   were at issue here, all of these A files have been available

21   for a very long time.

22        A couple of weeks ago he asked for access to 18

23   additional A files.  We produced them the next business day for

24   his review.  Yesterday he asked for access to four other A

25   files.  They're here this morning for his review.  I think

1    we've produced everything that needs to be produced.

2           Now, with respect to the request for the agent's notes,

3    I mean, aside from the request being untimely, I think Rule 16

4    clearly doesn't apply.  And I think the case law is quite well

5    settled that when the agent's completed, signed reports have

6    been produced, those are the witnesses' statements, and those

7    have been produced.  Those are the Jencks Act statements.

8           What the notes are -- and I've discussed this with the

9    agent -- the notes are her own rough notes that were used to

10   compile the reports that were produced.  They are quite rough

11   in the sense that they are not -- they could not remotely be

12   called a verbatim transcript of anything a witness has said.

13   She doesn't write that fast.  They are notes used to jog her

14   memory so that she can complete an accurate report.  They also

15   have some questions and other observations in there about -- to

16   herself about questions she should ask, but they are not

17   statements, verbatim statements of the witness.

18           THE COURT:  Well, that's music to my ears if you say

19   that the law is settled in this matter.

20           MR. WAGNER:  I think they are.

21           THE COURT:  Cite me a couple cases and --

22           MR. WAGNER:  I can.  U.S. versus Carrasco.

23           THE COURT:  U.S. versus Carrasco.

24           MR. WAGNER:  Yes.  C-A-R-R-A-S-C-O.

25           THE COURT:  All right.

1    MR. WAGNER:  537 F.2d 372, which is Ninth Circuit 1976,

2  which ruled that rough notes of an agent are not Jencks.

3    THE COURT:  Okay.

4    MR. WAGNER:  U.S. v. Pisello, P-I-S-E-L-L-O.

5    THE COURT:  Pisello?

6    MR. WAGNER:  Pisello, P-I-S --

7    THE COURT:  Oh, P-I-S.

8    MR. WAGNER:  Yes, P-I-S-E-L-L-O, which is 877 F.2d 762.

9    THE COURT:  All right.

10    MR. WAGNER:  That's a Ninth Circuit 1989 case which

11  ruled that it was not error for the district court to deny a

12  defense request for rough notes when the formal memos of that

13  agent had been produced.

14    U.S. versus Alvarez, 86 F.3d 901 at 904, footnote two,

15  which is a Ninth Circuit 1996 case which observed that an

16  officer's rough notes need not be disclosed pursuant to the

17  Jencks Act, only under Brady if they include material

18  exculpatory information.

19    And finally U.S. versus Henke, H-E-N-K-E, 222 F.3d 633

20  at 642 to 43.  And that's a Ninth Circuit 2000 case which also

21  ruled the government was not obliged to turn over the agent's

22  notes and upholding the district court's determination that it

23  would not conduct an in camera review of those notes because

24  the defendant had made no showing that they might discover

25  something exculpatory or impeaching, and so it didn't trigger

1   any obligation by the district court for an in camera review.

2       THE COURT:  Okay.

3       MR. WAGNER:  Now we can review the notes for Brady

4   material.  It will take us a little bit -- I have no reason to

5   think that there's any Brady material in there, and I think any

6   assertion that there is is pure speculation.  And I think what

7   this is is simply a fishing expedition so that Mr. Dratman can

8   spend two days asking the agent why she wrote happy in her

9   notes and glad in the final memo.

10      But we can review the notes, it will take us some time,

11  but we can do that Friday, I believe, and produce them Monday

12  if there is any Brady material in it, which I doubt there is.

13      THE COURT:  All right.

14      MR. WAGNER:  But I think it's certainly not Jencks Act

15  material.

16      MR. DRATMAN:  Your Honor, I had fully expected the

17  agent to say she didn't have any notes.  We had gotten E-mails

18  from the agent and --

19      THE COURT:  All right.  Well, she's got notes --

20      MR. DRATMAN:  She's got notes.

21      THE COURT:  -- and apparently that's not good enough,

22  though.  So -- I mean, unless the defense tells me otherwise.

23      MR. DRATMAN:  As a practical matter, I have authority

24  here that I have not researched, but it's in a book that Mr.

25  Zindel gave me that the Court may not simply rely on a

1    prosecutor's statement that undisclosed material is not Jencks

2    Act.  The Court shall order the government to deliver the

3    material to the Court for inspection.  One of the cases that is

4    cited is United States versus Miller at 771 F.2d 1219, a Ninth

5    Circuit 1985 case.

6         THE COURT:  These are rough notes of the agent?  That

7    doesn't sound like it.

8         MR. DRATMAN:  Pardon me?

9         THE COURT:  I mean, those are not -- I want a rough

10   notes case where the reports have been disclosed.  That to me

11   is what is -- you need to put a finer point on your research

12   there.

13        If you find some cases on that issue that would somehow

14   distinguish any of the cases cited by the government, I'll look

15   at these cases.  I'm going to request the government to take a

16   look for Brady material.  And absent something in case law that

17   would distinguish those cases, then my sense is that probably

18   I'm going to deny the request.  But I'll look at the cases

19   first.  I'm just relying on the representation of the

20   government in making that comment.  But I'll certainly give you

21   an opportunity to do your own research on this, Mr. Dratman.

22        MR. DRATMAN:  I will.

23        THE COURT:  Okay.

24        MR. DRATMAN:  Thank you.

25        THE COURT:  Bring the jury in.

1          (The following proceedings were had in the

2          presence of the jury:)

3          THE COURT:  Good morning, Ladies and Gentlemen.

4          Mr. Dratman, are you ready to proceed?

5          MR. DRATMAN:  I am, Your Honor.  Thank you.

6          THE COURT:  All right.  You may do so at this time.

7                    CAROL WEBSTER,

8  a witness called by the Government, having been previously duly

9  sworn by the Clerk to tell the truth, the whole truth, and

10 nothing but the truth, testified further as follows:

11                    CROSS-EXAMINATION (Continued)

12 BY MR. DRATMAN:

13 Q.     Good morning, Ms. Webster.

14 A.     Good morning.

15 Q.     Ms. Webster, yesterday I showed you Defendant's Exhibit

16 6B, which was your chart entitled Exculpatory.  You recall

17 that, don't you?

18 A.     Yes.

19 Q.     By exculpatory, can we agree that -- that exculpatory

20 evidence is that may in some way tend to show that there was no

21 criminal conduct or no criminal intent on the part of a

22 suspect?

23 A.     Well, it is provided as a -- as something that could be

24 used to present a theory about why it's there, but it doesn't

25 necessarily a hundred percent make somebody -- make it not

1    fraud or something like that.

2    Q.      Let me again give you a definition and see if you can

3    agree with it.

4            Exculpatory in your chart, would you agree that it

5    could be evidence that may tend to show that a person does

6    not -- has not engaged in criminal conduct or has no criminal

7    intent?  Would you agree with that?

8    A.      No.

9    Q.      Exculpatory is in your chart something that shows

10   absolute innocence?

11   A.      No.  What I said was it shows that it could be

12   something that is not fraud, but it needs to be explored

13   further, it's not a hundred percent.

14   Q.      It's something that may tend to show that someone has

15   not engaged in criminal conduct, correct?

16   A.      Well, no, it's just something that could be explored

17   further.

18   Q.      So you wrote down things that could be explored

19   further.

20   A.      Correct.

21   Q.      And as to -- as to Exhibit 6B, which is coming up, as

22   to the first item on the list, the person whose initials are

23   RA, did you take further steps to explore that evidence?

24   A.      Yes.  We found that narrative in -- or the scenario

25   about the bullets being sprayed and not being hit, like the

1   person was sprayed by bullets but none of the bullets hit him,

2   that was present in three narratives, and that was -- seemed a

3   highly implausible story to happen to three people.

4   Q.      Actually the narrative itself doesn't say that the

5   bullets were sprayed at him, bullets were sprayed; is that

6   correct?

7   A.      I think it says I was sprayed by bullets, but not a one

8   hit me.

9   Q.      Well, you had that information prior to the time that

10  you obtained the file concerning RA, correct?

11  A.      Umm --

12  Q.      The information you've just related.

13  A.      I had the asylum narrative, correct.  And then you're

14  referring to the client file?

15  Q.      I'm referring to the asylum narratives.  You had that

16  prior to the time that you obtained the client file, correct?

17  A.      Correct.

18  Q.      And you were aware prior to the time of obtaining the

19  file that there were three narratives that had similar language

20  in them relating to what you just said, correct?

21  A.      Correct.

22  Q.      And did you make any effort to talk to RA about this

23  particular incident that was described?

24  A.      No.

25  Q.      Did you have contact information for RA?

1  A.      Well, the contact information oftentimes wasn't

2  correct.  So --

3  Q.      The question I asked you, Agent Webster, if you can

4  recall it, was whether or not you had contact information for

5  RA.  Did you?

6  A.      You're referring to an address?  Well, he listed an

7  address on his asylum application.  And most -- a lot of the

8  addresses were not where the people actually resided.  So --

9  Q.      Did you have contact information for RA?

10  A.      Well, that's my answer.  We had the address, but I'm

11  not sure if that was his actual contact --

12  Q.      Did you make any effort at all to run down the address

13  using all of your law enforcement resources to locate RA?

14  A.      I know Special Agent Morihara was handling those files.

15  We had it split up, and she was handling the Nepalese.  And I'm

16  pretty sure she did run a background on that -- on those

17  individuals, and the address listed on the asylum application

18  did not reflect -- or did not come up on that -- on that query.

19  Q.      You are recalling now that there is a report by Agent

20  Morihara that says that a background check was run on RA and

21  that a current address did not appear?

22  A.      Well, I saw it in the alien file that there was a

23  printout, and at the time Agent Morihara had the file.  So I'm

24  pretty sure she did it, and that printout does not show an

25  address.

1   Q.      Did you attempt at any time to locate RA at the last

2   address that was shown in the asylum claim?

3   A.      No.

4   Q.      So you don't know if RA is still residing at the

5   address that is shown in the A file that you had in your

6   possession, correct?

7   A.      Correct.

8   Q.      And RA may still be at that residence as far as your

9   investigation has determined, correct?

10  A.      Correct.  I don't know where he's living.

11  Q.      Now, in terms of the Nepalis, RA was actually the

12  second application that was filed of the two Nepalis that you

13  testified about yesterday, is that correct, in terms of time?

14  A.      I'm not sure what you mean.  There were four Nepalis.

15  Q.      Correct.  And RA was filed -- according to your

16  testimony yesterday, RA was filed on February 20th, 2001.

17  A.      The asylum application?

18  Q.      Yes.  Is that correct?

19  A.      I don't have it in front of me, but if that's what it

20  says on there, on the application.

21          MR. DRATMAN:  If I can approach, Your Honor.

22          THE COURT:  You may.

23  Q.      BY MR. DRATMAN:  I'm going to show you --

24  A.      Well, wait.  It's right here on this chart, I think.

25  It says filed asylum 2/19/02.

1    Q.      Actually it's easier if I show you Exhibit 95 -- I'm

2    looking for the microphone.

3           THE COURT:  Is it in evidence?

4           MR. DRATMAN:  No, this is in evidence, Your Honor.

5           (Off the record.)

6    Q.      BY MR. DRATMAN:  Okay.  Exhibit 95.1 is the asylum

7    application without the attachment that was filed relating to

8    RA.  I'm going to just show you the front page.  Do you agree

9    with that?

10   A.      Yes.

11   Q.      And this -- and there is a date here that shows

12   February 10, 2002.  Is that the right date?

13   A.      Or 19 perhaps, yes.

14   Q.      And the application that relates to BM, which is

15   reflected in 96.1, was actually filed before that, December

16   26th, 2001.  Would you agree with that?

17   A.      Yes.

18   Q.      So that you have -- you seized notes or an entire file

19   that had notes in it that reflected information that was

20   incorporated or that appeared substantially similar to

21   information that was contained in a file that was filed with

22   the INS earlier or the asylum people earlier, correct?

23   A.      I didn't follow your question.

24   Q.      Okay.  Let's just put it simply.

25           96.1 was filed on December 26th, 2001, correct?

3773

1   A.      Correct.

2   Q.      And 96.2 has information in it that is somewhat similar

3   to the information that is contained in 95.1, correct, and

4   95.2?

5   A.      The asylum narrative, yes.

6   Q.      The asylum narrative.

7           And 95.2 relates to RA, and he is -- his file has in it

8   a written narrative which was introduced yesterday as Exhibit

9   6C1 that actually has handwritten notes that detail in some

10  four and a half pages, as you testified yesterday, the nature

11  of the asylum claim, correct?

12  A.      Yes.

13  Q.      Now, the initial -- the first asylum application for BM

14  in terms of time filed on December 26th, 2001, you testified

15  was filed by Jagdip Sekhon, correct?

16  A.      If you could show it to me.  I don't remember.

17  Q.      Do you see that?

18  A.      Yes.

19  Q.      And that was the one that was filed on February 26th,

20  2001, for which there are no notes in the file; is that

21  correct?  That you could find.

22  A.      I thought you said December 2001.

23  Q.      December 26th, 2001.

24  A.      Yes.  December -- December 2001.

25  Q.      December 2001.

1          And then 95.1 filed in February of 2002 was signed off

2    on by Jagdip Sekhon, but you identified that as having been

3    signed off on by Jagprit Sekhon; is that correct?

4    A.      Correct.  That resembles Jagprit's signature, but it

5    has Jagdip's name on it.

6    Q.      Correct.

7          And then the other two Nepalese or Nepali cases are

8    cases that were filed by Jagdip Sekhon, 69.1 and 69.2.  Do you

9    recall that?

10   A.      Yes.

11   Q.      That would be BP?

12   A.      BP, correct.

13   Q.      And that was filed on May 28th, 2002, correct?

14   A.      I don't remember the date.  If you could show me that.

15          MR. DRATMAN:  If I can just have a moment, Your Honor.

16          THE COURT:  All right.

17          MR. DRATMAN:  Okay.

18   Q.      I was just asking you about Exhibit 69.1.  And in terms

19   of timing, that was filed on June 11, 2002.  Does that appear

20   accurate, or June 5th?

21   A.      I can't see that date.

22   Q.      Oh, I have it upside down.  Well, there's several dates

23   on here.

24          Does it appear to be June 5th, 2002, but there's

25   crossed out -- it's around June of 2002?

1    A.      Yes.

2    Q.      Okay.  And that relates to MA, correct?

3    A.      If I could see the -- there.  Okay.  Yes.

4    Q.      Okay.  And then in terms of the sequence, 68.1 shows

5    the claim of BP?

6    A.      Yes.

7    Q.      And that was filed on September 30th, 2002, correct?

8    A.      That's crossed out, and it looks like there's an

9    October date.

10   Q.      October 17th, 2002?

11   A.      Yes.

12   Q.      Okay.  But it was filed after the first -- 68.1 was

13   filed after 69.1, correct?

14   A.      Correct.

15   Q.      Okay.  Now, did you contact or attempt to contact BP

16   about BP's claim?

17   A.      No.

18   Q.      Did you have contact information for BP?

19   A.      Just what was on there, which --

20   Q.      And you made no effort to go to that address or to have

21   contact with BP --

22   A.      No.

23   Q.      -- at that address, correct?

24   A.      No.

25   Q.      That means you didn't make any -- it may have been

1    my --

2    A.      Right.  There were hundreds of these, so we didn't

3    interview every single person.

4    Q.      The question I had was whether or not for that

5    particular person you attempted to make contact at that

6    address.  Did you?

7    A.      No, I did not.

8    Q.      Okay.  And as to RA we've discussed.  As to MA, which

9    is with BP, did you make any effort at all to contact MA at

10   the -- at any location including the address that was contained

11   in the asylum file?

12   A.      No.

13   Q.      And as to BM, did you make any attempt to locate BM at

14   any of those locations?

15   A.      No.

16   Q.      Were you present at any of the asylum interviews for

17   BP, MA, RA, or BM?

18   A.      No.

19   Q.      Did you review the asylum notes for BP, MA, RA, or BM?

20   A.      No, I didn't.

21   Q.      Now, these were Nepali -- these were all Nepali I-589s,

22   correct?

23   A.      The four that we're talking about, yes.

24   Q.      Yes.

25           And you reviewed a number of Romanian I-589s?

1    A.       Yes.

2    Q.       And of the Romanian I-589s that have been introduced

3    into evidence, are there any that were signed by Jagdip Sekhon,

4    that is, the I-589s?

5    A.       Yes, there were some.  I think we talked about them

6    here.

7    Q.       And the Romanian ones that were signed by him were

8    which ones?

9    A.       I think it was RG?

10   Q.       That was actually never filed.  You're aware that a

11   file was seized from the -- from the storage locker.  You heard

12   the testimony --

13   A.       Uh-huh.  Yes.

14   Q.       -- from the agent.

15           And the agent -- and you have no file, no A file for RG

16   indicating that that closed file that you're referring to as

17   signed by Jagdip Sekhon was ever filed with any government

18   agency; isn't that true?

19   A.       Yes, that one was not filed.

20   Q.       And that is the only file that was -- that you have for

21   a Romanian that was signed by Jagdip Sekhon, and that was not

22   filed, correct?

23   A.       I'm not sure if that's the only one because I remember

24   talking about others.  But --

25   Q.       Well, as you sit here now, can you recall any Romanian

3778

1    I-589 applications that were signed off on by Jagdip Sekhon?

2    A.      I remember someone with the initials PC that had his

3    signature on it, but I'm not sure if it was on a 589.

4    Q.      And is that the only one that you can remember?

5    A.      That I can remember, yes.

6    Q.      Now, when you did the searches of these I-589

7    attachments, what you did basically was you scanned in a number

8    of these applications into a computer.

9    A.      Correct.

10   Q.      Is that correct?

11   A.      The narrative, yes.

12   Q.      The narrative.  Did you do that or did you have someone

13   else do that?

14   A.      I did the Romanians, and Agent Morihara did the other

15   nationalities.

16   Q.      And you used some kind of a program to do that, a

17   computer program?

18   A.      Yes, Adobe.

19   Q.      And that program is one that you input certain words to

20   search these applications, correct?

21   A.      Correct, just a word search.

22   Q.      And you only researched or -- strike that.

23          You only did a word search of applications relating to

24   attachments of the -- that were filed by the Sekhons, correct?

25   A.      Oh, you mean the narratives?

1    Q.       The narratives.

2    A.       Yes.

3    Q.       Now you have testified earlier that you had the ability

4    to have an A file delivered to you.  Was that correct?

5    A.       Yes, I can order an A file.

6    Q.       You can order any A file, is that an accurate

7    statement?

8    A.       I can order -- yes.  I don't know if it will be

9    delivered, but I can order it.

10   Q.       And for the most part when you order an A file, because

11   you're an investigator, the A file is delivered to you; isn't

12   that accurate?

13   A.       No, not -- that's not accurate.

14   Q.       For the most part you do get the A files, though?

15   A.       Not if they're pending in immigration court, no.  It's

16   hard.  If they're pending in immigration court, they usually

17   won't release it unless -- I have to send it right back.  So --

18   Q.       But they will release it to you so that you can examine

19   it, and then you have to send it back?

20   A.       For example, for this trial they released some of them

21   for -- that you guys wanted to review.

22   Q.       And you were able to get those?

23   A.       Yes.

24   Q.       Okay.  And you were able -- you were able to get A

25   files that relate to applicants that were filed by other law

1    offices; isn't that correct?

2    A.      Yes.

3    Q.      Did you make any effort at all to obtain A files that

4    were filed by attorneys on behalf of other Romanian clients?

5    A.      Yes.

6    Q.      And did you do that?

7    A.      Yes.

8    Q.      And how many such A files did you -- did you acquire?

9    A.      I don't know the number.

10   Q.      Well, can you give us an estimation?

11   A.      Maybe like ten from one attorney, ten from another,

12   five from a third.

13   Q.      And did you scan in documents or attachments from those

14   files?

15   A.      No, I didn't scan them in.

16   Q.      So, as I understand it, you just said you got about 25

17   files?

18   A.      That's an estimate.  I don't know if that's an accurate

19   number because it was like 2003, 2004.

20   Q.      Did you write any report relating to that?

21   A.      Yes, but it was a different case.

22   Q.      My able assistant, whoever it was that just walked up

23   behind me, just handed me something on the subject of PC.  You

24   remember we were just talking about PC?

25   A.      Yes.

1   Q.      And that is a person that you said -- thought may have

2   had an I-589 file -- an I-589 application signed off on by

3   Jagdip Sekhon.  Do you recall that?

4   A.      Yes.

5   Q.      I'm going to show you on the monitor what is in

6   evidence as Government's Exhibit 60.1 and ask you whether or

7   not you -- whether this is the PC that you were referring to.

8   A.      Okay.  Could you move it to the right?

9   Q.      Your right or my right?  Oh, sorry.

10  A.      Right, yeah.  Yeah, I think that's the one.

11  Q.      And you see it's Government's Exhibit 60.1?

12  A.      Yes.

13  Q.      And I'm going to show you the last page of that

14  document.  And do you recognize the signature as that of

15  Jagprit Sekhon?

16  A.      Yes, that's Jagprit Sekhon.

17  Q.      Okay.  Are there any other Romanian I-589s that you

18  recall or that were signed off on -- are there any Romanian

19  I-589s that were signed off on by Jagdip Sekhon?

20  A.      Of all the filings, I don't know.  Of every single

21  application filed by Sekhon & Sekhon or just the ones that

22  we're talking about here?

23  Q.      The ones that we're talking about that were introduced

24  by the government in this case.

25  A.      I think only RG, which wasn't filed.

1    Q.      Which was not filed --

2    A.      Correct.

3    Q.      -- correct?

4            Now, as to the 25 files that you took from another

5    office, you said that you wrote a report relating to a

6    different case?

7    A.      Correct.  There's -- there were other investigations

8    going on.

9    Q.      Did you examine those files and compare the language in

10   those cases?

11   A.      Yes.

12   Q.      And there is a report that exists on that?

13   A.      I think so.  I would have to check.  I remember writing

14   something about that, but I would have to look at it and see if

15   it's relating to the language.

16   Q.      Well, did you scan in -- you did not scan in those

17   files, correct?

18   A.      Correct.

19   Q.      And did you compare the language in those files to the

20   language in files that were seized in this case or that you had

21   possession of in this case?

22   A.      Yes.

23   Q.      And when did you do that?

24   A.      Must have been in 2003.

25   Q.      And you wrote a report, but it was a report that

1    related to another case?

2            Bless you, Your Honor.

3    A.      Correct.  There was other investigations going on, and

4    so, yes, I had to write a report.

5    Q.      But it's not one of the hundred and forty some odd

6    reports that you've written in this case?

7    A.      Actually it -- I think it was written on this case

8    report, but it related to another case.

9    Q.      Did you have those files prior to the time that you

10   sought a search warrant in September of 2004, those 25 other

11   files?

12   A.      Again, I don't know if that number 25 is accurate.  And

13   I don't remember keeping the files.  I think I just looked at

14   them.  I don't know if I had them.

15   Q.      Do you still have those files?

16   A.      No.

17   Q.      Okay.  The -- you did not do a database comparison with

18   those files that you had taken from or relating to three other

19   law offices with those of the Sekhon files.

20   A.      What --

21   Q.      Is that true?

22   A.      What kind of comparison?

23   Q.      A word search comparison.

24   A.      Like --

25   Q.      Like you --

A.      Like if I mixed them up with the Sekhons?

Q.      Yes.

A.      No.

Q.      Did you do a separate word search on those files to see whether or not phrases that were in those files were similar to phrases that you have pointed out in these charts?

A.      I did a cursory look at them, and they were not -- they did not have the same language of, like, going unconscious and the beatings.  They were not similar.

Q.      Do you -- and this was Romanian?  These were Romanian only?

A.      I think so.

Q.      Is it your testimony that none of those files had any language relating -- having the word "unconscious" in it?

A.      Well, I don't know if it's a hundred percent, but it wasn't like it is in this case where all of them go unconscious or faint from the pain.  That was not present.

Q.      All of the ones that you've related to on these charts?

A.      Well, the unconscious is not on the charts.  That's a different observation.

Q.      Okay.  Did you do the same type of word -- well, you didn't do a word search using a computer program, correct?

A.      Correct.

Q.      Did you make a report of the results of your word search or your examination of those 25 files?

1    A.       Again, I don't know if it's 25.

2    Q.       Approximately 25.  I'm sorry.

3    A.       I don't know if that's correct.  But I did not do a

4    word search.  I looked at some narratives, and they were not

5    similar.  I think I wrote a report.  I'm not sure what's in

6    there, because it was in 2003, but -- and it's a different case

7    than this case.

8    Q.       Did you attempt to obtain files relating to Indian

9    asylum applicants --

10   A.       Umm --

11   Q.       -- that related to other law firms?

12   A.       I've done a lot of benefit fraud investigations, so I'm

13   sure at some time I've dealt with Indian asylum applicants.

14   Q.       As part of your investigation in this case leading up

15   to the creation of these charts, did you at any time call up

16   the A files of Indian asylum applicants represented by other

17   law firms?

18   A.       No.  Well, Special Agent Morihara was actually handling

19   the Indian portion of this case, and so she was scanning those

20   in and things like that.  So I may have dealt with other Indian

21   asylum cases because I do other case work and benefit fraud,

22   but not part of this case or this comparison.

23   Q.       Agent Morihara did not write any report relating to an

24   examination of files of any other law offices and Indian asylum

25   applicants.  Would you agree with that?

1    A.      I don't know that.  She's also done a lot of

2    investigations, so she could have.

3    Q.      Well, did you write a report relating to the

4    investigation of Indian asylum applicants that were -- that

5    were represented by other law firms and an examination of the

6    attachments?

7    A.      Not as part of this attachment, no.

8    Q.      And you can't recall that Agent Morihara wrote such a

9    report either; isn't that correct?

10   A.      Not as part of this, no.

11   Q.      Okay.  And, in fact, that was not part of your

12   investigation or your creation of these charts, was obtaining

13   Indian asylum applicants from another law firm represented by

14   another law firm and examining their attachments; isn't that

15   correct?

16   A.      Well, no, the investigation was not on other people, it

17   was on this entity.  But I have seen a lot of different asylum

18   applications and -- from different nationalities.

19   Q.      But in terms of the creation or comparisons that were

20   being made on these charts, you didn't -- you didn't make any

21   effort at all, nor did Agent Morihara, as part of this

22   investigation relating to the creation of these charts to

23   obtain other Indian asylum files and compare.

24   A.      No.  But we have looked at several just because of the

25   type of work we do.  So we know what to -- what are in other

1    Indian asylum applications.

2    Q.      The fact is, though, that there's no report listing

3    those files that you may have reviewed in some other

4    investigation.

5    A.      Correct.  That's just from our experience, correct.

6    Q.      And you have not had experience actually working in an

7    asylum case, as I understand it.  You -- you've never been an

8    asylum officer, correct?

9    A.      No, I have not.

10   Q.      You were some kind of an officer, you had other

11   employment with immigration and naturalization, though, other

12   than being an agent?

13   A.      Yes.

14   Q.      And what was that?

15   A.      I was an inspector at an airport, and I was also a

16   district adjudication officer.

17   Q.      And exactly what did you do as a district adjudication

18   officer?

19   A.      I interviewed people for naturalization and for

20   adjustment of status to lawful permanent resident.

21   Q.      You interviewed people relating to their claims in

22   connection with an I-485 application, which would be the

23   request to change status to being a legal permanent resident

24   and getting a green card?

25   A.      Correct.

1   Q.       And did you examine people concerning whether or not

2   they qualified for change of status based upon their spouse

3   filing for them?

4   A.       Yes.

5   Q.       That would be the I-130 form, correct?

6   A.       Correct.

7   Q.       And did you examine people concerning whether or not

8   they were eligible for a waiver of ineligibility or

9   inadmissibility?

10  A.       Yes.

11  Q.       And that would be the I-601?

12  A.       Yes.

13  Q.       And a waiver of inadmissibility or -- am I saying it

14  right?  Is it inadmissibility or ineligibility?

15  A.       Inadmissibility.

16  Q.       Inadmissibility.  That I-601 waiver is not something

17  that is handed out like candy by the government, is it?

18  A.       Well, you have to qualify for it.

19  Q.       And qualifying for it is not simply a matter of saying,

20  oh, I committed fraud, please allow me to be waived.  There's a

21  little bit more that's involved in it than that, isn't there?

22  A.       It depends.  Like, over the years there's different

23  interpretations of it.  Sometimes it's difficult, sometimes

24  it's less difficult.  It just depends on, like, what our

25  instructions are from headquarters on how to interpret it.

1    Q.      It becomes less difficult to get a waiver of

2    inadmissibility when a government investigator recommends a

3    waiver -- that a waiver of admissibility be granted to a

4    particular person.  Would you agree with that?

5    A.      It becomes what, less difficult?

6    Q.      Less difficult.

7    A.      Can you repeat that one.

8    Q.      It becomes -- you said it's more difficult sometimes,

9    it's less difficult other times.

10   A.      Uh-huh.

11   Q.      Would you agree that it's less difficult to get a

12   waiver of inadmissibility granted when a government agent or

13   investigator recommends it?

14   A.      Yes.  I'm sure a recommendation would be considered in

15   the decision, but it's not automatic.

16   Q.      And, in fact, that happened in relating to one of the

17   witnesses that -- that you had cooperating with you, correct?

18   A.      Yes.

19   Q.      That was Radu Vlad?

20   A.      Correct.

21   Q.      And Radu Vlad had admitted to you that he had committed

22   immigration fraud, correct?

23   A.      Yes.  Asylum fraud.

24   Q.      Asylum fraud.  And he had -- he had also been facing

25   arrest and deportation as well, correct?

1  A.      Right.  Because he came in on a German passport, it's

2  under the visa waiver program so it's called visa waiver

3  removal or something like that.

4  Q.      Well --

5  A.      It's not like a deportation proceeding.

6  Q.      He was -- well, he was certainly subject to deportation

7  based upon the fact that he failed to appear at -- for an

8  immigration court hearing relating to the -- what he says is a

9  false asylum application, correct?

10 A.      Correct.

11 Q.      So there were two separate basis to have him basically

12 removed from this country.  One was a deportation based upon

13 his failure to appear for -- in connection with the asylum

14 claim, and the second was because he came here on a false

15 German passport, correct?

16 A.      Well, the thing is what happened in his case is they

17 put him under the wrong category when they referred him to the

18 immigration judge.  So that was a mistake, and then it wasn't

19 supposed to be handled in that way.  He was supposed to get a

20 different -- he was supposed to be under a different category

21 because of the visa waiver.  So all the paperwork that was

22 issued to him was actually in error.  So it wouldn't have gone

23 in those proceedings.

24 Q.      It could have been either/or or both.  He was subject

25 to arrest and deportation for his failure to appear before an

1    immigration judge.  Would you agree with that?

2    A.      Umm --

3    Q.      Relating to his asylum claim.

4    A.      What I just explained is it wasn't exactly deportation,

5    it's a visa waiver removal, and the paperwork that they issued

6    wasn't under the right category.  So when I got his A file, we

7    had to straighten that out, and we gave him a deferred action

8    based on the visa waiver removal category.

9    Q.      He had filed a false asylum claim according to you,

10   correct?

11   A.      Yes.  That -- through the Law Offices of Sekhon &

12   Sekhon.

13   Q.      He could have been prosecuted for that separately,

14   correct?

15   A.      Well, there's discretion on single scheme violaters.

16   They are usually not prosecuted.

17   Q.      Well, according to his statement he committed perjury,

18   correct?

19   A.      Excuse me?

20   Q.      According to his statement, he committed perjury by

21   signing a false asylum application, correct?

22   A.      Well, I don't think that was translated to him, the 589

23   oath.  But he did take an oath at the asylum office.  So --

24   Q.      He committed perjury.  I mean, are you saying that --

25   are you saying that he didn't commit perjury?

3792

1   A.       No.  I said when he signed the 589, I don't believe

2   that that paragraph was translated --

3   Q.       Well, you weren't --

4   A.       -- for him.

5   Q.       You weren't there, correct?

6   A.       Well, that -- no, I wasn't there.  But --

7   Q.       You only -- you have what he told you.

8           THE COURT:  Allow the witness to answer.

9           MR. DRATMAN:  Oh, I'm sorry.  Did I interrupt you?

10          THE WITNESS:  Yes.  But go ahead.

11  Q.       BY MR. DRATMAN:  Well, you weren't present when that

12  application was signed, were you?

13  A.       No.

14  Q.       And you know that he signed an oath, and according to

15  what he said he violated that oath by telling lies.

16  A.       Right.  He was advised to do that by the law office.

17  Q.       He told you that he was advised to do that.

18  A.       Right.  And he told the court, too.

19  Q.       Okay.  And is that -- does that mean that he didn't

20  commit perjury?

21  A.       No, it doesn't mean that.

22  Q.       Okay.  So getting back to my original question, he

23  committed -- Radu Vlad committing perjury, correct?

24  A.       Yes, he did make false statements.  He took an oath,

25  and he related the false story that was provided to him by the

1    law office on their advice.  So --

2    Q.      According --

3    A.      Yes, he did, but I don't think he's a hundred percent

4    responsible for that.

5    Q.      The law office -- well, okay.  Let's -- are you saying

6    that based on -- well, strike that.

7            You are holding a number of files right now at your

8    office that are A files, correct?

9    A.      Correct.  I ordered -- I tried to order all the alien

10   files for the trial in case the defense wanted access to them

11   or in case we needed them.  So I tried to get as many as

12   possible, but I don't think I have all of them in our file room

13   here.

14   Q.      And you have -- and because you have those files, no

15   action can be taken on those files, correct?

16   A.      Correct.  And we also -- headquarters asylum requested

17   that -- or we became -- we came into agreement that all these

18   cases should be placed on hold until the criminal case is over

19   and then we can address each case individually.

20   Q.      And that was in part at your request?

21   A.      Well, it was a mutual decision.

22   Q.      In part based upon your request that that be done,

23   correct?

24   A.      Well, I had told them what the investigation revealed.

25   I don't think they want to go forward with a case that we have

3794

1   evidence of fraud on.

2   Q.      Now, in each of -- in those cases that have been held

3   up, people have not been able to have their claims adjudicated

4   for permanent residency, correct?

5   A.      Yes.

6   Q.      Many of those A files that you're holding have

7   applications relating to requests for permanent residency for

8   having relatives brought over from another country based on

9   their asylum claims, correct?

10  A.      Correct.

11  Q.      And other action that's being requested by the asylees,

12  correct?

13  A.      Excuse me.  That's correct.

14  Q.      And all of those have been put on hold, correct?

15  A.      Correct.  Based on this investigation, yes.

16  Q.      Except that there have been some cases that you

17  actually exercised your power to release files, correct?

18  A.      Yes.  On some witnesses, I -- a few of them I sent

19  their file to be adjudicated as a way of making sure that

20  they're going to be available to testify at trial, they don't

21  go back to Romania.

22  Q.      You released files relating to people that you referred

23  to as cooperators, correct?

24  A.      They're witnesses, yes.

25  Q.      You have not released any file relating to a person

1    that is -- could be termed a non-cooperator.  Would you agree
2    with that?
3    A.     Well, no, that's not true.  I have released ones that
4    have been requested by different entities.  There's so many of
5    them, and there's all these different situations that they're
6    encountering.  So some of them are in immigration court in
7    places, some of them may have been arrested for a crime and
8    they need the file, things like that.  So I've sent out some.
9    Q.     But you have not sent out any for adjudication that
10   would result for the non-cooperators in the kinds of benefits
11   that Radu Vlad, Cosmin Iacob and others have received who
12   testified here today.  Would you agree with that?
13   A.     Yes.  Well, also, I haven't spoken to them, and I
14   haven't gotten their statement about what happened.  So theirs
15   is still --
16   Q.     The answer to the question is that you have never sent
17   out a file to make sure that someone got a benefit that they
18   had requested from the service such as you did for those people
19   that have cooperated in this case.  Would you agree to that?
20   A.     Yeah.
21   Q.     And would you agree that sending out a file that you're
22   holding for a person so that a claim can be adjudicated where
23   you've been holding the file is a substantial benefit to that
24   person?
25   A.     Well, I have -- I'm doing a fraud investigation on

1   their file, so I haven't completed it yet.  This -- this

2   criminal case was extended, extended, extended, so that's why

3   I've been holding them so long.  Eventually, once this is over,

4   they can continue with their administrative applications and --

5   Q.     Do you remember my question?

6   A.     I thought I answered it, sorry.  But do you want to ask

7   it again.

8          THE COURT:  Ask it again, counsel, if you're not

9   satisfied.

10  Q.     BY MR. DRATMAN:  Would you agree that releasing a file

11  to your -- for your witnesses' cases to be adjudicated gave

12  them substantial benefits?

13  A.     Yes.  They received benefits that they would -- they

14  would have qualified for.

15  Q.     Well, in the case of Cosmin Iacob, he is a person that

16  came to see you and admitted that he had committed fraud,

17  correct?

18  A.     Correct.

19  Q.     He said that he lied.

20  A.     Yes.

21  Q.     He said that -- and because he said that he lied, you

22  released his file that allowed the adjudication of a claim on

23  someone who had admitted that they had committed fraud.

24  A.     Yes.  He was actually supposed to file a waiver for

25  that fraud.  He qualifies for the green card with the waiver,

3797

1    but he didn't file the waiver.  He still needs to do that.

2           And, yes, I sent it down there as a way of making sure

3    he doesn't leave the country or take off and never -- and not

4    be able to appear here for trial.

5    Q.      But he received a substantial benefit as a result of

6    your releasing that file.

7    A.      Well, yes.  Yes, he would have gotten that anyway, but

8    just maybe later.

9    Q.      Had the service decided to pursue a claim against him

10   based upon -- he filed his I-485 on his marriage, he said that

11   he was an asylee, correct?

12   A.      Say that again.

13   Q.      When he filed his I-485, that is his application for

14   permanent -- to become a permanent citizen --

15   A.      Uh-huh.

16   Q.      -- he did that disclosing that he was an asylee,

17   correct?

18   A.      Yes, that was his status when he filed it.

19   Q.      His status was unlawfully obtained according to what he

20   said to you, correct?

21   A.      Yes.

22   Q.      And that -- that in and of itself could have prohibited

23   him from getting any status in this country.

24   A.      No.  He would have had to file that waiver that I

25   talked about.

1    Q.      Well, the waivers aren't always granted simply because

2    someone asks for them.  Oh, I lied and committed fraud and

3    committed a crime against the United States, will you please

4    excuse me and give me a green card because I married an

5    American citizen.  It doesn't always work that way, does it?

6    A.      Well, it never works that way, the way you described

7    it.  But if -- in my experience with the waivers is they're

8    granted a lot as long as the paperwork is filled out correctly.

9    A lot of times if they have assistance from an attorney, that

10   lays out the case for the waiver they -- that is granted.

11   Q.      So that a person who has committed in the eyes of you

12   as an investigator a fraud against the United States can get

13   status in this country by filing a waiver?

14   A.      Yes.  If you marry a U.S. citizen, you're eligible for

15   that waiver.  Fraud waiver, there's also waiver for if you have

16   criminal convictions, if you marry a U.S. citizen for certain

17   criminal convictions.  There's a lot of waivers available for

18   people who marry U.S. citizens.

19   Q.      Those waivers are not always granted, though.

20   A.      They're not always granted, but they're available.

21   Q.      It's not required that the service grant those waivers,

22   correct?

23   A.      No, it's never required that they deny or grant any

24   application.

25   Q.      And the service --

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

3799

1    A.       As long as -- they would have to determine if someone

2    is eligible for it.

3    Q.       But it's not just eligibility, there's discretion that

4    is exercised.  That is, a hearing officer such as the one

5    you -- such as what you used to do looks at the case and

6    determines the extent of the fraud and determines whether or

7    not this person is of such good moral character that they

8    should be allowed to stay in this country, correct?  Isn't that

9    one of the things that's evaluated?

10   A.       It's not exactly that.  It has to do with the U.S.

11   citizen.  The waiver has to do with the U.S. citizen more than

12   the alien.  Because -- I guess I don't really know why the

13   waiver was designed, but I think it's because -- not to break

14   up families.  But it has to do with how the U.S. citizen's life

15   would change if they had to go to the other person's country.

16   I think they call it hardship if they would have -- if the

17   waiver were not granted.

18   Q.       On the other hand, the government can -- and you

19   have -- strike that.

20           The I-601 waiver of inadmissibility is not always

21   granted.  Would you agree with that?

22   A.       I would agree with that, yes.  Not every application is

23   always granted.

24   Q.       And when an investigator such as yourself sends a file

25   to a place like Phoenix and asks for it to be adjudicated

1    because this person is a key witness in a case, that is giving

2    either implicitly, that is out in the open, or under the table

3    an idea that this should be granted.  Would you agree with

4    that?

5    A.      No.

6    Q.      Well, let me ask you this.  For Cosmin Iacob, did you

7    want them to grant that waiver?

8    A.      Yes.

9    Q.      And --

10   A.      I think he qualifies for it.

11   Q.      As to Ranbir Khera, he is a person who we talked about

12   earlier in this case, correct?  That's been talked about.  You

13   testified about him in direct examination, correct?

14   A.      Correct.

15   Q.      And Ranbir Khera is someone that came to your office?

16   A.      Yes.

17   Q.      And you had his eye -- his A file, correct?

18   A.      Actually a different agent was handling that.  Special

19   Agent Edward Roach was handling that case at the time that he

20   came in.

21   Q.      That case was -- the A file was delivered to you,

22   correct?

23   A.      After Agent Roach was -- he was assigned to help on

24   this investigation for a period.  And after he transferred and

25   Agent Morihara took his place, I think the file went to me at

1    that time, yes.

2    Q.    And the file went to you so that you could have it and

3    review it in connection with your interview of Mr. Khera,

4    correct?

5    A.    No.  At the time he was interviewed, Agent Roach had

6    it.  I believe Agent Roach wrote the report on that interview.

7    Q.    At some point in time prior to the time that Ranbir

8    Khera's request for adjustment of status was adjudicated, you

9    obtained his A file, correct?

10   A.    Yes.

11   Q.    And you reviewed that A file completely, correct?

12   A.    Yes.

13   Q.    And you reviewed that A file completely because you

14   wrote a report relating to his pending adjustment of status

15   application, correct?

16   A.    A report?  I think -- are you referring to a memo?

17   Q.    A memo.

18   A.    Yes.

19   Q.    And in reviewing his application -- strike that -- his

20   A file, you learned that he had married more than once,

21   correct?

22   A.    Correct.

23   Q.    And that there was a hearing -- or strike that -- a

24   meeting that occurred on July 6, 2002, that's Exhibit JJJ

25   that's in evidence, relating to his I-485 application, correct?

1   Do you remember that?

2   A.      If you show me something, I can --

3   Q.      Remember these?

4   A.      Yes.  I think the date usually DOM refers to date of

5   marriage.  So I don't think that was the date that this --

6   Q.      Oh, I see.

7   A.      I'm not sure.

8   Q.      But you were aware that there was a -- what do they

9   call it, an interview or two interviews, one with the -- one

10  with Mr. Khera and one with his sponsoring wife?

11  A.      No, I don't think there were two interviews.  It's hard

12  to tell by these notes, but it does not reflect that there were

13  two interviews in my -- in my deciphering of it.

14  Q.      Does it -- in these situations involving a husband and

15  a wife that are applying for adjustment of status, isn't it

16  customary for the hearing officer to interview them separately

17  and see whether or not they tell the same story of their

18  relationship?

19  A.      No.  Well, first, it's not a hearing officer, it's an

20  adjudication officer.  And usually the couple will come in for

21  a 20-minute interview, sometimes less.  And if the officer is

22  not satisfied at that first interview on any point, they will

23  ask for a second interview.  And at the second interview they

24  may be separated, and they have more time, they'll schedule

25  that for more time.

3803

1    Q.       You recall seeing this document in the A file of Mr.

2    Khera, correct?

3    A.       Correct.

4    Q.       And you recall that Mr. Khera denied that he had

5    provided information that his wife and he met on the Internet,

6    correct?

7    A.       Are -- you're -- he said that in trial, but I never

8    talked to him about that.

9    Q.       In trial you heard his testimony, correct?

10   A.       Correct.

11   Q.       And you saw this -- you had seen this document in his A

12   file, JJJ, before sending a memorandum relating to the

13   adjustment of his status, correct?

14   A.       Correct.

15   Q.       And on the left-hand side it says petitioner, correct,

16   right there?

17   A.       Yes.

18   Q.       And on the right-hand side it says beneficiary,

19   correct?

20   A.       Yes.

21   Q.       And the petitioner would be the wife, correct?

22   A.       The U.S. citizen, correct.

23   Q.       And the beneficiary would be Mr. Khera, correct?

24   A.       Correct.

25   Q.       And according to this, someone denied by Mr. Khera in

1    his trial testimony said that there was an Internet romance.

2    Do you see that?

3    A.      Yes, I see that.

4    Q.      And that the wife or someone said that they were 16

5    years old when they started talking to B, which would be the

6    beneficiary.  Oh, it says P was age 16 when she started talking

7    to B, the beneficiary, on the Internet.  Do you see that?

8    A.      Yes, it says that there.

9    Q.      And that was denied by Mr. Khera in his testimony, you

10   remember that, don't you?

11   A.      Yes, but that was eight years ago, so I don't know.

12   Q.      And it also says that they were married when P was 17

13   and a half years old in Reno, Nevada, correct?

14   A.      That's what that says, yes.

15   Q.      And -- now, at the time actually of the marriage, you

16   recall that she was in fact 16 years old, correct?

17   A.      Well, I learned that at the trial, too.  I never knew

18   that she was 16.

19   Q.      And had you done any background investigation on Mr.

20   Khera before or after you had met him?

21   A.      After, yes.  I think I ran him in a program we have,

22   Choice Point or Accurate, something like that.

23   Q.      Did you send an agent out to see whether in fact he was

24   living with his wife?

25   A.      No.  I didn't feel that was necessary because I spent a

1   long time with he and his wife, they seemed like a normal

2   couple, they had good interaction.

3   Q.      But you were not the adjudication officer that had

4   interviewed them as set forth in JJJ, correct?

5   A.      Correct.

6   Q.      And you're aware that the adjudication officer -- that

7   a memorandum for special operations was prepared based upon a

8   follow-up interview that was being requested.  That was in the

9   A file, do you remember that?

10  A.      Can I see that?  Or put it up --

11          MR. DRATMAN:  Yeah.  Can I approach, Your Honor?

12          THE COURT:  You may.

13          MR. DRATMAN:  That is KKK.

14  Q.      That was in the Khera file, correct?

15  A.      It doesn't say special operations on here.  Oh, I see.

16  AFU.  Sorry, it does say that.

17  Q.      And that would be a memorandum to a unit that

18  investigates essentially sham marriages, correct?

19  A.      It's San Francisco office.  I'm not sure.

20  Q.      Well, you're aware that the San Francisco office does

21  investigate sham marriages, correct?

22  A.      Everybody investigates that, yes.

23  Q.      In this particular case, you reviewed this memorandum

24  prior to the time that you sent a memorandum to -- that was

25  initially written out to San Francisco, but you changed to

1    Fresno, correct?

2    A.      Correct.  Yes.  Well, my interpret -- my --

3    Q.      The question before you is whether or not you reviewed

4    this memorandum.

5            THE COURT:  The witness can answer the question.

6            THE WITNESS:  Can you ask the question again.

7    Q.      BY MR. DRATMAN:  You reviewed this memorandum that's

8    dated September 2nd, 2003, prior to the time that you sent a

9    memorandum to the adjustment of status unit in, first, San

10   Francisco and then Fresno, which is LLL in evidence.

11   A.      Yes.  Umm, I think --

12   Q.      Actually it's not in evidence.  Let me show this to

13   you.  I just remembered it's not in evidence.

14           THE COURT:  Let the witness answer the question,

15   counsel.  You can't keep butting in.

16           MR. DRATMAN:  I'm sorry.  I just realized --

17           THE COURT:  I know you may be sorry, that's not the

18   point.  Don't do it.

19           MR. DRATMAN:  Okay.  May I approach, Your Honor?

20           THE COURT:  You may.

21   Q.      BY MR. DRATMAN:  Showing you LLL, is this the

22   memorandum that -- I'm sorry, I didn't mean to throw that at

23   you.  Is that the memorandum that you had written relating to

24   the adjustment of status for Mr. Khera?

25   A.      Yes.

1   Q.      And that was written in 2006, correct?

2   A.      Correct.  December 2006.

3   Q.      And in writing that memorandum, you had the entire A

4   file, correct?

5   A.      Yes.

6   Q.      And you had reviewed the September 2nd, 2003,

7   memorandum that was written for special operations, correct?

8   A.      Yes.

9           MR. DRATMAN:  Your Honor, I move KKK and LLL in

10  evidence.

11          THE COURT:  Be admitted.

12                      (DEFENSE EXHIBITS 3K and 3L, AFU

13                       memorandum and adjustment of status

14                       memorandum re: Ranbir Khera, ADMITTED

15                       INTO EVIDENCE.)

16          MR. DRATMAN:  May I publish?

17          THE COURT:  You may.

18  Q.      BY MR. DRATMAN:  Showing you KKK, this is the

19  memorandum that was written September 2nd, 2003, that was in

20  the A file relating to an A -- a request for an AFU interview

21  based on the following, and there's a whole list of things.

22          What's an AFU interview?

23  A.      I have no idea.  Additional follow up perhaps.

24  Q.      And the items that are listed here are all items that

25  relate to an investigation of what may be termed a sham

3808

marriage.  Would you agree with that?

A.      No, that's not an investigation.  That's a second interview.

Q.      Okay.  Well, the first one -- there are check boxes here, correct?

A.      Yeah.  This form is used to ask the supervisor for a second interview, and they have to justify it, the officer has to justify it.

Q.      But there are a number of items that are here that suggest that they were looking to see whether or not the initial interview was satisfactory to show that this was a proper marriage.

A.      Yes.  But it -- that's all it means, that they're going for a second interview.  Umm --

Q.      Let's go through these items.

        THE COURT:  Let's wait till after the break.

        MR. DRATMAN:  Okay.  Thank you.

        THE COURT:  We'll take the midmorning recess, Ladies and Gentlemen.

        (Recess taken.)

        THE COURT:  You may proceed.

        MR. DRATMAN:  Thank you, Your Honor.

        Just for housekeeping, JJJ, which was shown to the witness, I think I neglected to move that into evidence.  The government has no objection to JJJ.

1          THE COURT:  Very well.  KKK was just admitted, wasn't

2    it?  That had previously been admitted.

3          MR. DRATMAN:  KKK and LLL were admitted just a little

4    while ago.

5          THE COURT:  Okay.  But JJJ has not.

6          MR. DRATMAN:  Correct.

7          THE COURT:  Be admitted.  You may publish.

8                         (DEFENSE EXHIBIT 3J, memorandum

9                         re: Ranbir Khera, ADMITTED INTO

10                        EVIDENCE.)

11         MR. DRATMAN:  This is KKK, Your Honor.

12   Q.     We were just looking at this memorandum that was in Mr.

13   Khera's A file.  That memorandum requested an interview with a

14   list of items to re-interview Mr. Khera -- actually the

15   petitioner and the beneficiary, Mr. Khera's wife and himself,

16   correct?

17   A.     I'm sorry.  I didn't hear your question.

18   Q.     There was a request to interview Mr. Khera and his wife

19   based on the following, and there's a list there.  Do you see

20   the list?

21   A.     Yes.

22   Q.     And the list has checked on it age or cultural

23   disparity, correct?

24   A.     Correct.

25   Q.     And there is an age difference between Mr. Khera and

1  his wife, several years?  She was quite young when they met and

2  ultimately married?

3  A.    Yes.

4  Q.    The second is that the marriage and divorce history are

5  not typical, that's checked.  And there is an indication that

6  Mr. Khera has one prior, maybe two prior marriages that were

7  brief duration, correct?

8  A.    It says one, not two.

9  Q.    One, okay.  One prior marriage but of brief duration,

10  you recall the testimony concerning that, correct?

11  A.    Well, that's not -- it doesn't say brief duration on

12  it, does it?

13  Q.    Well, it says marriage and divorce history not typical.

14  That's checked, right?

15  A.    Yeah, that could be anything.

16  Q.    Well, you were here during his testimony and the

17  introduction of evidence that showed that he had a very brief

18  marriage shortly after he arrived in the United States with a

19  very quick divorce, correct?

20  A.    Right.  But this memo was written I think in 2003.  So

21  the testimony here was -- I don't think the person writing the

22  memo had the benefit of the testimony here.

23  Q.    Okay.  They did have the benefit of the I-485 that

24  indicated a prior marriage, correct, and divorce?

25  A.    Right.  That's -- yeah, he was married before, he had a

1    prior marriage.

2    Q.      Okay.  And checked off is BEN or petitioner, meaning

3    beneficiary Mr. Khera or petitioner the wife very nervous

4    during interview, correct?

5    A.      Yes.

6    Q.      Also checked off was a notation that there was little

7    interaction between the two, correct?

8    A.      Correct.

9    Q.      And there were -- there's also a check that says joint

10   documents do not support bonafides.  And did you review the

11   file and determine what that might have been a reference to?

12   A.      I think -- I don't know why that was checked because my

13   review of the file did not reflect that.  Her parents sponsored

14   him financially.  So it did show to me that they had --

15   Q.      Perhaps showing you JJJ.  He indicated or someone

16   indicated -- actually it says here beneficiary stated that

17   father pressured him to marry his daughter.  Do you see that?

18   A.      Yes.

19   Q.      Perhaps that's what the memo was referring to.

20   A.      I don't know.

21   Q.      And then there's -- other is checked off as well,

22   correct?

23   A.      Correct.

24   Q.      Indicating that the beneficiary was admitted on April

25   7th, 1988, as a P-3 from India, correct?

1    A.      Yes.  That really doesn't have anything to do with the

2    marriage but, yes, it's written there.

3    Q.      But the reason that it's written there is the next

4    line, beneficiary's first marriage to a U.S. citizen was in --

5    was in May 12th, 1998, which was less -- a little over four

6    weeks after arriving in the United States, correct?

7    A.      Correct.

8    Q.      And divorced in November 19th, 2001, correct?

9    A.      Correct.

10   Q.      Then the next line is BEN filed asylum in 9/25/2000,

11   correct?

12   A.      Correct.

13   Q.      And then BEN, beneficiary and petitioner met on the

14   Internet in January of 2001, correct?

15   A.      Correct.

16   Q.      Then the next line is BEN, beneficiary was age 23 and

17   petitioner was 16 years when they met and started dating,

18   correct?

19   A.      Correct.

20   Q.      Petitioner's parents are from India, she was born here

21   is the next line, correct?

22   A.      Correct.

23   Q.      Beneficiary stated that father of petitioner pressured

24   him to marry his daughter, correct?

25   A.      That's what it says, yes.

1   Q.      Beneficiary and petitioner married in Reno, Nevada,

2   July 16th, 2002.

3   A.      Correct, that's what it says.

4   Q.      And the next line says beneficiary withdrew his

5   application for asylum in August 2002, correct?

6   A.      Yes.

7   Q.      Petitioner will be graduating high school this year is

8   the next line, correct?

9   A.      Correct.

10  Q.      Beneficiary and petitioner failed to support any

11  support -- failed to submit any supporting documents, correct?

12  A.      Correct, that's what it says.

13  Q.      And beneficiary -- finally beneficiary might be related

14  to petitioner's family on her father's side, correct?

15  A.      Correct, that's what it says.

16  Q.      And was there any follow-up memorandum that was

17  contained in the A file relating to that memorandum?

18  A.      No, not that I know of.  Maybe there's something in

19  there I don't remember, but I don't think so.

20  Q.      I don't have anything.  I just wanted to know if you

21  remembered.

22  A.      What happened was our office --

23  Q.      The question I asked you was whether or not there was

24  any other memo.

25          THE COURT:  Counsel.

1          MR. DRATMAN:  And it was answered, Your Honor.

2          THE COURT:  Counsel, just ask the question.  Don't butt

3   in and interrupt the witness.  Let the witness complete her

4   statement, and then you can move on.

5          MR. DRATMAN:  Well, I had gotten an answer, Your Honor,

6   and the answer was complete.

7          THE COURT:  Just stop doing that, please.  Be more

8   respectful of the witness.  Go ahead.

9   Q.     BY MR. DRATMAN:  Showing you Exhibit LLL, this is

10  the -- this is the document that you sent, the memorandum that

11  you sent to the adjustment of status unit, correct?

12  A.     Correct.

13  Q.     And that was for the purpose of having Ranbir Singh

14  Khera's pending adjustment of status application adjudicated,

15  correct?

16  A.     Correct.

17  Q.     And you sent a memo saying that, first of all, you were

18  releasing the file to them, correct?

19  A.     Yes, I sent this with the file.

20  Q.     And that release of file was something that, had you

21  not done that, there would have been no adjudication, correct?

22  A.     Correct.  It had been pending at that time about over

23  four years.  So --

24  Q.     There had been other files that had matters pending for

25  over four years with people that had not spoken with you,

3815

1    correct?

2    A.      Correct.  And Mr. Khera never submitted the asylum

3    application, and so he -- there was really no reason to hold

4    up.

5    Q.      The fact is, though, that you had not independently

6    sent that file over to the adjudications unit until after Mr.

7    Khera met with you, correct?

8    A.      Three years after, correct.

9    Q.      And you -- you indicated that he was a key witness?

10   A.      Yes, he is a witness here.

11   Q.      And that you wanted -- essentially you wanted them to

12   proceed with the adjudication, correct?

13   A.      Yes.

14   Q.      And from your standpoint, that was an indication to the

15   adjudications unit that you -- meaning when you sent it over,

16   that they would adjudicate it and give him his status as a

17   permanent legal resident, correct?

18   A.      No.  They would -- adjudicate means to make a decision,

19   so they would conduct whatever they need to do to make the

20   decision on the application.

21   Q.      In this particular case, you were letting them know,

22   though, that he was a key witness whose presence you wanted at

23   this trial, correct?

24   A.      Yes.  I didn't want them to send the A file somewhere

25   and I wouldn't be able to get it back.

1    Q.      And you also did not want Mr. Khera deported as well,

2    correct?

3    A.      Yes.  I need him here as a witness, but they wouldn't

4    be able to put him -- to deport him.

5    Q.      They could deny his status.

6    A.      Yes, they could do that.  And hopefully with that memo,

7    if he decided to deny it, they would let me know so I could do

8    what -- keep him on a parole or something so he could be here

9    as a witness.

10   Q.      Or apply for an S Visa for him.

11   A.      I -- I don't know.

12   Q.      In any event, it was your memo -- following your memo

13   and the release of the file, he received a substantial benefit,

14   that is his green card, correct?

15   A.      Well, it was based on his marriage.  He was eligible

16   for that benefit.

17   Q.      But that --

18   A.      It wasn't -- I mean, just because I have the file, it

19   doesn't really give him a benefit.  His benefit was based on

20   his marriage.

21   Q.      There are other people that have requests for benefits

22   that are -- that are in A files that you have under your

23   control, correct?

24   A.      Yes.  And as I explained earlier, we're waiting for

25   this criminal case to be over.  We're going to revisit all

1   those files.  But there are so many of them, there's hundreds,

2   I can't do all of them and get ready for the criminal case.  So

3   we're going to do the criminal case first and then each

4   individual case, their applications.

5   Q.      But as a practical matter, the -- Mr. Khera's file, the

6   release of Mr. Khera's file by you resulted in him getting a

7   substantial benefit, that is his green card.

8   A.      No, it was based on his marriage.

9   Q.      Had you not released the file, would he have been able

10  to have gotten his green card?

11  A.      He would have had the green card had we not requested

12  the file to begin with.  He would have had it before we

13  requested the file.

14  Q.      Well, he according to his statement and his testimony

15  participated in immigration fraud, correct?

16  A.      No, he didn't.

17  Q.      He did not?

18  A.      Not according to what he told me.

19  Q.      Okay.  Practically speaking, then, there was no

20  impediment whatsoever to him having gotten his green card

21  status.

22  A.      Not that I'm aware of.

23  Q.      And the fact that -- the things that were raised in the

24  memo in 2003 were things that were never followed up on.  There

25  was no interview after that according to the A file on any of

1    those items that were set forth in --

2    A.      Yes, I'm confident he would have gotten his green card.

3    I met his wife.

4    Q.      You were not the adjudications officer, though,

5    correct?

6    A.      Correct.  But a lot of these things that are listed,

7    the fact that they're from India, it doesn't really have any

8    bearing on a marriage.

9            MR. BLACKMON:  Your Honor, I'm going to object to this

10   testimony.  It's speculation of this witness.

11           THE COURT:  Well, it's cross-examination, and the door

12   has been opened.  I mean, we've had a very open-ended

13   discussion --

14           MR. DRATMAN:  I'll withdraw the question, and I --

15   quite frankly there is no basis for the question, and I'll

16   withdraw it.

17           THE COURT:  All right.

18   Q.      BY MR. DRATMAN:  What you do know as a fact is that

19   there is nothing in the A file indicating that there was ever

20   any follow-up interview concerning any of these items.  Would

21   you agree with that?

22   A.      Yes.  Because what happened was, before the interview

23   was scheduled, Agent Roach requested the file for the --

24           MR. BLACKMON:  Your Honor, I'm going to object as

25   nonresponsive.  The question was a yes or no answer, she

1   answered it, and I'd ask that the further answer be stricken.

2          THE COURT:  That was subject to a yes or no answer, and

3   I will instruct the jury to disregard the balance of that

4   question -- answer, excuse me.  Proceed.

5          MR. DRATMAN:  Thank you.

6   Q.     Now, concerning other persons who have testified in

7   this case whose A files you had, in order to secure their

8   testimony you had to act and make sure that they obtained

9   certain benefits from the government, correct?

10  A.     No.  I was -- my purpose is to make sure that they're

11  going to be available to come to this trial, they don't go back

12  to their country, they don't move somewhere and lose contact.

13  Q.     You're familiar with an S visa, correct?

14  A.     Yes.

15  Q.     And, in fact, you have made application for S visas on

16  behalf of at least three witnesses in this trial and were

17  prepared to have -- well, three witnesses in this trial,

18  correct?

19  A.     Yes, I think so.

20  Q.     That would be Alina Contis, correct?

21  A.     Yes.

22  Q.     You also made an application on behalf of her sister

23  Ana Maria Contis, correct?

24  A.     Correct.

25  Q.     And you made an S visa application for Stefan Kadar,

1    correct?

2    A.        Correct.

3    Q.        And I'm going to show you what's been marked as Exhibit

4    6D and ask you if you recognize this as a copy of the S visa

5    application made on behalf of Florin Vorobiov.

6              If I could approach, Your Honor.

7              Do you see your signature on the second page?

8    A.        Yes.

9    Q.        And is that a copy of the S visa that you applied for

10   on behalf of Florin Vorobiov?

11   A.        Yes.

12             MR. DRATMAN:  Okay.  Move 6D into evidence, Your Honor.

13             THE COURT:  Be admitted.

14                           (DEFENSE EXHIBIT 6D, S visa application

15                            for Florin Vorobiov, ADMITTED INTO

16                            EVIDENCE.)

17             MR. DRATMAN:  May I publish?

18             THE COURT:  You may.

19   Q.        BY MR. DRATMAN:  Now, each of these S visas for Florin

20   Vorobiov, for Alina Contis, for Ana Maria Contis and for Stefan

21   Kadar are all using the same form; is that correct?

22   A.        Yes.

23   Q.        And for each of them, application was made by you as

24   the law enforcement agent that was requesting that the

25   particular person, in this case those four people I've referred

1   to, receive this S visa, correct?

2   A.      Can you ask that again, please.

3   Q.      You were the one that made this application, correct?

4   A.      Yes, I filled out the form.

5   Q.      Meaning that you're the one that made the application

6   for the S visa on behalf of these witnesses, your witnesses,

7   right?

8   A.      Yes.  But it has to be signed by a lot of people, I

9   just want to make that clear.

10  Q.      Ms. Webster, you filled out the initial application

11  form, correct?

12  A.      Correct.

13  Q.      Now, on this form it requires you to set forth the

14  various reasons or the various waivers for these individuals on

15  the grounds -- on the following grounds of excludability.  And

16  there is a checkmark box for -- there are -- there's a whole

17  list of items that could be checked off, correct?

18  A.      Yes.

19  Q.      And you were the one that fills those out, correct?

20  A.      Yes, I fill it out initially.  And then when it gets to

21  a certain point in the long process, it goes to an ICE attorney

22  in our headquarters, and they revisit these excludability

23  grounds.

24          MR. DRATMAN:  I would move to strike the last part of

25  the answer that was nonresponsive.  I asked if the witness

1    filled this out.  It calls for a yes or no.

2            MR. WAGNER:  No.  Your Honor, it is responsive.

3            THE COURT:  No, it is responsive.  Because I think

4    she's explaining that maybe not all this was filled out by her.

5    That is my understanding of the witness's response.  Is that

6    correct?

7            THE WITNESS:  Yes, Your Honor.

8            THE COURT:  All right.  Then it is responsive.

9    Q.      BY MR. DRATMAN:  On the first page, did you fill -- was

10   anything else filled out on this first page by anybody else

11   other than yourself?

12   A.      Well, I'm not sure because one of them is written

13   in. --

14           MR. BLACKMON:  I'm going to object, Your Honor, it's

15   nonresponsive.  The question was --

16           THE COURT:  Let her explain her answer, counsel.

17   Overruled.

18           THE WITNESS:  Like I was saying before, this part is

19   revisited when it gets to our headquarters by an ICE attorney.

20   And I don't know if that's the person who put that X in pen

21   that's not typed, the typed X.

22   Q.      BY MR. DRATMAN:  Well, let's look at the next page

23   which is the certification.  This is something that you have to

24   certify, correct, along with the witness?

25   A.      Yes.

1   Q.      And this is an alien certification that you also

2   certify as well, correct, as the LEA witness?

3   A.      Yes, I guess so.

4   Q.      Well, it says here, I certify under penalty of perjury

5   that I have reviewed with the LEA all the information in part

6   A, correct?

7   A.      I think that "I" is referring to the alien.

8   Q.      Correct.

9   A.      Okay.

10  Q.      But this is something that you're required to do before

11  you sign off on this form, correct?

12  A.      To make sure that I cover all those areas of

13  excludability, yes.

14  Q.      Okay.  It says here that I certify under penalty of

15  perjury that I reviewed with the LEA -- and the LEA is -- what

16  does that mean?

17  A.      Law enforcement agent, so that would be me.

18  Q.      Okay.  All the information in part A, disclosed all

19  information to the best of my ability, and disclosed all

20  reasons for which I may be excludable from the United States.

21          And that's something that you reviewed with each one of

22  these people, Alina Contis, Ana Maria Contis, Stefan Kadar and

23  Florin Vorobiov, correct?

24  A.      Correct.

25  Q.      That I shall report at least every three months my

1    whereabouts and activities as the above LEA shall require; that

2    I understand I am subject to deportation for any grounds of

3    excludability conduct or condition not disclosed at this time

4    or for conduct committed after admission to the United States.

5            That's also something that you reviewed with each of

6    these four people, correct?

7    A.      Yes.

8    Q.      That I shall abide by all conditions, limitations and

9    restrictions imposed upon my entry.  You reviewed that as well,

10   correct?

11   A.      Upon my entry.  Umm, I don't really know.

12   Q.      Okay.

13   A.      Because I guess that's what they get after they get the

14   S visa.

15   Q.      That -- well, you reviewed this paragraph with each of

16   these witnesses, did you not?

17   A.      Yes, but I'm not sure if I told them what they have to

18   do after they get the S visa because they haven't gotten it

19   yet.

20   Q.      That the classification I seek is temporary and will

21   terminate within three years, correct?

22   A.      Correct.

23   Q.      That I shall -- that I am restricted by the terms of my

24   admission to very specific means by which I will be able to

25   remain permanently in the United States, correct?

1    A.        Correct.

2    Q.        They are told that they are not by virtue of that

3    three-year limitation prohibited from being able to stay

4    permanently beyond that three years, correct?

5    A.        They're not prohibited from what?

6    Q.        This last sentence says that I am restricted by the

7    terms of my admission to very specific means by which I will be

8    able to remain permanently in the United States.   That means

9    they can stay permanently in the United States if they comply

10   with certain conditions; isn't that correct?

11   A.        I think that's what it means.

12   Q.        And you explained that to each one of these witnesses,

13   correct?

14   A.        Well, I told them it was valid for three years and that

15   there is a way to apply for a permanent one during that time.

16   Q.        There is a way to apply for permanent legal residency

17   during that period of time, correct?

18   A.        During the three years, yeah, after this is approved.

19   Q.        That -- and they're told that I will pay Social

20   Security and all applicable taxes on all employment in the

21   United States, correct?

22   A.        Yes.

23   Q.        And that I hereby waive my right to a deportation

24   hearing and to contest other than on the basis of an

25   application for withholding deportation any action for

3826

1     deportation instituted against me.

2     A.      Yes.

3     Q.      And then there's a certification.  I certify that I

4     have read and understand all the questions and statements in

5     this form.  If I do not understand English, I further

6     acknowledge that has been read to me in a language I do

7     understand.  The answers I have furnished are true and correct

8     to the best of my knowledge and belief.

9              And that's signed by, in this case, Florin Vorobiov,

10    correct?

11    A.      Yes.

12    Q.      And that's Exhibit 6D.

13             And in the case of Ana Maria Contis, showing you QQ, is

14    that a copy of hers on the board here?

15    A.      Yes.

16    Q.      And the bottom half of that page, correct?

17    A.      Correct.

18    Q.      And the same certification is set forth with her

19    signature and your signature, correct?

20    A.      Correct.

21    Q.      And would you agree that the -- that as to Stefan Kadar

22    that the same -- well, I'm going to just show you 4F here.

23             And is this a copy of his S visa?

24    A.      Application, yes.

25    Q.      His application.

3827

1        And in Stefan Kadar's case -- you heard Stefan Kadar

2   testify that the alien certification, that he had not read that

3   and not gone over that with you, correct?

4   A.      Yes, but I talked to him over the phone about it.

5   Q.      Okay.  And following the signature of yourself and Mr.

6   Kadar, the unit chief has to sign off on the -- as the law

7   enforcement agent, correct?  That's what the next part under

8   the certification is, LEA certification?  You see where I'm

9   pointing?

10  A.      Yes.  I don't recall the exact order of how this is

11  signed off, but I kind of recall that it went to the U.S.

12  Attorney first.

13  Q.      And that appears --

14  A.      Then it went to the unit chief.

15  Q.      It appears to be the case here, because the date on the

16  U.S. Attorney's signature -- and is that McGregor Scott's

17  signature?

18  A.      Yes.

19  Q.      And that was March 8th, 2007, correct?

20  A.      Correct.

21  Q.      And then it goes on to the deputy assistant Attorney

22  General who after your unit chief signs off on it -- that was

23  April 10, 2007, in Mr. Kadar's case, correct?

24  A.      Yes.

25  Q.      It then is sent to the Department of Justice criminal

1  division, correct?

2  A.      Correct.

3  Q.      And there's a certification that the above alien is

4  recommended for the S classification requested, right?  That's

5  at the bottom?

6  A.      Yes.

7  Q.      And then after that, there are -- once the S visa is

8  granted, there are different parts that allow different actions

9  that can be taken on behalf of the S visa applicant once they

10  get their S visa, correct?

11  A.      I don't know.  I'm not that familiar with it.

12  Q.      Well, you testified in response to Mr. Wagner's

13  questions that this was a non-immigrant S visa, correct?

14  A.      This application, yes.  What we applied for were

15  non-immigrant S visas.

16  Q.      And, in fact, you checked off on page 1 for each of

17  these people that this was an S-5 visa.  Do you see that?

18  A.      Yes.

19  Q.      And I'm showing you Mr. Kadar's which is 4F first, and

20  it's an S-5 visa, correct?

21  A.      Application, yes.

22  Q.      Application.

23          And for -- in 6D for Mr. Vorobiov, it's the same

24  request for an S-5 visa, correct?

25  A.      Yes.

3829

1    Q.      And for Ms. Contis, QQ, it's the same request, correct?

2    A.      Correct.

3    Q.      And the same would be true -- would have been true for

4    Ana Maria Contis, correct?

5    A.      Yes, they're all the same.

6    Q.      Okay.  Now, there is a part -- and you're familiar with

7    this form, are you not?

8    A.      I have -- because these have been pending so long, I

9    haven't really looked at them since '07.

10   Q.      But you do know that in the certifications that are

11   contained down here on the third page on each one of these,

12   there is a portion that says request to allow an S

13   non-immigrant to file for adjustment of status to permanent

14   resident.

15   A.      Yes, but we did not make that request.  Because our

16   request was for the S non-immigrant, so they haven't -- nobody

17   has been granted this as a non-immigrant yet.

18   Q.      Your request was for an S non-immigrant visa, correct?

19   A.      Correct.

20   Q.      And once that S non-immigrant visa has been granted --

21   have they been granted yet?

22   A.      No.

23   Q.      But they're pending, and they've been signed off by --

24   everyone that needs to sign has signed, correct?

25   A.      I don't think so.

3830

1    Q.      Okay.  It's in the bureaucratic pipeline.

2    A.      Yes, that's a good description of it.

3    Q.      And at some point those S visas should be granted.

4    A.      I don't know.

5    Q.      At least on your behalf, you're doing everything that

6    you can and the government is doing everything that they can to

7    make sure that these people who have applied for S visas, that

8    you've applied for S visas for get those S visas, correct?

9    A.      We made an application, but I really don't know what's

10   going to happen.

11   Q.      Well, you know that you made the application on their

12   behalf in order to keep them in this country on an S visa for

13   at least three years, correct?

14   A.      Well, that's how long this is valid for.  But it -- we

15   needed them here to testify at the trial.

16   Q.      And they were told that an S visa application was being

17   made on their behalf.  We all agree on that, correct?

18   A.      Right.

19   Q.      They were told that in writing.

20   A.      Yes.

21   Q.      And at some point once the S visa is granted for each

22   of these individuals, they will have the ability under part F

23   to request to allow an S non-immigrant to file for adjustment

24   of status to permanent resident.  That's what's on this form,

25   correct?

1  A.      Yes, that's on the form.

2  Q.      And underneath that it says that this request may not

3  be completed or submitted until the alien has fulfilled the

4  terms and conditions of his or her S non-immigrant

5  classification, correct?

6  A.      Yes.

7  Q.      And in the case of an S-5, which is what all of these

8  people are, there are two certifications here that are

9  possible, two checkmarks under S-5 where I'm pointing.  Do you

10  see where I'm pointing?

11  A.      Yes.  Well, I just want to clarify they haven't been

12  given the S-5 yet, so it's still pending.

13  Q.      Once they are given the S-5, which you've applied

14  for --

15  A.      Uh-huh.

16  Q.      -- and which you have told them that you are applying

17  for and which has been sent in this bureaucratic pipeline, they

18  will have the ability at some point to be considered for --

19  under part F, correct?

20  A.      If they're approved for -- for the S-5, if they're

21  approved?

22  Q.      If they are approved for that which you've made an

23  application for, the S-5, someone will have to certify one of

24  the two things, correct?

25  A.      It looks like that on the form, yeah.

1    Q.      Well, that is what it says on this form.  They'll have

2    to certify one of two things, correct?

3    A.      Yes.

4    Q.      And the first one doesn't apply to any of these people,

5    supplied the information that formed the basis of entry.  That

6    is not why you made the S-5 application on behalf of these

7    people, correct?

8    A.      I'm not sure what this means.  I haven't read this form

9    yet.

10   Q.      Okay.  Well, let's look at the second one and see

11   whether or not that applies.

12           The information substantially contributed to the

13   success of an authorized criminal investigation or the

14   prosecution of an individual as per terms of entry.  Isn't that

15   the part of the S-5 visa that makes each of these people

16   eligible if there's a successful prosecution in this case for

17   permanent residency?

18   A.      It look like that would be the category they would fall

19   under.  S-5 -- I'm not sure what they mean by basis of entry.

20   Q.      As a practical matter, though, you know that the S visa

21   and you told them, you told each of these people that the S

22   visa could lead to permanent residency, correct?

23   A.      Yes.

24   Q.      And the basis, the only basis that's available to these

25   people to obtain permanent residency is if they substantially

3833

1   contributed to the success of this prosecution, correct?

2   That's what it says here.

3   A.      I guess it says -- it says investigation or

4   prosecution, so it's not necessarily a prosecution.  That's

5   what it says on the form.

6   Q.      Well, you haven't signed off on this or authorized

7   anyone to sign off on their behalf to get a green card yet,

8   correct?

9   A.      Like I said, the S-5 non-immigrants are still pending.

10  So --

11  Q.      So the answer to my question is that you have not

12  signed off for any of these people yet to get legal permanent

13  residency.

14  A.      No, because they haven't gotten the S-5 yet.

15  Q.      And that is being -- do you know -- is the S-5 being

16  held up based upon the outcome of this case?

17  A.      No.  No.  I think it's just like you described, it's

18  the bureaucracy.

19  Q.      These -- these applications have been pending since --

20  in the case of QQ, Ana Maria Contis, since 2007, correct?

21  A.      Yes.  I think we started in February 2007 filling these

22  out.

23  Q.      In the case of Florin Vorobiov in 6D, it's been pending

24  also since January of 2007, correct?

25  A.      Correct.

1    Q.      And in the case of Stefan Kadar, same thing, January of

2    2007 is when it started, correct?

3    A.      Can you move that down a little?

4    Q.      Oh, I'm sorry.  Can you see that?

5    A.      Yes.  Yes.

6    Q.      And all of these -- and it would be fair to say that

7    Ana Maria Contis, who is trying to get benefit through her

8    sister here -- would you agree that she's trying to get benefit

9    through her sister's testimony here?

10   A.      No.

11   Q.      Okay.  In any event, hers has been pending as well

12   since January of 2007.

13   A.      Yes.  She was also -- she also provided information in

14   the investigation.

15   Q.      So, as a practical matter, it's been over two years

16   since these applications were -- were begun, correct?

17   A.      Yes.

18   Q.      Now, there was also a concern about another witness,

19   Davinder Singh, and whether or not he was going to be given a

20   basis to stay in this country.  Do you remember that?

21   A.      I'm not sure I understand.

22   Q.      I'm going to show you -- there was at some point an

23   indication that you did not know whether or not he was going to

24   get an I-601 waiver of admissibility or whether you were going

25   to have to apply for an S-visa for him as well.  Do you recall

3835

1    that?

2    A.      I -- I think we advised him to file the -- or I advised

3    his attorney to file the I-601 waiver.

4            MR. DRATMAN:  Your Honor, can I show something to the

5    witness?

6            THE COURT:  You may.

7            MR. DRATMAN:  Thank you.

8            THE WITNESS:  Okay.  I didn't fill out this form, so

9    I'm not familiar with this.

10   Q.      BY MR. DRATMAN:  Did you provide information to Mr.

11   Wagner in this case concerning Mr. Singh and his immigration

12   issues?

13   A.      Yes.

14           MR. DRATMAN:  May I approach again, Your Honor?

15           THE COURT:  You may.

16           THE WITNESS:  Okay.

17           MR. DRATMAN:  I've shown you a three-page letter so

18   that you can identify that as being written on February 3rd,

19   2009.  And it's signed off on by Mr. Wagner.

20   Q.      Does that refresh your recollection as to whether or

21   not you provided information to Mr. Wagner as the case agent

22   indicating that Mr. Davinder Singh would either get -- have to

23   apply for an I-601 waiver of admissibility or you would have to

24   make an application for an S visa on his behalf?  Did you

25   communicate that to Mr. Wagner?

1    A.      I -- I don't think so.  Maybe it was just an

2    assumption.  But I know that we talked about the I-601 waiver

3    with his attorney because he qualifies for a green card based

4    on his marriage.  So, again, he needs a waiver based on the

5    asylum fraud.  So -- that's what we told his attorney.

6    Q.      And in the event that he's not granted a waiver, you

7    would have applied for an S visa on his behalf, correct?

8    A.      I can't predict the future, but --

9    Q.      Well, that was the plan that was communicated to Mr.

10   Wagner, correct?

11   A.      I don't know.  I don't remember that.

12   Q.      Did you indicate to Mr. Singh that you were going to

13   assist him in obtaining the ability to stay in this country to

14   assist in this case?

15   A.      No.  I spoke to his attorney about immigration matters.

16   He has an immigration attorney.

17   Q.      And you assisted his attorney by suggesting a means for

18   the attorney to proceed in order to give your witness status in

19   this country, correct?

20   A.      Yes.  His attorney is aware of the I-601 waiver.

21   Q.      But it had not been accomplished.

22   A.      Well, he just retained that attorney right before we

23   had our meeting when he contacted me.  I'm not sure if that was

24   2008.  I think it was 2008.

25   Q.      In fact, you met with Davinder Singh -- you're

1    referring to the 2008 meeting that you had with him?

2    A.      Is that the date on the report?

3    Q.      I don't have the report in front of me, but --

4    A.      Oh, I think it was 2008.

5    Q.      And you testified earlier that in 2007 you had never

6    threatened Davinder Singh or his wife with any kind of

7    deportation action against him?

8    A.      Correct.

9    Q.      But that you had informed him that his asylum

10   application, his asylum application was under investigation.

11   A.      Yes.

12   Q.      And that you were holding his file?

13   A.      I told him, yes, his file was part of the

14   investigation, and we had seized documents at the law firm

15   relating to his case.

16   Q.      You told him that you were holding his file.  That

17   calls for a yes or no.  Correct?

18          MR. WAGNER:  She answered yes, Your Honor.

19          THE COURT:  She did answer, counsel.

20   Q.      BY MR. DRATMAN:  And you told him that you were going

21   to hold his file until this case was over, correct?

22   A.      I told him that after the criminal case is over, that

23   we were going to send all the files to the asylum office with a

24   request for termination, which -- and I explained to him that

25   it would mean that it would be reopened.

3838

1    Q.      And that he would be facing deportation.

2    A.      No, I didn't say that.  I mean, he would get a chance

3    to explain at the asylum office.

4    Q.      Did you tell him that the reason that you would be

5    returning the file to the asylum office so that proceedings

6    could be opened up so that he could be stripped of his asylum

7    and be deported as an illegal alien?

8    A.      No.  I don't think he would be deported.  I think if

9    his asylum would have been terminated, he would have gone to an

10   immigration hearing, and the immigration judge most likely

11   would have granted him lawful permanent resident based on his

12   marriage.

13   Q.      Did you tell him that you were holding his file so that

14   you could at the end of these proceedings return it to the

15   asylum office?

16   A.      Yes.  I told him that we were going to -- after the

17   trial was over, after the criminal case was over that we would

18   take -- deal with the administrative issues for each individual

19   case and send all the files to the asylum office.

20   Q.      You explained to him that -- about other cases?

21   A.      I'm pretty sure I said all of them.  I don't know if I

22   said just his or all of them, but we were planning to send all

23   of them.

24   Q.      And you told him that the practical effect of that was

25   that his case could be reopened and that he could be facing

1    deportation proceedings.

2    A.      I don't -- I don't remember saying that.

3    Q.      As a practical matter, that is the result that could

4    have occurred at the time that you were speaking to him upon

5    the sending of the file.  That's what you were essentially

6    communicating to him, that he was essentially being faced with

7    losing his asylum status.

8    A.      Losing his asylum status, yes.

9    Q.      And losing his asylum status meant that that would not

10   have been a basis for him to have been in this country,

11   correct?

12   A.      Well, like I said, because of his marriage.

13   Q.      But you didn't tell him because of your marriage,

14   though, you really don't have to worry about this because

15   you've got another basis to stay here.  You wanted to

16   communicate to him that you were holding his file so that it

17   could be returned to the asylum office and he could be facing

18   very serious proceedings that could result in him being

19   stripped of his asylum; isn't that correct?

20   A.      No, that is not correct.  It was -- basically I was

21   trying to explain to him how long it was going to take.  They

22   wanted to know how long everything was going to take, so I was

23   explaining the --

24   Q.      In --

25   A.      -- long process.

1    Q.       In 2007 he was not being cooperative with you, correct?

2    A.       He was -- yes, he was not being forthcoming.

3    Q.       And later on when he was forthcoming, what did you do

4    with his file?

5    A.       Nothing.

6    Q.       Has he been granted his green card?

7    A.       No.

8    Q.       I'm going to return to Exhibit 6B, which I'm going to

9    put up on the board.

10           We discussed RA.  There is also reference to four other

11   files.  Do you see that?

12   A.       Yes.

13   Q.       And the first one is BSB, correct?

14   A.       I can't read that, sorry.  Can I have a copy of it?

15   Q.       I gave you one yesterday.  You don't have that with

16   you?

17   A.       No.  I don't know if it's at the table there.

18   Q.       I don't have an extra because I had given you one

19   yesterday.

20   A.       Okay.  Well, I can try to -- if you can focus it maybe

21   a little.

22           THE COURT:  Counsel, the government has a copy.

23           MR. DRATMAN:  Oh, okay.  Thank you.

24           THE WITNESS:  Okay.

25           MR. DRATMAN:  I wonder if it's the case that no one can

1    read this.  And is there any -- what button should I press to

2    make this easier?  I don't want to blow up the whole place.

3            (Off the record.)

4            MR. DRATMAN:  Is that easier to read?  Okay.

5    Q.    You see the next entry is BSB, correct?

6    A.    Correct.

7    Q.    And are you aware that BSB at one point was on one of

8    your charts but is no longer on the chart?

9    A.    I don't know.  There are so many names, and with these

10   initials it's hard to tell.

11   Q.    Showing you Exhibit 75.2.  Do you see the initials BB?

12           THE COURT:  I don't think that she can see that,

13   counsel.

14           MR. DRATMAN:  Oh, I'm sorry.  I did that again.  Okay.

15           THE WITNESS:  BB?  No, I don't see BB.

16           MR. DRATMAN:  Okay.

17   Q.    Now, this chart was something that you had created

18   prior to this trial in another form, correct?

19   A.    Yes.  It's been modified several times.

20           MR. DRATMAN:  If I can approach, Your Honor.

21           THE COURT:  You may.

22           THE WITNESS:  Okay.

23   Q.    BY MR. DRATMAN:  Do you see that?

24   A.    Yes.

25   Q.    Okay.  And if I could have that back.

1    A.        Okay.

2    Q.        And was the name BSB on this chart in another form?

3    A.        Yes, it was on the search warrant affidavit attachment.

4    Q.        And after -- at some point this name was taken off your

5    chart, correct?

6    A.        Yes.

7    Q.        And was that because a review of the file indicated on

8    the second line that intake notes indicate a plausible asylum

9    claim?

10   A.        No.  It was because I didn't have access to the alien

11   file to provide the documents from the alien file.

12   Q.        In any event, you make a notation here that there were

13   intake notes again, correct?

14   A.        Yes.

15   Q.        And that's why you put this in the exculpatory list?

16   A.        Yes.

17   Q.        Okay.  Even though contained within that asylum

18   application there was, in some form, a reference to a large

19   number of police raiding this person's home in the middle of

20   the night, throwing the applicant or his or her relative in a

21   Jeep, taking them to the police station and presenting them

22   before an officer.

23   A.        What was the question?  I'm sorry.

24   Q.        Well, you took this person off of this form even though

25   there was reference in his attachment, the attachment to his

1   I-589 this reference.

2   A.      This Jeep scenario?

3   Q.      Yes.

4   A.      I'm not sure.  I don't think that was in the notes.

5   But it also -- there were also comments in the file that were

6   nonexculpatory regarding the sample affidavits.

7   Q.      That had nothing at all to do with the attachment B,

8   with the attachment to the I-589 application, correct?

9   A.      Well, in the investigation, most of the sample

10  declarations were taken from the attachment.

11  Q.      And the -- what you refer to as sample declarations

12  that are there taken from the attachment, those are things that

13  you found in files that sometimes did and sometimes did not

14  wind up as attachments in later filings, correct?

15          Not all -- you found attachments -- you found sample

16  affidavits in some files that did not wind up in the A file in

17  another form; isn't that correct?

18  A.      I don't know.  I don't know if that's correct or not.

19  Q.      Okay.  All right.  In any event, there were sample

20  affidavits in that file, but did you find any evidence that

21  there were any actual affidavits either obtained from other

22  people or delivered to the asylum office?  Did you find that in

23  this file?

24  A.      I might have, but I would have to refer to notes or

25  look in the A file and look at the client file and look at that

1  again.

2  Q.      In any event, the intake notes indicated according to

3  you a plausible asylum claim, correct?

4  A.      Correct.

5  Q.      However, you're not familiar -- this was an Indian

6  claim, correct?

7  A.      Correct.

8  Q.      You are not someone that is familiar based upon your

9  personal knowledge of conditions in India with the plausibility

10 of an asylum claim.  Would you agree with that?

11 A.      Yes.

12 Q.      You have not undertaken training as an asylum officer,

13 correct?

14 A.      Correct.

15 Q.      You have not reviewed the country conditions for India

16 or any of these other countries that are a part of this,

17 correct?

18 A.      Correct.

19 Q.      And you have not interviewed actual -- strike that.

20         You have not done the things that would help in

21 evaluating whether or not a particular asylum claim was

22 credible.  Would you agree with that?

23 A.      Yes.  But I've heard a lot of fraud asylum claims, so I

24 have that experience.

25 Q.      In any event, are you aware of whether or not Indian

1    police drive Jeeps as opposed to other kinds of vehicles?

2    A.      No, I have -- I don't have knowledge of that.

3    Q.      So the fact that a person may have been driven -- if a

4    person in the United States were to say that they were taken in

5    a patrol car upon their arrest, that would not necessarily be

6    something suspicious if every single person said that upon

7    their arrest they were taken in a patrol car, because we know

8    that the police have patrol cars, correct?

9    A.      Correct.  But I think here we're talking about a

10   sequence of events, not just type of vehicle.

11   Q.      I'm taking it one at a time.

12   A.      Okay.

13   Q.      Okay.  And you don't know whether or not -- whether or

14   not someone describing that they were taken in the middle of

15   the night is something that is part of the way that police deal

16   with people in that country, correct?  You don't know that.

17   A.      Yes, you're correct, I don't know that.

18   Q.      In fact, you said that in connection with your

19   activities in serving a search warrant that you always serve a

20   search warrant at 6:00 a.m.; isn't that correct?

21   A.      No, Agent Morihara said that.

22   Q.      Okay.  Well, you were present when she said that,

23   correct?

24   A.      Yes.

25   Q.      And you would testify in accordance with your

1    experience that that is when a search warrant is served.

2    A.        No.

3    Q.        Okay.  You know that Agent Morihara testified --

4    Morihara, I keep mispronouncing her name or pronouncing it

5    differently -- she testified in her experience 6:00 a.m. was

6    the time to do it, correct?

7    A.        I think she used the word that it's standard.

8    Q.        Standard.  Okay.

9              So that we don't know or you don't know whether or not

10   the way that police conduct raids in another country is by

11   raiding in a large group of people, do you?

12   A.        No, I don't know that.

13   Q.        And, in fact, when you served the search warrant in

14   this case on Mr. Caza, there were a large number of officers,

15   15 to 20 as I recall the testimony, correct?

16   A.        Yes, because he had such a large property and three

17   houses on it.

18   Q.        Okay.  But 15 to 20.

19   A.        Yes.

20   Q.        Okay.

21   A.        Because of the large area.

22   Q.        And you don't know whether or not in any of these

23   countries that raiding in the middle of the night is similar to

24   the standard procedure of serving a search warrant first thing

25   in the morning, correct?

1   A.      Correct.

2   Q.      And you don't know -- and it stands to reason that

3   someone, once they're raided by the police, would be taken to

4   the police station and presented before an officer.  You don't

5   know if that's -- I mean, that sounds like it would be standard

6   police technique here.  That is, you arrest someone, and you

7   present them to an officer or you put them in the jail.  That

8   would be a standard kind of thing, wouldn't it?

9   A.      Well, I guess in this case we're talking about the

10  wording, not like what happened in that country.

11  Q.      Well, actually you said according to this it's a

12  scenario.  It's not the wording, it's the scenario that's

13  similar.

14  A.      Right.  It's like the sequence of events.

15  Q.      But in serving a search warrant, as I understand it,

16  you have at times when there's a large property a large number

17  of police raiding the home at a standard time, maybe not

18  throwing the applicant in a Jeep and taking him downtown, but

19  securing the place so that the place can be searched and, if

20  necessary arrest them, put them into some kind of a vehicle,

21  and then present them -- then take them to the jail.

22          Wouldn't that be a regular scenario that is repeated

23  day in and day out by law enforcement?

24  A.      I think, like, in real life it's always different.  You

25  don't have the same scenario repeatedly.

3848

1    Q.      Well --

2    A.      There's always something different.

3    Q.      Well, in describing what occurred with -- in the

4    service of a search warrant, that is not an unusual description

5    what I just summarized in a paragraph, is it?

6            A large number --

7    A.      Like I said, every situation is different.  That's my

8    experience.

9    Q.      You are not willing to concede -- well, you've conceded

10   that there is -- that there's a standard time at least

11   identified by your co-leader in this case for serving search

12   warrants, correct?

13   A.      Well, I testified that we serve search warrants at all

14   different times.

15   Q.      But --

16   A.      She said 6:00 a.m. is not an unusual time.  I think

17   that's what her -- it's a standard time for serving a search

18   warrant.

19   Q.      Okay.  It's a standard time for serving a search

20   warrant, correct?  That's what she said.

21   A.      Yes.

22           MR. WAGNER:  Asked and answered.

23           THE WITNESS:  Not that they're all at that time.

24   Q.      BY MR. DRATMAN:  And you're not willing to concede that

25   there is a standardized kind of scenario that occurs when a

1    search warrant is served and a person is arrested.

2              MR. WAGNER:  Asked and answered, Your Honor.

3              THE COURT:  One more time I'll allow it.  Overruled.

4    Q.      BY MR. DRATMAN:  Are you willing to concede -- I'll ask

5    it again.

6              Are you willing to concede that there is a standardized

7    scenario relating to the service of a search warrant that leads

8    to the arrest of a person?

9    A.      In my experience in law enforcement, every search

10   warrant is different.  You might want it to always be the same,

11   but it's always different.

12   Q.      And -- but your experience is limited to how many

13   search warrants?

14   A.      About 30.

15   Q.      Now, also on -- there are two other -- there are two

16   names that are below BSB that also show up on 75.2, correct?

17   That is GS and MS?

18   A.      Yes.

19   Q.      And those -- by the way, did you ever interview -- ever

20   interview Mr. BSB?

21   A.      I don't know what his name is.

22             MR. DRATMAN:  If I can approach, Your Honor.

23   Q.      Did you ever interview Mr. BSB?

24   A.      I don't think so.

25   Q.      Did any --

1    A.        I get them mixed up a lot because they have the same

2    last name, but I don't think I did.

3    Q.        And Mr. GS, did you ever interview him?

4    A.        No.

5    Q.        Did you ever interview Mr. MS?

6    A.        No.

7    Q.        And those all relate to the chart 75.2, correct?

8    A.        Yes.

9    Q.        And the final one is SS.  And did you ever interview

10   him?

11   A.        Do you have his name?

12   Q.        It's -- oh, I'm sorry.  If you -- what I gave you, if

13   you just flip over the pages.

14   A.        I don't think so.

15   Q.        And he appears on chart 75.4, which is -- the last

16   three numbers of his A -- the last three -- oh, I did it again.

17            The last three numbers in his A number are 132,

18   correct?

19   A.        Correct.

20   Q.        And he appears on Exhibit 75.4, correct?

21   A.        Correct.

22   Q.        As to 75.4 and as to -- as to 75.4, this is a scenario

23   where the applicant is taken to the police station, presented

24   before the officer, the officer slaps the applicant and screams

25   insults at the applicant, correct?

1    A.      Correct.

2    Q.      You do not have any personal knowledge as to whether or

3    not that is the manner and means by which police agencies have

4    dealt with persons in these various countries, do you?

5    A.      No.

6    Q.      And you've done no investigation concerning whether or

7    not that is the manner and means by which police agencies

8    conduct themselves in these countries, correct?

9    A.      Correct.

10           MR. DRATMAN:  If I could just have a moment, Your

11   Honor.  I'm trying to locate one of the charts.

12   Q.      Are you familiar with a person whose initials are BSS

13   relating to 75.2?

14   A.      Is that the same one we just talked about?

15   Q.      No, somebody else.  75.2, and if you want to take a

16   look.

17   A.      Okay.  Yes.

18   Q.      The last three numbers --

19   A.      096.

20   Q.      Correct.

21   A.      Okay.  Yes.

22   Q.      And showing you -- can you see Government's Exhibit

23   37.2?

24   A.      Yes.

25   Q.      And is that the I-589 for BSS?

1    A.      Yes.

2    Q.      Did you make any effort at all to contact BSS and to

3    interview BSS?

4    A.      I think we did.

5    Q.      Did you actually interview him?

6    A.      No.

7    Q.      In the case of Radu Vlad, just returning to him for a

8    moment, you were in Chicago on July 8th, 2003, correct?

9    A.      Yeah, I think that's the date.

10   Q.      I can show you your report.  Would that help you?

11   A.      Yes.  Thank you.

12           Okay.  Yes.

13   Q.      And you agree you were in Chicago on July 8th, 2003,

14   correct?

15   A.      Correct.

16   Q.      And you had a 9:30 meeting with Beniamin Opris in the

17   office of his attorney, Mr. Gaman, correct?

18   A.      Yes.

19   Q.      And he spoke to you about his cousin Radu Vlad,

20   correct?

21   A.      I don't think he gave me the name.  I don't remember

22   that he gave me Radu Vlad's name.  I met Radu Vlad at a later

23   date, the next day I think.

24   Q.      Did he tell you when he was talking, that is, Mr. Opris

25   tell you that he had gone with his cousin or -- yes, with his

1    cousin Radu Vlad to Sacramento?

2    A.      If you're reading from my report then, yes, it probably

3    says that.  But I can't remember.

4            MR. DRATMAN:  If I can approach, Your Honor.

5            THE WITNESS:  Okay.  Yes.

6    Q.      BY MR. DRATMAN:  In the early part of your interview

7    with Mr. Opris in the office of his attorney Mr. Gaman, he told

8    you about his cousin Radu Vlad, correct?

9    A.      Yes, that when he went to Sekhon & Sekhon, he was with

10   his cousin.

11   Q.      He told you about Radu Vlad, and then he said -- then

12   you asked if there was anyone else at the end of the interview

13   that you could speak with.  And I -- you were speaking about

14   Radu Vlad, correct?

15   A.      No.  Well, I didn't know anyone -- that was my question

16   to him.  I didn't know -- I didn't say specifically Radu Vlad,

17   anybody that he knew.

18   Q.      And you made an appointment to go to Mr. Opris's house

19   the next day, correct?

20   A.      Yes.

21   Q.      And that was at about 6:30 at night, correct?

22   A.      Yes, it was in the evening.

23   Q.      And he told you that he had made arrangements for his

24   cousin Radu Vlad to be present so that you could interview him,

25   correct?

3854

1    A.      I don't remember if he told me his cousin Radu Vlad.

2    Q.      Well, he did tell you that he was having a witness --

3    you had no reason to re-interview Mr. Opris, correct?

4    A.      Yes.  I was at his house in order to meet with somebody

5    else who he knew who also had the same thing happen to them

6    with the Sekhon law firm.

7    Q.      And it was arranged that there be an interpreter

8    present, correct?

9    A.      I don't remember the interpreter.

10           Okay.  Now I remember.

11   Q.      It was arranged to have a Romanian interpreter present,

12   correct?

13   A.      Yes.

14   Q.      It was not arranged with Mr. Gaman because this was not

15   something that involved the re-interview of Mr. Opris, correct?

16   Mr. Gaman wasn't there, the attorney.

17   A.      No.  Radu Vlad was not represented by an attorney.

18   Q.      And you were not there to re-interview Beniamin Opris,

19   correct?

20   A.      No.  I was there to meet with Radu Vlad, but I'm not

21   sure at the time if I knew who I was meeting with.  I can't

22   remember that.  Or if I found out after I met him who he was.

23   Q.      What you do know is that this appointment was arranged

24   by Beniamin Opris the day before.

25   A.      Yes.

1    Q.      And it was -- the appointment was a day and a half

2    after you had left Mr. Opris's place, correct?

3    A.      Umm, I met with Mr. Opris at an office.

4    Q.      I'm sorry.  A day and a half after you met with Mr.

5    Opris at his attorney's office.

6    A.      And the following day I met with Mr. Vlad, correct.

7    Q.      Correct.

8            And was this something that -- were you kept waiting at

9    the apartment or the house that Mr. Opris was at for Mr. Vlad

10   or was it a prearranged time?

11   A.      I don't remember if I was kept waiting.  I don't

12   remember that.

13   Q.      Was -- was Mr. Vlad present when you arrived?

14   A.      Umm, I don't think so.

15   Q.      And how long after you arrived was it that he showed

16   up?

17   A.      I don't remember.

18           THE COURT:  Counsel, it's the noon hour.  We'll break

19   at this time, Ladies and Gentlemen.  Remember the admonition.

20           I want to see counsel.

21           (The following proceedings were had outside

22           the presence of the jury:)

23           THE COURT:  The Court is convened outside the presence

24   of the jury.

25           On the issue of the rough notes, I would direct the

1    parties' attention to a couple cases.  I don't think this

2    matter is settled as I've been represented.  I think there are

3    some issues here that need to be discussed.

4           U.S. versus Boshell, 952 F.2d 1101, Ninth Circuit.  The

5    court states a verbal acknowledgement that the notes constitute

6    an accurate account of the witness's interview is sufficient

7    for reports or notes to qualify his statement under 3500(e)(1).

8           U.S. versus Harris, 543 F.2d 1247.  These are all Ninth

9    Circuit cases.  Notes such as those taken by FBI agents from

10   interviews with either prospective government witnesses or the

11   accused constitute potentially discoverable terms.

12          The courts make a distinction between notes taken

13   during surveillance versus notes taken contemporaneously with

14   the interview of witnesses.  And I think that is clearly a

15   distinction.  Obviously surveillance notes are not

16   discoverable.

17          U.S. versus Johnson, 521 F.2d 1318.  The court notes a

18   further inquiry is appropriate and notes producible even where

19   it affirmatively appears that the entire contents of the notes

20   are included in a document which was turned over to the

21   defense.

22          U.S. versus Kaiser, 660 F.2d 724.  The court notes that

23   where the rough notes were neither intended as a final

24   statement nor as a contemporaneously written factual account of

25   what was said, such notes are not statements and do not fall

1    within Jencks.

2         I think we need to take a look.  I mean, counsel, I

3    don't know whether the government has looked at the notes, but

4    I think with that in mind I think that might affect the Court's

5    thinking.  So I would appreciate if, Mr. Wagner, you could give

6    us some idea what these notes are.  And obviously the Brady

7    materials is a separate issue, but that's what the Court's

8    interest is in.

9         MR. WAGNER:  Your Honor, I have not personally reviewed

10   the notes, but I've talked to Agent Webster about them.  And my

11   understanding is that the notes are not -- they do not purport

12   to be verbatim statements of what the witnesses said who she

13   was interviewing.  They are her own notes meant to -- in, I

14   think to use her words, chicken scratch which are her notes to

15   herself so that she could refresh her recollection in order to

16   accurately complete the final report.  It's not anything close

17   to a complete statement of what occurred during any of these

18   interviews.

19        THE COURT:  All right.  If that's the case, but I think

20   you need to look at the notes and draw your own conclusions in

21   that regard.

22        MR. WAGNER:  Yes, we'll do that, Your Honor.

23        THE COURT:  And I'd certainly be guided by that to a

24   certain extent certainly.

25        All right.  Recess.

1          (Lunch recess taken.)

2                        ---o0o---

```
 1                    SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, MAY 6, 2009, 1:43 P.M.

 3                         ---o0o---

 4         (The following proceedings were had in the

 5         presence of the jury:)

 6         THE COURT:  Mr. Dratman, have you concluded?

 7         MR. DRATMAN:  I have.  Mr. Blackmon didn't just push me

 8  away.  He's bigger and always has been.

 9         THE COURT:  Mr. Blackmon, you've reached the pinnacle.

10  Go ahead.

11         MR. BLACKMON:  All right.  Thank you very much, Your

12  Honor.

13                      CROSS-EXAMINATION

14  BY MR. BLACKMON:

15  Q.     Ms. Webster, I'd like to ask you a few questions here

16  this afternoon.

17         And, first of all, I want to ask you about government

18  Exhibit 26.5, which I believe has been admitted into evidence,

19  Your Honor.

20         THE CLERK:  Yes, it has.

21         MR. BLACKMON:  Thank you.  See if I can put this up in

22  a way that you can see it.

23  Q.     You can see it there, Ms. Webster?

24  A.     Yes.

25  Q.     And this is a pleading, if you will, that is submitted
```

1    to the immigration court providing additional evidence,

2    correct?

3    A.      Yes.

4    Q.      And this -- we've put up the second page of that

5    exhibit, and you'll see that that was signed by Manjit Rai on

6    March 8th of 2002, correct?

7    A.      Yes.

8    Q.      And if I may then go to I think it's the fourth page of

9    this exhibit, and this is a letter from a Dr. K.K. Sidhu.  Let

10   me use the microphone.

11          This is a letter from a Dr. K.K. Sidhu in India,

12   correct?

13   A.      Yes.

14   Q.      And if I understand the situation correctly, Ms.

15   Webster, this is one of the letters or documents rather that

16   was sent to India for Mr. Sharma to do some investigation in

17   connection with it, correct?

18   A.      Yes, that's correct.

19   Q.      My question to you is, do you know specifically in

20   connection with that letter that the -- from Dr. Sidhu in

21   India, that was submitted with this pleading that Ms. Rai

22   signed, do you know specifically what she did in terms of how

23   that letter came into her possession so she could then send it

24   on to the immigration court?

25   A.      No.

3861

1    Q.      You don't know, for example, whether or not she may

2    have been acting at the direction or instruction of somebody

3    else?

4    A.      I don't know that.

5    Q.      Okay.

6    A.      No.

7    Q.      And then the next exhibit that I want to ask you about

8    is Exhibit 15.2, which I believe also has been introduced now

9    in evidence in this case.

10          Let me put the first page of this exhibit on the

11   projector here.  And can you see that?

12   A.      Yes.

13   Q.      And this is also a pleading -- and by a pleading I mean

14   just a legal form, a legal paper that lawyers use.  But this is

15   also a pleading which is submitting additional evidence to the

16   immigration court.  Am I correct in that?

17   A.      Yes.

18   Q.      And do you recall that this is -- this exhibit also

19   contained some pages that had stamped images on it that were

20   consistent with items that were found in Mr. Caza's house?

21   A.      I can't remember, but I think so.

22   Q.      Okay.  Well, let me see if I can show you another page.

23          This is a second page of the exhibit that shows it was

24   signed by Manjit Kang, who is -- Kang was Ms. Rai's maiden

25   name.  Is that your understanding?

3862

1    A.      Yes.

2    Q.      Okay.  That Ms. Rai signed on February 11th of 2002.

3            And let me see if I can find -- this looks like page 14

4    out of that exhibit, and I think this bears stamps that you or

5    someone has testified to that evidence pertaining to these

6    sorts of stamps were found at Mr. Caza's house, correct?

7    A.      Correct.

8    Q.      And again my question to you as it pertains to Ms. Rai

9    is you don't know how these documents specifically came into

10   Ms. Rai's possession so that she was in a position to send them

11   on to the immigration court; is that correct?

12   A.      That's correct.

13   Q.      You interviewed Davinder Singh on two occasions as I

14   understand it.

15   A.      Yes.

16   Q.      And the last one was in 2008?

17   A.      Yes.

18   Q.      Do you recall roughly when in 2008 it was?

19   A.      I'm not sure.  I think it might have been the summer.

20   Q.      My recollection is that it was I think July of 2008.

21           And you were in court when Mr. Singh testified for us

22   earlier in the trial, correct?

23   A.      Correct.

24   Q.      Do you recall your conversation with Mr. Singh in the

25   summer of 2008?

1   A.      Yes.

2   Q.      In court he testified that Manjit Rai and Jagdip Sekhon

3   did a prep session with him.  Do you recall that?

4   A.      Yes.

5   Q.      Do you recall what he told you about any prep sessions?

6   A.      Yes.

7   Q.      Do you recall that he told you that he had -- a few

8   days before the asylum interview had met with Jagdip Sekhon and

9   that Jagdip had gone over questions that might be asked of him

10  at the asylum interview?

11  A.      Yes.

12  Q.      He did not tell you that Manjit Rai had participated in

13  a prep session with him, did he?

14  A.      No, he did not.

15  Q.      Okay.  And do you recall that when he testified here in

16  court he said that he had walked with Manjit Rai from the

17  Sekhon San Francisco office to the asylum interview and that

18  Manjit had talked about questions that would be asked of him at

19  the asylum interview?  Do you recall that testimony?

20  A.      I don't, but that's probably correct.

21  Q.      Okay.  Do you recall what Mr. Singh told you about his

22  walk with Manjit Rai from the Sekhon office to the asylum

23  interview?

24  A.      No, but it's probably in the report.

25  Q.      Okay.  If I provided you with at least a copy of one

1    page of that report, do you think that might refresh your

2    memory?

3    A.      Yes.

4            MR. BLACKMON:  Your Honor, may I approach?

5            THE COURT:  You may.

6            MR. BLACKMON:  Thank you.

7            THE WITNESS:  Okay.  Thank you.  Okay.

8    Q.      BY MR. BLACKMON:  You've had a chance to look at it?

9    A.      Yes.

10   Q.      What did Mr. Singh tell you about his walk from the

11   Sekhon office with Ms. Rai to the building where the asylum

12   interview would be held?

13   A.      He told me that he did not discuss his case with Ms.

14   Rai.

15   Q.      And he also told you, didn't he, that she had attended

16   the asylum interview with him, but she didn't say much?

17   A.      Let me read that real quick.

18   Q.      Okay.

19   A.      Okay.  Yes, that's correct.

20   Q.      That's what she -- what he told you?

21   A.      Yes.

22   Q.      And you also spoke with Robert Irons in the course of

23   your investigation, did you not?

24   A.      Yes, I did.

25   Q.      And do you recall what Mr. Irons told you about when he

1    passed the California bar examination?

2    A.      I don't recall that.

3    Q.      Let me provide you with a copy of your report and see

4    if that refreshes your recollection.

5    A.      Okay.

6            THE COURT:  Is there a date on that, counsel?

7            MR. BLACKMON:  The date of the interview was June 8th

8    of 2005.

9            THE COURT:  Thank you.

10           THE WITNESS:  Okay.  Yes, he told me February 2002 that

11   he passed the bar.

12           MR. BLACKMON:  Thank you.

13   Q.      And you also had a conversation with Ms. Wazhma

14   Mojaddidi.

15   A.      Yes.

16   Q.      And do you recall in your interview it was -- it was a

17   formal interview of somebody who might be a witness in this

18   case, am I correct in that?

19   A.      Yes.

20   Q.      And do you recall that you interviewed her fairly

21   recently, I think.  It was on March 20th of 2009.

22   A.      Yes.

23   Q.      So it would have been after this case actually got

24   started.

25   A.      Yes.

1    Q.       All right.  Do you recall asking her questions about

2    the day she left the Sekhon office?

3    A.       Yes.

4    Q.       The day she -- essentially her employment was

5    terminated, correct?

6    A.       Yes.

7    Q.       Do you recall what she told you about any interaction

8    she had with Mr. Jagprit Sekhon on that day?

9    A.       Yes.  I believe it was a verbal confrontation.

10   Q.       Do you recall that she told you that -- that she went

11   into his office and had some sort of a confrontation with him?

12   A.       I'm not sure about the went into the office.

13   Q.       Okay.

14   A.       I know that's in my report, but I don't really know if

15   I just assumed she meant -- because she said she went to talk

16   to him, so I assumed he was in his office.

17   Q.       Would you like to see the report that you wrote?

18   A.       No.  Because it wasn't that long ago, I remember.

19   Q.       Okay.  Well, in your report you wrote that she first

20   apparently had some sort of a confrontation with Manjit Rai and

21   I think Cushminder Singh.  And then in your report you wrote,

22   Then Mojaddidi went to Jagprit Sekhon's office and told him she

23   was quitting the firm.

24   A.       Yes.

25   Q.       And that is your -- what you wrote in the report was

3867

1    your best recollection of what the conversation was with Ms.

2    Mojaddidi?

3    A.       Yes.  But, like I said, I think the assumption was that

4    she went to his office.  Because I've been in the office, and

5    there's not that much space between the offices.

6    Q.       Sure.

7              But --

8    A.       So I just assumed he was in his office, and she went

9    over there to talk to him.

10   Q.       But you do understand as an experienced and

11   well-trained law enforcement officer of the United States that

12   your reports need to be as accurate as possible, correct?

13   A.       Correct.

14   Q.       And, of course, you try to make them as accurate as

15   possible, don't you?

16   A.       Yes.

17   Q.       Do you recall that Ms. Mojaddidi told you that once she

18   had gone into Mr. Jagprit Sekhon's office, that she told him

19   that she was quitting the firm and also told him that she knew

20   all about the fraud that was going on and that he would, quote,

21   go down, unquote, for it?

22   A.       Yes.

23   Q.       Those words she used, he would go down for it --

24   A.       Yes.

25   Q.       -- correct?

                                                                      3868

1    A.        Correct.

2    Q.        Let me ask you some questions about the charts that you

3    prepared about which you've testified, if I might.

4    A.        Okay.

5    Q.        And the first one I'm going to ask you about is 75.2.

6    And I think you have a copy of that up there in front of you?

7    A.        Yes.

8    Q.        Okay.  Let me put it on the projector here.

9              And you see it there on the screen, right, Ms. Webster?

10   A.        Yes.

11   Q.        And this is the first chart.  And this is the one that

12   has to do with the scenario that you say you discovered in

13   these narratives about a large number of police raiding the

14   home in the middle of the night, throwing the applicant or his

15   or her relative in a Jeep, taking that person to a police

16   station and presenting them before an officer, correct?

17   A.        Correct.

18   Q.        My question to you, Ms. Webster, is in connection with

19   the folks on this list, what evidence did you come across that

20   Manjit Rai had had some involvement, if you will, with the

21   files for these particular Sekhon clients?

22             Do you understand the thrust of my question?

23   A.        Yes.

24   Q.        And I want to ask you first about the person on -- the

25   first one on this list, MS.

1    Do you have -- what evidence do you have that Ms. Rai

2    had something to do with the file for MS?

3    A.    Do you have the other list which lists the names that

4    Mr. Dratman provided earlier?  That might help me answer the

5    question.

6          MR. BLACKMON:  Mr. Dratman is looking, I think.

7          THE WITNESS:  Okay.

8          MR. BLACKMON:  May I have just a moment?

9          (Off the record.)

10         MR. BLACKMON:  I'm sorry, Your Honor.

11   Q.    Ms. Webster, let's take a look at this and see --

12         THE COURT:  What is that, counsel?  Is that an exhibit?

13         MR. BLACKMON:  It's not.  It is -- it's the attachment

14   B4 that was connected with the search warrant in the case.

15         THE COURT:  All right.

16         THE WITNESS:  It has the name and the alien numbers so

17   I can make a better -- let's see.

18   Q.    BY MR. BLACKMON:  Ms. Webster, is that -- thank you.

19         The one I've just handed you, the document, the list if

20   you will, is -- that matches up with Exhibit 75.2?

21   A.    Yes.

22   Q.    Okay.  With that in hand, then, let me proceed with my

23   question.  And actually let me hand the rest of these up to you

24   so you'll have them as we go on.

25   A.    Thanks.  Yeah, that helps a lot.

3870

1          (Off the record.)

2          THE WITNESS:  Well, I just like the numbers because I

3    can get an idea.

4          MR. BLACKMON:  That's fine.  Thanks.

5          Okay.  Now, with those documents in front of you, let's

6    go back to my question.

7    Q.     What can you tell us specifically in connection with

8    Ms. Rai that indicates that Ms. Rai had some involvement with

9    the file for MS in the Sekhon law firm?

10   A.     I don't have -- I don't have an answer to your question

11   by looking at this list.

12   Q.     Okay.  Well, that's my question --

13   A.     Okay.

14   Q.     -- to you as you sit there now on the witness stand.

15   A.     Yes.  I can't.

16   Q.     Same question as to the next person on the list, AS.

17   A.     I can answer for every -- all the list that I don't

18   have any information.  It might be in those exhibits, but I

19   can't remember.

20   Q.     Okay.  As you sit there now, as to each of the people

21   whose initials appear on this list, Government's Exhibit 75.2,

22   you can't point to any specific involvement that Ms. Rai may

23   have had with those Sekhon client files, correct?

24   A.     Just not that I remember.  I would have to look.

25          But it doesn't --

1   Q.      All right.  I'm asking --

2   A.      -- jump out at me that she --

3   Q.      I'm asking for your answer now as you sit there because

4   that's the way we have to proceed.  Okay?

5   A.      Correct.

6   Q.      And the answer is as of now as you sit there you don't

7   have any information.

8   A.      I don't, no.

9   Q.      Okay.  Do you have documentation there in front of you

10  in connection with the next chart, which is 75.3?

11  A.      Okay.  Yes.

12  Q.      And can you see that chart there on the projector?

13  A.      Yes.

14  Q.      And my question to you in connection with this chart is

15  essentially the same.

16          Now, the very first person whose initials appear on

17  that list, AE, is someone with whom you had at least a

18  telephone conversation in connection with your investigation

19  into this matter, correct?

20  A.      Correct.

21          THE COURT:  Counsel, it would be helpful for the record

22  if you'd just -- what is this document?

23          MR. BLACKMON:  I'm sorry.

24          THE COURT:  I mean, what --

25          MR. BLACKMON:  The exhibit is 75.3, Your Honor.

3872

1          THE COURT:  But it has what narrative?

2  Q.      BY MR. BLACKMON:  This is the exhibit that pertains to

3  your scenario having to do with an officer and two or three

4  policemen approach the applicant and the officer slaps the

5  applicant across the face, correct?

6  A.      Yes.

7  Q.      All right.  So you do have some information that --

8  pertaining to AE that Ms. Rai had some connection with AE's

9  file in the Sekhon office.  Is that the case or do you know?

10 A.      I would have to look at it again.

11 Q.      You have no recollection?

12 A.      Well, there's so many, it's hard to remember every

13 single one and every single involvement of every single person.

14 Q.      It's over 12,000 -- well, there's approximately 12,000

15 pages of discovery, 2,000 pages of exhibits, so I know there's

16 a lot of information to try to keep track of.

17          But, again, I'm asking for what you know, what you can

18 tell us as you sit there on the witness stand right now.

19 A.      I don't remember on AE.

20 Q.      How about, if you look down the list of the other

21 Sekhon clients whose initials appear here, can you tell us that

22 in connection with any of them you have information that Ms.

23 Rai was involved with the files for those particular clients?

24 A.      I think the third one that you just showed me.

25 Q.      That would be MDB?

1    A.      Yes.

2    Q.      Okay.

3    A.      And that PS, there were some notes in the client file

4    regarding documents, I believe.

5    Q.      And you say that would be the initials PS?

6    A.      PS.

7    Q.      P as in Peter, S as in Sam?

8    A.      Correct.

9    Q.      And that appears down -- looks like one, two, three,

10   four, five lines from the bottom?

11   A.      Yes.

12   Q.      Okay.  Anybody else on that list?

13   A.      I would have to look in the files --

14   Q.      Okay.

15   A.      -- to confirm.

16   Q.      Again, as you sit there now --

17   A.      As I sit here now --

18   Q.      -- that's the best you can tell us, correct?

19   A.      That's the best I can recollect.

20   Q.      Okay.  And how many names appear on this Exhibit 75.3?

21   Am I correct that there are 21 on that list?

22   A.      Yes.

23   Q.      All right.  And going back to 75.2, the first chart

24   that I discussed with you, there are 12 people on that list?

25   A.      Yes.

1   Q.      Let me then put up 75.4.

2           And you see that one, Ms. Webster?

3   A.      Yes.

4   Q.      This is the chart that pertains to your scenario the

5   applicant was taken to the police station and presented before

6   an officer, the officer then slapped the applicant and screamed

7   insults at the applicant, correct?

8   A.      Correct.

9   Q.      Now, this one as my count indicates, there's 43 people

10  on this list.  Is that consistent with the way you've counted

11  these?

12  A.      43.

13  Q.      43.

14  A.      Correct.

15  Q.      Right.

16          And, again, the same question as to information that

17  you have that would indicate specifically that Ms. Rai had some

18  involvement with these client files in the Sekhon office.

19  A.      I remember Davinder Singh's client file had notes that

20  appeared to be in Manjit Rai's handwriting.

21  Q.      Okay.

22  A.      And that's all I can recall from this list off the top

23  of my head, but I would have to refer to all those exhibits.

24  Q.      Well, I'm sure that one of the government lawyers will

25  certainly give you that chance before there's any redirect

1    examination in the case.

2           But as of right now, Davinder Singh is the only one

3    that you can recall that Ms. Rai had something to do with?

4    A.      Yes.

5    Q.      Okay.  And let me now ask you about 75.5, I believe it

6    is.  And this is the chart that has to do with your scenario

7    about the applicant was beaten unconscious at the police

8    station, then when the appellate -- or applicant, I'm sorry --

9    let me start over.

10          The applicant was beaten unconscious at the police

11   station, then when the applicant regained consciousness he or

12   she was lying in a cell, and the police returned and beat him

13   or her again until he or she lost consciousness again.

14          Okay.  The same question here.  What can you tell us as

15   you sit there now about Ms. Rai's involvement with any of the

16   client files on this list?

17   A.      I think the applicant with the initials PC.

18   Q.      Okay.  That would be in the first or the left-hand

19   column of the exhibit, correct?

20   A.      Correct.  And I can't remember the rest.  I would have

21   to check.

22   Q.      Okay.

23   A.      As I sit here now, I can't recall.

24   Q.      All right.  And there are 35 names on this list.  Am I

25   correct in that?

1    A.       Yes.

2    Q.       Now if I can direct your attention to Exhibit 75.6,

3    which I'll put on the board.

4             And this one has to do with the scenario -- well, this

5    one had -- apparently this chart pertains to similar or exact

6    wording replicated in portions of the I-589 narratives,

7    correct?

8    A.       Correct.

9    Q.       And do we have 14 names on this list?

10   A.       Yes.

11   Q.       And this is the -- is this the one that -- where they

12   were in pairs, correct?

13   A.       Correct.

14   Q.       Let me ask you about the first pair where you compared

15   the I-589 narratives of a client with the initials DP with the

16   narrative of a client whose initials were LB as in Baker.

17   A.       Uh-huh.

18   Q.       With regard to that pair, do you have any information

19   now as you sit there that Ms. Rai had some involvement with

20   either one of the files pertaining to those Sekhon clients?

21   A.       No.  I would have to check.

22   Q.       Okay.  Would your answer be the same for the next pair,

23   IV and IP?

24   A.       Yes, same answer.  I don't remember.  I would have to

25   check the file.

1    Q.      Okay.  But the next name -- the next line has a name,

2    Gheorge Jianu.  That's Mr. Chisca, correct --

3    A.      Correct.

4    Q.      -- your undercover informant?

5    A.      Yes.

6    Q.      All right.  And we know she did indeed have access to

7    Mr. Chiska's or Mr. Jianu's file in the office because we've

8    heard the recording of that preparation session involving him,

9    correct?

10   A.      Correct.

11   Q.      But that file was compared with the file of a client

12   whose initials are FZ as in zebra, correct?

13   A.      Correct.

14   Q.      With regard to FZ, what information do you have right

15   now as to her involvement with FZ's file?

16   A.      I don't have any information.

17   Q.      Okay.  Would your answer be the same as to Ms. Rai for

18   the next pair, VB and BGS?

19   A.      Yes.  I can answer for the whole rest of the list --

20   Q.      Okay.

21   A.      -- that I don't remember.  I would have to look at the

22   files --

23   Q.      Okay.

24   A.      -- and find out.

25   Q.      Now, I've put up the next chart and the last one I'm

3878

1    going to ask you about, and this is Government's Exhibit 75.7.

2    It pertains to the scenario about villagers attacked the

3    applicant and his or her colleagues while they were

4    evangelizing, destroyed their musical instruments and

5    vandalized their cars, right?

6    A.      Yes.

7    Q.      The same question as to this list.  What information do

8    you have about Ms. Rai's access to files of these particular

9    clients?  And access, I mean something actually more than that,

10   involvement with those particular files.

11          Now, of course, the first name's Mr. Jianu or aka Mr.

12   Jianu, Mr. Chisca, and we know as we've established that she

13   had access and involvement with that file.

14          How about the rest of the names on there?

15   A.      Again, it's the same answer.  I would have to look at

16   the reports.  There's so many --

17   Q.      Okay.

18   A.      -- it's hard to keep them straight.

19          And, yes, the only one I recognize is Gheorge Jianu.

20   Q.      You were asked questions earlier I think both on direct

21   and then rather extensively on cross-examination about this

22   issue of sham marriages.  And I think you told us that there

23   were apparently a number of -- let's say if there's an initial

24   finding that somebody had engaged in a sham marriage seeking to

25   obtain a benefit under the immigration laws, that that finding

3879

1    can be appealed through a number of steps, correct?

2    A.      I'm kind of unclear about what the finding --

3    Q.      Let's say --

4    A.      We don't really use the term "sham marriage" officially

5    so you mean -- are you referring to 204(c) or are you

6    referring --

7    Q.      I think so.  Maybe you and I are having sort of a

8    disconnect here in communication.  In my involvement in this

9    case, I have used that term "sham marriage."

10          Do you understand what the term refers to --

11   A.      Yes.

12   Q.      -- generally in immigration law?

13   A.      What I'm referring to is, like, the finding.  Yesterday

14   we discussed there's a Section 204(c) --

15   Q.      Uh-huh.

16   A.      -- which refers to marriage fraud.

17   Q.      Okay.

18   A.      But I'm not sure if that's what your question is

19   referring to.

20   Q.      That's essentially it.  Somebody -- as I understand it,

21   if somebody comes into the United States and marries a United

22   States citizen solely for the purpose of gaining immigration

23   benefit, that is to say getting to be a permanent, you know,

24   legal resident of the United States, if somebody enters into a

25   marriage solely for that purpose, that is a fraudulent or sham

1   marriage that basically is not going to work, right?  The

2   person is not going to get the benefit.

3   A.       Right.  And there's also a legal definition.  So I

4   understand, like, the layman's term of sham marriage.

5   Q.       Right.

6   A.       But then you have to have a finding of marriage fraud,

7   which has a higher standard.  And what I was explaining

8   yesterday is in order for us to reach that standard, basically

9   oftentimes we need a sworn statement from the U.S. citizen

10  spouse who says in a sworn statement that it's a fraud

11  marriage.

12  Q.       Okay.  Well --

13  A.       And in order to get to that level, other -- if you

14  don't get to that level, then you can't really call it a fraud

15  marriage.

16  Q.       Okay.

17  A.       You have to prove it.

18  Q.       Well -- and I take it fraud marriage in the way you're

19  using it now is equivalent to sham marriage as I've been using

20  it?  Is that the case?

21  A.       Well, what I'm talking about is in order to prove it.

22  Q.       All right.  So let's say --

23  A.       You can't just look at a piece of paper and say that's

24  a sham marriage.

25  Q.       I understand.

1    A.      You have to get evidence.

2    Q.      Right.

3    A.      And for immigration purposes, usually it's an admission

4    from the U.S. citizen spouse.

5    Q.      Okay.  But whatever the evidence is -- and like in most

6    legal proceedings, it operates on evidence, correct?

7    A.      Correct.

8    Q.      Whatever the evidence is, okay, and however it may be

9    determined or however it may be referred to, once it is

10   determined that the person has entered into a fraudulent

11   marriage, okay, and all the appeals have been done and the

12   final determination is that it was a fraudulent marriage, am I

13   correct that then that person is permanently barred from the

14   United States?

15   A.      Okay.  Okay.  Now I understand you're talking about

16   Section 204(c).  Yes, if it reaches that level.

17   Q.      Right.

18   A.      In order to implement the 204(c) bar, you have

19   something like I said, a sworn statement from the U.S. citizen

20   spouse.

21   Q.      Right.

22   A.      And I don't know -- I don't really know if there's any

23   appeals for that.

24   Q.      Pardon me.  Well, there may not.  But my point -- and

25   I'm not interested in how much evidence that has to be in, I'm

3882

1    just interested in the effect.

2              And that is that once it's found to be a fraudulent

3    marriage and that's the final determination, then that person

4    is permanently barred from the United States.

5    A.       Right.  Well, for me it is -- there is a -- you have to

6    distinguish between 204(c) and non 204(c).  Because there's --

7    oftentimes the petition will be denied because of whatever

8    reason, but there's no finding of fraud officially because it

9    did not reach the level to implement the permanent bar.

10   Q.       So you're --

11   A.       So there's a different level of --

12   Q.       But your testimony and your understanding is that if it

13   is found to be a fraudulent marriage, then that is a permanent

14   bar; is that correct?

15   A.       No.  My testimony is if it reaches the level of 204(c).

16   Q.       It's 204(c)?

17   A.       It's a section of law that is the permanent bar.

18   And --

19   Q.       What is your understanding it takes to reach that?

20   A.       It takes a lot, that's what my testimony is.  It's not

21   like you can just look at it and say, oh, that's a fraud.  You

22   have to have a finding.

23   Q.       I understand that.  But once that evidence is in front

24   of the court, and once that determination has been made that

25   the evidence has reached that level, no more appeals, final

1   determination, then that's a bar.

2   A.      Yes.

3   Q.      Okay.

4           MR. BLACKMON:  I don't have any further questions.

5   Thank you very much, Ms. Webster.

6           THE WITNESS:  Thank you.

7           THE COURT:  Mr. Zindel?

8           MR. ZINDEL:  One moment, Your Honor.

9           MR. BLACKMON:  May I approach the witness, Your Honor?

10          THE COURT:  Yes, you may.

11                          CROSS-EXAMINATION

12  BY MR. ZINDEL:

13  Q.      Ms. Webster, you understand while you're testifying

14  here today that you don't get to make the final decision in

15  this trial.  You understand that?

16  A.      Yes, of course.

17  Q.      It's the -- the jury gets to make the final decision --

18  A.      Yes.

19  Q.      -- right?

20          And you've put your evidence on, and you've worked with

21  the prosecutors in presenting your case to them, right?

22  A.      Yes.

23  Q.      But you understand that they get to make the final

24  decision.

25  A.      Correct.

3884

1    Q.       And will you respect their verdict no matter what it

2    may be?

3    A.       Yes.

4    Q.       Now, I may ask you some questions that are based on

5    your own knowledge, things that you've seen.

6    A.       Uh-huh.

7    Q.       And this -- these questions may not ask you to tell

8    about what other people have said to you.

9             Do you understand that?

10   A.       Yes.

11   Q.       And you understand from having been in here since the

12   10th of March that, generally speaking, you can't talk about

13   what other people said to you, right?

14   A.       Yes.

15   Q.       Okay.  Will you do that if I ask you a question?  Will

16   you refrain from volunteering things that other people have

17   said to you?

18   A.       I guess if you don't ask me what they said, then, yeah.

19   Q.       All right.  The judge when we started trial, Judge

20   Damrell ordered the government to provide to us all the E-mails

21   that you had sent back and forth with various witnesses, ICE

22   agents, others of any kind about this case.

23            Do you remember that?

24   A.       Yes.

25   Q.       And shortly after that you gave us a -- you released a

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    stack of E-mails.  Do you remember that?

2    A.      Yes.

3    Q.      But there were about two years that were not covered in

4    that stack of E-mails.

5    A.      Yes.

6    Q.      2004, 2005?

7    A.      Something like that, yes.

8    Q.      Because of some computer crash?

9    A.      Yes.

10   Q.      All right.  And that was a crash in your office?

11   A.      Umm, my -- my personal computer.

12   Q.      Your personal computer?

13   A.      I mean, the -- the C drive.

14   Q.      The C drive on your personal computer at work?

15   A.      Correct.

16   Q.      Okay.  Is your computer --

17   A.      It wasn't, like, the whole office.

18   Q.      Is your computer tied into a network?

19   A.      Yes.

20   Q.      Do you use an E-mail program?

21   A.      Yes.

22   Q.      Is that a network-based E-mail program?

23   A.      Umm, well, we had two programs.  I think this trial --

24   or this case started in '03.  We had what was called cc:Mail,

25   and I think sometime in '05 we switched to Outlook.

3886

1    Q.       That was after these -- until 2005 you were using

2    cc:Mail?

3    A.       Umm, some -- yeah, I'm not sure of the date.  I think

4    it was '05 or '06 or somewhere in that time period.

5    Q.       And that's a program that the government licenses for

6    various government agencies to be able to use E-mail back and

7    forth?

8    A.       Yes.  I think it's Lotus-based, something like that.

9    Q.       Okay.  Lotus Notes is what it's called now.

10   A.       I think, yeah.

11   Q.       And do you use Lotus Notes now?

12   A.       No, we switched to Outlook.  We have Microsoft Outlook

13   currently.

14   Q.       All right.  And is that also on a network-based system?

15   A.       I think so.  I don't really know much about how the

16   computer system works.

17   Q.       Okay.  Your E-mails, then, were used -- from 2004 --

18   well, 2004 was the time that you did the search warrant in this

19   case, September of 2004.  September 10th, all the search

20   warrants were done that day, right?

21   A.       Yes.

22   Q.       Yet none of the E-mails you provided relate to the

23   execution of those search warrants, correct?  You're aware of

24   that?

25   A.       I don't know.  I -- there's so many E-mails.  I would

1    think that there would be something, but maybe that's during

2    the time where I don't have them.

3    Q.      What have you done to find the E-mails that you did not

4    provide after the judge ordered you to provide them to us?

5    A.      Well, I knew that those E-mails were missing a long

6    time ago because I can't -- I couldn't recover them.  Because

7    they had information that I needed, and I could not recover

8    them.  Because they were archived onto a C drive, I was

9    archiving my E-mail, and it was archived to my C drive instead

10   of the network drive.

11   Q.      This was archived on your own C drive on your computer?

12   A.      Yes.

13   Q.      Okay.  Did you do anything to find out from the

14   computer people in your office whether they could be recovered

15   from some other source after the judge ordered you to release

16   those on March 10th?

17   A.      Yes, I contacted our IT people.

18   Q.      Okay.  Who did you speak to about that?

19   A.      Umm, I think his name was Nicholas Keaton in our San

20   Francisco office.

21   Q.      Okay.  And what did he tell you about the

22   recoverability of those E-mails?

23   A.      He said that if I did not archive them, then they're

24   gone.  They only keep them for a month.

25   Q.      Okay.  Now, you are also under orders to provide to the

3888

1    defense all reports that you have generated relating to your

2    investigation of Mr. Caza and the Sekhons, correct?

3    A.        Correct.

4    Q.        And you have done that you say?

5    A.        I believe so.

6    Q.        Okay.  Now, Mr. Dratman was asking you earlier and

7    there have been other questions about the process that you took

8    of taking all of the -- or bringing all the Sekhon files to

9    your office at 650 Capitol Mall and holding them there after

10   starting the investigation.

11           Do you remember that?

12   A.        Umm, yes.  I -- I mean, the evidence of this

13   investigation is located in the alien file.  So --

14   Q.        Okay.

15   A.        -- that's my investigation, it's all inside the alien

16   file.

17   Q.        All right.

18   A.        That's where the documents go that are submitted.

19   Q.        So the alien files on the Sekhon asylum applicants have

20   been for the past several years at your office on the first

21   floor of 650 Capitol Mall?

22   A.        Umm, not all of them.

23   Q.        No, I know -- I understand that some of them you have

24   released for whatever reason.

25   A.        No, and I don't think I was ever -- I ever requested

1    every single one.

2    Q.       But several hundred?

3    A.       Yes.

4    Q.       All right.  Several hundred, they're there.

5    A.       To get -- yes.  And I requested even more to get ready

6    for the trial because we knew that the defense would be needing

7    them and we may be needing them, so we wanted to have them at

8    our disposal.

9    Q.       Okay.  Well, one of the things that I've figured out is

10   because they're there, over the past few years applicants have

11   come by your office inquiring about their files, correct?

12   A.       Yes.  Yes, because this case has been going on for six

13   years, and usually investigations don't go this long.  And so

14   that's just kind of the -- the outcome of something that took

15   this long.

16   Q.       Okay.  But a by-product of that is that people who were

17   represented by the Sekhons in connection with their asylum

18   applications, they'd come by your office to inquire about

19   various benefits that they've asked for under the Immigration

20   and Nationality Act.

21   A.       Yes.  Because they're all on a fraud hold, and so

22   they're -- we're waiting for the criminal case to be over.  And

23   so, yes.

24   Q.       Okay.  But they come to you, right?

25   A.       Yes.  I told the information desk to refer them to me.

1    Q.      All right.  So when they come to the information desk

2    and they make an inquiry, the people at the information desk

3    put their numbers into a computer and your name pops up, right?

4    A.      I think it's the name of the case.

5    Q.      Okay.  And then they get sent down to the

6    investigations division of the first floor, which is where your

7    office is located.

8    A.      Yes.

9    Q.      This is a secured area, right?

10   A.      Umm, well, the waiting room, I'm not sure if it's that

11   secure.

12   Q.      Well, they have -- you have a, you know, bulletproof

13   window with a little place to put -- pass papers through.

14   A.      Uh-huh.

15   Q.      That's the lobby.

16   A.      I don't know if it's bulletproof.  But, yeah, there's a

17   window.

18   Q.      There is glass --

19   A.      Yes.

20   Q.      -- right?

21           And then there's somebody who operates the door in

22   order for the door to be opened?

23   A.      Correct.

24   Q.      Okay.  And when people come -- I don't remember who it

25   was, maybe it was the gentleman from Arizona.  Was that Mr.

1    Vlad or Mr. Iacob?

2    A.      Mr. Iacob, uh-huh.

3    Q.      Okay.  He stopped by on his way up to work, and he was

4    one of the people who did that, right?

5    A.      Yes.

6    Q.      Mr. Davinder Singh stopped by.

7    A.      Yes.

8    Q.      Okay.  And there have been several others.

9            So when these people come to you, your spiel to them --

10   well, do you take them back into that secured area to interview

11   them?

12   A.      Umm, we have an interview room.

13   Q.      Okay.  Is it in that secured area?

14   A.      It's in our office, yes.

15   Q.      Is your office behind the secured door?

16   A.      Well, I think the whole building is secure because it's

17   a federal building.  So --

18   Q.      Remember the part we were talking about a minute ago

19   with the glass wall and somebody controlling the door, is that

20   where you take them, do they go through that door?

21   A.      Yes, that's how our office is set up.  They go through

22   security, yes.

23   Q.      They go through that door with you.

24   A.      Yes.

25   Q.      And you're wearing a badge.

1    A.      Not every day.  I don't wear it every day.

2    Q.      No, but sometimes you wear the badge?

3    A.      Yes.

4    Q.      Now, when somebody -- when Mr. Iacob came to your

5    office, do you remember, did you have the badge on?

6    A.      I have no idea.

7    Q.      Mr. Singh, when he came to your office, Davinder Singh,

8    did you have the badge on?

9    A.      Yeah, I don't know.  But even if I had it on, I usually

10   don't have it showing.  So I don't know --

11   Q.      But you have it, right?

12   A.      Like I said, sometimes I have it, sometimes not.

13   Q.      Okay.  And do you carry a gun?

14   A.      We're not supposed to show it.  Yes.

15   Q.      Do you carry a gun?

16   A.      Yes, I do.

17   Q.      Where do you wear your gun?

18   A.      On my -- sometimes I carry it on my belt or in my

19   purse.

20   Q.      Okay.  Now when you do these interviews, there are

21   other agents present, right?

22   A.      Correct.

23   Q.      And there have been just a number of people over the

24   years, quite a few different agents, right?

25   A.      That have worked in my office?

1    Q.      That have worked in your office, but in this

2    investigation.

3    A.      Yes.

4    Q.      Who have joined you for interviews.

5    A.      Yes.

6    Q.      Ms. Morihara is one.

7    A.      Yes.

8    Q.      Roger Moore is another.  Not James Bond, Roger Moore.

9    A.      Yes.

10   Q.      All right.  Mr. Roach, you mentioned him.

11   A.      Yes.

12   Q.      Luce Dunn is another agent --

13   A.      Yes.

14   Q.      -- in your office.

15           And they've joined you for these interviews.

16   A.      Correct.

17   Q.      Now, during these interviews, you always let the

18   applicants know that the reason they're there is because

19   there's an investigation taking place.  Correct?

20   A.      I don't know if I can say every time I do it a certain

21   way.  But usually I tell them that -- yes, that there's an

22   investigation or something or we found fraud in their asylum

23   application, something like that.

24   Q.      Oh, okay.  So you tell them that the fraud that you

25   found is in their asylum applications.  Is that what you told

1    Mr. Iacob?

2    A.       Well, like I said, I don't know if I say the same thing

3    every time.  But usually, yes, I tell them either we found

4    fraud documents or the story is like all the others or

5    templates from the client file or whatever the case may be.

6    Q.       So you let them know -- that's probably pretty early in

7    the interview that you let them know that their particular

8    application is suspect.  Correct?

9    A.       Yes.

10   Q.       And you also, I assume, explain to them that it's their

11   lawyers who are also suspected, the Sekhon law firm, correct?

12   A.       Umm, like I said, I don't know if I say the same thing

13   every time.  But I usually mention that or I oftentimes mention

14   that, yes.  It's been in the newspaper, too, so a lot of people

15   already know.

16   Q.       Okay.  The -- and these applicants, the ones who have

17   agreed to speak to you and have come to -- come to testify, for

18   example, Mr. Iacob, Mr. Davinder Singh, they admitted to you

19   that they committed perjury in their asylum interviews.

20   A.       Yes.  They told me the whole thing was made up and that

21   they got it from the law office, the law office told them --

22   Q.       I'm not asking you what they got from the law office.

23   And you promised me you wouldn't tell me what other people told

24   you.

25           MR. WAGNER:  Objection, Your Honor.

1    Q.      BY MR. ZINDEL:  I'm asking you --

2           MR. WAGNER:  He just asked what they told him, so I

3    don't think he can object to the answer.

4           THE COURT:  No, I think you opened that door up, but

5    let's proceed.

6           MR. ZINDEL:  Okay.

7    Q.      These persons admitted to you that they themselves, for

8    whatever reason, for whatever motive committed perjury during

9    their asylum interviews.

10   A.      Yes, but it's a larger scale investigation.  It's --

11   Q.      Ma'am, I understand that.  You've said that many times.

12   My question is, did these persons admit perjury to you?

13   A.      Yes.

14   Q.      All right.  Once they did that or actually before they

15   did that, did you tell them that they could be prosecuted for

16   committing perjury?

17   A.      I think on some people I did or I did mention the

18   fraudulent documents, they could be prosecuted.  I'm not sure

19   if I mentioned perjury that they could be prosecuted for.

20   Q.      All right.  So sometimes you did tell them you've

21   committed perjury and you could be in trouble.

22   A.      No, I said I don't think I told them about perjury, but

23   I told them about fraud documents.

24   Q.      Making false documents.  Perjury is one crime, making

25   false documents is another --

1    A.      Yes.

2    Q.      -- correct?

3    A.      That's the one that comes to mind that I mentioned.

4    Q.      They're both felony crimes under the laws of the United

5    States.

6    A.      Yes.

7    Q.      And they're both investigatable by you as a special

8    agent for Immigration and Customs Enforcement.

9    A.      Yes.

10   Q.      All right.  Now, can you give me an estimate about how

11   many times during these interviews you mention the prospect of

12   prosecuting the applicants.

13   A.      How many times?

14   Q.      Yes.

15   A.      I don't know.  I know I did mention it a couple times.

16   Q.      What about the other agents?  Did you ever hear the

17   other --

18   A.      Maybe, like, five times.

19   Q.      Did you ever hear the other agents suggest to these

20   visitors who were coming to inquire about their applications

21   that they could personally be prosecuted for some kind of false

22   statement or fraud?

23   A.      Well, actually when I just answered your question, I

24   was talking about every applicant I ever interviewed, not just

25   the ones that came to my office.

1    Q.      Okay.  I'm asking you --

2    A.      But now do you want me to talk about every -- all the

3    applicants I talked to --

4    Q.      No.

5    A.      -- or just the ones that --

6    Q.      I'm asking you now about other agents.  Did you ever

7    hear, for example, Ms. Morihara tell any of these applicants

8    that they themselves could be criminally prosecuted?

9    A.      I think so, yes.  But, again, I'm referring to every

10   applicant we interviewed, not just the ones that came in.

11   Q.      Okay.  And Mr. Moore, did you ever hear him tell

12   applicants that they could be criminally prosecuted?

13   A.      No.

14   Q.      Mr. Roach?

15   A.      He might have said that.

16   Q.      And Ms. Dunn?

17   A.      I think she may have mentioned something.

18   Q.      All right.  And there are actually holding cells in

19   your office, correct, where persons can be taken into custody

20   and held, right?

21   A.      In the deportation office there's a holding cell, yes,

22   but not in my office.

23   Q.      And many times in your life, in order to have somebody

24   arrested, you have sworn out a criminal complaint using the

25   assistance of a United States Attorney so that you can take

1    somebody into custody.  Correct?

2    A.        Umm, are you talking about --

3    Q.        Yeah, in your experience.

4    A.        -- just any type of arrest?  Yes.  Like, for an arrest

5    warrant, you have -- you usually have to swear out a criminal

6    complaint.

7    Q.        Right.  And you have the power to do that?

8    A.        Well, it's my job description.

9    Q.        Okay.  And that's true of the other names that I

10   mentioned, Ms. Dunn, Mr. Roach.

11   A.        Yes, that's what we do.  Actually that's our job.

12   Q.        Okay.  All right.  Now, when you tell these visitors

13   who come to inquire and the others that their applications are

14   under -- or their cases are under investigation, that certainly

15   leads them -- gives them reason to think that their case either

16   may be reopened or do you tell them that it will be reopened?

17   A.        Like I said, every interview is different.  So there's

18   no, like, blanket statement of what I told someone.

19   Q.        Okay.

20   A.        And it's kind of like when you have a conversation with

21   somebody, it's never the same.  So --

22   Q.        I understand that.  But generally you convey to them

23   that they may be back in the immigration court at some point.

24   A.        Yes.  Especially if we have found fraud --

25   Q.        Okay.

1    A.       -- it's going to be -- something has to be done about

2    it.  They either need a waiver or the case is going to be

3    reopened or terminated.  And if it's reopened, they get another

4    asylum interview, they get a chance to go in and reapply for

5    asylum.

6           MR. ZINDEL:  I'm going to move to strike the last part

7    of that answer.  I didn't ask you about what's going to happen,

8    I'm just asking you about what you convey to them.

9           THE WITNESS:  That's what I told them.

10          MR. ZINDEL:  Okay.

11          THE COURT:  Well, apparently she told them that.  Your

12   answer is that's what you told the applicants?

13          THE WITNESS:  Yes.

14   Q.       BY MR. ZINDEL:  You told them that they'll get another

15   asylum interview.

16   A.       As part of the termination, yes.

17   Q.       Well, many of these people, they've already had asylum

18   interviews, right?

19   A.       That's how termination works.  They get a notice of

20   intent to terminate, and then they can come in for an

21   interview.

22   Q.       Okay.  Have they already had asylum interviews, Ms.

23   Webster?

24   A.       Yes.  If you're granted asylum, you have an asylum

25   interview.  And then if -- after it's granted, if they get a

1   notice to terminate, then, yes, they would get another asylum

2   interview.

3   Q.      Okay.  And these people for the most part have been

4   granted asylum, the people who are coming to inquire about

5   their green cards and things?

6   A.      Yeah, almost everybody was granted.

7   Q.      Okay.  So they've all been in front of the

8   immigration -- or the asylum officer or in some cases the

9   immigration judge?

10  A.      Yes, most of them.

11  Q.      When they've been in front of the immigration judge,

12  they've actually passed at least two hurdles, they've seen one

13  asylum officer and one immigration judge.

14  A.      Yeah.  And several appeal their cases to the Board of

15  Immigration Appeals --

16  Q.      Which would be a third level.

17  A.      -- and others to the Ninth Circuit.  Almost all of

18  them, if they're denied by the judge, they're appealed.

19  Q.      Okay.  Now -- so -- but is it fair to say except for

20  those applicants like Mr. Vorobiov, I guess -- Mr. Vorobiov was

21  able to get a green card?

22  A.      No.

23  Q.      Mr. Vlad has a green card?

24  A.      Yes.

25  Q.      Okay.  Other than people like that who had a green card

1  or maybe those who have left or been deported, the future of

2  all the applicants remains up in the air today, all the Sekhon

3  applicants.

4  A.      Yes.  We're waiting for the criminal case to be over,

5  and then we're going to address the administrative side.  We

6  call it administrative where it deals with immigration court or

7  the asylum office.  Because we can't have both proceedings

8  going at the same time for all those hundreds of cases.

9  Q.      Okay.  Is there some law that prevents you from having

10 them both at the same time or is it just as a practical matter

11 you can't have them both at the same time?

12 A.      It's a practical matter because you can't have the

13 alien file in two places at once.

14 Q.      All right.  So they're all, though, going to go back to

15 immigration court at some point, correct?

16 A.      I wouldn't use the word "all."

17 Q.      Except for those who have made some other arrangement

18 about their status, either they've got status or they're gone,

19 right?

20 A.      No.  Each case is different, so we would base it on --

21 Q.      Okay.  Well --

22 A.      -- the merits of every case.

23 Q.      -- let me ask you this, then.

24         The majority of them are facing a return to immigration

25 court.

3902

1    A.      No.  It's a termination, and so they get another asylum

2    interview and -- with an asylum officer, and that officer will

3    make the determination.

4    Q.      Is that -- so where I misspoke was I said immigration

5    court.  They're going back to the asylum office?

6    A.      Yes.  Okay.  If they were granted asylum by the asylum

7    office and there's fraud indicators, then their case will be

8    returned to the asylum office.  If they were granted by the

9    immigration judge and there's fraud indicators, then their case

10   would be reopened at the immigration court.  And so on with

11   Board of Immigration Appeals or whatever level they were

12   granted and then subsequently fraud was found.

13   Q.      So, in short, you go back to the level where you

14   succeeded.

15   A.      Well, whatever --

16   Q.      Where --

17   A.      -- entity was -- granted them, correct.

18   Q.      Where your claim was finally decided.

19   A.      Correct.

20   Q.      Except -- okay.

21           Now, some of these people you're aware have family

22   members, spouses and children who are still in Romania?

23   A.      Yes.

24   Q.      And several, quite a few of these people have been

25   waiting years for this to resolve.

1    A.       Yes.  Well, I don't think they're going to be able to

2    bring their families because their application was fraud so

3    they can't bring family members in on an application --

4              MR. ZINDEL:  I'm sorry.  I'm going to move to strike

5    that answer, Your Honor.

6              I asked you if they'd waited years --

7              THE COURT:  The answer was nonresponsive.  Disregard

8    that answer, Ladies and Gentlemen.

9    Q.       BY MR. ZINDEL:  Have they waited years in some cases?

10   A.       Yes.  Because this is -- I think it's been six years

11   that this investigation has been going on.

12   Q.       All right.  Now, you're describing this process of

13   people coming by to your office as -- these are interviews that

14   take place in your office?

15   A.       If -- yes, if somebody comes by, if I have the

16   opportunity, I will interview them.

17   Q.       Okay.  And early on in the investigation you were

18   dealing with Mr. Mark Temple, the fellow who testified early in

19   the trial.  You remember Mr. Temple?

20   A.       Yes.

21   Q.       And you two were the ones who put your heads together

22   and sort of took responsibility for this investigation from the

23   outset.

24   A.       I wouldn't use those words, no.

25   Q.       Well, you were the officially assigned investigator,

1    but Mr. Temple was instrumental in your -- in the early part of

2    your investigation.

3    A.      Well, he's the one who brought the lead to ICE, or I

4    guess we were INS back then, and that's what started the

5    investigation.  And he had language skills that assisted also.

6            MR. ZINDEL:  Okay.  May I approach?

7            THE COURT:  You may.

8    Q.      BY MR. ZINDEL:  I'm going to hand you -- this is a --

9    do you recognize this as one of the E-mails that you sent to

10   Mr. Temple early in the investigation?

11   A.      Yes.

12   Q.      And in this E-mail, you and Mr. Temple discuss

13   interviewing the Sekhon firm's applicants, asylum interviews

14   basically, right?

15   A.      Umm, there's a lot of topics covered in this, but

16   that's one of them.

17   Q.      And you describe that process of the asylum interview

18   as being used to break Sekhon Romanian applicants.

19   A.      Yes.

20   Q.      And that was April 5th, 2003, that you were E-mailing

21   Mr. Temple that you wanted to try to break Sekhon applicants?

22   A.      Yes.  And I told the asylum office, too, that if they

23   have any Sekhon clients that admit to any fraud that they

24   should refer them to me.  That's the terminology we use.  When

25   someone admits to fraud, we say they broke or they break.

3905

1   Q.       We were talking a moment ago about your reports and

2   whether you handed them all over.

3            MR. ZINDEL:  What is defendants' next in order?

4            THE CLERK:  That would be 6E.

5   Q.       BY MR. ZINDEL:  And that would certainly include any

6   reports pertaining not just to the Sekhons, but to Mr. Caza?

7   That was within the scope of the Court's order that you provide

8   reports to the defense?

9   A.       Umm, yes.

10  Q.       I'm going to hand you what I've marked as Defendants'

11  Exhibit 6E.

12           MR. WAGNER:  Do you have a copy?

13           THE COURT:  Do you have a copy for the Court?

14           MR. ZINDEL:  I do.

15           THE COURT:  Mr. Zindel?

16           MR. ZINDEL:  Yes.

17  Q.       Have you had an opportunity to look at that?

18  A.       Yes.

19  Q.       That report pertains to Mr. Caza?

20  A.       Yes.

21  Q.       It makes --

22  A.       But I think he was working with a different attorney.

23  Q.       All right.

24  A.       So it wasn't -- like, in my view, it wasn't part of

25  this case.  But he was working with --

3906

1    Q.      There's no question pending.

2    A.      Okay.  Sorry.

3    Q.      That report pertains to Mr. Caza, correct?

4    A.      Umm, yes.

5    Q.      It makes extensive references to your investigation in

6    this case.

7    A.      Yes.

8    Q.      The name Sekhon & Sekhon appears in that report over

9    and over again.

10   A.      Yes.

11   Q.      All right.  Did you disclose that?

12   A.      Umm, this was in an alien file that was not part of

13   this case, so I probably didn't have access to it.  It wasn't,

14   like, part of the investigation.  It was a memo that was

15   written to the alien file.  So there may be other memos like

16   this out there because there's so many cases.  But I did my

17   best to get everything.

18   Q.      You had no access to that document?

19   A.      Well, because it's in an alien file not related to this

20   case.

21   Q.      Who wrote it?

22   A.      Umm, I did.

23   Q.      It's got your name on it?

24   A.      Yes.

25   Q.      You saved it to your computer?

1    A.        Probably, yes.

2    Q.        Would you have had access to it through your computer?

3    A.        Yes, but I don't think I saved it in the case -- in

4    this case portion of my computer.

5    Q.        Now, that young man was assisted by -- his asylum claim

6    was filed by a different attorney, correct?

7    A.        I think so, yes.

8    Q.        But Mr. Caza translated some documents for him?

9    A.        Umm, I don't remember Mr. Caza's involvement a hundred

10   percent, but I think it was more than translations.

11   Q.        Okay.  And what was it that caused you -- well, when

12   did you write that memo?

13   A.        July 31st, 2008.

14   Q.        And what was it that caused you to put that memo in

15   that young man's A file?

16   A.        Umm, I received a request from somebody in my office

17   that -- I think this gentleman came in for an interview when

18   they discovered fraud or something like that in Sacramento, and

19   they wanted to refer him to the immigration judge or do

20   something like that, and they requested that I write this memo.

21   Q.        Did that man come into your office and ask about why

22   his green card had not been issued?  Is that what caused you to

23   put that in his file?

24   A.        No.  It was -- he went for an interview, an LPR or I-45

25   interview with CIS, and CIS contacted me.

1   Q.      Okay.  So he went for some kind of interview.

2   A.      Yes.

3   Q.      And did not -- did special agents in your office

4   interview him?

5   A.      I don't think so.  Not that I know of.  I think it was

6   CIS who interviewed him.

7   Q.      Okay.  You don't know?

8   A.      Well, I'm hoping they would have told me if they

9   interviewed him, but nobody told me that they interviewed him

10  in my office.  But I was told that he had an interview by CIS.

11  Q.      Okay.  It's possible he was also interviewed by agents?

12  A.      I don't think so.

13  Q.      But at some point you stuck that memo in his file.

14  A.      Yes, I did.

15  Q.      Asking that his case be reopened.

16  A.      Is that what it says?  No, it just says that he has a

17  lot of fraud indicators.

18  Q.      Well, let's take a look at the other one.

19  A.      It says fraud indicators that --

20          THE COURT:  There's no question pending.

21          THE WITNESS:  Oh, sorry, Your Honor.

22          MR. ZINDEL:  That's 6E?

23          THE WITNESS:  Yes.

24          MR. ZINDEL:  All right.  May I see that, please.

25          THE WITNESS:  Sure.

1    Q.        BY MR. ZINDEL:   Now, you were here earlier today when

2    Mr. Wagner told the Court that he'd handed over all the

3    documents that were in the possession of the government.

4    A.        Yes.

5    Q.        And you didn't stand up and say that's not true, did

6    you?

7    A.        Well, like I said, it's almost impossible to get every

8    single document, but -- especially if it's not part of the case

9    file.  Like, that's not related to this case, but it has to do

10   with one of the defendant's actions in a different case that

11   might be similar to his actions in this case.

12   Q.        Well -- one moment, please.  I'm going to hand this

13   back to you.

14            When you say it's not related to this case, that's not

15   entirely correct, correct?  You agree with what I've said?

16   A.        Well, and I did not categorize it under this case

17   because Mr. Caza was working with a different lawyer.  And --

18   Q.        But by my count you mentioned Sekhon & Sekhon at least

19   seven times on the first page of this two-page document.

20   A.        Right.  It described Mr. Caza's activities with Sekhon

21   & Sekhon.  And --

22   Q.        And that doesn't relate to this case?

23   A.        Well, it relates to his activities, and that he may

24   have taken the same activities in this case.

25   Q.        And how many memos did you place in this young man's

1    file?

2    A.       Umm, I don't know.  I could look in the file.

3    Q.       I'm going to mark -- hand you what I've marked as 6F.

4    A.       Okay.

5    Q.       This is the second memo?

6    A.       Yes.

7    Q.       Same file?

8    A.       Yes.

9    Q.       Also July 2008?  What's the date of 6F?

10   A.       July 7th, 2008.

11   Q.       Okay.  Let me take that back.

12            How many more documents like this are there out there

13   that you have not disclosed to the government?

14   A.       There could be several documents.  There were so many

15   applications like this, it was just mind boggling how many

16   there were.  So I tried to get all the ones related to Sekhon &

17   Sekhon together as best I could.  But if it went into an alien

18   file for an administrative action not related specifically to

19   this case, it may not be here.

20   Q.       Okay.  Thank you for that explanation.

21            How many are there?

22            MR. WAGNER:  Asked and answered, Your Honor.

23   Q.       BY MR. ZINDEL:  You said many?

24   A.       I don't know.

25            THE COURT:  That's her answer.

1           MR. ZINDEL:  Your Honor, I would ask that they --

2           THE COURT:  We'll take our midafternoon, Ladies and

3    Gentlemen.  Recess for 15 to 20 minutes.

4           (The following proceedings were had outside

5           the presence of the jury:)

6           THE COURT:  Counsel, not on this matter, getting back

7    to the rough notes.

8           I've done some more reading of some cases, and I think,

9    Mr. Wagner, particularly the Johnson case, we've been at this

10   for two months, I think the safest course is to have an in

11   camera review by the Court of the rough notes.  I think that

12   would be by far the most sensible.

13          MR. WAGNER:  Very well.

14          THE COURT:  Okay.  Whenever you can get those together,

15   let me take a look at them.

16          MR. WAGNER:  Your Honor, I suspect partly because Agent

17   Webster has been on the stand and she's the one that has to

18   collect them, we might not be able to get them to you till

19   Friday.

20          THE COURT:  I understand.  I understand.

21          MR. WAGNER:  Thank you.

22          THE COURT:  All right.  Then I take it you wanted a

23   request for more of these --

24          MR. WAGNER:  Your Honor, could I -- before we leave

25   that topic, could I ask for one more clarification?

1          THE COURT:  Yes.

2          MR. WAGNER:  Which is I mentioned earlier that in

3    addition to producing them to you for review as to whether or

4    not they're Jencks Act materials, we'll also look at them to

5    see if they're Brady material.  But I would request that Mr.

6    Dratman spell out what it is he thinks would be Brady to give

7    us some guidance as to what we're looking for.  I mean --

8          THE COURT:  Brady.  I don't know.

9          MR. WAGNER:  I mean, he's the one that's making the

10   request.  So I would just --

11         THE COURT:  I think you'll know a Brady document when

12   you see it, wouldn't you?

13         MR. WAGNER:  Well, I'm not sure, Your Honor.  Because

14   we produced all those reports, and I think all the information

15   in the notes are in the reports.

16         THE COURT:  I suspect that they are, too.

17         MR. WAGNER:  But I don't want him to be saying later,

18   hey, you didn't look for X, and that's what I wanted.  I don't

19   know what he wants.  So I would request that at least he spell

20   it out, and we'll try to accommodate --

21         THE COURT:  All right.  Well, then maybe, Mr. Dratman,

22   you can meet and confer on that issue.  I'll do my own in

23   camera on the rough notes.  I think that's -- whenever you have

24   time to get them to me, that's fine.

25         Mr. Dratman, if you can enlighten the government, I

1    think it would be helpful to expedite this.  All right.

2         MR. DRATMAN:  Yes.

3         THE COURT:  Very well.  I take it, Mr. Zindel, you're

4    standing there.  What do you want me to do?

5         MR. ZINDEL:  I would like the Court to enforce its

6    order that all documents pertaining to this case be released.

7    As to whether they were filed in this case or some other case,

8    it really doesn't matter to me.

9         THE COURT:  I have my own thoughts on it, but go ahead,

10   Mr. Wagner.

11        MR. WAGNER:  Your Honor, what Mr. Caza is charged with

12   is conspiring with the Sekhons.  This is a conspiracy case

13   involving the filing of Sekhon client applications.  What Mr.

14   Zindel is now talking about is applications that do not involve

15   the Sekhons.  The fact that she mentions the Sekhons a lot is

16   simply responding to information about what do we know about

17   Mr. Caza that may relate to what he's doing in an entirely

18   unrelated matter.

19        So I don't think they're part of this case, I don't

20   think -- and they're certainly not exculpatory.  If anything,

21   they just recap what we already know about this case.

22        THE COURT:  That's my impression of this document.

23        MR. ZINDEL:  Okay.  How could Mr. Wagner know whether

24   they're exculpatory if he's never seen them?  Your Honor --

25        THE COURT:  Counsel, look it --

1          MR. ZINDEL:  Okay.

2          THE COURT:  -- I understand your concern.  You know,

3    we're now in the second month.  There may be other cases out

4    there with other defendants.  I don't know what other

5    investigations are going on that may involve other defendants

6    in this case.  I don't know that, either.  I'm not so sure that

7    that is necessarily -- this is another separate case now, not

8    this case.  When I look at this document, I read it and it

9    basically recaps what went on in this case and raises the

10   suspicion in another case.

11         MR. ZINDEL:  Well, the problem is that that man did

12   submit documents, and they were documents that he got from --

13   from Romania with one exception, which was a letter that Mr.

14   Caza helped him draft that was taken to a local pastor to sign.

15   But in this witness's mind, it becomes all fraud.  Now, there

16   are other things like that.  And this man now is afraid to come

17   testify.  So I want to know what else is out there.

18         And it definitely pertains to the subject matter of the

19   witness's testimony.  This is a dodge to say, well, we filed it

20   in a different case.  I mean, if they get to do that --

21         THE COURT:  It is a different case.  You think this is

22   part of this case?

23         MR. ZINDEL:  It may not be part of this case, but it

24   relates to this case.  The subject matter of that memo, that

25   piece of writing is this investigation, which is what she's

1    been testifying about since Friday afternoon.  And I'm entitled

2    to that by this Court's order and by the government's promise

3    that it would hand over everything relating to this

4    investigation.

5          THE COURT:  Well, my view is that what was presented to

6    the witness and marked as 6E, number one, involves the

7    possibility of another case of fraud unrelated to this case.  I

8    don't think it is related to this case.  And the pattern may be

9    the same or the conduct may be the same, but it's not this

10   case.

11         And if you're asking me to order the government to go

12   over to 650 Capitol Mall or go over wherever they're going to

13   find, you know, these applications and say find every

14   application that somebody from the government has or the

15   immigration, ICE, whatever has prepared referencing this case,

16   that doesn't make any sense.

17         MR. ZINDEL:  It's this witness --

18         THE COURT:  That doesn't make any sense.  It's not

19   relevant, it's not helpful to the defendant, your client or any

20   of the defendants in my view.

21         I mean, if there is information that relates to the

22   conduct in this case that is in some report form, I think that

23   would be appropriate.  I don't see this particular -- if this

24   is an example of what you want me to order, I don't see this --

25   this just recaps what is in this case.  It doesn't have

1    anything to do with any separate action that somehow is

2    involving the facts in this case inferentially.  The pattern

3    may be the same, but what do you have in mind, that every --

4         MR. ZINDEL:  I have spoken --

5         THE COURT:  I have a hard time understanding how it

6    could be helpful to you.

7         MR. ZINDEL:  I have spoken to Mr. Metehau, the man in

8    whose file that letter was placed, and he has assured me that

9    his legitimate -- his application was entirely legitimate, his

10   documents were legitimate.  That material is not just relevant

11   to this witness's testimony, but it's also exculpatory.  She

12   hid it from us.  And to --

13        THE COURT:  She what?

14        MR. ZINDEL:  She hid it from us.  She did not reveal

15   it.  She has been here every day.  We've taken this subject up

16   over and over again.  And I would ask the Court not to indulge

17   her fantasy that because she filed it in a different case, it

18   does not relate to this case.  You've read the document.  You

19   know it relates to it.

20        THE COURT:  What did you have in mind -- okay.  Let's

21   talk about this case.  I don't know what exists in any case,

22   maybe you have other evidence, but what do you have in mind?

23   What are you asking the Court to do?

24        MR. ZINDEL:  I want her to disclose to us all the --

25        THE COURT:  About this case.

1            MR. ZINDEL:  -- other memos that she has written --

2            THE COURT:  On this case.

3            MR. ZINDEL:  Not on this case, but that she has

4    written --

5            THE COURT:  This case being -- wait a minute.  Wait a

6    minute.  Let's make the record clear.  This case being the

7    Metehau case?

8            MR. ZINDEL:  Yes, but not just --

9            THE COURT:  You're done with that case?

10           MR. ZINDEL:  Yes.  She said that there were many,

11   potentially many similar documents.

12           THE COURT:  I don't recall many, but -- I don't know if

13   she knows there are any.  I'll give it thought.  My inclination

14   is I just -- this particular document, which I'm relying on,

15   the document you've marked as 6E, I think this document is --

16   while it does reference the name of Mr. Caza and he being the

17   interpreter and her suspicion this may contain some fraudulent

18   statements, you know, beyond that, I'm not so sure that, other

19   than recapping what's going on in this case, what this has to

20   do with this case.

21           MR. ZINDEL:  I'm going to ask that 6F --

22           THE COURT:  Pardon me?

23           MR. ZINDEL:  -- 6F also be put in the record, which is

24   a second memo relating to this man.

25           THE COURT:  All right.  Let me take a look at 6F.

1        This is an earlier memo.

2        MR. ZINDEL:  Yes.

3        THE COURT:  All right.  This references search and --

4  which raises suspicions in the mind of the witness that the

5  same kind of fraud that she believes in this case occurred in

6  the Metehau case.

7        MR. ZINDEL:  Yeah.

8        THE COURT:  That's it?

9        MR. ZINDEL:  There are other indications in the

10  discovery that there were many times that -- I don't know if

11  there were many times, but there were certainly times when Ms.

12  Webster suspected fraud --

13        THE COURT:  Let me ask you this.

14        MR. ZINDEL:  -- where fraud was found not to have

15  occurred.

16        THE COURT:  You know, I've been going since about 6:00

17  this morning, and I haven't had any lunch yet.  This is a good

18  way to lose weight.

19        Let me ask you this.  Suppose there are a number of

20  investigations going on regarding your client, his

21  interpretation of various items, other stamps that might be

22  fraudulent, I don't know what it could be.  Suppose that's

23  going on in a dozen other cases.  Is it your view that should

24  all be brought to this courtroom?

25        Is that your view, that the government, even though

3919

1  they may have other fraud cases pending or ready to spring on

2  your client, that that all should be disclosed here in this

3  courtroom?

4          MR. ZINDEL:  If it relates to the subject matter of

5  this witness's testimony, yes.

6          THE COURT:  Not the subject matter.  This is the

7  subject matter of fraud that can encompass all kinds of people,

8  all kinds of things.  You're telling me that all comes into

9  this trial?

10         MR. ZINDEL:  Yes.  It relates to -- those memos both

11 relate to the subject matter of her testimony, which is --

12         THE COURT:  The subject matter is fraud, I agree with

13 that.

14         MR. ZINDEL:  -- the investigation of Mr. Caza and

15 documents and the search of his house.  That's all that relates

16 to really.  It may have been that he was working for another

17 lawyer.  He was working for another lawyer.  You know --

18         THE COURT:  Do the other defendants have any objection

19 to this request?  Would you like to see all this come in?

20         Mr. Stepanian, what's your view?

21         MR. STEPANIAN:  We're going to object to the

22 introduction.  I'm not objecting to --

23         THE COURT:  I'm surprised that everyone is silent over

24 there.  No one wants to get into this?

25         MR. STEPANIAN:  I'm not silent.  We have no problem

```
 1    with Mr. Zindel using it for cross-examination, but 6F relates

 2    to Sekhon & Sekhon.  We would object to the introduction --

 3            MR. ZINDEL:  I should make it clear, I'm not asking

 4    that the documents be introduced into evidence.  I'm asking --

 5            THE COURT:  Well, you're asking to open the door up

 6    that I'm not sure that your co-defendants here are interested

 7    in opening this door up.

 8            MR. ZINDEL:  No, I'm asking for discovery.  I'm asking

 9    for the Court to enforce its order that all those things be

10    disclosed under the Jencks Act, which was an order that was

11    made long ago.

12            THE COURT:  Well, I think my Jencks Act order is

13    intact.  I'm not aware of -- you've apparently found these two

14    documents, and you suspect there are other investigations going

15    on involving your client or maybe other defendants in this

16    case.  That's your premise, right?

17            MR. ZINDEL:  Right.  And I don't know what else is out

18    there.  I don't know whether there are other investigations --

19            THE COURT:  And how is that relevant?  What's the point

20    here?  What's the point?  What's the relevance?  Give me the

21    relevance of that right now about other investigations.

22            MR. STEPANIAN:  It shows bias, Your Honor.  And we feel

23    that we would join in the request for discovery of these

24    documents.  Michael Stepanian.  We would feel that it shows

25    bias, motive and a lot of other aspects about cross --
```

1    cross-examination material.

2          These are relevant to this investigation.  Sekhon &

3    Sekhon are on those documents, and Mr. Caza is represented by

4    Mr. Zindel.

5          THE COURT:  You can give me a discovery request, and

6    the request being what specifically?

7          MR. ZINDEL:  That they be disclosed to us --

8          THE COURT:  Give me the -- that what be disclosed?

9          MR. ZINDEL:  That all reports prepared by this witness,

10   all memoranda, reports, writings concerning the subject matter

11   of her testimony here, her investigation of the Sekhon & Sekhon

12   law firm and Mr. Caza in connection with documents be provided

13   to us --

14         THE COURT:  Okay.

15         MR. ZINDEL:  -- as the Court has previously ordered on

16   several occasions.

17         THE COURT:  Mr. Dratman.

18         MR. DRATMAN:  Your Honor, the witness has many times

19   mentioned hundreds of files which she apparently is intimately

20   aware of.  And I haven't seen this, but if it is a file that

21   she's holding, then it's -- she's already told this jury about

22   these hundreds of files.  The materials that she's written, the

23   memos that she's written --

24         THE COURT:  Doesn't she refer to the Sekhon & Sekhon

25   client application files?  That's my understanding.  That's

1    what that testimony was about.

2        MR. DRATMAN:  Well, I don't know, I haven't seen this

3    memo.  But if it's a memo that she's written that had the

4    subject matter of the Sekhon & Sekhon investigation, that it

5    certainly relates --

6        THE COURT:  No, it's not the Sekhon investigation.  It

7    has to do with another law firm.

8        MR. DRATMAN:  Well, I would join in the discovery

9    request, but point out that she has referred to hundreds of

10   files.

11       THE COURT:  All right.  Well, my take is that she's

12   talking about the clients of the Sekhon firm, but that's what I

13   remember.

14       Mr. Wagner.

15       MR. WAGNER:  Yeah, that's exactly right, Your Honor.  I

16   don't think the record is what Mr. Zindel is trying to say it

17   is, that it shows bias.  This case that he's referring to in 6E

18   and 6F of Mr. Metehau, I've never heard of Mr. Metehau.  And

19   Ms. Webster just testified this is not her case, she's not

20   investigating it.  It doesn't involve Sekhon & Sekhon.  It's

21   some other investigation that's going on in which she was

22   requested to provide information.  Because it involved Mr. Caza

23   and because Mr. Caza is under indictment in this case, she was

24   requested to provide information about what's going on in this

25   case.

1          This is not her case, and so to say that this shows

2     bias simply because she's recapping what's going on in this

3     case I think is just a distortion of the record.

4          MR. ZINDEL:  You know, Your Honor, Mark Temple, who

5     testified in this trial, offered this man, Danut Metehau, an S

6     visa to testify against Mr. Caza and the Sekhons.  So they

7     can't have it that way.  They can't go behind our backs and do

8     that and then keep it separate.

9          THE COURT:  Wait a minute.  Are you telling me you're

10    going to call Mr. Metehau to come in and testify?

11         MR. ZINDEL:  He doesn't want to testify now because

12    he's scared.

13         THE COURT:  Well, why would he be allowed to testify?

14    What does he have to say about this?

15         MR. ZINDEL:  What he has to say is that he was

16    interviewed by two special agents, that he was made a promise

17    that if he testified against the Sekhons that -- or Mr. Caza,

18    rather, that they would -- that they would --

19         THE COURT:  In that case.

20         MR. ZINDEL:  -- give him an S visa.  And that he's now

21    afraid to do that because they won't act on his --

22         THE COURT:  You're talking about --

23         MR. ZINDEL:  -- they won't act on his application here.

24         THE COURT:  -- in this case here.

25         MR. ZINDEL:  Right.

1            THE COURT:  All right.  I'm going to get a cup of

2     coffee, and I'll be back in about 15 minutes.

3            (Recess taken.)

4            THE COURT:  The Court's convened outside the presence

5     of the jury.

6            Counsel, I've reviewed these memoranda, and I'm going

7     to rule and deny the request for discovery.  This request of

8     defendant Caza, which was joined in by I think all the

9     defendants -- is that correct?

10           MR. GOHEL:  Yes.

11           MR. BLACKMON:  Yes.

12           THE COURT:  -- is the request for discovery order of

13    any other investigatory documents and reports that Agent

14    Webster made to her agency regarding defendant Caza's conduct

15    that may relate to applications of individuals that were not

16    clients of the Sekhon law firm.  Defendants have failed to set

17    forth arguments or evidence that Exhibit 6E or 6F demonstrate

18    any basis of Agent Webster sufficient to justify what I would

19    think of as a fishing expedition.

20           Now, that doesn't preclude any of the defendants from

21    cross-examining Ms. Webster about any other documents that she

22    may have prepared.  They may be able to develop evidence of

23    that which may alter this ruling or modify it in some fashion.

24           However, these exhibits, these memos in 6A -- excuse

25    me -- in 6E and 6F refer to documents seized from the Caza

1    residence pursuant to the search warrant four years prior to

2    the date of these memos, not before the search, but after the

3    search by some four years.  These memos also respond to

4    inquiries apparently regarding defendant Caza's involvement in

5    the alleged -- or the charges contained in this indictment and

6    to the extent they may relate or are similar to an apparent

7    investigation taking place of another individual or lawyer.

8    I'm not sure who's being investigated in that particular case,

9    this case that these exhibits relate to.

10            However, nothing in these exhibits in my view

11   illustrates that the witness has acted with any kind of malice

12   or bias in providing such information to her agency.  So the

13   request for further discovery is denied at this point given the

14   state of the evidence.

15            Bring the jury in.

16            MR. REARDON:  Your Honor, if I may, just one

17   housekeeping matter.

18            THE COURT:  What's this?

19            MR. REARDON:  Mr. Stepanian and I have a housekeeping

20   matter.

21            THE COURT:  That brings a smile to my face.

22            MR. REARDON:  The government's final witness -- that

23   should bring a smile to your face as well -- the government's

24   final witness is a doctor who has traveled from Romania.  If

25   we're not done with Ms. Webster today, we'd ask that she be

1    taken out of order tomorrow morning so that she can get on a

2    plane Friday to return to her medical practice in Romania.

3              THE COURT:  Is this --

4              MR. STEPANIAN:  We have no problem with that.

5              We would request one further matter.  That is that we

6    request, on behalf of the defendants, that we be allowed to

7    start our case on Monday morning.  We have witnesses to

8    organize.  It would expedite it a great deal.

9              THE COURT:  All right.  I understand.

10             MR. STEPANIAN:  Thank you.

11             THE COURT:  Tomorrow's witness is being called by --

12             MR. REARDON:  By the government, Your Honor.

13             THE COURT:  Is this your last witness?

14             MR. REARDON:  This is our last witness, yes, Your

15   Honor.  That puts a smile on your face.

16             THE COURT:  The last witness.

17             MR. ZINDEL:  Maybe we should get a whiskey after all.

18   I think that we would probably be done by noon tomorrow at the

19   latest including --

20             THE COURT:  Yeah, that's fine.  Okay.  All right.

21             (The following proceedings were had in the

22             presence of the jury:)

23             THE COURT:  Mr. Zindel, you may proceed.

24   Q.    BY MR. ZINDEL:  Just before we move on to a new

25   subject, Ms. Webster, we were looking at 6E and 6F before the

1     break.

2           Those memos -- I understand they pertain to a different

3     investigation, but does the text of those memos pertain to your

4     investigation of the Sekhon & Sekhon law firm and Mr. Caza?

5     A.     It summarizes the activities, yes.

6     Q.     Okay.  And is that the subject that you have been

7     testifying about here over the last three days?

8     A.     The subject of these memos --

9     Q.     Yes.

10    A.     -- or the investigation?

11    Q.     Yes.  Is that --

12    A.     Right.  This case --

13    Q.     Your investigation of Sekhon & Sekhon and Mr. Caza,

14    that's what you've been testifying about, isn't it?

15    A.     Yes.  But this memo was related --

16    Q.     I'm just asking you what you've been testifying about.

17    A.     Okay.

18    Q.     And those -- memos such as that one, you said there may

19    be many of them?

20    A.     Well, yes.  I mean, if he was working with another

21    attorney --

22    Q.     All right.  So there may be other memos of that nature,

23    correct?

24    A.     Yes.

25    Q.     And do those -- do those memos also relate to the

1    subject matter of your testimony here?

2    A.      Umm, to the fraud activities, it could be.

3    Q.      Right.  They may relate to your investigation of Mr.

4    Caza, for example?

5    A.      Umm, I don't know.  I don't -- I don't know if there

6    are memos or what's in them.  So --

7    Q.      All right.

8            THE COURT:  I didn't hear the last part of that answer.

9            THE WITNESS:  I don't know specifically if there are

10   memos or what's in them, but there could be.  There are a lot

11   of cases.

12   Q.      BY MR. ZINDEL:  Okay.  And these memos, some of these

13   memos that have not been disclosed were written by you?

14   A.      Like I said, there are so many cases that I write memos

15   about fraud.  And if it has to do with a different case with

16   the same defendant, there could be some out there.  And I could

17   have summarized this case, but I don't know any specifics.  I

18   would have to go and research that.

19   Q.      There may be, so there may be other memos that you

20   wrote that pertain to this case that have not been disclosed.

21   A.      To the defendant.

22           MR. WAGNER:  I object to "pertain to this case."  She's

23   testified that they did not pertain to this case.

24           THE COURT:  May pertain to?

25           MR. ZINDEL:  Excuse me.  Pertaining to the defendants

1    in this case, whether they're Sekhon & Sekhon or Mr. Caza.

2              THE WITNESS:  Yes.  Relating to -- yes.

3    Q.        BY MR. ZINDEL:  Okay.  And those memos have been placed

4    in applicant files?  Is that my understanding?  Am I

5    understanding correctly, that they have been placed in A files?

6    A.        There could be, yes.

7    Q.        Okay.  And these files are over in your office?

8    A.        No.

9    Q.        Okay.  But they're -- they're accessible to you,

10   they're A files that you could order?

11   A.        I don't even know what -- which files they are.

12   Q.        Okay.

13   A.        But I'm just saying there are so many cases, I'm sure

14   there's some out there.

15   Q.        All right.  Are there -- there are other memos written

16   by you?  Are there other memos written by you?

17             MR. WAGNER:  Asked and answered, Your Honor.

18             THE COURT:  Let's get to the bottom of this.  I'll

19   allow the cross.

20   Q.        BY MR. ZINDEL:  Are there other memos --

21   A.        I write -- I write lots of memos.  So -- do you mean --

22   are you talking about the same question --

23             THE COURT:  Why don't you ask questions that are --

24             MR. ZINDEL:  Okay.

25             THE COURT:  Let's point to the --

3930

1    Q.       BY MR. ZINDEL:  Have you written other memos touching

2    on your investigation of Mr. Caza and the Sekhons?

3    A.       Yes.

4    Q.       That you have not disclosed to the defense.

5    A.       Umm, it's possible because -- if they related to

6    another case.  But I don't know specifics.

7    Q.       Can you get those off your computer?

8    A.       I can look to see if I have some on my computer, but

9    that might mean that they're in the A file but not on my

10   computer.

11   Q.       Okay.  Can they be found using resources available to

12   you as an immigration agent?

13   A.       Umm, I don't know.

14   Q.       Really you don't know that?

15   A.       I mean, it's so unknown your question.  Like, first of

16   all, I don't know how many there are.  I would have to look.

17   And then, from there, I don't know if they're on my computer.

18   Q.       Well, okay.  Let's please not play games.

19            You wrote memos --

20            MR. WAGNER:  Objection, argumentative, Your Honor.

21            THE COURT:  That is argumentative, counsel.

22            MR. ZINDEL:  Okay.

23            THE COURT:  Sustained.

24            MR. ZINDEL:  All right.

25   Q.       If you wrote a memo as an immigration agent, do you

3931

1   save that memo in some format?

2   A.      Yes.  But over six years --

3   Q.      Did you print that memo --

4           THE COURT:  Let her answer.  Let her answer.

5           THE WITNESS:  Over six years, I might not have it.

6   Q.      BY MR. ZINDEL:  That one is dated 2008.  What about in

7   2008?

8   A.      Yeah, I should have the 2008 ones.

9   Q.      What about 2007?

10  A.      Yes.

11  Q.      What about 2006?

12  A.      I don't know about that, if I still have things from

13  2006.

14  Q.      Okay.  Is there somebody you could ask to find out if

15  those would be available?

16  A.      Well, I don't know what I'm asking for.

17  Q.      Memos written by you referencing your investigation in

18  this case that have not been disclosed to the defense.

19  A.      I don't -- I don't know.  I don't -- I mean, who would

20  I ask and what would I ask if I don't have the information?

21          MR. ZINDEL:  I feel like I've fallen through the rabbit

22  hole, Your Honor.

23          THE COURT:  You said you've been through a rabbit hole?

24          MR. ZINDEL:  I said I feel like I've fallen through the

25  rabbit hole.

1        THE COURT:  No, you haven't.  You're standing tall.

2        MR. ZINDEL:  Thank you.

3        THE COURT:  Why don't we move on.

4        MR. ZINDEL:  All right.

5    Q.    You've had this case for over six years?  That's when

6    you started your investigation, 2003?

7    A.    Yes.

8    Q.    Maybe actually late 2002, right?

9    A.    I think it was 2003.

10   Q.    Okay.  And you've probably spent thousands of hours I

11   imagine during that time working on this investigation?

12   A.    Yes.  Over six years, yes.

13   Q.    Okay.  You've traveled to Chicago, Arizona, and other

14   places in connection with your investigation?

15   A.    Yes.

16   Q.    How many hours did you spend in Romania in connection

17   with your investigation?

18   A.    I didn't go to Romania.

19   Q.    What about Punjab?

20   A.    No, I didn't go to India, either.

21   Q.    Remember early in the trial, I think Mr. Garnett was

22   testifying, and Mr. Blackmon offered in evidence Exhibits F, G

23   and H, the country reports relating to Romania?

24   A.    Umm, yes.  I didn't see the exhibits, though, but yes.

25   Q.    Okay.  You ever read them?

3933

1    A.      No.

2    Q.      Your primary source of information on Romania or your

3    major source of information include Mark Temple and Michael

4    Mates.  Is that a fair statement?

5    A.      Umm, not really, no.

6    Q.      Okay.  Well, you've certainly talked to Mr. Temple and

7    Mr. Mates about Romania.

8    A.      Yes.

9    Q.      And your investigative decisions were certainly

10   influenced by information that was given to you by Mr. Temple

11   and Mr. Mates.

12   A.      Umm, well, Mr. Mates conducted an investigation in

13   Romania so, yes, he gave me the results.

14   Q.      Right.

15   A.      And Mr. Temple provided the lead information, and he

16   helped me with some translation.  So --

17   Q.      And Mr. Mates is an embassy official, correct?

18   A.      Yes, he works for the state department.

19   Q.      That means he's some kind of an ambassador or he works

20   for the ambassador.

21   A.      Umm, I'm not sure about how the chain of command works,

22   but probably yes.

23   Q.      Okay.  Do you understand what an ambassador does?

24   A.      Umm, not really.

25   Q.      You're familiar with the idea that an ambassador's job

3934

1    is to promote harmony between nations?

2    A.      I don't really know.

3    Q.      All right.  Now, one thing that these Romanian asylum

4    applicants' claims have in common is they complain about the

5    conduct of Romanian authorities, often the police.  Is that a

6    fair statement?

7    A.      Yes.

8    Q.      And except for those witnesses who have cooperated by

9    renouncing their asylum claims, you do not actually know

10   personally how many of the Romanian asylum claims we've been

11   looking at are valid.

12   A.      The ones in this case?

13   Q.      Right.  You don't personally know whether the things

14   that they report actually occurred in Romania.

15   A.      Well, I have a lot of evidence that it did not occur.

16   Q.      I didn't ask you about what others may have said.  I

17   asked you whether you personally knew.

18   A.      Well, I did the investigation, so that's the -- I know

19   the results of that.

20   Q.      Never mind.

21           Orthodox --

22           THE COURT:  No, no, no.

23           MR. ZINDEL:  I'll withdraw the question, Your Honor.

24           THE COURT:  Withdraw the comment as well.

25           MR. ZINDEL:  I withdraw the comment, and I apologize to

1    the Court for my comment.

2    Q.      The predominant religion in Romania you've heard

3    testimony is Orthodox Christianity, correct?

4    A.      I really don't know.

5    Q.      Oh, okay.

6            Are you aware that 80 percent of Romanians in

7    Sacramento are Evangelicals?

8    A.      No, I don't know that.

9    Q.      Did you discover that of the -- that there are two

10   Orthodox Romanian churches in Sacramento, but 13 Pentecostal

11   churches?

12   A.      I haven't done that research.

13   Q.      One thing that the Romanian applicants all have in

14   common is they don't want to go back to Romania.  All the

15   witnesses who have testified here have admitted they don't want

16   to go back to Romania, correct?

17   A.      I didn't get that impression with all of them.  But --

18   Q.      Okay.  The documents that Mr. Wagner walked you through

19   Monday and Tuesday, the various seals and certificates and

20   things like that, you never saw anyone actually making those

21   documents, correct?

22   A.      Correct.

23   Q.      And that's true whether it was a declaration or a

24   medical certificate or whatever, correct?

25   A.      Correct.

1    Q.      And you have no personal knowledge as to who may have

2    manufactured any fake document submitted to CIS by the Sekhon

3    law firm, correct?

4    A.      Well, I just have the results of the investigation.

5    Q.      Right.  But you have no personal knowledge --

6    A.      I wasn't there when they did it because I'm sure they

7    wouldn't have done it in front of me.

8    Q.      Now some clients, you've discovered through the course

9    of your investigation, got their own documents, correct?

10   A.      Yes.

11   Q.      Mr. Kadar, for example.

12   A.      Correct.

13   Q.      His documents were fake.

14   A.      Yes.

15   Q.      All right.  Now, and some of the documents we looked at

16   have the name Simina Caza on them, correct?

17   A.      Yes.

18   Q.      That's Mr. Caza's wife --

19   A.      Yes.

20   Q.      -- correct?

21           And she was there when you executed the search warrant

22   in September of 2004.

23   A.      Yes, she was.

24   Q.      And was handcuffed at that time as well.

25   A.      I think so.  I think everybody was handcuffed for a

1   brief moment.

2   Q.     And it was -- the following summer, the police

3   determined that she committed suicide.  I think it was June of

4   2005.  Did you learn that through your investigation?

5   A.     Yes.

6   Q.     All right.  Now, these Romanian versions of the

7   narratives, we've seen many of them up on the screen, some of

8   them with notes written on them, some of them plain.

9          You don't personally know whether Mr. Caza ever typed

10  any of those Romanian translations of narratives, correct?

11  A.     Umm, I'm not sure if he told me that or not.  But I

12  wasn't there when any of them were typed, that's correct.

13  Q.     Okay.  And there were a number of translators whose

14  names have come up -- Mr. Chihai, Ms. Stelea, Simina Caza, Mr.

15  Mihalas, Ms. Harmath.  There were others than the five that

16  I've mentioned who performed translation and interpretation

17  services for the Sekhon law firm during the period that you

18  investigated, correct?

19  A.     Yes.  I would -- I would say they did it for Mr. Caza,

20  not -- they worked for him.

21  Q.     Okay.  That's right.

22         Now, Mr. Vorobiov, you watched him testify here the

23  other day, correct?

24  A.     Correct.

25  Q.     And he said that that was the first time he's testified

1    in this case.

2    A.        Yes, I think he said that.

3    Q.        And as far as you know, he never testified any other

4    time, correct?

5    A.        Umm, as far as I know.

6    Q.        Okay.  And you heard him say that he had -- he had no

7    idea who made his documents, correct?

8    A.        I don't remember that.  I thought he said --

9    Q.        Okay.  Do you remember I asked him about his lawyer,

10   how he had told his lawyer that he had no idea who made the

11   documents?  Do you remember that?

12   A.        I thought he purchased them from Mr. Caza.

13   Q.        No.  He testified he had no idea who made his

14   documents.  Do you recall that?  You don't recall that?

15   A.        I don't recall that.  I'm sorry.

16   Q.        Do you recall his lawyer telling you he has no idea who

17   made his documents or where the documents came from?

18   A.        No.

19   Q.        Okay.  I'm going to hand you -- if I hand you a portion

20   of your report, do you think that will refresh your memory?

21   A.        Yes.

22   Q.        If you could take a look at the underlying portion.

23   Does that refresh your memory about what Mr. Vorobiov's lawyer

24   told you?

25   A.        Yes.

1    Q.      And what did he tell you?

2    A.      What did Mr. Vorobiov's lawyer tell me?

3    Q.      Yes.

4    A.      He told me what -- that I -- he summarized what his

5    client Florin Vorobiov said about how he got his --

6    Q.      What did he tell you about Mr. Vorobiov's documents?

7    Let me narrow it down, please.

8    A.      Okay.  He said that Vorobiov did not know how the law

9    office was able to obtain the document, but Vorobiov believed

10   it was fraudulent.

11   Q.      Okay.  Thank you.  Let me take that back.

12           And do you recall Mr. Vorobiov testifying that he never

13   spoke to Mr. Caza about documents?  Well, let me move on.

14           You interviewed Mr. Vorobiov in December 2004 just

15   shortly after you received this communication from his

16   attorney.

17   A.      Yes.

18   Q.      And that was a few months after you got back from Mr.

19   David Sexton the reports of his document investigation done in

20   his secret place in Virginia.

21   A.      Umm, I received several reports from Mr. Sexton, so I

22   don't know which one you're -- if there was one at that time,

23   there could have been --

24   Q.      Those were all in May and June 2004, does that sound

25   about right?

KATHY L. SWINHART, OFFICIAL COURT REPORTER, USDC -- (916) 446-1347

1    A.      I believe there were some in 2003.

2    Q.      Okay.  So, anyway, long before you -- a few months

3    before you went to Chicago to meet Mr. Vorobiov?

4    A.      Like I said, there were a lot of reports from the

5    forensic document laboratory, so I'm sure there were

6    interspersed throughout the investigation.

7    Q.      Okay.  And these were the ones in which he told you

8    that the technology used to print some of the documents was

9    inkjet technology, correct?

10   A.      That's what the report said, yes.

11   Q.      Okay.  And then when you interviewed Mr. Vorobiov at

12   the -- in middle December 2004, you also wrote a report of that

13   interview, correct?

14   A.      Yes.

15   Q.      And you understood that that report would be provided

16   to the prosecutor.

17   A.      Yes.

18   Q.      And you understood that the prosecutor would provide

19   that report to the defense.

20   A.      Yes.

21   Q.      Correct?

22           And that report was intended to be an accurate account

23   of Mr. Vorobiov's words.

24   A.      Yes.

25   Q.      And this report, when he made it, this was not anything

1    that he swore to under oath, correct?

2    A.      Correct.

3    Q.      And I'm going to hand you the report.

4            And in this report you wrote, relating to that meeting

5    between Mr. Caza and Mr. Vorobiov in September 2004, that Caza

6    told Vorobiov --

7            MR. WAGNER:  Your Honor, I'd object that this is

8    hearsay unless he's refreshing a recollection for her present

9    testimony.

10           THE COURT:  Sustained.

11           MR. ZINDEL:  Okay.

12   Q.      What did Mr. Vorobiov tell you -- or let me ask you

13   this.

14           Did you write in your report that Mr. Vorobiov claimed

15   that Mr. Caza told him to say his documents did not contain

16   digitally made stamps?

17           MR. WAGNER:  Same objection, Your Honor.

18           THE COURT:  Sustained.

19   Q.      BY MR. ZINDEL:  When you spoke to Mr. Vorobiov, did he

20   use the words "digitally made"?

21   A.      Yes.

22   Q.      That's your testimony?

23   A.      Yes.

24   Q.      Now, Mr. Vorobiov was a witness that you really wanted.

25   Is that a fair statement?

1    A.      No.

2    Q.      Okay.  You didn't really care whether he testified here

3    in trial?

4    A.      Well, I wanted all the witnesses to come to trial, yes.

5    But I just -- I don't know what you mean by really wanted.

6    Q.      Okay.  You were eager to have him testify against the

7    Sekhons.

8    A.      Well, we had to have a certain number of witnesses.  I

9    interviewed a lot of witnesses, but we needed a certain number

10   to be available for trial.

11           MR. ZINDEL:  I'm going to hand you what's been marked

12   as Exhibit 6G.

13           MR. WAGNER:  Do you have a copy of that?

14   Q.      BY MR. ZINDEL:  You met with Mr. Vorobiov on December

15   14th, 2004?

16   A.      Yes.

17   Q.      And you made this memo eight days later?

18   A.      Yes.

19   Q.      And what does this memo relate to?

20   A.      It's to an attorney that works for ICE so she could

21   review Vorobiov's A file and see if he qualifies for voluntary

22   departure so he could be paroled back in as a witness.

23           MR. ZINDEL:  Okay.  Your Honor, I'm going to ask that

24   6G be admitted into evidence.

25           THE COURT:  Admitted.

```
 1              (DEFENDANTS' EXHIBIT 6G, memorandum

 2              re: Florin Vorobiov, ADMITTED INTO

 3              EVIDENCE.)

 4         MR. ZINDEL:  May I publish?

 5         THE COURT:  You may.

 6    Q.    BY MR. ZINDEL:  Now, in this memorandum, which you

 7    wrote eight days after meeting Mr. Vorobiov, you describe him

 8    as a really good material witness.

 9    A.      Yes, he had a really good memory compared to other

10    witnesses.  He could remember details --

11    Q.      And you actually wrote really good in all caps, right?

12    A.      Yes, that's my -- that's still my feeling today.

13    Q.      And then I know that you've talked about how you

14    weren't able to do these things, but in this you actually start

15    making suggestions about what you can do to make sure that Mr.

16    Vorobiov stays here.

17    A.      Correct.  Because she's an attorney that works for ICE,

18    so she could review it and see if those options are viable

19    options.

20    Q.      So then do I understand correctly, this memo is you

21    starting the ball rolling on getting Vorobiov some status.

22    A.      Correct.

23    Q.      Okay.  And one of the things that you say that can be

24    done is can he withdraw his asylum app and request VD, meaning

25    voluntary departure?
```

1    A.      Correct.

2    Q.      And then we can parole him back in, we meaning you and

3    your employer?

4    A.      Correct.

5    Q.      And/or can proceedings be administratively closed.

6    That means can we just pretend that nothing is going on?

7    A.      No, it's not pretend.

8    Q.      Okay.

9    A.      But they can close the proceedings and -- I don't

10   know -- I don't know exactly all the details or it's a deferred

11   action, something like that.  There's different options.

12           Okay.  And then a few months later -- well, these

13   suggestions to this attorney Ardinger, the service attorney --

14   A.      Uh-huh.

15   Q.      -- these were your suggestions, right?

16   A.      Right.  I wanted her to tell me if these are viable

17   options when she looks at his alien file and all the

18   proceedings he'd been in.

19   Q.      Okay.  So that's the time, December 2004, that you

20   began to track Mr. Vorobiov and assure that he did not have any

21   problems with immigration.

22   A.      Well, it -- I want to make sure that he's available for

23   trial.  And that -- what I was doing in his case is paroling

24   him in so he would be on a parole status.

25   Q.      But obviously, ma'am, you would not have done that if

1    he had said that he made up his claim himself, would you?

2    A.      Well, this case is not -- this case is about the

3    defendants, and so he was a witness for -- for that.

4    Q.      Would you have sent a memo like this to Ms. Ardinger,

5    the service attorney, if Mr. Vorobiov had admitted to you that

6    he made up his own political claim?

7    A.      He wouldn't have been a witness, then, in this case, so

8    no.

9    Q.      Okay.  What about Radu Vlad?  Would you have helped him

10   if he had said that he made up his Pentecostal story?

11   A.      Well, like I said, if they're not witnesses to a crime,

12   then they couldn't be paroled in as a witness.

13   Q.      Okay.  Do you intend to have any of these witnesses

14   prosecuted for lying in their asylum interviews?

15   A.      No.

16   Q.      At any point did you intend to have any of the

17   witnesses prosecuted for lying in their asylum interviews?

18   A.      Well, actually I don't make that decision --

19   Q.      Okay.

20   A.      -- it's by U.S. attorneys.  But --

21   Q.      What do you intend to do with regard to recommending

22   action on their petitions to adjust status?

23   A.      For who?

24   Q.      For -- well, let's take them one at a time.  What about

25   Vorobiov?

1    A.      Well, they're the three witnesses who have the S visas

2    pending.

3    Q.      Okay.

4    A.      So everyone is kind of in a different status.  So --

5    Q.      Let's talk about those.

6    A.      Okay.

7    Q.      Who are the three witnesses who have S visas pending?

8    A.      Alina Contis, Radu Vlad -- oh, no, sorry -- Florin

9    Vorobiov, and I can't remember the last one.

10   Q.      Iacob?

11   A.      Oh, no.

12   Q.      Kadar?

13   A.      Excuse me?

14   Q.      Kadar, Iacob --

15   A.      Kadar, there we go.  Kadar.

16   Q.      What do you intend to do with Contis?

17   A.      Well, her S visa is pending --

18   Q.      What recommendation are you going to make?

19           THE COURT:  Let her answer.

20           MR. ZINDEL:  Okay.  I thought she had.  I'm sorry.

21   Q.      What recommendation are you going to make?

22   A.      Well, it's pending.  There was a recommendation made

23   that she be issued an S visa and that is up in the bureaucracy

24   in Washington, D.C.  It's pending there.  So right now I'm

25   waiting for that to come through.

3947

1    Q.      What do you intend to do when it comes through?

2    A.      Well, I can't predict the future.  And I haven't

3    told -- I told her I don't know what's going to happen in the

4    future, I can't make any promises --

5    Q.      And I imagine you give that --

6            THE COURT:  Let the witness answer the question.

7            MR. ZINDEL:  Sorry.

8    Q.      I imagine you'd give the same answer as to everybody,

9    right?

10   A.      Well, no.  Because if something were to happen and I

11   made a promise, then I don't want to be in that situation.

12   Where they don't -- if it's denied, it's possible, then I don't

13   want to be in the position of that happening.

14   Q.      Okay.  Now, I get the impression that sometimes -- we

15   talked about the Canada tunnel incident involving Mr. Vorobiov.

16   I understand that sometimes, and I expect you'll agree with

17   this, it's very difficult for you to deal with your own agency

18   in terms of protecting these witnesses' ability to remain in

19   the United States and be here for this trial.

20   A.      I don't understand your question.

21   Q.      Did you sometimes have to intercede to keep your agency

22   from upsetting or taking status away from your witnesses?

23   A.      No, not ICE.

24   Q.      Okay.  But you had to assure, for example, that they

25   were granted parole.

1   A.      Well, the parole, I mean, it's a process that I have to

2   apply for.  And when I apply for a parole, it goes all the way

3   up to headquarters.  And then, depending on what port of entry

4   the person is going to come in, the parole packet is sent to

5   that port of entry or it's sent to the consulate overseas if

6   they go outside and get the parole document, the consulate, and

7   then come back.

8           So whatever process that goes through, I have to --

9   Q.      Let's take a different approach.

10          Remember back in Chicago Mr. Vlad applied through his

11  wife to get status?

12  A.      Yes.

13  Q.      And they turned him down because he didn't pay a fee.

14  Remember that?

15  A.      Yes.

16  Q.      And his wife called you.  Remember that?

17  A.      Yes.

18  Q.      And they reopened it.  Remember that?

19  A.      Yes.

20  Q.      And he got status.  Remember that?

21  A.      Right.  Because he got the waiver, correct.

22  Q.      And you were right there making sure that happened.

23  A.      Well, we are -- my office wrote a letter --

24  Q.      Okay.

25  A.      -- asking them if they would consider --

1    Q.      My office.  Are you washing your hands of that?  Did

2    you have any involvement in that letter?

3            MR. WAGNER:  Objection, argumentative, Your Honor.

4            THE COURT:  Sustained.

5    Q.      BY MR. ZINDEL:  Did you have any involvement in that

6    letter that was written by your office?

7    A.      Yes.  It was written by my office head.  But, yes, I

8    had involvement.

9    Q.      And I imagine you went into your office head's office

10   and asked him to write that letter or her.

11   A.      Yes.

12   Q.      Okay.  Mr. Vorobiov, he tried to do a parole back in

13   but they wouldn't let him into Canada.  Remember that?

14   A.      Yes.

15   Q.      So he couldn't leave the United States.

16   A.      Correct.

17   Q.      And he --

18   A.      Not through the Canadian border.

19   Q.      And he was stuck in the tunnel.  Do you remember that?

20   A.      Well, I don't know where -- I wasn't there when it

21   happened, so I don't know how that port of entry is set up,

22   it's inside the tunnel or what.

23   Q.      When there was a problem you were called.

24   A.      Well, always -- usually on the parole, if it goes to a

25   port of entry, they call the agent when the person is paroled

1   in, and they verify it.

2   Q.      Were you called?

3   A.      So I'm always called.

4   Q.      Okay.  You were the person that was called about Mr.

5   Vorobiov being stuck in the tunnel?

6   A.      Yes, because my name was on the parole application

7   that -- the packet that went to that port of entry.

8   Q.      Okay.  My question was, I imagine that sometimes it was

9   a headache to deal with the other parts of your department who

10  are also dealing with these witnesses.  Is that true, sometimes

11  it was tough?

12  A.      Well, it's always tough, bureaucracy.  But I don't -- I

13  mean, I don't know which department you're talking about.

14  Q.      All right.  I'm going to hand you what I've marked as

15  Defendants' Exhibit 6H.

16  A.      Thank you.

17  Q.      Do you remember writing this memo?

18  A.      Yes.

19  Q.      And what was the purpose of this memo?

20  A.      It's a request for a parole and employment

21  authorization for Florin Vorobiov.

22  Q.      Okay.  And who was this memo directed to?

23  A.      It's the director of our parole office in Washington,

24  D.C.

25  Q.      And who was the author of this memo?

3951

1    A.      My supervisor.

2    Q.      Okay.  And the information in this memo, where did your

3    supervisor get that information?

4    A.      I provided it.

5    Q.      Okay.  Did you actually write this memo for him?

6    A.      I think I wrote a draft and he corrected it, and so it

7    was from both of us.

8    Q.      Okay.  You see down at the bottom where I've

9    highlighted?  Let's see.  You wrote this memo in February 2005?

10   A.      Yes.

11   Q.      And this memo says that Mr. Vorobiov has abided --

12           THE COURT:  This is not in evidence, is it?

13           MR. ZINDEL:  No.

14           THE COURT:  Don't read the memo.

15           MR. ZINDEL:  Okay.

16   Q.      Did you tell your department that Mr. Vorobiov provided

17   sworn testimony?

18           MR. WAGNER:  Have you got a copy, counsel?

19   Q.      BY MR. ZINDEL:  Did you tell your department in

20   February 2005 that Mr. Vorobiov had provided sworn testimony?

21   A.      Yes, the word "sworn" is on here, but that's not

22   correct.  He did not provide sworn testimony, it was just

23   testimony.

24   Q.      Okay.  Why the mistake?

25   A.      I don't know.  It could have been that my supervisor

1    put that in or it was put there -- in there by mistake, but

2    it's not correct.

3    Q.      It's not true?

4    A.      No.

5    Q.      I'm going to show you what's marked as 6-I.

6            And what is 6-I?

7    A.      It is a request to grant deferred action to Radu Vlad.

8    Q.      And you were here when Mr. Vlad testified, correct?

9    A.      Correct.

10   Q.      And he had never testified in this case before either.

11   A.      Yes.

12   Q.      But in this memo -- well, let me ask you, who wrote

13   this memo?

14   A.      I think what happened is these are -- we received,

15   like, examples on how to write these requests, and that's the

16   wording that was in there.  Because oftentimes in other cases

17   they take sworn statements.  Like the sworn statement I was

18   referring to from a U.S. citizen in order for a fraud marriage,

19   a lot of times we take sworn statements from witnesses.  We did

20   not do that in this case.  But that wording was in the example

21   that we're supposed to use to follow for these applications, so

22   I think that's why that word was in there.

23           But it's not true.  He -- the witnesses did not provide

24   sworn testimony until here in this trial.

25   Q.      Just so we all understand here, that's because in this

3953

1   memo you again wrote in 2003 that Mr. Vlad had provided sworn

2   testimony in this case, correct?

3   A.      Correct.

4   Q.      All right.  And that was in August 2003, correct?

5   A.      Yes.

6   Q.      Okay.  I'm going to hand you what I've marked as 6-J

7   and 6-K.

8           And are those two more memos that -- to your department

9   concerning humanitarian parole for Radu Vlad?

10  A.      Yes.

11  Q.      And 6-J is dated July 6th, 2004?

12  A.      Yes.

13  Q.      And in the second -- on the second page of this

14  document, you again repeat that Mr. Vlad had provided sworn

15  testimony, correct?

16  A.      Yes, it's the same wording used in all the memos.

17  So --

18  Q.      Okay.  Well, take a look.  Go down four lines and look

19  on the right side.

20          It says Vlad provided testimony.  But Vlad never

21  provided testimony, did he?

22  A.      Well, that's the report.  When I interviewed him,

23  that's what that is referring to.

24  Q.      Does it say something that's not true?

25  A.      The sworn part is not true.

3954

1    Q.       Okay.  And does the next one -- I don't remember the

2    number, 6-K I think it is -- also say something that's not

3    true?

4    A.       Yeah, the same wording is used in all of them.  So if

5    that's in all of them, then that word "sworn" is not right.

6    Q.       All right.  Cosmin Iacob has been participating in your

7    investigation for quite some time?

8    A.       Participating?  Not really.

9    Q.       I mean, he was a witness, right?

10   A.       Yes, he came here --

11   Q.       And in connection with that, he waived confidentiality?

12   A.       Excuse me?

13   Q.       In connection with that, he waived his right to keep

14   his asylum application confidential, correct?

15   A.       Yes.  He signed a waiver, yes.

16   Q.       Okay.  Did you ever arrange for anyone to interview

17   Laura Manu, his journalist friend in Romania?

18   A.       No.

19   Q.       What about Victor Opris, the uncle of Radu Vlad?

20   A.       Did I arrange for someone to interview him?

21   Q.       Right.

22   A.       No.

23   Q.       Mr. Chisca, you testified that you did in fact pay him

24   for his work.

25   A.       Yes.

1  Q.      And you were -- do you recall when he told the jury

2  that he had not been paid for his work?

3  A.      Yes.

4  Q.      Any idea why he lied to the jury about that?

5  A.      I don't think he was lying.  I think it was so long ago

6  and it was such a small amount of money that he doesn't

7  remember.

8  Q.      You paid him in cash?

9  A.      Yes, we always pay in cash.

10  Q.      I want to -- I just have a couple more questions here,

11  a couple -- two areas really.

12          Mr. Sexton's investigation, you gave some documents in

13  '03 and then again in '04, May and June '04.  And you were here

14  when he testified about those documents, correct?

15  A.      Yes.

16  Q.      And you are the person who chose what documents would

17  be sent to Mr. Sexton?

18  A.      No, they were submitted by our ICE attorney.  A group

19  of them were submitted by our ICE attorney in San Francisco.

20  Q.      Did you participate in the selection of those

21  documents?

22  A.      I did some, and then others were done by the ICE

23  attorney.  So --

24  Q.      Okay.

25  A.      Yes.

1    Q.      And these were all documents that purported to have

2    original wet seals?

3    A.      Yes.  Or the FDL examiner explained it best.

4    Q.      As what?

5    A.      Mr. Sexton's testimony about the wet seals was a better

6    way to explain it.

7    Q.      But the ones that were sent to him, as far as you know,

8    were all documents that appeared to have wet seals on them.

9    A.      Yeah.  It was like -- it looked like it was supposed to

10   be from a rubber stamp stamped over, like, a postage style

11   stamp.  That's what it looked like.

12   Q.      Right, right.

13          All the documents, though, that were sent to him, they

14   had that on them.

15   A.      I don't think all the documents were the same.  There

16   was a variety of documents.  Some were doctor -- medical

17   certificates, and some were, like, Hungarian letterhead.

18   Q.      Now -- and after he examined these documents, you

19   received reports back from him, correct?

20   A.      Yes.  It was from his office.  I'm not sure if he

21   authored all the reports, but he later verified all the

22   reports.  So he -- he would make sure that they were accurate.

23   Q.      And all the documents that were sent to him were

24   documents that had been submitted by the Sekhon law firm in

25   connection with their applicants?

3957

1    A.       I'm pretty sure.

2    Q.       Okay.  And some of the documents that you examined

3    turned out to actually have wet seals on them, correct?

4    A.       Yes.

5    Q.       All right.  Were those documents belonging to anybody

6    who testified in this case?

7    A.       I don't think so, but I -- there could be.

8    Q.       Okay.

9    A.       I don't remember that.

10   Q.       Now, Mr. Mates's investigation in 2003 was

11   confidential, right?

12   A.       What do you mean by confidential?

13   Q.       Well, it wasn't anything that you broadcast outside of

14   your agency, correct?

15   A.       Yes.  Well, it was his agency and my agency.

16   Q.       Right.

17   A.       Correct.

18   Q.       But, before that, Mr. Temple -- or I guess at the same

19   time Mr. Temple had gone to Romania or was going to Romania on

20   vacation and wanted to start sniffing around for some of these

21   doctors and declarants.  You remember that?

22   A.       Well, he made the contact with Mr. Mates.  So Mr. --

23   Q.       I'm just asking you, you remember him going over -- him

24   saying I'm going over to Romania, I want to go sniff around and

25   talk to some of these people?  You remember that?

1   A.      I don't remember that exact terminology.  But I know he

2   was going to Romania, and it was a good opportunity to check on

3   some documents and make the connection with Mr. Mates and the

4   state department.

5   Q.      Do you remember the E-mail he sent you about how he was

6   glad Carmen is screwed?

7   A.      Yes.

8   Q.      Okay.  And that E-mail came about because he wanted to

9   investigate in some way Carmen Stelea, correct?

10  A.      I think he was upset that she was so open about the way

11  they were conducting business and these applications and things

12  like that.

13  Q.      I just asked you, he wanted to investigate --

14          MR. WAGNER:  Your Honor, she responded to his question.

15  He's asking what Temple wanted, and she --

16          MR. ZINDEL:  I'm just trying to finish.

17          MR. WAGNER:  Well, he's not entitled to the answer he

18  wants.

19          THE COURT:  Let's let the witness answer.  You've asked

20  the question.  Okay?

21  Q.      BY MR. ZINDEL:  Do you recall cautioning Mark Temple to

22  not do anything because you were afraid that he would tip off

23  the Sekhons that they were being investigated?

24  A.      Yes.

25  Q.      Okay.  So Mr. Temple was only with Mates in June during

1    that month that he was in Romania visiting his wife's family.

2    You remember that?

3    A.     Well, I wasn't there, but that's what it seemed like,

4    yeah.  That --

5    Q.     So most of Mr. Mates's investigation took place without

6    Mr. Temple.

7    A.     Correct.

8    Q.     Right?

9           And to your knowledge, Mr. Mates never disclosed the

10   results of that, his collection of rubber stamps and

11   signatures, to anybody but you, correct?

12   A.     I think he had workers in his office that were

13   assisting him.

14   Q.     Okay.  And it was -- do you recall when it was that he

15   interviewed this Dr. Pincotan?

16   A.     I'm pretty sure it was 2003.  I'm not sure of the exact

17   date.

18   Q.     Okay.  But you believe that the first time the Sekhon

19   law firm was aware of the investigation was in February 2004

20   when somebody attached an E-mail about the investigation to a

21   motion concerning Mr. Vorobiov, correct?

22   A.     I think they might have been aware prior to that.

23   Because --

24   Q.     Well, that was -- wasn't that the purpose of showing

25   that motion to the jury the other day talking about that Kevin

1    Lashus E-mail?

2    A.      Well, I know that they -- maybe they figured out the

3    investigation was going on a long time, so they should be

4    worried about it.

5    Q.      Do you know that or are you speculating?

6    A.      Well, I know that they're aware that I made an arrest

7    of one of their clients, and that was in 2003.

8    Q.      Okay.  That had -- that had nothing to do with Mr.

9    Mates's investigation, correct?

10   A.      No.

11   Q.      Okay.  The documents that you had Mr. Mates take around

12   in Romania, those were also documents selected with your

13   assistance, correct?

14   A.      Yes.  He requested that I select documents or doctors

15   that were in close proximity to where he was stationed so he

16   wouldn't have to travel a long ways.  So I was looking for

17   doctors located around his area.

18   Q.      Okay.  And you also participated in the selection of

19   the Sexton documents?

20   A.      Like I said, some of them were from our ICE attorney,

21   and I did some of them, yes.

22           MR. ZINDEL:  All right.  All right.  I have no further

23   questions for you.  Thank you.

24           THE COURT:  All right.  Mr. Gohel, how long will you

25   be?

3961

1          MR. GOHEL:  Can we go over onto tomorrow?  I'm short,

2     but I'd like --

3          THE COURT:  You want to do it in the morning?

4          MR. GOHEL:  Yes.

5          THE COURT:  All right.  Ladies and Gentlemen, I've been

6     informed that we will probably be able to wrap up the testimony

7     of the government's case by the noon hour tomorrow.  So we're

8     going to recess at noon tomorrow and then reconvene at 1:30 on

9     Monday.  So I just give you that heads up so tomorrow afternoon

10    you'll be free.  But the government thinks we'll rest in the

11    morning, perhaps, or should.

12         MR. WAGNER:  We believe so.

13         THE COURT:  Okay.  Very well.

14         All right.  Ladies and Gentlemen, we'll recess at this

15    time and reconvene tomorrow morning at 9:00 a.m.  Remember my

16    admonition.  Don't discuss the case with anyone or form any

17    opinions about it until it's submitted to you.

18         (The following proceedings were had outside

19         the presence of the jury:)

20         THE COURT:  All right.  Counsel, I would like to

21    revisit my ruling outside the presence of the jury.

22         I get the impression, Mr. Wagner, that there are a

23    number of memoranda perhaps, although it's not clear from the

24    testimony if there's two or twenty.  But it doesn't appear to

25    be that difficult for Ms. Webster apparently to retrieve those

1    memoranda that relate to these defendants or their conduct.

2          I may add -- and I'm thinking it's 2008, 2007, possibly

3    2006.  Apparently that might be something that could be done.

4          But I want to also add that if the documents appear to

5    be similar to what I've seen in 6E and 6F, I do not believe

6    that they would constitute necessarily discoverable evidence.

7    I want to review those documents in camera if they can be

8    retrieved along with the rough notes if I could.

9          Do you understand my order?

10         MR. WAGNER:  I think I do, Your Honor.  I just wanted

11   to point out I think one potential difficulty with that.

12         Certainly she can go back to her computer and see what

13   she can find on her computer.  The problem is a lot of these

14   apparently were sent to other individual files as to which

15   we've been given no name and no A file number, so there's no

16   way --

17         THE COURT:  I understand that, and just based on her

18   testimony -- I think it's a fact issue, and I understand there

19   may be difficulties, and it may not be possible to retrieve all

20   the memos or many of them.  Based on that testimony, I think it

21   would be proper for me to make the order that those documents

22   or memos that can be retrieved from the computer using some

23   kind of word search, it sounds like that that may be possible,

24   then I think that would be appropriate, and I'm going to order

25   you to do that where possible.  And then I want those submitted

1    to me in camera along with the rough notes.

2              MR. WAGNER:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. WAGNER:  I have one other issue I'd like to take

5    up, Your Honor.

6              THE COURT:  Okay.  Go ahead.

7              MR. WAGNER:  In my redirect I plan to ask Ms. -- the

8    agent, Ms. Webster, where Mr. Caza was at the time that his

9    wife committed suicide because he was in jail for domestic

10   violence.  And Mr. -- I did not plan on going into that, of

11   course, but Mr. Zindel tried to make the jury think that she

12   committed suicide because she was handcuffed.  He asked was she

13   handcuffed at the search, and then she committed suicide trying

14   to blame the government for the suicide when he knows that he

15   was reported by own wife for spouse abuse and child abuse and

16   was jailed for domestic violence.

17             And I think that -- he's opened the door to that by

18   unfairly trying to cast aspersions on the agent's activities

19   for that suicide.  I think that was a cheap shot, and I think

20   it opened the door --

21             THE COURT:  What I would like is to have the transcript

22   of that portion of Mr. Caza's testimony, Madam Reporter, if you

23   can retrieve that for me in the morning.

24             MR. WAGNER:  Agent Webster's testimony?

25             THE COURT:  Agent Webster's testimony under

1    cross-examination.  I have my notes, but I would be more

2    comfortable if I could get just that portion of the testimony

3    on cross regarding Ms. Caza's suicide.

4                THE COURT REPORTER:  Yes.

5                THE COURT:  Mr. Zindel.

6                MR. ZINDEL:  I'm almost speechless.

7                THE COURT:  Well, I'm not speechless because you left

8    the impression that Ms. Caza's suicide was related to the

9    search.  That was a fair impression.

10               MR. ZINDEL:  Well, I'm happy to cover that up.

11               THE COURT:  Pardon me?

12               MR. ZINDEL:  I'm happy to explain that that was not my

13   intention.  I simply wanted to establish that she is -- that

14   she died, that -- it was nine months later.  It had no

15   connection --

16               THE COURT:  But the jury is left with the impression by

17   your questions that the search led to Ms. Caza's suicide.  That

18   is the impression I have, and I'm sure that's the impression

19   the jury has.

20               MR. ZINDEL:  That was not my intention.

21               THE COURT:  What was the point of it, then?

22               MR. ZINDEL:  That was not my intention.

23               THE COURT:  I mean, the bottom line is you --

24               MR. ZINDEL:  I mentioned it in my opening statement.  I

25   should have established it at a different point in time.

1          THE COURT:  You have the handcuffs and she committed

2    suicide.  I mean, what did you expect the jury to think?  I

3    thought that was your intention.  I want to see that testimony.

4          MR. ZINDEL:  I -- all right.  I'll have to deal with it

5    tomorrow.

6          THE COURT:  Stand in recess.

7               (Proceedings were adjourned at 4:30 p.m.)

8                          ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5
                          /s/ Kathy L. Swinhart
6                         KATHY L. SWINHART, CSR #10150

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25