UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Respondent,<br><br>v.<br><br>JAGDIP SINGH SEKHON, MANJIT KAUR RAI,<br><br>Movants. | No. 2:06-cr-0058-JAM-EFB P<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT MOVANTS' SECTION 2255 MOTIONS (ECF Nos. 711 & 731) BE DENIED |

    The parties have spent nearly six years litigating movants' section 2255 motions, including extensive discovery and a five day evidentiary hearing.[1]  At bottom, the case tasks the court with deciding a question of fact:  did the prosecution offer one of its witnesses—Ranbir Khera—lawful permanent residency in exchange for his testimony?  Movants argue that, if so, the prosecution violated their rights in two ways.  First, under *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose that offer at trial.  Second, under *Napue v. Illinois*, 360 U.S. 264 (1959) when another prosecution witness—Agent Carol Webster— testified at trial that no such offer had been made and that she had been convinced of the *bona fides* of Khera's marriage during a meeting between herself, the witness, and his wife, Sarbjit Kaur.  Movants argue that no meeting

---

[1] The original section 2255 motions were filed on November 30, 2015 and December 1, 2015, respectively.  ECF Nos. 621 & 622.

1

between Khera, Kaur, and Webster ever occurred.  The court finds, for the reasons stated below, that movants have failed to carry their burden of showing that the government violated their rights under *Brady* or *Napue*.  Their section 2255 motions should be denied.

### I.      Legal Standards

#### A.      Section 2255 Motions

Section 2255 permits a prisoner in federal custody to move the sentencing court to vacate, set aside or correct the sentence if he claims the right to be released upon any of the following four grounds:  (1) that the sentence was imposed in violation of the Constitution or laws of the United States; (2) that the court was without jurisdiction to impose the sentence; (3) that the sentence was in excess of the maximum authorized by law; or (4) his conviction is otherwise subject to collateral attack.  28 U.S.C. § 2255(a).

#### B.      *Brady* Claims

*Brady* and its successors require the prosecution to disclose evidence that is favorable to the accused, "either because it is exculpatory, or because it is impeaching."  *Strickler v. Greene*, 527 U.S. 263, 282 (1999).  There is no violation under *Brady*, however, unless the evidence the prosecution failed to disclose prejudiced the accused — that is, that there is a reasonable probability the suppressed evidence would have produced a different verdict.  *Id.* at 281; *see also Gentry v. Sinclair*, 705 F.3d 884, 905-906 (9th Cir. 2013) (tangential evidence does not cast doubt on the ultimate result of a trial).

#### C.      *Napue* Claims

The Supreme Court's decision in *Napue* holds that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates a defendant's rights under the Fourteenth Amendment.  360 U.S. 264, 269 (1959).  *Napue* is also violated where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id.* *Napue* draws no distinction between false testimony that goes directly to a defendant's guilt and testimony that bears only on the credibility of a witness.  *Id.*  To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony

was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). "In assessing materiality under *Napue*, we determine whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotations and citations omitted). "Under this materiality standard, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Mere inconsistencies in testimony are insufficient to establish either that the testimony was false or that the prosecutor knowingly used false testimony. *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997).

## II.  Background

On December 13, 2007, by way of a second superseding indictment, movant Sekhon was charged with conspiring to defraud the United States in violation of 18 U.S.C. § 371 by making false statements in asylum applications. ECF No. 94 at 1-14. Movant Rai was charged with six separate counts: (1) a § 371 violation identical to Sekhon's; (2-3) two counts of aiding and abetting the advancement of false statements in violation of 18 U.S.C. § 1546; (4) one count of aiding and abetting the advancement of false statements under 18 U.S.C. § 1001; (5) one count of violating the offense clause of § 371; and (6) one count of making false statements under § 1001. ECF No. 627-1 at 42. Trial began on March 11, 2009 before the Honorable Frank C. Damrell, Jr. and on June 25, 2009, after roughly three months, a jury concluded that Sekhon was guilty of the charge against him. ECF No. 326 at 4. The jury acquitted Rai of one count of making false statements in asylum applications under § 1546 but found her guilty on all other counts. ECF No. 325. Sekhon was sentenced to sixty months of incarceration and thirty-six months of supervised release (ECF No. 462); Rai was sentenced to thirty months of incarceration and thirty-six months of supervised release (ECF Nos. 468, 491). Both movants appealed their convictions to the U.S. Court of Appeals for the Ninth Circuit. ECF Nos. 476-477. The Ninth Circuit affirmed Sekhon's conviction. *See United States v. Harmath*, 580 F. App'x 591 (9th Cir. 2014). With respect to

/////

Rai, it vacated one of the conspiracy convictions as multiplicitous and otherwise affirmed her convictions. *Id.* at 596.

Movants, as noted *supra*, filed their initial section 2255 motions in late 2015. On November 17, 2016, the court ordered an evidentiary hearing on the *Brady* and *Napue* claims related to Webster and Khera. ECF No. 671. These are not the only claims at issue, however. Movant Sekhon also raises other, ancillary *Napue* claims related to the testimony of government witnesses Davinder Singh and Wazhma Mojaddidi. ECF No. 731 at 5. Sekhon also argues that his trial counsel was ineffective by failing to investigate Sarbjit Kaur and failing to investigate a statement that he (Sekhon) allegedly made to Mojaddidi. *Id.* at 6. The court will contextualize each of these claims as they arise in the analysis to follow.

**III.   Analysis**

    **A.   Movants' *Brady* Claim**

Both movants argue that the government violated its obligation under *Brady* by failing to disclose that the prosecution had offered Khera permanent residency in exchange for his testimony. The government denies that any such offer was made and argues that Khera received his positive adjustment as a matter of course. The court held an evidentiary hearing on the matter and heard testimony from, among others, witnesses involved in the decision to grant Khera permanent residency status and from the case agent at movants' trial.

Before delving further into the specifics, the court finds it helpful to set the boundaries of this claim by emphasizing what it is not tasked with deciding. During the evidentiary hearing, the parties spent hours questioning officers of the United States Citizenship and Immigration Services ("USCIS") Agency, including Carlos Guadamuz, the official who granted Khera's positive immigration adjustment. Much of that questioning focused on the quality of that adjustment, including whether Guadamuz had followed appropriate agency procedures, whether he should have investigated the marriage beyond the four corners of the application, whether there were obvious signs of fraud that he overlooked or ignored. The connection between these questions and movants' claims is obvious. It stands to reason that, if the adjustment should not have been granted on its merits, it is easier to conclude that some other factor, like prosecutorial intervention

on behalf of a witness, was the basis, at least in part, for the grant.  The inquiry into the ultimate correctness of the adjustment is tangential, however, and is not determinative of the success of movants' claims.  This court is neither empowered nor inclined to second-guess the decisions of USCIS officials.  What matters is whether there is convincing evidence that *the prosecution*— which Guadamuz was not part of[2]—violated its obligations under *Brady* or *Napue*.

      By way of background, after Kaur married Khera in March 2002, she applied for adjustment of Khera's immigration status in July of that year.  ECF No. 867-1 at 65.  Processing of that application was interrupted by the criminal investigation of the charges that were ultimately brought in this case.  Webster, as a Special Agent with ICE, came into custody of the A-file that the officials in USCIS needed to complete the processing and adjudication Kaur's application to adjust the status of her husband.  As Webster explained, because the criminal proceeding was pending, a decision had been made to put a hold on the processing and adjudication of any related applications.  ECF No. 932 at 98.  Webster noted that "we had the file in our office for three years, and that seemed like a long time to just be holding it." *Id.* at 97. Kaur eventually complained about the delay, *id.* at 135-136, 204, and in December of 2006, Webster sent Khera's file to the USCIS office in Fresno for adjudication.  ECF No. 504 at 56 (Trial Transcript pg. 3520).  At trial (and at the evidentiary hearing in this case), Webster testified that she did so because she regretted having held up adjudication of Khera's marriage status adjustment application.  *Id.* at 55-56 (Trial Transcript pgs. 3519-20).  Webster included a memo with Khera's file that requested that it be adjudicated and then returned to her.  ECF No. 745-5 at 102.  The memo identified Khera as a witness who had provided information against attorneys in

---

[2] USCIS, of which Guadamuz was part, was not directly involved in the prosecution. Agent Webster was part of Immigration and Customs Enforcement ("ICE"), a separate agency. ECF Nos. 932 at 14 (Hearing Transcript pg. 384) & 933 at 49 (Hearing Transcript pg. 622).  The prosecution has no *Brady* obligation to produce information that it does not possess or that it is unaware of.  *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).  The fact that both ICE and USCIS are federal agencies is insufficient to conclude that the latter was acting on behalf of the former (or the prosecution) when Guadamuz made his adjudication.  *See United States v. Velte*, 331 F.3d 673, 680 (9th Cir. 2003) (rejecting argument that a weather station was acting on behalf of the prosecution simply because it was government operated).  During the evidentiary hearing, Guadamuz credibly expressed unfamiliarity with the facts of the movants' prosecution and trial.  ECF No. 931 at 172 (Hearing Transcript pg. 350).

an asylum fraud ring. *Id.* The memo did not, however, ask that the Fresno USCIS office reach any particular outcome on Khera's application. *Id.* USCIS Officer Guadamuz was assigned Khera's file for adjudication by his supervisor, Paul Felix. ECF No. 931 at 68 (Hearing Transcript pg. 246).

Guadamuz granted Khera's legal permanent resident application on January 30, 2007. ECF No. 945-1 at 92 (Respondent's Evidentiary Hearing Exhibit A at 91). He granted Khera's request for adjustment of status on February 26, 2007. *Id.* at 32 (Respondent's Evidentiary Hearing Exhibit A at 31). Guadamuz testified under oath at the evidentiary hearing that he granted Khera's application and adjustment on the merits. *See*, *e.g.*, ECF No. 931 at 64 (Hearing Transcript pg. 242). On May 28, 2021, at the conclusion of most of the testimony, the court indicated that it had concerns about Guadamuz's testimony that the merits of Khera's application warranted a grant.[3] ECF No. 933 at 183-184 (Hearing Transcript pgs. 756-57). It also indicated, however, that the testimony did not suggest that the grant was motivated by pressure from Webster (or any other member of the prosecution). *Id.* at 184 (Hearing Transcript pg. 757).

For her part, Agent Webster credibly testified that she did not undertake to influence the outcome of Khera's application. ECF No. 932 at 145 (Hearing Transcript pg. 515); *see also* ECF No. 933 at 184 (Hearing Transcript pg. 757) (the court stating that it found Webster's testimony credible). She wanted the application, which had been pending for more than three years, adjudicated. ECF No. 932 at 143 (Hearing Transcript pg. 513). She also wanted the adjudicators to know the reason for holding his file was not that Khera was under investigation but rather that he was a witness. *Id.* Further, Webster credibly explained why she referenced Khera in the memo as an important witness. The trial was approaching, and she needed the file back.

/////

---

[3] The court finds it unnecessary to describe the various red flags, including those first noted by Officer Villalon, surrounding Khera's application that likely warranted further investigation. Movants have devoted substantial time and energy describing those in detail, both through witness testimony at the evidentiary hearing and their briefing. To re-emphasize, however, the question is not the whether the adjudicator performed diligently or whether the correct outcome was reached. It is whether the grant was an undisclosed benefit conferred by the prosecution.

Webster's memo, which accompanied Khera's application to the Fresno USCIS office, was intended to convey the context in which the adjudication was being requested; it was not an attempt to put a thumb on the scale. *Id.* at 144-45 (Hearing Transcript pgs. 514-15). There is no evidence that any other member of the prosecution team influenced the adjudication of Khera's file. Further, as the government argues, it disclosed Special Agent Webster's memo and she was cross-examined extensively at trial. ECF No. 948 at 15 (citing ECF No. 863-2 at RT 3804-3805, RT 3814-3818). Finally, the court notes that it would have made little sense for the prosecution to procure undisclosed benefits for Khera after it had done so openly for other witnesses. ECF No. 863-2 at 87-88 (Trial Transcript pgs. 6779-80) (indicating that S-Visas had been procured for other government witnesses).[4]

Webster also credibly testified that she: (1) had a meeting with Khera in Sacramento in 2004 and Kaur was present; and (2) had some impressions of their bona-fides as a couple during that meeting. ECF No. 932 at 89-92, 95 (Hearing Transcript pgs. 459-62, 465). Kaur testified that she could not remember that meeting (ECF No. 933 at 135 (Hearing Transcript pg. 708)), but the court finds her testimony wanting in credibility.[5] Kaur has offered conflicting declarations in these proceedings (ECF Nos. 622-10 at 295-98 & 887-2) and her testimony during the evidentiary hearing did nothing to rehabilitate her damaged credibility. She had to be admonished to cooperate with cross-examination (ECF No. 933 at 157 (Hearing Transcript pg. 730)) and, at one point, admitted that she was willing to perjure herself in order to avoid having her parents involved in the case (*id.* at 165 (Hearing Transcript pg. 738)). The court will not belabor Kaur's poor performance as a witness or the myriad ways in which her credibility is suspect. Suffice it to

---

[4] Obviously, an S-Visa would have been less desirable for Khera than a positive adjudication of the marriage application. The salient point, however, is that Webster had options to secure Khera's testimony that did not involve an under-the-table agreement.

[5] Kaur testified that AUSA Katherine Lydon had coerced her into signing her second declaration. ECF No. 933 at 165-66 (Hearing Transcript pgs. 738-39). In their post-hearing brief, movants argue the same. ECF No. 944 at 69. Out of an abundance of caution, the court reviewed the exhibits provided by the government that establish the propriety of its interactions with Kaur. ECF Nos. 948-6 & 948-7. It is satisfied, based on the contents of those exhibits and Kaur's total lack of credibility, that Lydon committed no misconduct and the allegations against her are meritless.

say, the interaction between Kaur, her parents, and Khera appears complex and Kaur's plight is not an unsympathetic one. Sympathy does not equate to credibility, however.

In light of the foregoing, the court finds that movants' rights under *Brady* were not violated.

Finally, although the court find that the prosecution did not confer an undisclosed benefit on Khera, as movants allege, the record also fails to support the prejudice prong of a *Brady* claim. There is no reasonable probability that telling the jury that Khera had received the allegedly undisclosed benefit would have produced a different verdict. *Strickler*, 527 U.S. at 282. As the government points out, Khera was one of forty-seven witnesses in a three-month trial, and one of numerous former clients of the Sekhon & Sekhon firm to testify. And the importance of his testimony did not pertain to either movant. Khera provided no testimony against either Rai or Jagdip Sekhon. Rather, his only interactions with--and testimony about--any of the defendants at trial involved Jagprit Sekhon, not either movant.

### B. Movants' Joint *Napue* Claim

The foregoing analysis also forecloses a successful claim under *Napue*. As explained above, the court credits Webster's testimony that a meeting between herself and Khera occurred and Kaur was present.

To the extent movants argue that the prosecution violated *Napue* by using Khera as a witness, that claim also fails. The record demonstrates that the likely falsity of Khera's first marriage to Maribel Diaz was explored on cross-examination and the jury was made aware of it. The jury heard, for instance, that Khera married Ms. Diaz a mere three weeks after arriving in the United States and it heard him incorrectly recall her first name as "Marble." ECF No. 863-2 at 63-64 (Trial Transcript pgs. 1668-69). It cannot be reasonably argued that a more in-depth exploration of Khera's first marriage would have affected the jury's judgment. *See Hayes v. Brown*, 339 F.3d 972, 985 (9th Cir. 2005).

/////

/////

/////

### C. Sekhon's Remaining Claims

#### 1. *Napue* Claims Relating to Singh and Mojaddidi

As noted above, Sekhon also argues that the government violated his rights under *Napue* by presenting false testimony from two other witnesses—Davinder Singh and Wazhma Mojaddidi. ECF No. 731 at 5. These claims are procedurally barred because they could have been, but were not, raised on direct appeal.

With respect to Singh, Sekhon first argues that United States Attorney Ben Wagner falsely indicated that Singh had been presented with Exhibit 61.4.4, his asylum application, during a meeting with Sekhon and Rai in San Francisco. *Id.* at 72. Second, Sekhon argues that Singh falsely testified about three dates written on the application by indicating that: (1) the dates were in Sekhon's handwriting and, therefore (2) Sekhon supplied those dates. *Id.* at 73. These claims rely entirely on the trial record and, thus, should have been raised on direct appeal. They were not and are now procedurally barred. *See Sunal v. Large*, 332 U.S. 174, 177 (1947); *Bousley v. United States*, 523 U.S. 614, 622 (1998). Moreover, Singh's testimony was clarified on subsequent cross-examination and he admitted uncertainty about whose handwriting was on the exhibit, stating that it "might have belonged to [Sekhon or Rai]." ECF No. 503-10 at 33-34 (Trial Transcript pgs. 2249-50). Thus, the court concludes that, even if this claim were not procedurally barred, it would not have affected the judgment of the jury.

With respect to Mojaddidi, Sekhon argues that she falsely testified about calling the State Bar and attempting to file a complaint about the fraud occurring at the Sekhon & Sekhon law firm. ECF No. 731 at 74. The defense described Mojaddidi's testimony as perjurious at trial and, thus, this claim could have been raised on direct appeal. It was not and is now procedurally barred. Moreover, the testimony was directly rebutted by another witness at trial (ECF No. 504-6 at 47 (Hearing Transcript pg. 4649)) and Sekhon's trial counsel attacked the truthfulness of Mojaddidi's testimony during closing argument (ECF No. 504-16 at 22-32 (Hearing Transcript pgs. 6886-96)). The jury had all the information it needed to determine Mojaddidi's credibility and Sekhon cannot show that additional investigation—either by defense counsel or the government would have altered the jury's judgment.

## 2. <u>Ineffective Assistance of Counsel Claims</u>

Sekhon raises three ineffective assistance of counsel claims.[6]  First, he argues that his trial counsel should have investigated Sarbjit Kaur.  ECF No. 731 at 86.  Second, he argues that his trial counsel should have investigated a statement that Mojaddidi attributed to Sekhon at trial.  *Id.* at 88.  Third, Sekhon argues that his appellate counsel was ineffective in failing to: (1) join his co-defendant's challenge to the district court's application of a sentencing enhancement for "abus[ing] a position of trust" (*id.* at 93); and (2) failing to challenge the district court's application of an "obstruction of justice" enhancement.  *Id.* at 93-94.

Pursuant to the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a habeas petitioner alleging ineffective assistance of counsel must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Id.* at 688, 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  None of Sekhon's claims meet both these prongs.

Sekhon's claim that his trial counsel should have investigated Sarbjit Kaur is unconvincing.  As the government points out, Khera offered no testimony against Sekhon; his testimony only implicated Sekhon's brother.  ECF No. 503-2 at 75-93 (Trial Transcript pgs. 1633-51).  Thus, it would not have been reasonable, given what Sekhon's trial counsel knew at the time, to have devoted resources to an investigation of Kaur.

The court also finds that trial counsel acted reasonably with respect to Mojaddidi.  At trial, Mojaddidi testified that she confronted Sekhon about fraudulent asylum claims involving Romanian applicants.  She claims that Sekhon replied "Wazhma, those cases are handled by my brother Jagprit Sekhon who runs the Sacramento office, you know what work I do."  ECF No. 502-11 at 31 (Trial Transcript pg. 811).  Sekhon argues this statement was obviously false because Mojaddidi already knew his brother's name and where he worked.  ECF No. 731 at 88.

---

[6] These claims are not procedurally barred.  *See Massaro v. United States*, 538 U.S. 500, 504 (2003) (holding that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal").

He claims that his trial counsel should have investigated this statement and, in so doing, exposed Mojaddidi as an unreliable witness. As the government points out, however, Mojaddidi herself later admitted that she did not remember exactly what words Sekhon had used in response to her question. ECF No. 502-12 at 99 (Trial Transcript pg. 966) ("*He just kind of said* this is – those cases – 'My brother works on those cases and I do what's here and he handles that stuff.'") (emphasis added). And, during cross-examination, Sekhon's counsel used ambiguities in Mojaddidi's alleged exchange with Sekhon to paint her recollection as unreliable. *Id.* at 81 (Trial Transcript pg. 948) (eliciting an answer from Mojaddidi that "I'm going to clarify and say that I don't remember the exact words that were used."). Based on Mojaddidi's testimony, a reasonable attorney would have concluded that she only claimed to remember the substance and general demeanor of her exchange with Sekhon, not the exact phrasing. Thus, it would have been fruitless to launch an investigation based on her wording.

Sekhon's ineffective assistance of appellate counsel claims also fail. As stated above, he alleges that appellate counsel should have challenged Judge Damrell's application of a § 3C1.1 enhancement for obstruction of justice. ECF No. 731 at 94-95. Sekhon relies on a Ninth Circuit decision—*United States v. Castro-Ponce*, 770 F.3d 819 (9th Cir. 2014)—for the proposition that a defendant's decision to testify and contradict the prosecution's allegations does not, standing alone, support the application of the foregoing enhancement. As the government points out, however, *Castro-Ponce* was decided approximately two and a half years after Sekhon's opening brief on appeal was filed. Additionally, given that Sekhon's sentence and supervisory release have concluded, *see* ECF No. 746 at 58 n.23, this sentencing claim is moot. *See*, *e.g.*, *United States v. Ubah*, No. CR S-01-0071-LKK-DAD P, 2009 U.S. Dist. LEXIS 105467, 2009 WL 3806256, at * (E.D. Cal. Nov. 12, 2009) (a § 2255 motion that challenges only the sentence is mooted upon the completion of the sentence).

Sekhon also alleges that his appellate counsel was ineffective in failing to join a co-defendant's challenge to Judge Damrell's application of a § 3B1.3 "abuse of a position of trust" two-point enhancement. ECF No. 731 at 93. As an initial matter, this claim is also mooted by the termination of Sekhon's sentence and supervisory release. Additionally, the government

11

persuasively argues that declining to challenge the two-point enhancement was defensible. Sekhon's counsel was not obligated to raise every conceivable issue on appeal, even if some of the omitted issues were nonfrivolous. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). It was reasonable to narrow the focus to those issues from which Sekhon stood to gain the most, namely those claims which attacked the conviction itself.

## IV. Conclusion

Movants' section 2255 motions have taken years to litigate and the court is satisfied that they had every reasonable opportunity to discover and present concrete evidence of governmental misconduct. Despite exhaustive discovery and an evidentiary hearing, they have been unable to do so and their convictions must stand.

Accordingly, it is RECOMMENDED that:

1. Movants' section 2255 motions, ECF Nos. 711 & 731, be denied;
2. The Clerk be directed to enter judgment accordingly; and
3. The Clerk be directed to close the companion civil cases, Nos. 2:15-cv-2491-JAM-EFB P and 2:16-cv-0067-JAM-EFB P.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section

/////

/////

/////

2255 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: August 6, 2021.

*/s/ Edmund F. Brennan*
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE